UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

FRANCESCA AMATO,

                              Plaintiff,

                                                        1:21-cv-00860
                                                        (GLS/TWD)

v.

ANTHONY MCGINTY,

                              Defendant.

---

APPEARANCES:

**FRANCESCA AMATO**
Plaintiff, *pro se*
PO Box 774
Marlboro, NY 12542

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

Francesca Amato ("Plaintiff" or "Amato"), proceeding *pro se*, filed an action against

Ulster County Family Court Judge Anthony McGinty ("Defendant" or "Judge McGinty").  (Dkt.

No. 1.)  This case is related to *Orr v. McGinty*, 1:17-cv-1280 (GLS/TWD).  (Dkt. No. 5.[1])

Plaintiff has not paid the filing fee, but instead seeks leave to proceed *in forma pauperis* ("IFP").

(Dkt. No. 16.)  For the reasons discussed below, the Court grants Plaintiff's fourth IFP

application (Dkt. No. 16) and recommends dismissal of the amended complaint (Dkt. No. 6) in

its entirety.

---

[1]  Amato was terminated as party plaintiff in the related action by Order entered August 7, 2019.
*See Orr v. McGinty*, 1:17-cv-1280 (GLS/TWD), ECF Dkt. No. 73.  The Court assumes
familiarity with the related case.

## I.   BACKGROUND

Plaintiff initiated this action and moved to proceed IFP on July 30, 2021.  (Dkt. Nos. 1, 2.)  However, the initial pleading was not signed and Plaintiff was directed to submit a signed copy of the complaint.  (Dkt. No. 5.)  On August 13, 2021, Plaintiff submitted a signed copy of the complaint, but also attached five exhibits that were not submitted with the original pleading.  (Dkt. No. 6.)  As such, the signed pleading was docketed as the amended complaint.

Thereafter, by Orders filed October 28, 2021, November 17, 2021, and December 17, 2021, this Court denied Plaintiff's motions to proceed IFP.  (Dkt. Nos. 8, 11, 14.)  In the December 17, 2021, Order, Plaintiff was afforded one final opportunity to submit a fully completed IFP application or pay the entire filing fee by January 6, 2022.  (Dkt. No. 14.)  Despite the foregoing directive, Plaintiff's fourth IFP application was not filed until January 10, 2022.  (Dkt. No. 16.)

## II.   IFP APPLICATION

Plaintiff declares in her fourth IFP application that she is unable to pay the filing fee.  (Dkt. No. 16.)  After reviewing the submission, the Court finds Plaintiff meets the requirement for economic need and thus her IFP application is granted.

## III.   SUFFICIENCY OF THE AMENDED COMPLAINT

### A.   Legal Standard

28 U.S.C. § 1915(e) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).

To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*.

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

A *pro se* litigant's pleadings are held to a less strict standard than attorney drafted pleadings. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, *pro se* litigants are held to a lesser pleading standard than other parties."). Because Plaintiff is proceeding *pro se*, the Court construes her pleadings "to raise the strongest arguments that they suggest." *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (per curiam) (internal quotation marks omitted). However, this "does not exempt

[Plaintiff] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983).

**B.      Summary of the Amended Complaint**

Plaintiff brings this action against Defendant in both his "judicial" and "individual" capacity.  (Dkt. No. 6 at 1.[2])  The amended complaint is written on a form complaint brought pursuant to the American with Disabilities Act ("ADA").  *Id*. at 1-4.  Plaintiff also lists her minor child, C.A.B., as a plaintiff.  *Id*. at 1, 5 ("Plaintiffs Francesca Amato & C.A.B. (hereafter, the 'Plaintiffs')—hereby makes these allegations against Defendant herein as follows[.]").

Her disabilities are listed as "ptsd" and "LAS", which she defines as "Legal Abuse Syndrome caused by defendant's actions and inactions."  *Id*. at 2.  She complains of the following conduct: denial of participation in public service or program, failure to make alterations to accommodate disability, retaliation, and others "in federal suit."  *Id*. at 3. However, the section of the form complaint titled "Facts" is blank.  *See id*.  As to the "Prayer for Relief", Plaintiff states "see attached lawsuit."  *Id*. at 4.

The "attached lawsuit" consists of 24 typewritten, single spaced pages, *id*. at 5-29, along with an additional 56 pages of exhibits.  (Dkt. Nos. 6-1 through 6-5.)  The "attached lawsuit" references the related action, *Orr v. McGinty*, 1:17-cv-1280 (GLS/TWD), and Plaintiff states she is "requesting the right to re plead [and] I am also filing a new verified complaint due to ongoing abuse by the defendant."  *Id*. at 5.

---

[2]  Page references to documents identified by docket number refer to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Plaintiff's amended complaint also references 42 U.S.C. § 1983.  *See id*. at 5-6.  Plaintiff

claims the "policies, practices, procedures and standards established and/or maintained by

Defendant violate the Due Process and Equal Protection Clauses of the Fourteenth Amendments

to the U.S. Constitution."  *Id*. at 5.  She also claims that "[u]nder color of authority, Anthony

McGinty deprived me of my rights to my child, due process, and ADA rights were completely

violated."  *Id*.  Plaintiff seeks compensatory and punitive damages, along with injunctive and

declaratory relief.  *Id*. at 5-6.  She further states:

> I demand my son's immediate return to his home with me at once
> and that a permanent restraining order is placed on this highly
> abusive Judge Anthony McGinty and also in his individual
> capacity as I feel he is a threat and danger to my family within his
> political power and lack of professionalism and boundaries.  I'm
> also concerned with his mental state and feel he is unfit and I have
> overwhelming information and belief that he is an addict.

*Id*. at 26.

According to Plaintiff, "this is also a civil rights action brought pursuant to Title VII of

the Civil Rights Acts of 1964" because Defendant authorized "unconstitutional, gender-biased

contested Judgment of Custody polices, practices, procedures and standards."  *Id*. at 6.  Plaintiff

contends Judge McGinty's "policies, practices, procedures and standards are gender biased,

unconstitutional, have disparate impact on women and violate women's NYS entitled equal

economic, property ownership and custody rights in contested Judgement of Custody Orders

when domestic violence ("DV") exists."  *Id*. at 7.  Judge McGinty "has a history of court orders

that change custody to abusive fathers and remove them from safe, loving caretakers with an

extreme general bias against mothers."  *Id*. at 11.  Defendant also ignores the ACP address

confidentially program of New York State.  *Id*.

Generally, Plaintiff alleges that from "February 2019 to Ongoing" Defendant "enforced polices, practices, procedures, and standards that prevented Plaintiff from proving the Custody Orders issued by trial were based on the wrong legal standards, erroneous facts, a biased unconstitutional trial.  And prevented me from being able to have my witnesses and my own testimony."  *Id*. at 7.  Defendant also "denied Plaintiff child access to his Service dogs and home status quo and private bedroom and consistent life needed to heal from past abuse."  *Id*.

Plaintiff alleges Judge McGinty denied her "all ADA accommodations requested over and over orally and in writing and further abuse[d] his power by forcing plaintiff to draft own motions and train all parties in the ADA in order to protect my rights that continually are denied."  *Id*.

She further claims Judge McGinty is "intentionally practicing and inflicting highly unlawful Discriminatory abuse upon [Plaintiff] due to [her] years of reputable advocacy and exposure of him."  *Id*. at 6.  He has also retaliated against her because of her "two time best-selling book, *Punished 4 Protecting: The Injustice of Family Court*."  *Id*.[3]

Plaintiff explains that "anytime I enter the Family Court it will be the three of them[4] against me leaving an extremely unfair disadvantage, further harm and suffering and full control.

---

[3]  Plaintiff explains the book "talks about the ongoing abuse of Anthony McGinty and his ongoing abuse to my family for exposing him.  I have been publicly outspoken long before he was put on my case in 2016.  I've been exposing him since 2014 and my best selling book was published in 2018.  He refuses to recuse from this case which I orally explained pre trial in 2019 that I would not only never receive a fair trial but that having to come before him after the tremendous harm he caused my son . . . ."  (Dkt. No. 6 at 14.)

[4]  Plaintiff appears to be referring to Defendant, along with "Child Attorney Amy Ingram and opposing Counsel Andy Gilday."  (Dkt. No. 6 at 11.)  The Court notes Amy Ingram was named as a defendant in the related case and all claims asserted against her were dismissed with prejudice.  *See Orr v. McGinty*, No. 1:17-cv-1280 (GLS/TWD), ECF Dkt. No. 47 at 13.  The Court takes judicial notice that Amato, along with others, also filed suit against Judge McGinty, Amy Ingram, and Attorney Andrew Gilday (for his role as assigned counsel to Patrick Beesmer, C.A.B.'s father), Beesmer, and another individual in a previous action, also captioned *Amato v.*

I am constantly bullied and they cooperate together to continue to retaliate against me by using

my child as their pawn.  McGinty's actions have caused my son and I irreparable injury and each

second this continues threatens to harm us indefinitely." *Id*. at 11.

Plaintiff claims "having pre diagnosed ptsd and LAS received zero ADA

Accommodations requested and missed a court appearance on March 8, 2020." *Id*. at 12.

According to Plaintiff, she missed the court appearance "due to stress and denial of rights

combined with fear of [the] court causing further harm to my son and family and fear of further

McGinty retaliation causing ptsd to be triggered." *Id*.  She has "no recollection of being handed

a slip" and did not put the March 8, 2020, court date on her calendar. *Id*.  Plaintiff claims

Defendant:

> refused to give me enough time to get proper expensive counsel
> needed to fight such a traumatic 3rd trial.  I was thrown into trial
> and discriminated further bc I "did such a good job, I couldn't
> possibly have ptsd" this only proves that I didn't willfully miss a
> court date two days before our Country was on COVID quarantine
> but that with ptsd memory issues occur during high stress
> moments.  McGinty used it as a legal loophole to strip me of all
> custody giving my son to his estranged father who barely had visits
> of 8 hours a month and abandoned the child in California after he
> was released from jail.  McGinty was clearly Aware of all of this
> as he testified to it during the 2020 trial.

*Id*. at 13.

---

*McGinty*, 1:17-cv-00593 (MAD/ATB), ECF Dkt. No. 1.  In that case, although Amato paid the
filing fee, United States Magistrate Judge Baxter recommended, *inter alia*, that Amato's Section
1983 claims against Judge McGinty be dismissed with prejudice as barred by judicial immunity.
*See id*., ECF Dkt. No. 11.  United States District Judge D'Agostino adopted the report-
recommendation in its entirety and judgment was entered accordingly on September 15, 2017.
*See id*. at ECF Dkt. Nos. 19, 20.

Plaintiff also claims Judge McGinty "intentionally ignores all emergency motions and puts them out months and months at a time; and takes hearsay from the father without any evidence or fact finding violating and taking/ away more rights." *Id*. at 14.

Plaintiff references the related case, and states that her ADA claims against Judge McGinty were dismissed in *Orr v. McGinty*, without prejudice and with leave to replead. *Id*. at 15.[5] According to Plaintiff, she is pursuing her "right to replead and add ongoing violations in current proceedings against Judge Antony McGinty and his ongoing abuse to me and my son C.A.B." *Id*. She explains that she "didn't continue at that time to fight this case because my son was returned to my sole custody on September 17, 2017[,] and we were healing from the damages and severe trauma." *Id*.

Plaintiff states that she was diagnosed in 2016 and "orally and in writing has requested ADA Accommodations" "numerous" times to "let the court know" that Defendant has "withheld" her child's "full service therapy dogs" since October 2, 2020, amounting to "intentional and deliberate indifference." *Id*. at 15.

According to Plaintiff, "Anthony McGinty continues his abuse in the form of retaliation, abuse of power, extreme harm and pain and suffering, violations of ADA title ii [which resulted] in a final order dated October 2, 2020. Granting Patrick Beesmer sole physical custody [of C.A.B.] and all decision making power . . . ." *Id*.

Plaintiff lists several ways Judge McGinty has "denied" her "reasonable accommodations" and "basic rights." *Id*. at 16-17. For example, she claims Judge McGinty

_____

[5] However, and contrary to Plaintiff's assertion, in the related action she was not afforded the "right to replead and add current ongoing violations" rather, Amato's Section 1983 claims against Judge McGinty were dismissed with prejudice and her Title II ADA claims were dismissed for failure to state a claim upon which relief may be granted. *Orr v. McGinty*, 1:17-CV-01280 (GLS/TWD), ECF Dkt. Nos. 47, 74.

failed to recuse himself and denied her a fair trial.  *Id*. at 16.  He also denied C.A.B. his "full service therapy dogs since October 2, 2020."  *Id*.  Judge McGinty denied and restricted communication between Plaintiff and C.A.B., conspired with C.A.B.'s and Beesmer's attorneys, and omitted "strong evidence off the record," and "pushed several emergency motions out far past their legal requirements."  *Id*. at 16-17.  She also complains of "ongoing discrimination." *Id*.  Plaintiff also alleges Judge McGinty failed to replace C.A.B.'s attorney with an "ethical" attorney.  *Id*.

She further alleges Judge McGinty lied in the October 2, 2020, Order which cited "concerns" in Plaintiff's home, without evidence, and falsely stated C.A.B.'s father's home "has no domestic violence."  *Id*.

Additionally, on June 3, 2021, Judge McGinty denied C.A.B.'s "rights to his service dog again" and "showed preference to fathers" in that he gave C.A.B.'s father a "courtesy call" when he missed "virtual court" but did not extend the same courtesy to Plaintiff on March 8, 2021, when she failed to appear in court.  *Id*. at 16.  When she questioned Judge McGinty, he "falsely" explained that "virtual court is different from physical Court when someone doesn't show up we call them."  *Id*.

Under a section of the amended complaint labeled "Damages" Plaintiff lists twelve "counts."  *Id*. at 17-19.  Plaintiff also lists five "counts" under Title II ADA Violations.  *Id*. at 19. Plaintiff also devotes several pages to what appears to be excerpts and summaries of what she refers to as "Title II ADA Case Law re: Accommodations."  *See id*. at 19-26.

As relief, Plaintiff seeks a temporary restraining order, a permanent restraining order, and preliminary injunction.  *Id*. at 26, 28.  Plaintiff is "seeking injunctive relief and a permanent restraining order against [Judge McGinty] to stop his abuse and allow us to have a fair trial with

an unbiased Judge without any connections to him whatsoever to avoid any further harm." *Id*. at 9. She requests declaratory relief "to the effect" that Defendant's "actions were illegal and violative of Plaintiff's right to due process of the law and to equal protection of the laws." *Id*. at 28.

Plaintiff seeks damages in the amount of at least $3,000,000. *Id*. at 27-28. Plaintiff asks this Court to "assume jurisdiction over this matter." *Id*. Plaintiff also wants this Court to "restore" her sole custody rights over her minor child. *Id*. at 28. She also asks for any further relief as the Court shall deem just and proper. *Id*.[6]

For a complete statement of Plaintiff's claims, reference is made to the amended complaint. (*See generally* Dkt. No. 6.)

C.   **Discussion**

Initially, the Court finds the amended complaint fails to comply with Rules 8 and 10 of the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Hudson v. Artuz*, No. 95 CIV 4768, 1998 WL 832708, *1 (S.D.N.Y. Nov. 30, 1998) (citations omitted). The statement should be "short and plain" because "[u]nnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it

---

[6] Plaintiff also seeks attorneys fees pursuant to 42 U.S.C. § 1988 and the Equal Access to Justice Act. (Dkt. No. 6 at 28.) However, as she was informed in the related action, *pro se* plaintiffs are not entitled to such fees. *Orr v. McGinty*, No. 1:17-cv-01280, ECF Dkt. No. 47 at 3 n.6 (citing *SEC v. Price Waterhouse*, 41 F.3d 805, 808 (2d Cir. 1994)).

because they are forced to select the relevant material from a mass of verbiage." *Salahuddin v. Cuomo*, 861 F.2d 40, 41-42 (2d Cir. 1998) (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1281, at 365 (1969)).  Moreover, Rule 10 of the Federal Rules of Civil Procedure provides, in part:

> (b) Paragraphs; Separate Statements.  A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.

Fed. R. Civ. P. 10(b).  This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Flores v. Graphtex*, 189 F.R.D. 54, 55 (N.D.N.Y. 1999) (quotation marks and citations omitted).

A complaint that does not comply with these Rules "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [the plaintiff's] claims," and may properly be dismissed by the court. *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996).  "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Artuz*, 1998 WL 832708, at *2 (internal quotation marks omitted).

The amended complaint contains rambling legal arguments, numerous disjointed sentences, and repeated conclusory allegations.  (Dkt. No. 6.)  Moreover, while the amended complaint contains some numbered sections, the numbering is of limited value since some of the numbered sections contain numerous sentences, and/or contain multiple paragraphs, and/or are repeated. *Id*.  As a result, it is difficult for the Court to determine the sufficiency of Plaintiff's allegations, and it would be difficult for Defendant to shape a comprehensive defense.  As such,

the amended complaint fails to comply with Rules 8 and 10 of the Federal Rules of Civil Procedure.

However, the Court refrains from recommending dismissal on this basis alone because the amended complaint does not quite rise to the level of being "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  Rather, this action represents yet another lawsuit whereby Plaintiff is complaining of Defendant's handing of and decisions issued in family court proceedings.  Construed liberally, Plaintiff seeks to nullify family court and custody determinations issued by Defendant, and asks this Court to restore her sole custody, requests declaratory and injunctive relief, and monetary compensation.  As such, in accordance with 28 U.S.C. § 1915(e), the Court will review the sufficiency of the amended complaint.

### 1.    Minor Plaintiff

As Plaintiff is aware, an individual "who has not been admitted to the practice of law may not represent anybody other than himself."  *Amato v. McGinty*, No. 1:17-CV-00593 (MAD/ATB), 2017 WL 4083575, at *4 (N.D.N.Y. Sept. 15, 2017) (quoting *Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010) (citing *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007))); *see also Orr v. McGinty*, No. 1:17-cv-1280 (GLS/TWD), ECF Dkt. No. 47 at 1 n.1, 13 (plaintiff-mothers cannot bring an action "as next of friend for their minor children" and directing the Clerk to amend the caption to remove all references to the minor children).  Similarly, "a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child."  *Amato v. McGinty*, 2017 WL 4083575, at *4 (quoting *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990)).

Therefore, the Court does not construe the amended complaint to include any claims or causes of action brought on behalf of C.A.B.  The Court also recommends that the Clerk be directed to amend the docket to remove all references to C.A.B.

### 2.    Section 1983

Section 1983 provides redress for a deprivation of federally protected rights by persons acting under color of state law.  42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155-57 (1978).  To state a claim under Section 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor."  *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

As noted, Plaintiff has named Judge McGinty as the sole defendant in his "judicial" and "individual" capacity.  However, and as Plaintiff was previously informed in the related action, Plaintiff's Section 1983 claims against Judge McGinty are barred by the Eleventh Amendment and judicial immunity.[7]  *See Orr v. McGinty*, No. 1:17-cv-1280 (GLS/TWD), ECF Dkt. No. 47 at *4 (dismissing Amato's Section 1983 claims against Judge McGinty with prejudice); *Treistman v. McGinty*, No. 1:16-cv-1403, 2018 WL 4078262, at *1 (N.D.N.Y. Aug. 27, 2018) (finding the plaintiff's claims against the individual defendants in their official capacity as

---

[7] Judicial immunity shields judges from suit to the extent that they are sued in their individual capacities.  *See Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 529 (2d Cir. 1993); *Martinez v. Queens Cty. Dist. Attorney*, No. 12-CV-06262, 2014 WL 1011054, at *8 n. 8 (E.D.N.Y. Mar. 17, 2014), *aff'd*, 596 F. App'x 10 (2d Cir. 2015); *McKnight v. Middleton*, 699 F.Supp.2d 507, 521-25 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2d Cir. 2011).  The Eleventh Amendment, on the other hand, shields judges from suit to the extent that they are sued in their official capacities. *See Ying Jing Gan*, 996 F.2d at 529 ("To the extent that . . . a claim is asserted against the state official in his official capacity, he may assert the state's Eleventh Amendment immunity against suit.").

Family Court employees are barred by the Eleventh Amendment); *see also Amato v. McGinty*, 2017 WL 4083575, at *4.  The same result is required here.

Judges are absolutely immune from suit for damages for any actions taken within the scope of their judicial responsibilities.  *Mireles v. Waco*, 502 U.S. 9, 11 (1991).  Generally, "acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009).  "Even allegations of bad faith or malice cannot overcome judicial immunity." *Id*. at 209 (citations omitted).  This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation [.]" *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994).  In addition, Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  42 U.S.C. § 1983.

Judicial immunity does not apply when the judge takes action "outside" his judicial capacity, or when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction."  *Mireles*, 502 U.S. at 9-10; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature).  But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

As detailed above, Plaintiff has brought several allegations against Judge McGinty, including that he violated her constitutional rights, conspired with other individuals, endangered the welfare of C.A.B., denied her "accommodations," and retaliated against her for being outspoken about Judge McGinty's purported abuses and discrimination against mothers and children.  However, all of the acts described in the amended complaint arise out of family court proceedings before Judge McGinty, the functions complained of were ones normally performed

14

by a judge, and Plaintiff was a party who dealt with Judge McGinty in his judicial capacity.

Plaintiff has not alleged that Judge McGinty took nonjudicial actions or that he acted in the

absence of jurisdiction.  Notwithstanding Plaintiff's allegations that Judge McGinty made

improper adverse rulings against Plaintiff during the custody proceedings with malice or in

retaliation for her "exposing" abuses in Family Court, Judge McGinty was still performing

judicial functions and presiding over Plaintiff's custody action in Ulster County Family Court.

As stated above, a judge does not lose his or her judicial immunity because he is accused of

acting with malice or corruptly.  Accordingly, Judge McGinty is entitled to judicial immunity.

*See Mireles*, 502 U.S. at 12-13; *Bliven*, 579 F.3d at 210.

Judge McGinty is also protected under sovereign immunity.  In *Gollomp v. Spitzer*, the

Court held that the New York Unified Court System is an "arm of the State" and affirmed the

dismissal of a Section 1983 claim against a judge under sovereign immunity.  568 F.3d 355, 365-

68 (2d Cir. 2009).  Likewise, Plaintiff has filed her complaint against Judge McGinty, a member

of the Ulster County Family Court, which is part of the New York Unified Court System.  N.Y.

Const. Art. VI, §§ 1, 13.  All of Judge McGinty's alleged constitutional violations occurred while

he acted within his official capacity as a Family Court judge in adjudicating a custody dispute.

Therefore, all claims against Judge McGinty should be dismissed, because "a suit against a state

official in his official capacity is, in effect, a suit against the state itself, which is barred."

*Walker v. Fam. Ct. Judge Catherine Cholakis*, No. 1:19-CV-1288 (LEK/CFH), 2020 WL

3503158, at *7 (N.D.N.Y. June 29, 2020) (citations omitted).

Moreover, Plaintiff is not entitled to injunctive relief because she "allege[d] neither the

violation of a declaratory decree, nor the unavailability of declaratory relief."  *See Montero v.*

*Travis*, 171 F.3d 757, 761 (2d Cir. 1999).  Nor is Plaintiff entitled to declaratory relief because

she alleges only past conduct and does not seek to prevent an ongoing or future violation of federal law.  *See Shtrauch v. Dowd*, 651 F. App'x 72, 74 (2d Cir. 2016) (citing *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 698 (3d Cir. 1996) (concluding that relief sought was not prospective where the "specific allegations target[ed] past conduct" and the "remedy [was] not intended to halt a present, continuing violation of federal law")).

The Court therefore recommends dismissing Plaintiff's Section 1983 claims against Judge McGinty under the doctrines of judicial and sovereign immunity and as frivolous.  *See* 28 U.S.C. § 1915(e)(2)(B)(i), (iii); *see also Montero*, 171 F.3d at 760 ("A complaint will be dismissed as 'frivolous' when 'it is clear that the defendants are immune from suit.'" (quoting *Neitzke*, 490 U.S. at 327)).

### 3.      Title VII

Title VII provides that "[i]t shall be unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a); *see Vega v. Hempstead Union Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (A plaintiff asserting a Title VII discrimination claim must allege facts showing that "(1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision.").

Here, Plaintiff claims in conclusory fashion that Judge McGinty "discriminates" against women in violation of Title VII.  Plaintiff does not, however, allege employment discrimination

or that she is or was an employee of Judge McGinty and, therefore, the claim is frivolous.[8]  *See*

*Jones v. Thomas*, No. 20-CV-5581, 2020 WL 5077026, at *4 (S.D.N.Y. Aug. 27, 2020)

(dismissing plaintiff's claims pursuant to Title VII where the plaintiff did not allege that he is or

was an employee of any of the defendants); *Basora-Jacobs v. Palevsky*, No. 20-CV-1675, 2020

WL 3868710, at *2 (E.D.N.Y. July 10, 2020) (dismissing the plaintiff's Title VII claims because

"[t]he complaint does not list Plaintiff's employer as a defendant in the case caption.").  Since

Title VII claims are to be raised against a plaintiff's employer, there is no proper Title VII

defendant in this case.  *Militinska-Lake v. Kirnon*, No. 1:20-CV-443 (TJM/CFH), 2021 WL

3569807, at *9 (N.D.N.Y. Aug. 11, 2021) ("As a general rule, the proper defendant in a Title VII

case against a State entity is the actual department or agency that employs the plaintiff.")

(citation omitted).

Accordingly, the Court recommends that Plaintiff's Title VII claims against Judge

McGinty be dismissed.

### 4. ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132.  To plead an ADA claim, a plaintiff must allege: "(1) that [s]he is a

qualified individual with a disability; (2) that [s]he was excluded from participation in a public

---

[8]  Moreover, "[i]t is axiomatic that 'Title VII does not impose liability on individuals.'"  *Hamlett v. City of Binghamton*, No. 3:20-CV-880 (GLS/ML), 2021 WL 3723091, at *2 (N.D.N.Y. Aug. 23, 2021) (quoting *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) (citations omitted)); *see also Golden v. Syracuse Reg'l Airport Auth.*, No. 5:20-CV-1566 (MAD/TWD), 2021 WL 485731, at *1 (N.D.N.Y. Feb. 10, 2021) ("[I]ndividuals are not subject to liability under Title VII.") (quotation marks and citation omitted).

entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to [her] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks and citation omitted).

As discussed, Plaintiff has utilized a form ADA complaint, largely alleges disability due to PTSD, and claims Judge McGinty denied her "accommodations" and "retaliated" against her during family court proceedings.  For reasons set forth below, Plaintiff's purported disability-based claims under the ADA must also be dismissed.

First, to the extent Plaintiff asserts ADA claims against Judge McGinty in his individual capacity, such claims fail as a matter of law because there is no individual liability under Title II of the ADA.  *See Garcia v. SUNY Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001) (holding that defendants cannot be sued in their individual capacities for violating Title II of the ADA); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) ("the retaliation provision of the ADA . . . cannot provide for individual liability"); *Myers v. N.Y.-Dep't of Motor Vehicles*, No. 06-CV-4583, 2013 WL 3990770, at *9 (E.D.N.Y. Aug. 5, 2013) ("[N]umerous district courts in this [C]ircuit have persuasively held that there is no individual liability under Title I or Title II of the ADA, regardless of whether the claim is brought in an individual or official capacity."); *Netti v. Ayers*, No. 17-CV-976, 2017 WL 7542494, at *18 (Oct. 5, 2017) ("individuals cannot be held liable under the ADA") (citing cases).  Thus, Plaintiff's ADA claims against Judge McGinty, insofar as he is sued in his individual capacity, must be dismissed.[9]

---

[9]  The Court notes judicial immunity also extends to Plaintiff's ADA claims for damages.  *See Orr v. McGinty*, No. 1:17-cv-01280, Dkt. No. 47 at 5 (citing *Brooks v. Onondaga Cty. Dep't of Children & Family Servs.*, 5:17-CV-1186, 2018 WL 2108282, at *4 (N.D.N.Y. Apr. 9, 2018) (collecting cases)).

Even if the Court assumes for purposes of initial review only, that Plaintiff was disabled during the state court proceedings within the meaning of the ADA, and Judge McGinty was a proper defendant in his official capacity,[10] her assertions do not show that Judge McGinty discriminated or retaliated against her because of her PTSD.  It is not enough for Plaintiff to state that she is disabled and that bad things happened to her in the state court proceedings; she must allege facts from which a reasonable trier of fact could infer that these things happened to her because of discrimination on the basis of her disability.  The use of "buzz words" such as "disability," "accommodation," and "retaliation" does not cure a pleading defect such as the one herein.  *See Barr v. Abrams*, 810 F.2d 358, 362 (2d Cir. 1986) (the Second Circuit has repeatedly held, "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning").  She does not allege any facts suggesting a plausible connection between her alleged PTSD and "LAS" and the actions that were taken against her in the state court proceedings.  Rather, Plaintiff merely states she "has no recollection of being handed a slip" regarding the March 8, 2020, court date that she missed.  Moreover, Plaintiff's passing reference that she "requested audio of the court hearings so that I can have time to listen to prepare as *pro se* for continuing proceedings" or that Judge McGinty "refused to

---

[10]  As observed in the related case, "It is questionable whether defendants, even when sued in their official capacities, are public entities."  *Orr v. McGinty*, No. 1:17-cv-01280, Dkt. No. 74 at 4 n.4 (citing *Santiago v. Garcia*, 70 F. Supp. 2d 84, 89 (D. P.R. 1999) (holding state court judge sued in official capacity was not "public entity" under Title II); *but see Shollenberger v. N.Y. State Unified Court Sys.*, 18 CV 9736, 2019 WL 2717211, at *5 (S.D.N.Y. June 28, 2019) (allowing ADA claims seeking prospective injunctive relief to proceed against Chief Judge of the State of New York and Chief Administrator of the New York State Unified Court System because "a plaintiff need only allege the defendant[s] ha[ve] responsibility for the alleged conduct and the ability to redress the alleged violations")).

give me enough time to get proper expensive counsel needed to fight such a traumatic 3rd trial"
are insufficient to state a claim.  (Dkt. No. 6 at 13, 14.)

In light of the foregoing, the Court recommends dismissing Plaintiff's ADA claims, if
any, against Judge McGinty.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### 5.   Domestic Relations Exception, *Rooker-Feldman*[11] Doctrine, and *Younger*[12] Abstention

Due to the nature of Plaintiff's amended complaint, it is difficult to precisely determine
exactly which doctrines apply, but based upon the relief sought, even if Plaintiff had sued an
appropriate defendant, her claims are also likely barred by the *Rooker-Feldman* doctrine,
domestic relations exception, and/or *Younger* abstention.

### a.   Domestic Relations Exception

Under the domestic relations exception to the jurisdiction of federal courts, cases
involving divorce, alimony, and child custody remain outside federal court jurisdiction.
*Marshall v. Marshall*, 547 U.S. 293, 308 (2006).  This exception is based upon a policy dictating
that the states have traditionally adjudicated marital and child custody disputes, developing
"competence and expertise in adjudicating such matters, which federal courts lack."  *Thomas v.
N.Y. City*, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993).

Here, in order to return custody of C.A.B. to Plaintiff, or to "enjoin" the state court's
orders, this Court would have to re-determine Judge McGinty's decision in the custody matter.
This would also involve resolving factual disputes regarding custody and visitation.  This court is
divested of jurisdiction to make such determinations.  *See Ankenbrandt v. Richards*, 504 U.S.

---

[11]  *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v.
Fidelity Trust Co.*, 263 U.S. 413, 414-17 (1923).

[12]  *Younger v. Harris*, 401 U.S. 37 (1971).

689, 703 (1992); *Hernstadt v. Hernstadt*, 373 F.2d 316, 317 (2d Cir. 1967) (it has been uniformly

held that federal courts do not adjudicate cases involving the custody of minors and rights of

visitation); *Sobel v. Prudenti*, 25 F. Supp. 3d 340, 353 (E.D.N.Y. 2014) (the domestic relations

exception "divests the federal courts of power to issue divorce, alimony, and child custody

decrees").   Accordingly, to the extent the amended complaint is seeking a child custody decree

from the Court, the court lacks jurisdiction to adjudicate such a claim.   *See, e.g.*, *Amato v.

McGinty*, No. 17-CV-593 (MAD/ATB), 2017 WL 9487185, at *8 (N.D.N.Y. Jun. 6, 2017)

*report and recommendation adopted* by 2017 WL 4083575 (N.D.N.Y. Sept. 15. 2017).

**b.**     ***Rooker-Feldman* Doctrine**

In the event the relevant underlying state court proceedings are concluded, such claims

may be barred by the *Rooker-Feldman* doctrine.   This doctrine divests the federal court of

jurisdiction to consider actions that seek to overturn state court judgments.   *Fernandez v.

Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon

Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Dorce v. City of New York*,

2 F.4th 82, 101 (2d Cir. 2021) ("The *Rooker-Feldman* doctrine bars federal district courts from

hearing cases that in effect are appeals from state court judgments, because the Supreme Court

is the only federal court with jurisdiction over such cases.")).   The doctrine also bars the federal

court from considering claims that are "inextricably intertwined" with a prior state court

determination.   *Fernandez v. Turetsky*, 2014 WL 5823116, at *3 (quoting *Johnson v.

Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir. 1999)).

The *Rooker-Feldman* doctrine applies where the federal court plaintiff: (1) lost in state

court, (2) complains of injuries caused by the state court judgment, (3) invites the district court

to review and reject the state court judgment, and (4) commenced the district court proceedings

after the state court judgment was rendered. *Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 426 (2d Cir. 2014).

Here, it appears Plaintiff "lost" in state court, complains of injuries caused by the state court judgments, and asks this Court to invalidate the state court's judgments regarding child custody. *See* Dkt. No. 6 at 29. Thus, as currently drafted, the amended complaint is likely barred under the *Rooker-Feldman* doctrine.

### c.     *Younger* Abstention

In the event the underlying state court proceedings remain pending, Plaintiff's request for this Court's involvement may also implicate the *Younger* abstention doctrine. *See generally Younger v. Harris*, 401 U.S. 37 (1971). Under the *Younger* doctrine, "federal courts [must] abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002); *see also Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 n.16 (1975) (extending the equitable principles that required abstention with respect to injunctive relief in *Younger* apply to requests for declaratory relief as well).

In *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), the Supreme Court clarified that the *Younger* doctrine is limited to three exceptional circumstances, including (1) state criminal prosecutions; (2) civil enforcement, or "quasi-criminal," proceedings; and (3) "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id*. at 72-73. "[T]here can be no doubt that a custody dispute . . . raises important state interests." *Graham v. N.Y. Ctr. for Interpersonal Dev.*, No. 15-CV-459, 2015 WL 1120121, at *2-3 (E.D.N.Y. Mar. 12, 2015) (holding that plaintiff's claim for

injunctive relief was barred by *Younger* when the plaintiff sought to challenge an ongoing family court custody proceeding) (citation omitted).

Accordingly, to the extent that the child custody issues are continuing in Family Court, the Court should abstain from interfering with that process. *See, e.g.*, *Cogswell v. Rodriguez*, 304 F. Supp. 2d 350, 357 (E.D.N.Y. 2004) (applying *Younger* abstention in child support matter); *Lomtevas v. New York State*, No. 03-CV-2359, 2003 WL 22937688, at *2 (E.D.N.Y. Nov. 13, 2003) (same).

## IV.    LEAVE TO AMEND

Generally, when the court dismisses a *pro se* complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to replead may be denied where any amendment would be futile. *Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Futility is present when the problem with the plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

Here, better pleading could not cure the Court's lack of subject matter jurisdiction based on the immunities described above, which appear to apply to all claims except for Plaintiff's ADA claim seeking prospective injunctive relief.

Nevertheless, in light of Plaintiff's *pro se* status and in an abundance of caution, as was the case in the related action, better pleading—addressing the deficiencies outlined above—could potentially save Plaintiff's ADA claim for prospective injunctive relief against Judge McGinty from being *sua sponte* dismissed on initial review. *See, e.g.*, *Orr v. McGtiny*, No. 1:17-cv-1280

(GLS/TWD), ECF Dkt. No. 47 at 10-11.[13]  As such, the Court recommends this claim be dismissed without prejudice and with leave to amend.[14]

## V.   PLAINTIFF'S ADDRESS

Under this Court's rules, an unrepresented litigant is under a duty to inform the Court of any address changes in writing.  L.R. 10.1(c)(2).  For the orderly disposition of cases, it is essential that litigants honor their continuing obligation to keep the Court informed of address changes.  To date, all the Court's Orders mailed to Plaintiff's address on file have been returned as undeliverable.  (Dkt. Nos. 10, 12, 15.)

In an extraordinary display of special solicitude to Plaintiff as a *pro se* litigant, the Clerk was directed to mail a one-time courtesy copy of each Order at the confidential and redacted address indicated on the envelope of Plaintiff's submissions to the Court and as verbally provided to the Clerk on December 1, 2021.  (*See generally* Docket Report; *see* Dkt. Nos. 11, 14.[15])  However, Plaintiff must file a change of address IN WRITING within thirty days, and she

---

[13]  At this juncture, the Court expresses no opinion on the sufficiency of any such claim.

[14]  If the District Court adopts this Report-Recommendation, and if Plaintiff chooses to file a second amended complaint, the pleading must comply with Rules 8 and 10 of the Federal Rules.  The revised pleading will replace the amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").  The revised pleading should not attempt to resurrect any claims dismissed with prejudice in this action and/or claims brought or could have been brought in the related case.  *See Lopez v. Jet Blue Airways*, No. 12-CV-0057, 2012 WL 213831, at *2 (E.D.N.Y. Jan. 24, 2012) ("Under the doctrine of *res judicata*, once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning the transaction, or series of connected transactions, out of which the [first] action arose.").

[15]  While not entirely clear to the Court, it appears this "confidential" address differs from Plaintiff's residence, while the PO Box on file is the business address for Plaintiff's "home office" Punished 4 Protecting.  (*See* Dkt. No. 16.)

must continue to submit any address changes to the Court as long as her action is pending. "Failure to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of any pending action." L.R. 41.2(b).

## VI.   CONCLUSION

**WHEREFORE**, after carefully considering this matter, and for the reasons explained above, it is hereby

**ORDERED** that Plaintiff's IFP application (Dkt. No. 16) is **GRANTED**;[16] and it is further

**RECOMMENDED** that Plaintiff's amended complaint (Dkt. No. 6) be *sua sponte* dismissed in its entirety pursuant to 28 U.S.C. § 1915(e); and it is further

**RECOMMENDED** that all claims be **DISMISSED WITH PREJUDICE** except that Plaintiff's ADA claim for prospective injunctive relief be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO REPLEAD**; and it is further

**RECOMMENDED** that the Clerk be directed to amend the docket to remove all references to C.A.B., and it is further

**ORDERED** that Plaintiff must file a **CHANGE OF ADDRESS** within **THIRTY DAYS** of the date of the Report-Recommendation, and she must continue to submit any address changes to the Court as long as this action is pending; failure to notify the Court of a change of address in accordance with L.R. 10.1(c)(2) may result in the dismissal of any pending action; and it is further

---

[16]  Plaintiff should note that although her IFP application has been granted, she will still be required to pay fees that she may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk mail a copy of this Order and Report-Recommendation to Plaintiff at the address listed on the docket and to mail a **FINAL** one-time courtesy copy to the confidential and redacted address indicated on the envelope of Dkt. No. 16 and as verbally provided to the Clerk on December 1, 2021.

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen days within which to file written objections to the foregoing report.[17]   Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 26, 2022
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[17]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility, Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's complaint alleges defendants violated his constitutional rights while he was an inmate at Green Haven Correctional Facility. [1] Plaintiff's complaint was dismissed *sua sponte* by Judge Thomas P. Griesa on June 26, 1995 pursuant to 28 U.S.C. § 1915(d). On September 26, 1995, the Second Circuit Court of Appeals vacated the judgment and remanded the case to the district court for further proceedings.

[1]  Plaintiff is presently incarcerated at Sullivan Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on January 31, 1996. Defendants moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996. Thereafter, the case was reassigned to Judge Jed S. Rakoff on February 26, 1997. On February 26, 1998, Judge Rakoff granted defendants' motion to dismiss, but vacated the judgment on April 10, 1998 in response to plaintiff's motion for reconsideration in which plaintiff claimed that he never received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was referred to me for general pretrial purposes and for a Report and Recommendation on any dispositive motion. Presently pending is defendants' renewed motion to dismiss. Plaintiff filed a reply on July 6, 1998. For the reasons discussed below, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the Green Haven Correctional Facility mess hall on March 14, 1995. (Complaint at 4.) He alleges that he was struck with a pipe and a fork while in the "pop room" between 6:00 p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends that the attack left him with 11 stitches in his head, chronic headaches, nightmares, and pain in his arm, shoulder, and back. (*Id.*) Plaintiff also states that Sergeant Ambrosino "failed to secure [the] area and separate" him from his attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz is that he "fail [sic] to qualify as warden." (Complaint at 4.) Plaintiff names Commissioner Coombes as a defendant, alleging Coombes "fail [sic] to appoint a qualified warden over security." (Amended Complaint at 5.) Plaintiff further alleges that Dr. Manion refused to give him pain medication. (Complaint at 5.) Plaintiff seeks to "prevent violent crimes" and demands $6,000,000 in damages. (Amended Complaint at 5.)

Defendants moved to dismiss the complaint, arguing that: (1) the Eleventh Amendment bars suit against state defendants for money damages; (2) the plaintiff's allegations fail to state a claim for a constitutional violation; (3) the defendants are qualifiedly immune from damages; and (4) plaintiff must exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and 10 of the Federal Rules of Civil Procedure and dismiss the complaint without prejudice and with leave to amend. Federal Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to give fair notice of the claim being asserted so as to permit the

adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.* [2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 Civ. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

[2]    Rule 10 states:

(b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible

that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429

U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 4083575

2017 WL 4083575
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Frances AMATO; John Doe, progeny minor child;
Adrienne Auchmoody; Toni Jean Kulpinski;
Vladimir Kulpinski; Michaela Kulpinski; Michelle
Arzola; Jane Doe, minor child; and John Doe,
minor child of Michelle Arzola, Plaintiffs,
v.
Judge Anthony MCGINTY, individually and as
Ulster County Family Court Judge; Attorney Andrew
Gilday, individually and as a public defender
of New York; Amy Ingram, state attorney for
the child; Patrick V. Beesmer, individually; and
Pamela Augustine, individually, Defendants.

1:17-CV-00593 (MAD/ATB)
|
Signed 09/15/2017

**Attorneys and Law Firms**

FRANCES AMATO, P.O. Box 820, Marlboro, New York
12542, Plaintiff, pro se.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**I. INTRODUCTION**

**\*1** On May 26, 2017, *pro se* Plaintiff Frances Amato
("Plaintiff Amato") commenced this action pursuant to
42 U.S.C. § 1983 ("Section 1983"). *See* Dkt. No. 1 at
1, 4. Plaintiff Amato is joined in this action with her
son ("Plaintiff CB"); her mother, Adrienne Auchmoody
("Plaintiff Auchmoody"); Plaintiff CB's aunt, Toni Jean
Kulpinski ("Plaintiff TK"); Plaintiff CB's uncle, Vladimir
Kulpinski ("Plaintiff VK"); Plaintiff CB's cousin, Michaela
Kulpinski ("Plaintiff MK"); Plaintiff CB's sister, Michelle
Arzola ("Plaintiff Arzola"); Plaintiff CB's niece ("Plaintiff
Jane Doe"); and Plaintiff CB's nephew ("Plaintiff John
Doe"). *See id.* at 1-2. Plaintiffs have brought this action
against Ulster County Family Court Judge Anthony McGinty
("Defendant McGinty") for his role in a decision dictating
the custody of Plaintiff CB entered on October 24, 2016.

*See* Dkt. No. 17 at 67; Dkt. No. 1 at 3. Plaintiffs
have also sued Plaintiff CB's father, Patrick Beesmer
("Defendant Beesmer"); Plaintiff CB's assigned counsel
for the custody proceedings, Amy Ingram, ("Defendant
Ingram"); Defendant Beesmer's assigned counsel for the
custody proceedings, Attorney Andrew Gilday ("Defendant
Gilday"); and Defendant Beesmer's "paramour" as Plaintiffs
refer to her, Pamela Augustine ("Defendant Augustine"), for
their roles in the custody proceeding. *See* Dkt. No. 1 at 3-4.

Plaintiffs filed a motion for a temporary restraining order
on June 2, 2017, *see* Dkt. No. 8, which the Court denied
that day, *see* Dkt. No. 9. On June 6, 2017, Magistrate
Judge Baxter issued an Order and Report-Recommendation
recommending that Plaintiffs' complaint be dismissed in
its entirety with prejudice as to all named Defendants in
this action. *See* Dkt. No. 11 at 26. Plaintiffs submitted
objections to Magistrate Judge Baxter's Order and Report-
Recommendation on June 19, 2017. *See* Dkt. No. 17.
Currently before the Court is Magistrate Judge Baxter's
Order and Report-Recommendation and Plaintiffs' objections
thereto.

**II. BACKGROUND**

Plaintiff Amato and Defendant Beesmer are the parents of
Plaintiff CB and were involved in custody proceedings over
Plaintiff CB. *See* Dkt. No. 1 at 5. According to the complaint,
Defendant McGinty presided over the custody proceedings
after the originally assigned judge recused herself. *See id.* In
an order dated October 24, 2016, Defendant McGinty granted
Defendant Beesmer primary custody of Plaintiff CB. *See* Dkt.
No. 17 at 64-65, 67.

Upset with the outcome of the custody proceedings, Plaintiff
Amato commenced the instant action against Defendants for
their roles in the proceedings.[1] *See* Dkt. No. 1. Plaintiff
Amato claims that during the custody proceedings, Defendant
McGinty was "[h]ighly abusive" to "all" plaintiffs; violated
Plaintiffs' "constitutional" and "ADA rights;" induced
"[e]xtreme pain and suffering and trauma to all plaintiffs;"
"endanger[ed] the welfare of a child;" and "[i]llegally
extended fictious authority in CLEAR ABSENCE of subject
matter jurisdiction." *Id.* at 6-7. Plaintiff Amato claims that
Defendant McGinty denied her access to "his court," denied
her "rights to proper serving process," and denied the
admission of "any evidence into the court for purpose of
record." *Id.* at 7.

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 4083575

1     While all Plaintiffs have submitted claims against Defendants, the narrative in the complaint and objections is written in a singular voice referring to Plaintiff Amato as "I," "me," and "myself." *See generally* Dkt. Nos. 1, 17.

**\*2** Plaintiff Amato claims that Defendant McGinty "co-conspired" with other Defendants in a "mock trial" to punish Plaintiff Amato for her role as an "outspoken community advocate" for human rights and family court reform. *See id.* at 7, 9, 15. Plaintiff Amato alleges that Plaintiff CB's custody proceedings were "plagued by retributions" for Plaintiff Amato's public criticism of Defendant McGinty prior to the custody proceedings. *Id.* at 7.

Plaintiff Amato alleges that Defendant McGinty, with cooperation from Defendants Ingram and Gilday, committed a number of violations resulting in the "kidnaping and endangerment of a minor." *Id.* at 8. Plaintiff Amato claims that Defendants McGinty, Ingram and Gilday committed "Malicious Trespass," "Abuse of Process," "Retaliation," "False [and] unlawful arrest," and "Child Endangerment." *See id.* at 8-9. Plaintiff Amato alleges that Defendant McGinty "[p]re decided [a] trial with no evidence allowed." *Id.* at 8.

Plaintiffs allege "Causes of Action" for "First Amendment," "Parental Impairment," and "Due Process." *Id.* at 14-26. Plaintiffs also allege additional state law claims for "intentional and negligent emotional distress." *Id.* at 24. Plaintiffs request the "immediate return of the child," compensatory damages of $10,000,000 on each cause of action, punitive damages, costs and attorneys' fees, and a "[j]udgment declaring the orders, edicts and processes in th[e] [c]omplaint unconstitutional[,] together with an order permanently enjoining the enforcement of [the family court] orders." *Id.* at 26.

### III. DISCUSSION

#### A. Standard of Review

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell,* 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants"

from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983)). However, "[t]he right of self-representation does not exempt a party from compliance with the relevant rules of procedural and substantive law." *Massie v. Ikon Office Solutions, Inc.,* 381 F. Supp. 2d 91, 94 (N.D.N.Y. 2005) (quoting *Clarke v. Bank of New York,* 687 F. Supp. 863, 871 (S.D.N.Y. 1988)).

In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.*; *Farid v. Bouey,* 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid,* 554 F. Supp. 2d at 307; *see also Gamble v. Barnhart,* No. 02-CV-1126, 2004 WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004).

Although a *pro se* litigant's objections should be accorded leniency, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." *DiPilato v. 7-Eleven, Inc.,* 662 F. Supp. 2d 333, 340 (S.D.N.Y. 2009) (quotation omitted); *see also IndyMac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.,* No. 07 Civ. 6865, 2008 WL 4810043, \*1 (S.D.N.Y. Nov. 3, 2008) ("To the extent ... that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error.").

**\*3** As mentioned, Plaintiffs have submitted objections to the Order and Report-Recommendation issued by Magistrate Judge Baxter. *See* Dkt. No. 17. The objections submitted by Plaintiffs are 117 pages long. *See id.* Despite the correct caption at the top of the document, the first 25 pages of the document appear to be an appellate brief to the State of New York Supreme Court, Appellate Division, Third Department. [2] *See id.* at 1-25. The remaining 92 pages include a brief analysis of custody factors, Defendant McGinty's custody decision, court transcripts, testimonial statements, and documents outlining the history of the custody proceedings. *See id.* at 25-117. There is no mention of Magistrate Judge Baxter or the Order and Report-

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 4083575

Recommendation in any of these documents. Accordingly, Plaintiffs have failed to file specific objections. However, regardless of whether the Court reviews the Order and Report-Recommendation *de novo* or for clear error, Plaintiffs' complaint is still subject to dismissal.

2    The objections make several comments claiming that "this court" "held" or "ruled" and cited case law from the Third Department. *See, e.g.*, Dkt. No. 17 at 23.

**B. Judicial Immunity**

Judges are afforded absolute immunity from suit for actions related to the exercise of their judicial functions. *Pierson v. Ray*, 386 U.S. 547, 553-54 (1967). Judges maintain judicial immunity "even when [the] judge is accused of acting maliciously and corruptly." *Id.* at 554. Judicial immunity is only defeated by "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity;" or "actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11 (1991) (citations omitted). A judicial action is "a function normally performed by a judge, and to the expectations of the parties." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). A judge's actions are in "absence of all jurisdiction" when the court has no "statutory or constitutional *power* to adjudicate the case." *Gross v. Rell*, 585 F.3d 72, 84 (2d Cir. 2009) (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)). Judicial actions made in error or "in excess of his authority" do not defeat judicial immunity. *Mireles*, 502 U.S. at 12-13 (quoting *Stump*, 435 U.S. at 356). Furthermore, a district court cannot grant injunctive relief "against a judicial officer for an act or omission taken in such officer's judicial capacity ... unless a declaratory decree was violated or declaratory relief was unavailable." *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) (quotation omitted).

Plaintiffs have brought a number of allegations against Defendant McGinty, including that he violated their constitutional rights, co-conspired with the remaining Defendants, endangered the welfare of Plaintiff CB, and retaliated against Plaintiff Amato for being outspoken about Defendant McGinty's purported "abuses and discrimination against mothers and children." Dkt. No. 1 at 5-9. Accepting Plaintiff's claims as true, all claims occurred while Defendant McGinty was working within his judicial capacity to determine the proper custody for Plaintiff CB. Accordingly, Defendant McGinty is entitled to judicial immunity. *See Mireles*, 502 U.S. at 12-13. Magistrate Judge Baxter correctly reasoned that any action Defendant McGinty committed with

malice or in retaliation of Plaintiff Amato's criticisms was still performed within the judicial functions of a family court judge presiding over a custody dispute. Magistrate Judge Baxter also correctly concluded that Plaintiff's arguments with respect to N.Y. Jud. Law § 21 are unavailing, as Defendant McGinty did not violate that provsion, and, even if he did, he would still be entitled to judicial immunity. *See generally Gross*, 585 F.3d at 84.

Furthermore, law guardians are entitled to quasi-judicial immunity for actions pertaining to their representation of a child in family court. *See Yapi v. Kondratyeva*, 340 Fed. Appx. 683, 685 (2d Cir. 2009) (citations omitted); *Lewittes v. Lobis*, No. 04 Civ. 0155, 2004 WL 1854082, *11 (S.D.N.Y. Aug. 19, 2004). Therefore, Magistrate Judge Baxter correctly concluded that Defendant Ingram is entitled to quasi-judicial immunity by virtue of her appointment as Plaintiff CB's law guardian. *See* Dkt. No. 11 at 12-13.

**C. State Action**

**\*4** To state a claim under Section 1983, "a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state ... law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Moreover, "[b]ecause the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2d Cir. 2005) (quoting *United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1295 (2d Cir. 1991)).

The conduct of a private actor may be considered state action when the private actor "is a willful participant in joint activity with the State or its agents." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). However, "private attorneys—even if the attorney was court appointed—are not state actors for the purposes of § 1983 claims." *Licari v. Voog*, 374 Fed. Appx. 230, 231 (2d Cir. 2010) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997)). The mere conduct of a private party is excluded from the reach of Section 1983 "no matter how discriminatory or wrongful" that conduct may be. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citation omitted).

Plaintiffs filed suit against Defendant Gilday for his role as Defendant Beesmer's assigned counsel and against Defendant

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 4083575

Ingram for her role as Plaintiff CB's assigned attorney. Defendants Gilday and Ingram, even if they were court appointed, cannot be considered state actors. *See Licari*, 374 Fed. Appx. at 231. Furthermore, Defendants Beesmer and Augustine are obvious private parties who are not state actors under Section 1983. Defendants Beesmer and Augustine had no connection to the state beyond their participation in the custody proceedings.

While Plaintiffs have claimed that Defendants Beesmer and Augustine "conspired" with the other Defendants to achieve the custody outcome, as Magistrate Judge Baxter found, there have been no facts to support these conclusory statements. [3] Conspiracy allegations that are wholly conclusory are insufficient to state a claim under Section 1983. *See Tapp v. Champagne*, 164 Fed. Appx. 106, 108 (2d Cir. 2006) (citing *Ciambriello*, 292 F.3d at 325); *see also Brito v. Arthur*, 403 Fed. Appx. 620, 621 (2d Cir. 2010) ("Complaints containing only 'conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights' will be dismissed.") (citing *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977)). Accordingly, this Court agrees with Magistrate Judge Baxter that Defendants Gilday, Ingram, Beesmer, and Augustine were not state actors, and the complaint is dismissed as to each of these Defendants.

[3]    Similarly, Plaintiffs' purported state law claims are entirely conclusory and do not come close to alleging facts to support a valid cause of action. *See* Dkt. No. 1 at 24-26.

**D. Minor Child Plaintiffs**

An individual "who has not been admitted to the practice of law may not represent anybody other than himself." *Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010) (citing *Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007)). Similarly, a "non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child." *Cheung v. Youth Orchestra Found. of Buffalo, Inc.*, 906 F.2d 59, 61 (2d Cir. 1990). Three minor plaintiffs, Plaintiff CB, Plaintiff John Doe, and Plaintiff Jane Doe, have been listed as *pro se* litigants in this action. *See* Dkt. No. 1 at 1-2; Dkt. No. 11 at 16. While the adult Plaintiffs may bring this lawsuit *pro se*, they may not act as counsel for the minor children without being a licensed attorney. *See Cheung*, 906 F.2d at 61. Therefore, this Court agrees with Magistrate Judge Baxter's determination that the adult Plaintiffs in this matter may not bring suit on behalf of the minor Plaintiffs.

**E. Standing**

 **\*5**  A plaintiff who wishes to invoke federal jurisdiction bears the burden of establishing that he or she has adequate standing to bring the action. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990)) (other citation omitted). To establish standing, "a plaintiff is constitutionally required to have suffered (1) a concrete, particularized, and actual or imminent injury-in-fact (2) that is traceable to defendant's conduct and (3) likely to be redressed by a favorable decision." *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 96 (2d Cir. 2009) (citations omitted). Moreover, there is a "prudential standing rule" which generally bars litigants "from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Rajamin v. Deutsche Bank Nat'l Trust Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (quotation omitted).

Here, despite multiple adult Plaintiffs filing suit against Defendants, Plaintiff Amato is the only Plaintiff that was a party to the custody proceedings regarding Plaintiff CB. Plaintiffs Auchmoody, TK, VK, MK, and Arzola only appear to be connected to the custody proceedings by their relationship with Plaintiffs Amato and CB. *See generally* Dkt. No. 1. Pursuant to the prudential standing rule, Plaintiffs Auchmoody, TK, VK, MK, and Arzola cannot assert the rights of Plaintiff Amato or Plaintiff CB. *See Rajamin*, 757 F.3d at 86. Therefore, all Plaintiffs other than Plaintiffs Amato and CB lack standing, and the complaint with respect to these Plaintiffs is dismissed.

**F. Domestic Relations Exception**

Magistrate Judge Baxter also noted that the Court lacks subject matter jurisdiction over several of Plaintiffs' claims pursuant to various legal doctrines. Due to the nature of Plaintiffs' complaint, it is difficult to precisely determine exactly which doctrines apply, but the Court will discuss several doctrines which preclude the Court from exercising subject matter jurisdiction over several of Plaintiffs' claims.

The domestic relations exception to federal jurisdiction divests federal courts of jurisdiction in matters involving divorce, alimony, and child custody. *Marshall v. Marshall*, 547 U.S. 293, 307-08 (2006) (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 703-04 (1992)); *see also Hernstadt v. Hernstadt*, 373 F.2d 316, 317 (2d Cir. 1967) ("[I]t has been uniformly held that federal courts do not adjudicate cases involving the custody of minors"). In *Bukowski v. Spinner*,

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 4083575

No. 17-CV-0845, 2017 WL 1592578, *1 (E.D.N.Y. Apr. 28, 2017), the Eastern District of New York dismissed a case with similar allegations as those brought in this case. [4]

[4] The court determined that despite the plaintiff "raising constitutional issues, the allegations stem from a state domestic relations matter and are thus outside this Court's jurisdiction." Bukowski, 2017 WL 1592578, at *3.

Plaintiffs allege that the "orders and processes" of the family court are unconstitutional; however, the crux of their argument arises out of the alleged improper custody determination by Defendant McGinty. See Dkt. No. 1 at 14-15, 21, 24, 26. Plaintiffs' alleged injuries stem directly from the disputed family court custody decision. See id. at 5-9, 14-16, 21, 24. Additionally, Plaintiffs request that this Court overturn the custody decision and permanently enjoin the enforcement of family court decisions. See id. at 26. Accordingly, to the extent that Plaintiffs request that this Court overturn the custody determination, this Court lacks jurisdiction to adjudicate such a case.

## G. *Rooker-Feldman* Doctrine

"The *Rooker-Feldman* doctrine provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment." Hachamovitch v. DeBuono, 159 F.3d 687, 693 (2d Cir. 1998) (citation omitted). "Such jurisdiction is lacking because within the federal system, only the Supreme Court may review a state court judgment." Id.

**\*6** In Exxon Mobile Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005), the Supreme Court held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceeding commenced and inviting district court review and rejection of those judgments." Exxon Mobile, 544 U.S. at 284. In light of *Exxon Mobile*, the Second Circuit has held that "there are four 'requirements' that must be met before the *Rooker-Feldman* doctrine applies." Green v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009) (citation omitted). The requirements are as follows:

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff

must "invite district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"—i.e., *Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation.

Id. (quoting Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005)).

Plaintiffs request that this Court overturn and enjoin the unfavorable decisions of the family court. See Dkt. No. 1 at 26. Plaintiffs claim that their injuries resulted from the custody determination made by Defendant McGinty prior to the commencement of this action. [5] See id. As such, to the extent that Plaintiffs seek to challenge the family court decision, this Court does not have jurisdiction to grant such relief under *Rooker-Feldman*.

[5] Plaintiffs filed this action on May 26, 2017 and Defendant McGinty rendered his custody determination on October 24, 2016. See Dkt. No. 17 at 4-5, 67.

## H. *Younger* Abstention [6]

[6] See Younger v. Harris, 401 U.S. 37 (1971).

*Younger* abstention "requires federal courts to abstain from exercising jurisdiction over claims that implicate ongoing state proceedings." Torres v. Gaines, 130 F. Supp. 3d 630, 635 (D. Conn. 2015) (citing Younger v. Harris, 401 U.S. 37, 43-44 (1971)). This doctrine "applies if the federal action involves ongoing: (1) 'state criminal prosecutions'; (2) 'civil proceedings that are akin to criminal prosecutions'; or (3) civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.' " Id. at 636 (quoting Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 588 (2013)). "If the federal action falls into one of these three categories, a [c]ourt may then consider the additional factors described in Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982)." [7] Id. Since the Supreme Court's decision in *Sprint*, several courts in this Circuit have held that *Younger* abstention applies in similar circumstances as this case. See id.; see also Graham v. N.Y. Ctr. for Interpersonal Dev., No. 15-CV-00459, 2015 WL 1120120, *2-3 (E.D.N.Y. Mar. 12, 2015) (holding that the plaintiff's claims for injunctive relief were barred by *Younger* where the plaintiff sought to challenge ongoing family court proceedings regarding the loss of custody of her son).

7    The factors examine "whether the state interest is vital and whether the state proceeding affords an adequate opportunity to raise the constitutional claims." *Torres*, 130 F. Supp. 3d at 636

Accordingly, as Magistrate Judge Baxter concluded, to the extent that any issues in this litigation are still pending in family court, this Court is barred from exercising such jurisdiction pursuant to *Younger*.

### I. Opportunity to Amend

**\*7** When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

Defendants McGinty and Ingram are entitled to immunity, and, thus, better pleading would not be able to cure the defects in Plaintiffs' allegations against them. Defendants Gilday, Ingram, Beesmer, and Augustine were not state actors, and the conspiracy allegations against them are entirely conclusory. Therefore, better pleading would not cure the substantive defects in the complaint. Accordingly, to the extent that Plaintiffs allege constitutional and state law violations that this Court has subject matter jurisdiction over, those claims are dismissed without leave to amend with respect to all named Defendants in this action.

However, Magistrate Judge Baxter recommended that, to the extent Plaintiff Amato challenges the constitutionality of the New York Domestic Relations Law §§ 236 and 240, she may be able to do so in certain circumstances. *See* Dkt. No. 11 at 25-26. The Court agrees, and Plaintiff's complaint is dismissed without prejudice with respect to

a claim challenging the constitutionality of the New York Domestic Relations Law, with only Plaintiff Amato as the named plaintiff, and the complaint must be filed against the proper defendant, at the proper time, and in the appropriate forum, as set forth more fully in the Order and Report-Recommendation. *See id.* at 25-26.

### IV. CONCLUSION

After carefully reviewing the record in this matter, Plaintiffs' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Baxter's Order and Report-Recommendation (Dkt. No. 11) is **ADOPTED** consistent with this Memorandum-Decision and Order; and the Court further

**ORDERS** that Plaintiffs' complaint (Dkt. No. 1) is **DISMISSED** as against Defendants McGinty, Ingram, Gilday, Beesmer, and Augustine; and the Court further

**ORDERS** that Plaintiff Amato's complaint (Dkt. No. 1) is **DISMISSED without prejudice** with respect to any claim challenging the constitutionality of the New York Domestic Relations Law, and only against the proper defendant for such challenge, at the proper time for such challenge, and in the proper forum, as discussed above; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4083575

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 36 of 151

Treistman v. McGinty, Not Reported in Fed. Supp. (2018)

2018 WL 4078262

2018 WL 4078262
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ben Gary TREISTMAN, Plaintiff,
v.
Anthony MCGINTY et al., Defendants.

1:16-cv-1403 (GLS/CFH)
|
Signed 08/27/2018

**Attorneys and Law Firms**

Ben Gary Treistman, Shady, NY, pro se.

Mark G. Mitchell, New York State Attorney General, Albany, NY, for Defendants.

## SUMMARY ORDER

Gary L. Sharpe, U.S. District Judge

 **\*1**  Plaintiff *pro se* Ben Gary Treistman brings this action under 42 U.S.C. §§ 1981, 1983, and 1985(3), alleging that his due process rights were violated in connection with a child custody hearing in Ulster County Family Court. (Compl., Dkt. No. 1.) Specifically, he alleges that defendant Anthony McGinty, the Family Court judge who presided over the custody hearing involving his minor child; defendant Donna Wiener, the court secretary; and various unnamed scheduling clerks who "assist[ed] ... McGinty during [Treistman]'s [custody proceeding] as to scheduling trial dates" violated his due process rights [1] by allowing the hearing to last longer than ninety days. [2] (*Id.* at 2, 6-8.) He alleges that this violation was "motivated in part by a discriminatory purpose of gender discrimination." (*Id.* ¶¶ 26, 29, 32, 35, 38, 41, 44.) Furthermore, he alleges that the "[New York] State Family Court[ ] [System] permitted the other ... defendants to operate in a discriminatory motive and fashion, yet did nothing to correct those actions." (*Id.* ¶ 47.) Treistman seeks monetary damages as well as injunctive and declaratory relief. [3] (*Id.* ¶¶ 58-73.) Pending is defendants' motion to dismiss. (Dkt. No. 16.)

[1]  Treistman does not specify whether his claims concern his substantive or procedural due process rights (or both). (*See, e.g.*, Compl. ¶¶ 30, 48.)

[2]  Treistman premises his claims on a violation of a New York State regulation. *See* N.Y. Comp. R. & Regs. tit. 22, § 205.14 ("In any proceeding brought pursuant to section 467, 651 or 652 of the Family Court Act to determine temporary or permanent custody or visitation, once a hearing or trial is commenced, it shall proceed to conclusion within 90 days."). As alleged, the underlying custody hearing, which commenced on July 31, 2013 and ended on February 1, 2016, was clearly in excess of ninety days. (Compl. ¶ 12.) The complaint purports to assert seven counts based on the excessive length of the proceeding; however, that is only because after outlining the aggregate trial duration, (*id.* ¶ 25), Treistman adds a separate count for each "intra-trial" delay exceeding ninety days, (*id.* ¶¶ 28, 31, 34, 37, 40, 43). It is dubious whether these are separate claims.

[3]  Treistman does not specify whether his claims are against defendants in their personal or official capacities (or both).

**I. Sovereign Immunity**

Defendants argue that Treistman's official capacity claims are barred by the Eleventh Amendment. (Dkt. No. 16, Attach. 3 at 9-11.)

It is well settled that "absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Because New York has not waived its immunity as to any of the claims alleged and the New York State Family Court is part of the New York State Unified Court System, which is an arm of the state, the claims against it are dismissed. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984); *Gollomp v. Spitzer*, 568 F.3d 355, 365-67 (2d Cir. 2009); *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004); *Robertson v. Allen*, 1:15-cv-11, 2016 WL 205381, at \*9 (N.D.N.Y. Jan. 15, 2016); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 521 (E.D.N.Y. 2010); *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 466-67 (S.D.N.Y. 2006), *aff'd*, 266 F. App'x 31 (2d Cir. 2008). Likewise, Treistman's claims against the remaining defendants in their official capacities as Family

Treistman v. McGinty, Not Reported in Fed. Supp. (2018)

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 37 of 151

2018 WL 4078262

Court employees, (Compl. ¶¶ 3-4), are also barred by the Eleventh Amendment. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that ... a claim is asserted against the state official in his official capacity, he may assert the state's Eleventh Amendment immunity against suit."). [4]

[4]    Treistman attempts to circumvent this bar by arguing that sovereign immunity is abrogated by Title VI of the Civil Rights Act of 1964. (Dkt. No. 21 at 8-9.) However, Title VI only prohibits discrimination based on "race, color, or national origin," in connection with "any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d; *see Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) ("In order to establish a claim based on [Title VI], the plaintiff must show, *inter alia*, that the defendant discriminated against him on the basis of race[.]"). Because Treistman alleges that the conduct he complains of was "motivated in part by a discriminatory purpose of gender discrimination," (Compl. ¶ 26), not race, Title VI is inapplicable. Furthermore, Treistman's alternative argument that "New York State has also waived its sovereign immunities for its officials under [Section 8 of] the Court of Claims Act," (Dkt. No. 21 at 9 n.2), is accurate, but misplaced. *See Samuel Adler, Inc., v. Noyes*, 285 N.Y. 34, 35 (1941) ("New York has not consented that any action to recover a sum of money may be brought against it in any of its tribunals other than the Court of Claims.").

## II. Absolute Judicial Immunity

 **\*2**  The Eleventh Amendment does not bar Treistman's claims against defendants in their individual capacities. *See Ying Jing Gan*, 996 F.2d at 529 ("To the extent that ... a claim is asserted against [a state official] in his individual capacity, he may assert privileges of absolute or qualified immunity but may not assert immunity under the Eleventh Amendment."). Nonetheless, defendants argue that Judge McGinty and his court clerks are entitled to absolute judicial immunity for the claims against them in their individual capacities. (Dkt. No. 16, Attach. 3 at 7-9.) In response, Treistman argues that neither Judge McGinty nor his court clerks are entitled to judicial immunity, in sum, because "[t]he docketing and scheduling of trial dates was not discretionary, and was constrained by the mandatory statute so as to be scheduled

within 90 days of trial commencement." (Dkt. No. 21 at 12-18.)

Judges have absolute immunity from liability for their judicial actions, *see Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009), and are subject to liability only for non-judicial actions or judicial actions "taken in the complete absence of all jurisdiction," *Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Such an immunity "is an immunity from suit, not just from ultimate assessment of damages." *Id.* at 11. Thus, it "operates to shield judges acting in their official capacity and bars claims against [judicial] defendants in their individual capacities," *McKnight*, 699 F. Supp. 2d at 523 (internal quotation marks and citations omitted).

> [T]he necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him.... [T]he scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction.

*Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (footnote, internal quotation marks, and citation omitted).

Treistman argues that absolute judicial immunity is inapplicable here because the family court is one of limited jurisdiction and N.Y. Comp. R. & Regs. tit. 22, § 205.14 removes any discretion from the ministerial act of scheduling proceedings in such a way that exceeds ninety days. (Dkt. No. 21 at 15-17.)

Here, it is abundantly clear that Judge McGinty had jurisdiction over the underlying child custody proceedings. *See* N.Y. Fam. Ct. Act § 115. Even if Judge McGinty's conduct in allowing the proceedings to exceed ninety days was motivated by impropriety, as Treistman contends, it does not mean his actions were taken in the complete absence of all

Treistman v. McGinty, Not Reported in Fed. Supp. (2018)

2018 WL 4078262

jurisdiction. *See Bliven*, 579 F.3d at 209 (holding "allegations of bad faith or malice cannot overcome judicial immunity"). Additionally, any error in extending the custody proceeding beyond ninety days did not affect the court's jurisdiction:

> Where the family court commences a hearing or trial to determine the issue of custody or visitation (whether permanent or temporary), [N.Y. Comp. R. & Regs. tit. 22, § 205.14] requires that the hearing or trial proceed to completion within 90 days. While this administrative rule is most salutary, there is no express provision for enforcement of the rule. If the matter is not completed within 90 days, the court does not lose jurisdiction to decide the matter; indeed, to require the parties to start over again would defeat the very purpose of the rule. Rather, the purpose of the rule would appear to be to give the parties, should the 90-day deadline approach or be exceeded, the opportunity to urge both the assigned judge and the local administrative judge to take steps to assure timely completion of the hearing or trial.

**\*3**  Alan D. Scheinkman, West's McKinney's Forms Matrimonial and Family Law § 20:46 (April 2018) (internal citation omitted). As such, Treistman's claims against Judge McGinty in his individual capacity must fail.

Additionally, judicial immunity extends to non-judges "who perform functions closely associated with the judicial process." *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985). A clerk's acts that are performed at the direction or under the supervision of a judicial officer come under the ambit of judicial immunity. *See Bliven*, 418 F. Supp. 2d at 138; *Oliva v. Heller*, 839 F.2d 37, 40 (2d Cir. 1988) (finding that court clerks are entitled to absolute immunity where their acts are of a judicial nature). "A court's inherent power to control its docket is part of its function of resolving disputes between parties. This is a function for which judges and their supporting staff are afforded absolute immunity." *Rodriguez v. Weprin*, 116 F.3d 62, 66 (2d Cir. 1997).

Here, the complaint alleges that Weiner and other unnamed clerks "effectuated scheduling of hearing dates" in such a fashion that extended the custody hearing beyond ninety days, in violation of Treistman's due process rights. (Compl. ¶¶ 5, 25.) Treistman's argument that such acts were ministerial in nature, (Dkt. No. 21 at 12-13), is not dispositive: "[e]ven when functions that are more administrative in character have been undertaken pursuant to the explicit direction of a judicial officer, ... that officer's immunity is also available to the subordinate." *Weprin*, 116 F.3d at 67 (internal quotation marks and citation omitted). Accordingly, defendant court clerks are entitled to absolute immunity for their actions in controlling the court's docket, and the claims against them in their individual capacities are dismissed.

### III. Declaratory and Injunctive Relief

Notwithstanding the foregoing, Treistman contends that he is not barred from seeking declaratory or injunctive relief because "the complaint alleges an ongoing ... violation of [a] mandatory statute, leading to [a] continuing federal due process violation." (Dkt. No. 21 at 9 (citing Compl. ¶¶ 63, 65, 70-73).)

Indeed, if a complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," then injunctive or declaratory relief is not foreclosed by immunity. *See Li v. Lorenzo*, 712 F. App'x. 21, 23-24 (2d Cir. 2017) (internal quotation marks and citations omitted) (collecting cases). However, Treistman concedes that the underlying child custody hearing "has ended with a dispositive decision." (Dkt. No. 21 at 5.) Treistman's alleged injuries stem from past conduct. (*See generally* Compl.) His speculative assertion that he "can re-petition for a similar type trial at any time, and he will face the same statutory violations with similar illegal delays," (*id.* ¶ 73), fails to convince the court that there is a plausible threat of future violations. The relief Treistman seeks is therefore entirely retrospective. *See Lorenzo*, 712 F. App'x. at 23-24. Accordingly, Treistman does not have standing to seek an injunction because there is nothing to enjoin. Likewise, Treistman is not entitled to declaratory relief because he alleges only past conduct and no ongoing or impending violation of federal law. *See Shtrauch v. Dowd*, 651 F. App'x 72, 74 (2d Cir. 2016). Even if a declaration stating that defendants violated the subject state regulation is arguably prospective in nature, the Eleventh Amendment would bar the district court from issuing it. *See Brown v. New York*, 975 F. Supp. 2d 209, 226 (N.D.N.Y. 2013) (finding that the Eleventh Amendment

Treistman v. McGinty, Not Reported in Fed. Supp. (2018)

2018 WL 4078262

"does not permit judgments against state officers declaring that they violated federal law in the past" and collecting cases) (internal quotation marks and citations omitted). [5] Accordingly, Treistman's claims are not saved by the fact that he seeks injunctive or declaratory relief.

[5] As for Treistman's claims against defendants in their individual capacities, claims for prospective relief against a state officer may be asserted only against the officer in his or her official capacity. *See* *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 270 (1997) ("[T]o permit a federal-court action to proceed in every case where prospective declaratory and injunctive relief is sought against an officer, named in his individual capacity, would be to adhere to an empty formalism and to undermine the principle ... that Eleventh Amendment immunity represents a real limitation on a federal court's federal-question jurisdiction. The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading.")

#### IV. Leave to Amend

**\*4** Finally, defendants argue that, in light of the substantive defects discussed above, granting Treistman leave to amend would be futile. (Dkt. No. 16, Attach. 3 at 14.) It should be noted that Treistman does not seek leave to file an amended complaint. (Dkt. No. 21.) However, given his *pro se* status, the court will consider whether to permit amendment in an abundance of caution. Ordinarily, a court should not dismiss a suit filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir. 1991). However, an opportunity to amend is not required where "the problem with [the plaintiff]'s causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000). Here, permitting Treistman an opportunity to amend would be futile because the deficiencies identified above are substantive in nature, and better pleading could not cure them. As such, the court declines to grant Treistman leave to amend his complaint. [6]

[6] Given the dispositive nature of the applicable immunities discussed above, the court need not address defendant's remaining arguments related to Treistman's failure to state a claim, (Dkt. No. 16, Attach. 3 at 11-13), which may have provided alternative avenues for dismissal.

Accordingly, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 16) is **GRANTED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Summary Order to the parties.

#### IT IS SO ORDERED.

#### All Citations

Not Reported in Fed. Supp., 2018 WL 4078262

---

End of Document      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 3503158
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Alisha C. WALKER, Plaintiff,
v.
FAMILY COURT JUDGE CATHERINE
CHOLAKIS, et al., Defendants.

1:19-CV-1288 (LEK/CFH)
|
Signed 06/29/2020

**Attorneys and Law Firms**

Alisha C. Walker, Melrose, NY, pro se.

Denise P. Buckley, New York State Attorney General -
Albany, Albany, NY, Mindy Ming-Huai Jeng, State of New
York Unified Court System Office of Court Administration,
New York, NY, for Defendant Family Court Judge Catherine
Cholakis.

James P. Lagios, Rivkin Radler LLP, Albany, NY, for
Defendant Joseph Drescher, Esq.

Matthew Foley, Esq., Troy, NY, pro se.

**MEMORANDUM-DECISION AND ORDER**

Lawrence E. Kahn, Senior U.S. District Judge

**I. INTRODUCTION**

**\*1** This action concerns alleged violations of pro se
plaintiff Alisha C. Walker's First, Fifth, and Fourteenth
Amendment rights. Dkt. No. 1 ("Complaint"). Plaintiff asserts
claims under 42 U.S.C. §§ 1983 and 1985 against the
Honorable Catherine Cholakis, a judge of the Family Court
of New York, Rensselaer County ("Judge Cholakis"), and
attorneys Joseph Drescher ("Drescher") and Matthew Foley
("Foley") (collectively, "Defendants"). Compl. ¶1. Plaintiff
seeks damages of at least $1,000,000 against Defendants
individually and collectively. Id. ¶¶ 49–52.

Before the Court are three motions to dismiss made pursuant
to Federal Rules of Civil Procedure 12(b)(1) and (6): one filed
by Foley, Dkt. Nos. 10 ("Foley Motion to Dismiss"); 10-1
("Foley Memorandum"); 10-24 ("Foley Affidavit"); one filed
by Drescher, Dkt. Nos. 13 ("Drescher Motion to Dismiss");

13-1 ("Drescher Memorandum"); and one filed by Judge
Cholakis, Dkt. Nos. 15 ("Cholakis Motion to Dismiss");
15-1 ("Cholakis Memorandum") (collectively, "Motions to
Dismiss"). Plaintiff did not respond to any motion.

For the following reasons, the Court grants Defendants'
Motions to Dismiss.

**II. BACKGROUND**

The Court draws all facts, which are assumed to be true, from
the Complaint. Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202,
210 (2d Cir. 2012). Plaintiff's claims stem from a pending
custody action in Rensselaer County Family Court ("Family
Court"). Plaintiff commenced the action in Family Court
on November 15, 2018, against the father of her children,
Luke Walker ("Walker") (who is represented by Drescher
in the state court proceeding). Id. ¶ 4. Foley was appointed
as an attorney for A.W. and T.W. ("Plaintiff's children") by
Judge Kehn. Id. ¶ 5. The case was later transferred to Judge
Cholakis, who issued orders on May 31, 2019 and August 19,
2019, granting temporary custody of Plaintiff's children to
Walker. Id. ¶11. In response to this temporary custody ruling,
Plaintiff brought this action against Defendants on October
18, 2019. Id. ¶ 2.

**A. Plaintiff's Factual Allegations and Claims**

Plaintiff alleges that Drescher and Foley conspired with
Judge Cholakis to deprive her and her children of their civil
and constitutional rights. Compl. ¶¶ 46–47. Judge Cholakis
violated her children's due process rights. Id. ¶¶ 42, 45. Foley
discriminated against Plaintiff on the basis of her Buddhist
religion by informing the court the Plaintiff believed in karma
and thus would not provide medical attention to the children.
Id. ¶ 17.

Moreover, in the course of the proceeding, Foley and
Drescher made "false and misleading statements with no
evidentiary support" and "belittled [Plaintiff's] character."
Id. ¶¶ 30–31, 37. Drescher and Foley engaged in deceit,
"character assassination and perjury." Id. ¶ 27.

Judge Cholakis demonstrated a lack of judicial competence,
as she "made numerous improper pejorative and
discriminatory statements," did not read the psychological
reports verifying Plaintiff's parental fitness, "appeared not to
know the case details," "unduly and unfairly relied on the spin
and deceit and character assassination and perjury" made by

Drescher and Foley, and exhibited "personal animus and bias" against Plaintiff. Id. ¶¶ 13–41.

**\*2** The temporary custody orders are "suspect, gained under lies and false pretenses, and should therefore be considered invalid." Id. ¶ 40.

As a result of improper conduct by Defendants, Plaintiff has been injured and suffered harm, worry, anxiety, sleeplessness, and a loss of protected family and liberty rights. Id. ¶ 48. Defendants are liable to her in an amount no less than $1,000,000, separately and collectively. Id. ¶¶ 45–48.

The Court construes the following claims: (1) a Fourteenth Amendment equal protection claim under § 1983 on behalf of Plaintiff's minor children, against Drescher and Foley; (2) a Fourteenth Amendment due-process claim under § 1983 on behalf of Plaintiff's minor children, against Judge Cholakis; (3) a Fourteenth Amendment "equal protection" claim and due-process claim under § 1983 and § 1985 against Judge Cholakis, Drescher, and Foley; (4) defamation claims against Foley and Drescher; (5) a claim against Judge Cholakis based on her lack of judicial competence; and (6) a claim for declaratory relief, seeking a declaration that the temporary custody order imposed by Judge Cholakis is invalid.

## III. LEGAL STANDARD

"Pursuant to [Rule] 12(b)(1), a party may, prior to serving a responsive pleading, move to dismiss a complaint on the ground the Court lacks subject matter jurisdiction. When a federal court lacks the statutory or constitutional power to adjudicate a case, it must be dismissed irrespective of its merits." McCluskey v. Town of E. Hampton, No. 13-CV-1248, 2014 WL 3921363, at \*2 (E.D.N.Y. Aug. 7, 2014) (citing Makarova, 201 F.3d at 113). Thus, "[w]hen defendants move for dismissal on a number of grounds, the 'court should consider the Rule 12(b)(1) challenge first it must dismiss the complaint for lack of subject matter jurisdiction, and the accompanying defenses and objections become moot and do not need to be determined.' " Lipin v. National Union Fire Ins. Co. of Pittsburgh, Pa., 202 F. Supp. 2d 126, 132 (S.D.N.Y. 2002) (quoting Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990)). Plaintiff bears the burden of establishing the Court's subject matter jurisdiction by a preponderance of the evidence. Id.

The Court recognizes that pro se plaintiffs enjoy a more liberal pleading standard. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."). "This is particularly so when the pro se plaintiff alleges that her civil rights have been violated." Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). But pro se plaintiffs must still "comport with the procedural and substantive rules of law." Javino v. Town of Brookhaven, No. 06-CV-1245, 2008 WL 656672, at \*3 (E.D.N.Y. Mar. 4, 2008). To survive a 12(b)(6) motion to dismiss, a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atl. Corp. v Twombly, 550 U.S. 544, 545 (2007).

## IV. DISCUSSION

**\*3** The Court grants the Defendants' Motion to Dismiss because there is a lack of subject matter jurisdiction, Plaintiff cannot assert claims on behalf of her minor children, and Defendants are protected by various forms of immunity.

### A. The Court Lacks Subject Matter Jurisdiction

Drescher and Foley move to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction under the Rooker-Feldman doctrine and the Younger Abstention doctrine. Foley Mem. at 1, 9; Drescher Mem. at 8, 10. All Defendants move to dismiss for lack of subject matter jurisdiction under the Domestic Relations exception. Foley Mem. at 8; Drescher Mem. at 7; Cholakis Mem. at 5. The Court analyzes each doctrine in turn.

### 1. Rooker-Feldman Doctrine

Defendants Foley and Drescher argue that Plaintiff's claims must be dismissed pursuant to the Rooker-Feldman doctrine. Foley Mem. at 1; Drescher Mem. at 8. This doctrine "pertains not to the validity of the suit but to the federal court's subject matter jurisdiction to hear it." Vossbrinck v. Accredited HomeLenders, Inc., 773 F.3d 423, 427 (2d Cir. 2014). The Rooker-Feldman doctrine bars "federal courts from exercising jurisdiction over claims 'brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.' " Sykes v Mel S. Harris and Assoc. LLC, 780 F.3d 70, 94 (2d Cir. 2015) (quoting Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005)).

Accordingly, the Rooker Feldman doctrine has four requirements: (1) the plaintiff must have lost in state court; (2) the loss must have occurred before the district court proceedings commenced; (3) the plaintiff must complain of injuries caused by a state court judgment; and (4) the plaintiff must invite district court review and rejection of that judgment. Hoblock v. Albany County. Bd. of Elections, 422 F.3d 77, 84 (2d Cir. 2005). The first and second requirements are "loosely termed" procedural, while the third and fourth requirements are substantive. Id.

The Rooker-Feldman doctrine does not bar jurisdiction in this action because the Plaintiff's claims do not meet the first requirement: Plaintiff did not lose in state court. The Rooker-Feldman doctrine does not apply when the state court had not entered a final custody order because the "outcome of the state action is unclear" and the "court proceedings never reached a final outcome that would be appealable in state court". Krowicki v. Sayemour, No. 16-CV-1186, 2016 WL 9227665, at *5 (N.D.N.Y. Oct. 5, 2016) (citing Green v. Mattingly, 585 F.3d 97, 102 (2d Cir. 2009), report and recommendation adopted by No. 16-CV-1186, 2017 WL 2804945 (N.D.N.Y. June 28, 2017)). Plaintiff commenced this action due to a loss in temporary custody of her children pursuant to a court order. Compl. ¶ 10. A final custody order to remove her children has not been issued. Id. ¶ 11. Given these circumstances, Plaintiff has not "lost" in state court. Green, 585 F.3d at 102. Therefore, the Court finds that Rooker-Feldman does not bar Plaintiff's claims.

### 2. *Younger* Abstention

Drescher and Foley argue that Plaintiff's claims are also barred by the doctrine of Younger abstention. Foley Mem. at 9; Drescher Mem. at 10. There is "a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances." Middlesex County Ethics Comm. v Garden State Bar Ass'n, 457 US 423, 431 (1982). The Younger abstention doctrine "requires federal courts to abstain from exercising jurisdiction over claims that implicate ongoing state proceedings." Torres v. Gains, 130 F. Supp. 3d 630, 635 (D. Conn. 2015) (citing Younger v. Harris, 401 U.S. 37, 43–44 (1971)). "[Younger] abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional

claims." Morpurgo v Inc. Vil. of Sag Harbor, 327 F. Appx. 284, 285 (2d Cir. 2009) (quoting Diamond "D" Constr. Corp. v. McGowan, 282 F.3d 191, 198 (2d Cir. 2002)).

**\*4** The Court must abstain from exercising jurisdiction over the present case. This suit undoubtedly "raises important state interests," because the Plaintiff has challenged a temporary order in an ongoing child custody dispute. Graham v N.Y. Ctr. for Interpersonal Dev., No. 15-CV-459, 2015 WL 1120120, at *3 (E.D.N.Y. Mar. 12, 2015) (quoting Reinhardt v. Com. of Mass. Dep't of Social Servs., 715 F.Supp. 1253, 1256 (S.D.N.Y. 1989)). Additionally, "[Plaintiff] is able to raise any potential constitutional claims in the state court system." Graham, 2015 WL 1120120, at *3.[1] Plaintiff stated that the temporary custody order was gained under "lies and false pretenses and therefore should be considered invalid." Compl. ¶40. Thus, in addition to seeking monetary damages, Plaintiff is seeking declaratory relief. Younger abstention effectively bars a plaintiff's claims for declaratory relief. See Morpurgo, 327 F. Appx. at 285–86 (holding that Younger barred plaintiff's claims for injunctive and declaratory relief). Therefore, Plaintiff's claims for declaratory relief are barred by Younger.

[1]      The appropriate place for a party to appeal a final decision made in Rensselaer County Family Court is the Supreme Court of New York, Appellate Division, Third Department. Family Ct. Act § 1111.

Conversely, the Second Circuit "[has] held that abstention and dismissal are inappropriate when [monetary] damages are sought, even when a pending state proceeding raises identical issues and we would dismiss otherwise identical claims for declaratory and injunctive relief." Kirschner v. Klemons, 225 F3d 227, 238 (2d Cir. 2000). In Morpurgo, for instance, the Court abstained from exercising jurisdiction over the plaintiff's claims for injunctive relief pursuant to Younger but did not bar the plaintiff's claims for monetary relief. 327 Fed. App'x at 286. Likewise, Plaintiff's claims for monetary relief are not barred by Younger.

Pursuant to Younger abstention, the Court is barred from exercising subject matter jurisdiction over Plaintiff's claim for declaratory relief. Although Younger does not bar Plaintiff's claims for monetary relief, as discussed above, all of Plaintiff's claims seeking monetary relief are dismissed for a lack of subject matter jurisdiction under the domestic relations exception.

### 3. Domestic Relations Exception

Defendants argue that Plaintiff's claims are barred by the domestic relations exception. Foley Mem. at 8; Drescher Mem. at 7; Cholakis Mem. at 5. It is well-settled that federal courts generally do not have jurisdiction over domestic relations matters, which include divorce, child custody, child support, and alimony. Marshall v. Marshall, 547 U.S. 293, 294–295 (2006). This policy exception exists because the states have developed competence and expertise in adjudicating marital and custody disputes, a skill that the federal courts traditionally lack. See Thomas v. New York City, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993). Claims that: (1) attempt to "rewrit[e] a domestic dispute as a tort claim for monetary damages," Schottel v. Kutyba, No. 06-1577-CV, 2009 WL 230106, at *6 (2d Cir. Feb. 2, 2009); or (2) allege constitutional violations but whose injuries "stem directly from the disputed family court decision," Amato v. McGinty, No. 17-CV-593, 2017 WL 4083575, at *5 (N.D.N.Y. Sep. 15, 2017), will be barred under the domestic relations exception.

Here, Plaintiff's claims fail because they stem directly from a child custody decision. Plaintiff commenced a civil rights action and has alleged that the actions and decisions of Judge Cholakis, Foley, and Drescher were unconstitutional. Compl. ¶¶ 45–48. Although she is not directly seeking a rejection of state judgment in her request for relief, the "crux of the argument" arises out of the temporary custody order because the Court would need to "re-examine and reinterpret" the state court order and evidence surrounding the order to effectively address her constitutional claims. Amato, 2017 WL 4083575, at *5; see also Pappas v. Zimmerman, No. 13-CV-4883, 2014 WL 3890149, at *4 (E.D.N.Y. Aug. 6, 2014) (holding that the domestic relations exception barred the plaintiff's claims because she raised constitutional issues that invited the federal court to "re-examine and reinterpret" state court divorce proceedings).

 *5  In Amato, although plaintiffs alleged that the "order and processes" of the family court were unconstitutional, the domestic relations exception applied because plaintiff's injuries "stem[med] directly" from the disputed family court custody decision. 2017 WL 4083575, at *5. Likewise, Plaintiff's claims are barred under the domestic relations doctrine, because she invited the Court to re-examine and reinterpret a temporary custody order made in Family Court, and her injuries stem directly from this custody decision.

Additionally, to obtain a review of the state court decision, Plaintiff has rewritten a domestic dispute as a tort claim for monetary damages. This Court recently clarified that state courts are better suited to adjudicate tort claims that "begin and end in a domestic dispute." Dodd v. O'Sullivan, 19-CV-560, 2019 WL 2191749, at *4 (N.D.N.Y. May 21, 2019) (quoting Schottel, 2009 WL 23106, at *1), report and recommendation adopted by 519-CV-560, 2020 WL 204253 (N.D.N.Y. Jan. 14, 2020) (Kahn, J.). Therefore, pursuant to the domestic relations exception, the Court dismisses Plaintiff's claims for monetary relief for lack of subject matter jurisdiction.

### B. Plaintiff Cannot Assert Claims on Behalf of Her Minor Children

Defendants move to dismiss Plaintiff's claims made on behalf of her minor children. Foley Mem. at 8; Drescher Mem. at 9; Cholakis Mem. at 8. "Federal Rule of Civil Procedure 17(c)(1)(A) permits a guardian to bring suit on behalf of a minor." Hagans v Nassau County Dept. of Social Services, 18-CV-1917, 2020 WL 1550577, at *4 (E.D.N.Y. Mar. 31, 2020). However, it is well established that a pro se plaintiff lacks the authority to represent anyone other than herself in a court action, including her child. Cheung v. Youth Orchestra Found of Buffalo Inc., 906 F.2d 59, 61 (2d Cir. 1990); LeClair v. Vinson, 19-CV-28, 2019 WL 1300547, at *4 (N.D.N.Y. Mar. 21, 2019), report and recommendation adopted by 19-CV-28, 2019 WL 2723478 (N.D.N.Y. July 1, 2019). This restriction exists because "the choice to appear pro se is not a true choice for minors who under state law cannot determine their own legal actions." Cheung, 906 F.3d at 61 (citation omitted).

Plaintiff purports to represent her minor children in this action. Compl. ¶¶ 42, 45–48. Accordingly, Plaintiff's claims alleging constitutional violations of her children's rights should be dismissed.

### C. Defendants Are Entitled to Immunity

Defendants assert that Plaintiff's claims should be dismissed under 12(b)(6), because even if the case had proper subject matter jurisdiction, Plaintiff fails to state a claim upon which relief can be granted, as Defendants are protected by quasi-judicial immunity, absolute immunity, and sovereign immunity.

### 1. Quasi-Judicial Immunity

Foley argues that as an appointed attorney, his actions are protected by quasi-judicial immunity. Foley Mem. at 6. "Law guardians are entitled to quasi-judicial immunity for actions pertaining to their representation of a child in family court." Amato, 2017 WL 4083575, at *3. Quasi-judicial immunity is absolute and protects court-appointed guardians from civil liability. Lewittes v. Lobis, 4-CV-155, 2004 WL 1854082, at *11 (S.D.N.Y. Aug. 19, 2004) aff'd, 164 F. Appx. 97 (2d Cir. 2006). Foley was appointed by Judge Kehn to represent Plaintiff's children. Thus, Foley, who is being sued for conduct he engaged in when representing Plaintiff's children, is protected from suit under quasi-judicial immunity.

### 2. Absolute Immunity

**\*6** Drescher argues that he is entitled to absolute immunity from defamation claims for all statements made during the family court proceedings. Drescher Mem. at 11–12. Attorneys have absolute immunity from liability for defamation "when such words and writings [made during a court proceeding] are material and pertinent to the questions involved." Front, Inc. v. Khalil, 24 N.Y.3d 713, 718 (2015) (quoting Youmans v. Smith, 153 N.Y. 214, 265 (1897)). This immunity allows an attorney to "speak freely to zealously represent their clients without fear of harassment or financial hazard." Park Knoll Assoc. v. Schmidt, 59 N.Y.2d 205, 209 (1983). When there is an absolute privilege, the defendant has immunity from liability regardless of motive. Id.

Plaintiff alleges that Foley and Drescher conspired with Judge Cholakis to deprive her of her constitutional and civil rights. Compl. ¶ 10. Plaintiff further alleges that Drescher and Foley gave "false and misleading statements" to Judge Cholakis that were "full of innuendo and not backed up by any factual evidence." Id. ¶ 13. Plaintiff believes that Drescher's language was full of "deceit", "character assassination, and perjury." Id. ¶ 27. Given that there are no factual allegations to support any other claim on these facts,[2] the Court has construed Plaintiff's allegations against Drescher as a claim for defamation, for which Drescher has absolute immunity.[3]

2  Plaintiff alleges that Defendants acted in concert to deprive her of her constitutional and civil rights under § 1983 and § 1985. To state a claim under

§ 1983, "a plaintiff must allege (1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived them of that right acted under color of state law.' " Velez v. Levy, 401 F.3d 75, 84 (2d Cir. 2005) (quoting Gomez v. Toledo, 446 U.S. 635, 640 (1980)). Private individuals who are not state actors (not acting under the color of state law) may be liable under § 1983 "if they have conspired with or engaged in joint activity with state actors." Storck v. Suffolk County Dept. of Social Services, 62 F. Supp. 2d 927, 940 (E.D.N. Y 1999). Allegations of conspiracy cannot be vague nor conclusory but must allege with "some degree of particularity" clear acts that defendants engaged in that were reasonably related to the alleged conspiracy. Id. Plaintiff did not allege any specific acts that Drescher and Foley engaged in that would indicate a conspiracy with Judge Cholakis. Therefore, the allegation should be dismissed under 12(b)(6) because Plaintiff fails to state a claim under § 1983 against Drescher and Foley. Similarly, to state a claim under § 1985, the plaintiff's claim must contain more than conclusory or vague allegations of conspiracy. Storck, 62 F. Supp. 2d at 940. Accordingly, Plaintiff's § 1985 claim should be dismissed under 12(b)(6) as well.

3  An individual can file an attorney misconduct complaint with the Third Judicial Department Attorney Grievance Committee in Albany, NY. New York State Unified Court System, Judicial Conduct, Attorneys, *Grievance Complaints*, http://ww2.nycourts.gov/attorneys/grievance/complaints.shtml (last visited June 26, 2020).

### 3. Sovereign Immunity

Judge Cholakis argues that all claims against her are barred by judicial immunity and Eleventh Amendment sovereign immunity. Cholakis Mem. at 2–5. Judicial immunity protects conduct "taken as part of all judicial acts except those performed in the clear absence of jurisdiction." LeClair, 2019 WL 1300547, at *7; see also Stump v. Sparkman, 435 U.S. 349, 356–57 (1978). When determining the limits of judicial action, the judge's jurisdictional scope must be construed broadly. LeClair, 2019 WL 1300547, at *7. This immunity is designed to benefit the public, so that the judge may

exercise her functions with "independence and without fear of consequences." Id. Further, the Eleventh Amendment bars a plaintiff from bringing suit in federal court against a state, its agencies, or officials unless the state consents to the suit or there is a statutory waiver of immunity. Pennhurst State Sch. & Hosp. v. Halderman, 465, U.S. 89, 99–101 (1984).

 **\*7** Judge Cholakis has absolute judicial immunity for all judicial actions that occurred within her judicial capacity. Accepting Plaintiff's allegations as true, all of Judge Cholakis's actions occurred while she was working within her judicial capacity to determine the proper custody for Plaintiff's children. Plaintiff alleges that Judge Cholakis demonstrated a lack of judicial competence and exhibited "personal animus and bias" against her. Id. ¶¶ 13–41. However, "[t]his immunity applies even when the judge is accused of acting maliciously and corruptly." Amato, 2017 WL 4083575, at \*3 (quoting Pierson v. Ray, 386 U.S. 547, 554 (1967)). Accordingly, Judge Cholakis is entitled to judicial immunity.

Judge Cholakis is also protected under sovereign immunity. In Gollomp v. Spitzer, the Court held that the New York Unified Court System is an "arm of the State" and affirmed the dismissal of a § 1983 claim against a judge under sovereign immunity. 568 F.3d 355, 365–68 (2d Cir. 2009). Likewise, Plaintiff has filed her complaint against Judge Cholakis, a member of the Rensselaer County Family Court, which is part of the New York Unified Court System. Compl. ¶3; N.Y. Const. Art. VI, §§ 1, 13. All of Judge Cholakis's alleged constitutional violations occurred while she acted within her official capacity as a Family Court judge in adjudicating a custody dispute. Therefore, all claims against Judge Cholakis should be dismissed, because "a suit against a state official in [her] official capacity is, in effect, a suit against the state itself, which is barred." Berman Enterprises, Inc. v Jorling, 3

F.3d 602, 606 (2d Cir. 1993) (citing Hafer v. Melo, 502 U.S. 21, 21 (1991)). [4]

[4]
>     A complaint regarding a judge's religious discrimination or bias may be filed with the USC Managing Inspector General for Bias Matters. New York State Unified Court System, *Judicial Conduct*, https://nycourts.gov/ip/judicialconduct/index.shtml (last visited June 26, 2020). Similarly, if a party believes that a judge violated the Rules of Judicial Conduct, a complaint can be filed against the judge with the New York State Commission of Judicial Conduct. Id.

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Foley's Motion to Dismiss (Dkt. No. 10), Drescher's Motion to Dismiss (Dkt. No. 13), and Cholakis's Motion to Dismiss (Dkt. No. 15) are **GRANTED**. Plaintiff's claims against Foley, Drescher, and Judge Cholakis are **DISMISSED** with prejudice, and without leave to amend; and it is further

**ORDERED**, that the Clerk of the Court is directed to close this action; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 3503158

---

**End of Document**                                   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Jones v. Thomas, Slip Copy (2020)

2020 WL 5077026

2020 WL 5077026
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Brandon C. JONES, Plaintiff,

v.

Ms. Jisin H. THOMAS; Mr. Jonathan Tauarez;
Volunteers of America Corporation; Volunteers of
America, Swartz Shelter; Volunteers of America
135 W. 50th Street, NYC, NY 10024, Defendants.

20-CV-5581 (LLS)
|
Signed 08/27/2020

**Attorneys and Law Firms**

Brandon C. Jones, New York, NY, pro se.

ORDER TO AMEND

LOUIS L. STANTON, United States District Judge:

 *1  Plaintiff, appearing *pro se*, invokes the Court's federal question jurisdiction, alleging that Defendants violated his federal constitutional and statutory rights. Plaintiff filed the initial complaint on July 17, 2020, and on July 30, 2020, he filed an amended complaint. (ECF Nos. 2 and 6.) Plaintiff also filed a motion for permission for electronic case filing. (ECF No. 5.) By order dated August 5, 2020, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis* ("IFP"). For the reasons set forth below, the Court grants Plaintiff leave to file a second amended complaint within sixty days of the date of this order.

**STANDARD OF REVIEW**

The Court must dismiss an IFP complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

The Supreme Court has held that under Rule 8, a complaint must include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if the plaintiff pleads enough factual detail to allow the Court to draw the inference that the defendant is liable for the alleged misconduct. In reviewing the complaint, the Court must accept all well-pleaded factual allegations as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). But it does not have to accept as true "[t]hreadbare recitals of the elements of a cause of action," which are essentially just legal conclusions. *Twombly*, 550 U.S. at 555. After separating legal conclusions from well-pleaded factual allegations, the Court must determine whether those facts make it plausible – not merely possible – that the pleader is entitled to relief. *Id.*

**BACKGROUND**

Plaintiff brings his claims using the Court's general complaint form. He checks the box on the form to invoke the Court's federal question jurisdiction, and in the section of the form asking which of his federal constitutional or federal statutory rights have been violated, Plaintiff writes, "4th and 14th Constitutional Amendment[,] ADA Act of 1990 42 USC Reasonable accommodation[,] Title VII Civil Rights Act 1964[,] Intimidation by defendants, 42 USC 3617[.]" (ECF No. 6, at 2.) He sues the Volunteers of America ("VOA") Corporation, VOA Schwartz Shelter, [1] a VOA facility located at 135 W. 50th Street in New York City, and VOA employees Jisin H. Thomas and Jonathan Tauarez.

[1]    The Schwartz Assessment Shelter is a shelter for homeless men that is operated by VOA and located

on Wards Island in New York City. *See* https://www.voa-gny.org/emergency-shelter.

**\*2** The following allegations are taken from the amended complaint, much of which is confusing and lacking context. Defendant Jisin H. Thomas "failed to provide Reasonable Accommodation, with regards to the advise [sic] of Medical Personnel and took upon herself to disregard all Medical Documentation." (*Id.* at 5.) Thomas "engaged tactics in Retaliation and forms of Intimidation by engaging unlawful behavior" and "filing a formal complaint with Individual Mr. Darrel Spencer," after Thomas found out that Plaintiff sent "sincere complaints to VOA Corporate Offices and other NYS/NYC Departments regarding Safety and Hygiene issues of Swartz [sic] Shelter." (*Id.* at 5.) Spencer then contacted Plaintiff and demanded that he report to Spencer's "Supervisor @ 500 Pearl Street SDNY." (*Id.*)

Plaintiff further alleges that Defendant Jonathan Tauarez "engaged in tactics and has disregarded all required assistance with Reasonable Accommodation as provided by the ADA of 1990." (*Id.*) Tauarez wrote "a formal Infraction" against Plaintiff "and sent [it] to Individual Mr. Darrel Spencer" before "demand[ing]" that Plaintiff sign the document. (*Id.*) Plaintiff did not comply and Spencer "contacted [Plaintiff] about the Infraction and made statements about going before the Judge and questioned [Plaintiff] about the aforementioned and the issues continue today without any relief or stoppage, in violation of various NYS Law and Federal Code 42 USC 1637." (*Id.*)

Plaintiff asserts that as a result of Defendants' unlawful acts, he has experienced at the Schwartz Shelter "[i]nfections, pain, and suffering from the failure to provide clean facilities." (*Id.* at 6.) He further states that he faced retaliation, "which could have landed [him] back in prison," because of "Blowing the Whistle on unsafe conditions" at Schwartz. (*Id.*) Plaintiff also asserts that he has experienced "[e]motional [i]ntimidation" and "prevention of proper medical treatment by refusing medical supplies deliveries, on multiple occasions." (*Id.*)

He seeks money damages and injunctive relief.

Plaintiff attaches to the complaint pages of medical records, and a July 29, 2020 "Notice of Transfer" from VOA, informing Plaintiff that "DHS is issuing [him] an administrative transfer within 48 hours" and that he will be notified of his "new assigned Mental Health shelter once it becomes available." (*Id.* at 17.)

# DISCUSSION

## A. Constitutional claims under 42 U.S.C. § 1983

The Court construes Plaintiff's allegations that Defendants retaliated against him for filing complaints as asserting claims under 42 U.S.C. § 1983 that Defendants violated his First Amendment rights. To state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988).

A claim for relief under § 1983 must allege facts showing that each defendant acted under the color of a state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Private parties are therefore not generally liable under the statute. *Sykes v. Bank of America*, 723 F.3d 399, 406 (2d Cir. 2013) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties."). As Defendant VOA is a private non-profit organization, and Defendants Thomas and Tauarez are private parties who do not work for any state or other government body, Plaintiff has not stated a claim against these defendants under § 1983.

## B. Claims under the ADA

Title III of the ADA governs places of public accommodations, and guarantees that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). To state a claim under Title III, a plaintiff must allege, "(1) [that] he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation;[2] and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA." *Roberts v. Royal Atlantic Corp.*, 542 F.3d 363, 368 (2d Cir. 2008), *cert. denied*, 556 U.S. 1104 (2009). A plaintiff must also allege that the "exclusion or discrimination was due to [the plaintiff's] disability." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (quoting *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)).

2      The definition of "public accommodation" includes a "homeless shelter ... or other social service center establishment." 42 U.S.C. § 12181(7)(K).

**\*3**  With respect to the third element, "a plaintiff can base a disability discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.' " *Brief v. Albert Einstein Coll. of Med.*, 423 Fed. Appx. 88, 90 (2d Cir. 2011) (quoting *Fulton*, 591 F.3d at 43). To bring a reasonable accommodation claim, a plaintiff must show "(1) [ ]he suffers from a disability (2) known to the defendant, for which (3) a reasonable accommodation is necessary for the plaintiff's enjoyment of the facility, and (4) the defendant refused the accommodation." *Lopez v. New York City Dep't of Homeless Servs.*, No. 17-CV-3014, 2019 WL 3531955, at \*4 (S.D.N.Y. Aug. 2, 2019), *report and recommendation adopted*, No. 17-CV-3014, 2019 WL 4593611 (S.D.N.Y. Sept. 23, 2019).

Here, Plaintiff asserts that Defendants "failed to provide [a] Reasonable Accommodation" as required by the ADA, but he fails to allege any facts suggesting that he has a disability within the meaning of the ADA. Moreover, Plaintiff alleges no facts regarding the nature of the reasonable accommodation that he sought or that Defendants discriminated against him in denying such an accommodation. *See Castillo v. Hudson Theatre, LLC*, 412 F. Supp. 3d 447, 451 (S.D.N.Y. 2019) (quoting *Shaywitz v. Am. Bd. Of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 467 (S.D.N.Y. 2012)) ("Title III's requirement that private entities make 'reasonable accommodations' for disabled individuals would be rendered meaningless if the entity had no basis for knowing (1) what accommodations the [plaintiff] was seeking, and (2) whether those accommodations were reasonable in light of the disability and the test."). The Court therefore grants Plaintiff leave to amend his complaint to allege facts supporting his claim that Defendants violated Title III of the ADA.

## C. Claims under the Fair Housing Act

Plaintiff also asserts that Defendants intimidated him in violation of 42 U.S.C. § 3617. That statute, a section of the Fair Housing Act, states, "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [the FHA]." Plaintiff must therefore allege facts suggesting that (1) he exercised or enjoyed a right under the FHA, and (2) Defendants intimidated or threatened him because he exercised or enjoyed a right under the FHA.

Section 3604 of the FHA, as applicable here, makes it unlawful to "discriminate in the [ ] rental [of], or to otherwise make unavailable or deny, a dwelling to any ... renter because of" the individual's disability. 42 U.S.C. § 3604(f)(1). It also prohibits discrimination against "any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such a dwelling, because of a [disability]." 42 U.S.C. § 3604(f)(2). Under certain circumstances, a refusal to make a reasonable accommodation can constitute unlawful discrimination under the FHA. *See* 42 U.S.C. § 3604(f)(3)(B).

Here, Plaintiff fails to allege facts suggesting that he has a disability under the FHA. *See Rodriguez v. Village Green Realty, Inc.*, 788 F.3d 31, 40 (2d Cir. 2015) (quoting 42 U.S.C. § 3602(h)) ("To demonstrate a disability under the FHA, a plaintiff must show: (1) 'a physical or mental impairment which substantially limits one or more ... major life activities'; (2) 'a record of having such an impairment'; or (3) that he or she is 'regarded as having such an impairment.' "). Even assuming that Plaintiff has a disability within the meaning of the FHA, he does not allege that he exercised his rights under the FHA and Defendants coerced, intimidated, or threatened him, or interfered with his exercise of those rights. *See* 42 U.S.C. § 3617. He rather makes the conclusory assertions that Thomas "engaged [in] tactic[s]" of retaliation and intimidation "by engaging [in] unlawful behavior." The only specific fact that Plaintiff alleges – that Thomas "fil[ed] a formal complaint" with Darrel Spencer after learning that Plaintiff filed complaints regarding safety and hygiene issues at Schwartz Shelter – does not suggest that Plaintiff was engaged in exercising his rights under the FHA or that Thomas's actions in filing an unspecified complaint against Plaintiff constituted intimidation or retaliation. If Plaintiff chooses to file a second amended complaint, he should allege facts suggesting that he exercised or enjoyed a right under the FHA, and that Defendants violated or interfered with that right or otherwise intimidated, coerced, or threatened Plaintiff in connection with his exercise or enjoyment of that right.

## D. Claims under Title VII

**\*4**  Plaintiff also brings claims under Title VII of the Civil Rights Act of 1964. Title VII provides that "[i]t shall be an unlawful employment practice for an employer ...

to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a). Plaintiff does not allege that he is or was an employee of any of the defendants. The Court therefore dismisses his claims under Title VII for failure to state a claim on which relief may be granted. 28 U.S.C. § 1915(e)(2)(B)(ii).

## LEAVE TO AMEND

Plaintiff proceeds in this matter without the benefit of an attorney. District courts generally should grant a self-represented plaintiff an opportunity to amend a complaint to cure its defects, unless amendment would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Indeed, the Second Circuit has cautioned that district courts "should not dismiss [a *pro se* complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (quoting *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999)). Because Plaintiff may be able to allege additional facts to state a valid claims under the ADA and FHA, the Court grants Plaintiff sixty days' leave to file a second amended complaint to detail his claims.

In the statement of claim, Plaintiff must provide a short and plain statement of the relevant facts supporting each claim against each defendant named in the amended complaint. Plaintiff is also directed to provide the addresses for any named defendants. To the greatest extent possible, Plaintiff's amended complaint must:

    a) give the names and titles of all relevant persons;

    b) describe all relevant events, stating the facts that support Plaintiff's case including what each defendant did or failed to do;

    c) give the dates and times of each relevant event or, if not known, the approximate date and time of each relevant event;

    d) give the location where each relevant event occurred;

    e) describe how each defendant's acts or omissions violated Plaintiff's rights and describe the injuries Plaintiff suffered; and

    f) state what relief Plaintiff seeks from the Court, such as money damages, injunctive relief, or declaratory relief.

Essentially, the body of Plaintiff's second amended complaint must tell the Court: who violated his federally protected rights; what facts show that his federally protected rights were violated; when such violation occurred; where such violation occurred; and why Plaintiff is entitled to relief. **Because Plaintiff's second amended complaint will completely replace, not supplement, the amended complaint, any facts or claims that Plaintiff wishes to maintain must be included in the second amended complaint.**

If Plaintiff chooses to file a second amended complaint, the Court strongly encourages him to seek assistance from someone who can help him organize his thoughts and claims. If Plaintiff needs legal advice related to this matter, he may contact the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants in the Southern District of New York, which is a free legal clinic staffed by attorneys and paralegals to assist those who are representing themselves in civil lawsuits in this Court. A copy of the flyer with details of the clinic is attached to this order.

## CONCLUSION

**\*5** The Clerk of Court is directed to transmit a copy of this order to Plaintiff. [3]

[3]    Plaintiff has consented to receiving electronic service of Court document. (ECF No. 7.)

The Court grants Plaintiff's motion for permission for electronic case filing. (ECF No. 5.)

The Court dismisses Plaintiffs § 1983 claims against Thomas, Tauarez, VOA Corporation, VOA Schwartz Shelter, and VOA at 135 W. 50th Street.

The Court grants Plaintiff leave to file a second amended complaint that complies with the standards set forth above within sixty days of the date of this order. Plaintiff must caption the document as a "Second Amended Complaint," and label the document with docket number 20-CV-5581

(LLS). A Second Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the Court will dismiss the complaint for failure to state a claim upon which relief may be granted.


SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____    ____ Civ. _____ (____)

_____
*(In the space above enter the full name(s) of the plaintiff(s).)*    **SECOND
AMENDED
COMPLAINT**

-against-

_____    Jury Trial: ☐ Yes  ☐ No
_____              *(check one)*
_____
_____
_____
_____
_____
_____

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**I.    Parties in this complaint:**

A.    List your name, address and telephone number. If you are presently in custody, include your identification number and the name and address of your current place of confinement. Do the same for any additional plaintiffs named. Attach additional sheets of paper as necessary.

Plaintiff    Name _____
             Street Address _____
             County, City _____
             State & Zip Code _____
             Telephone Number _____

B.    List all defendants. You should state the full name of the defendant, even if that defendant is a government agency, an organization, a corporation, or an individual. Include the address where each defendant may be served. Make sure that the defendant(s) listed below are identical to those contained in the above caption. Attach additional sheets of paper as necessary.

*Rev. 12/2009*    1

Defendant No. 1    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 2    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 3    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

Defendant No. 4    Name _____
                   Street Address _____
                   County, City _____
                   State & Zip Code _____
                   Telephone Number _____

**II.    Basis for Jurisdiction:**

Federal courts are courts of limited jurisdiction. Only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case involving the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one state sues a citizen of another state and the amount in damages is more than $75,000 is a diversity of citizenship case.

A.    What is the basis for federal court jurisdiction? *(check all that apply)*
      ☐ Federal Questions      ☐ Diversity of Citizenship

B.    If the basis for jurisdiction is Federal Question, what federal Constitutional, statutory or treaty right is at issue? _____
      _____

C.    If the basis for jurisdiction is Diversity of Citizenship, what is the state of citizenship of each party?
      Plaintiff(s) state(s) of citizenship _____
      Defendant(s) state(s) of citizenship _____

*Rev. 12/2009*    2

**III.    Statement of Claim:**

State as briefly as possible the facts of your case. Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph. Attach additional sheets of paper as necessary.

A.    Where did the events giving rise to your claim(s) occur? _____

B.    What date and approximate time did the events giving rise to your claim(s) occur? _____

C.    Facts: _____

| What happened to you? | _____ |
| What did what? | _____ |
| Was anyone else involved? | _____ |
| Who else saw what happened? | _____ |

**IV.    Injuries:**

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received.
_____
_____
_____
_____

*Rev. 12/2009*    3

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 51 of 151

**V.    Relief:**

State what you want the Court to do for you and the amount of monetary compensation, if any, you are seeking, and the basis for such compensation. _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.

Signed this ___ day of _____, 20__.

Signature of Plaintiff    _____

Mailing Address    _____

_____

Telephone Number    _____

Fax Number *(if you have one)* _____

<u>Note</u>:    All plaintiffs named in the caption of the complaint must date and sign the complaint. Prisoners must also provide their inmate numbers, present place of confinement, and address.

<u>For Prisoners:</u>

I declare under penalty of perjury that on this _____ day of _____, 20__, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff:    _____

Inmate Number    _____

*Rev. 12/2009*                    4



# Notice For
# Pro Se Litigants

As a public health precaution, the New York Legal Assistance Group's Legal Clinic for Pro Se Litigants has temporarily suspended all in-person client meetings as of Tuesday, March 17, 2020.

Limited scope legal assistance will continue to be provided, but only by appointment and only over the phone. During this time, we cannot assist walk-in visitors to the clinic.

If you need the assistance of the clinic, please call <u>212-659-6190</u> and leave a message, including your telephone number, and someone will get back to you as soon as possible. If you do not leave a message with your telephone number, we cannot call you back.

Please be patient because our responses to your messages may be delayed while we transition to phone appointments.



**All Citations**

Slip Copy, 2020 WL 5077026

---

                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   6

2020 WL 3868710
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, E.D. New York.

Eleanor BASORA-JACOBS, Plaintiff,

v.

CEO Arthur PALEVSKY; D.O. Ava Morgan;
Pat Perkins; Linda Schnabel, AC; Mgr. Greg
Defranceso; Michael Garcia, Defendants.

20-CV-1675 (LDH)(LB)
|
Signed 07/09/2020

**Attorneys and Law Firms**

Eleanor Basora-Jacobs, Staten Island, NY, pro se.

**MEMORANDUM AND ORDER**

LaSHANN DeARCY HALL, United States District Judge:

 **\*1** Plaintiff Eleanor Basora-Jacobs, proceeding pro se, brings an employment discrimination and retaliation action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* [1] (Compl., ECF No. 1.) Plaintiff's April 1, 2020 motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a) is granted. (Pl.'s Leave Mot., ECF No. 2.)

[1]     The complaint is dated March 21, 2020, was mailed on March 25, 2020, and was received on April 1, 2020.

**BACKGROUND** [2]

[2]     The following facts are taken from the complaint and are assumed true for the purposes of this memorandum and order.

Plaintiff is female and Hispanic. (Compl. at 5.) She is a former employee of Independent Living Association in Brooklyn. (*Id.* at 3.) Plaintiff "charge[s] Defendants with unlawful discriminatory practice relating to their employment based on race, national origin and retaliation" between July 2016 and March 2018. (*Id.* at 4-5.) She alleges that "staff spoke

other language against company policy in front of clients and their parents" and that her employment was terminated. (*Id.* at 4.) Plaintiff alleges no other specific facts in support of her discrimination and retaliation claims. She names the Arthur Palevsky, CEO and Ava Morgan, the Director of Operations and four other employees of Independent Living Association as Defendants. [3] (*Id.* at 1-3.)

[3]     Plaintiff named the four employee Defendants in the case caption, but only referred to Palevsky and Morgan in the body of her complaint. (*Id.* 1-2.)

**STANDARD OF REVIEW**

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the [C]ourt must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the [C]ourt must accept the factual allegations of the complaint as true." *Id.* (citations omitted).

Moreover, where, as here, a plaintiff is proceeding pro se, his pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). A pro se complaint, "however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 55 U.S. 89, 94 (2007) (per curiam)). This rule is "particularly so when the pro se plaintiff alleges that [his] civil rights have been violated." *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)).

 **\*2** Nevertheless, under 28 U.S.C. § 1915(e)(2)(B), a district court shall dismiss an *in forma pauperis* action where it is satisfied that the action "(i) is frivolous or malicious; (ii) fails

to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant when he is immune from such relief." Under 28 U.S.C. § 1915A(a), a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007).

**DISCUSSION**

**I. Individual Liability**

Title VII makes it unlawful to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). "[I]ndividuals are not subject to liability under Title VII." *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000). Accordingly, Plaintiff's Title VII causes of action are dismissed *sua sponte* as to the individual Defendants for failure to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) (permitting the district to dismiss an *in forma pauperis* action where it "fails to state a claim on which relief may be granted"); *see also Saunders v. N.Y. City Dep't of Educ.*, 07–CV–2725, 2010 WL 331679 at *8 (E.D.N.Y. Jan. 19, 2010) (dismissing plaintiff's Title VII claims *sua sponte* against individual defendants because "individuals are not subject to liability under those statutes and any 'official capacity' claim would be redundant to plaintiff's claims against [the public entity]").

**II. Sufficiency of Title VII Claim**

The complaint does not list Plaintiff's employer as a defendant in the case caption. However, even if it did, the complaint does not state sufficient facts to support a Title VII claim against Plaintiff's employer. "A plaintiff asserting a Title VII discrimination claim must allege facts showing that "(1) the employer took adverse action against h[er] and (2) h[er] race, color, religion, sex or national origin was a motivating factor in the employment decision." *Vega v. Hempstead Union Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015). A plaintiff can make such a showing "by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference

of discrimination." *Id.* at 87; *see also Littlejohn v. City of N.Y.*, 795 F.3d 297, 310 (2d Cir. 2015) (explaining that an employment discrimination complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face).

In the employment discrimination complaint form, Plaintiff checked the "race" and "gender/sex" boxes, and provides that she is Hispanic and female. (Compl. at 5.) However, she did not allege any facts suggesting that her termination or retaliation was done "at least, in part, for a discriminatory reason." *Vega*, 801 F.3d at 87. Accordingly, her Title VII claim is dismissed for failure to state a claim.

**CONCLUSION**

For the foregoing reasons, Plaintiff's complaint is DISMISSED for failure to state a claim. The Court grants Plaintiff leave to file an amended complaint against her former employer, the Independent Living Association, Inc., within thirty (30) days. If Plaintiff decides to file an amended complaint, it should name the former employer as the defendant, be titled "AMENDED COMPLAINT" and bear the same docket number as this order, 1:20-CV-1675 (LDH)(LB). Any amended complaint must include facts in support of such a claim. Any amended complaint will replace the original complaint and must stand on its own without reference to the original complaint. Failure to file an amended complaint within 30 days will result in dismissal of this case.

**\*3** No summons shall be issued at this time and all further proceedings shall be stayed for 30 days or until further order of the Court. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore, *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully directed to mail a copy of this memorandum and order to the pro se litigant, and include a form complaint for employment discrimination.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3868710

**Basora-Jacobs v. Palevsky, Slip Copy (2020)**

2020 WL 3868710

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

---

2021 WL 3569807
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Olena MILITINSKA-LAKE, Plaintiff,

v.

Elatisha KIRNON, in her individual capacity
as Chief Diversity Officer for the Governor's
Office of Employee Relations (GOER),
State of New York, et al., Defendants.

1:20-CV-443 (TJM/CFH)
|
Signed 08/11/2021

**Attorneys and Law Firms**

Olena Militinska-Lake, Albany, NY, Pro Se.

Denise P. Buckley, New York State Attorney General, Albany, NY, for Defendants Elatisha Kirnon, Doris Stout, John Scherer, Christine F. Balleau, Thomas Congdon, Government of New York State, New York State Office of Comptroller: Division of Legal Services, Public Service Commission (PSC).

**DECISION & ORDER**

THOMAS J. McAVOY, Sr. United States District Judge

*1  Before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint. See dkt. # 22. The parties have briefed the issues and the Court has determined to resolve the matter without oral argument.

**I. BACKGROUND**

This *pro se* civil action arises out of Plaintiff Olena Militinska-Lake's employment as a Senior Auditor with the New York State Department of Public Service (DPS). Amended Complaint ("Amend. Cmplt."), dkt. # 7, at ¶ 12. Plaintiff is a naturalized American citizen of Ukranian origin. Id. at ¶ 10. She speaks fluent English, but her native languages are Ukranian and Russian. Id. Plaintiff has advanced degrees in accounting, taxation, and economics. Id. at ¶ 11. On November 9, 2018, a day after she received a 10-year dedicated service award at a ceremony, Defendants informed Plaintiff that she had been suspended without pay

for "acts of discriminatory conduct and the use of [a] racially discriminatory term." Id. at ¶¶ 14-15. That suspension has become a subject of this action.

Plaintiff alleges national origin discrimination over a period of years. She contends that on March 18, 2014 Jerry Shang Hongbing ("Shang"), "Plaintiff's co-worker of" a "higher Grade" who had "[s]upervisory responsibilities" and was "her prior and future" cubicle "neighbor, committed a brutal harassing attack on Plaintiff based on her national origin." Id. at ¶ 16. On that day, Plaintiff claims, Shang approached Plaintiff in a narrow corridor, blocked her exit, and starting making the signal for a time-out with his hands in front of Plaintiff's face. Id. "Time out!" he stated, "No discussion! [Y]ou are Ukranian, you must not like what Putin did in Ukraine, don't you? ... I like it, because China supports Putin!" The Russian Federation had annexed Ukranian Crimea two days earlier. Id.

Plaintiff reported this incident as well as similar jokes made by another employee to Defendant Doris Stout, Director of the DPS Office of Accounting Audits and Finance ("OAAF"). Id. at ¶ 17. Neither Stout nor Human Resources took the matter seriously, even after Shang allegedly engaged in other harassment attempts. Id. Shang's conduct "deeply insulted" Plaintiff on a personal level, and she felt "even more insulted on behalf of all Ukranians, whose wound is very deep with that annexation and the following war." Id. Plaintiff also felt "insulted as a naturalized American, whose citizenship is also subjected to the Oath to America, its interests and constitution, not to China[.]" Id. Plaintiff also had family members in Ukraine, and she worried about them; "[h]arassing attacks from Mr. Shang ... and adverse positions and actions of Management towards Plaintiff resulted in stress" that caused Plaintiff to develop a "life-threatening health condition" that appeared in June 2014 and which "was finally diagnosed 09/11/2014." Id. at ¶ 18. [1]

[1]        Plaintiff does not reveal this diagnosis.

Plaintiff contends that Defendant Stout soon "completely turned" Plaintiff's complaint against Plaintiff in a memorandum dated October 15, 2015. Id. at ¶ 19. Stout characterized Plaintiff's communication concerning Shang as a " 'particularly hateful note apparently addressed at his Chinese roots[.]' " Id. Stout contended that Plaintif f's writing could be " 'considered a form of harassment based on his ethnicity" that involved " 'prohibited behavior.' " Id. Plaintiff alleges that she had reminded Stout "about the value

of the Naturalization Oath, as prerequisite for citizenship, and" that "citizenship" was "a requirement for Government employment." Id. Rather than "properly relating" Plaintiff's "whistleblower efforts," were "legislatively protected," Stout instead "discussed her core defamatory Memo with Plaintiff at a counseling session with HR." Id. at ¶ 20. Plaintiff contends that Stout's actions represent retaliation for Plaintiff's report of harassment in violation of her Title VII, due process rights, and First Amendment rights. Id. at ¶ 21. Plaintiff contends that this October 29, 2015 memorandum led to "further discriminative developments and actions" that continue to the date she filed her Amended Complaint. Id. at ¶ 22. "[T]he deterioration of Plaintiff's career and existence in the Office began and her position on the Organizational Chart was frozen at the bottom." Id.

**\*2** In early 2015, Plaintiff "was rotated out of" a "prestigious" job in the major utility sector. Id. at ¶ 23. This change in position came after OAAF's Deputy Director, Defendant John Scherer, in late 2014 rejected Plaintiff's "selfless work and significant findings in major Utility's Sandy Storm audit." Id. at ¶ 23. Scherer's actions came "at the time when" Plaintiff "fought for her life with [a] threatening health condition, being considered disabled." Id.

Despite this disability, which lasted from the second half of 2014 until the first half of 2015, Plaintiff worked on a number of "fruitful projects." Id. at ¶ 24. At the same time, however, Plaintiff alleges that Defendants "were developing the destructive and defaming retaliating activity against Plaintiff, complicating Plaintiff's fight for life against [a] life-threatening health condition." Id. Making all inferences in Plaintiff's favor, she appears to contend that between 2015 and 2017, "multiple Memo, emails, and notes, originated, encouraged or suggested by OAAF and HR management," alleged that Plaintiff had engaged in improper behavior. Id. These documents, Plaintiff claims, contradicted themselves, and "flooded the Plaintiff's profile leading to multiple counseling of Plaintiff and two Interrogations." Id. Plaintiff alleges that the Directors of HR and OAAF, as well as the Deputy Director of OAAF, "fabricated defamatory 'evidences' and subjected Plaintiff to disgraceful psychological evaluation at Employees Heath Service (ERS) with projected unpaid 1-year Leave of absence then potential further termination." Id. These efforts did not succeed, but Plaintiff avers that such "mentally harassing activity continued until" she "proved to HR that those actions constitute ... discrimination and harassment and requested HR to open [an] investigation[.]" Id.

An investigation opened by HR in 2017 did not end in Plaintiff's favor. Id. at ¶ 25. Plaintiff claims that the investigator limited his inquiry "only to the latest 2016 promotion and was looking for harassment's signs in discrimination matters." Id. This effort, Plaintiff alleges, was "elementally doomed to failure." Id. The investigator "ignored the facts, reported by Plaintiff, of some promotions of co-workers without any superiority of education, experience, or work achievements" Id. Plaintiff alleges that promotions occurred because of friendships. Id. Shang, for instance, had "common hobbies" with the Deputy Director, Scherer. Id. The two may also be neighbors. Id. Plaintiff witnessed poor quality work from Shang, as well as hearing long conversations between Sheng and another person in a foreign language that violated workplace rules. Id. Another supervisor gave a promotion to a woman with whom she frequently had lunches. Id. This "lunch-friend" did poor-quality work and still received a promotion. Id. These promotions came even though no one in Plaintiff's unit had Plaintiff's education or skills. Id.

Beginning in late 2014 and through 2017, Plaintiff informed the management team about errors in some calculation methods and proposed an alternative method that was a "math-proven, automated, multi-year," and "visualized Model with charts" as an additional aid. Id. at ¶ 26. Defendant Scherer "unreasonably abusively rejected Plaintiff's proposal and forbade any talks about her proposed and already used Model in analogous, Earnings Compliance, calculations." Id. In late 2015, Plaintiff "was moved" from "rate cases, mainstream knowledge and promotions" to a lower priority sector. Id. Questions about Plaintiff's new area of work "never appear on promotional exams," making it harder for Plaintiff to gain a promotion. Id. "Plaintiff was rejected" for promotion in 2015, 2016, 2017, and 2018. Id.

**\*3** While management refused to adopt Plaintiff's model when she suggested it, Plaintiff alleges that Shang obtained approval to use Plaintiff's model in staff training for earnings compliance in 2017. Id. at ¶ 27. Using this system helped advance Shang's career. Id. Plaintiff used her May 15, 2018 annual assessment "to inform MT and PSC Chair about mismanagement, inappropriate promotions, discriminative misappropriation of work results, detrimental to PSC personnel[.]" Id. Plaintiff contends that her calculation model was better than the one that Shang presented. Id. Still the management team "condemned her report in her 2019

Annual Assessment in negative 'Scription', in violation of retaliation and whistle blower protection rights." Id.

Plaintiff reported a "significant flaw" in audit methodology in early 2018. Id. at ¶ 28. The prior Account Executive Auditor had used that methodology for the previous 7 years and had been "promoted successfully out of it." Id. The methodological flaw "inhibited any meaningful Audit findings." Id. The flaw appeared in a re-opened audit and drew the attention of a Special Auditor, which found a "substantial deficiency." Id. Three prior auditors had missed the deficiency. Id. Faced with this deficient audit, the OAAF Director told Plaintiff to fix the audit in two to three weeks. Id. at ¶ 29. Previous auditors had been unable to solve the problem, even though they had a great deal more time to do so. Id. Shortly before the end of the assigned period, Plaintiff informed management that she had concluded that a serious deficiency existed. Id. Three days before the audit was to be completed, "Plaintiff was suddenly suspended from work with attempted termination without any attempts from management to secure and transfer of" Plaintiff's "work to somebody else." Id. Plaintiff alleges that these facts show that the purpose of assigning her the task was not to solve the problem, but to "harass" Plaintiff with "time pressure." Id. Plaintiff alleges that such behavior amounts to discrimination and retaliation. Id.

In January 2017, Shang moved to a cubicle near Plaintiff's. Id. at ¶ 30. Shang had received more supervisory responsibilities, had begun to oversee more subject matters, and had become an "unofficial" account executive auditor for a major utility. Id. Plaintiff noticed that when Shang had phone conversations with someone from the utility he oversaw he switched to another language, "most likely [his] native language." Id. Once Shang appeared to be speaking to a particular utility executive on the phone "he became pronouncedly friendly in his language." Id. Shang used the names of people in the office, and, speaking his own language, "was laughing and giggling." Id. Shang also used "professional terminology and again his own language." Id. Conversations with utilities, Plaintiff claims, are "very restrictive," since "DPS work is confidential until it is made public." Id. at ¶ 32.

At some point, Plaintiff heard Shang tell a colleague that he would tape Plaintiff's conversations in Russian. Id. at ¶ 33. Plaintiff alleges that this statement "was discriminative and harassing[.]" Id. Plaintiff had no one with whom she could speak about business in Russian. Id. The colleague did not attempt to stop Shang from speaking in Chinese,

or warn him not to engage in such conduct. Id. Plaintiff contends that management acted in a very "permissive" way toward Shang and very "restrictive" way towards her. Id. Such different treatment, she claims, "evidences the mismanaging and discrimination" that violated her rights. Id.

Plaintiff alleges that a dispute occurred between her and managers about whether languages other than English could be spoken at the workplace. Id. at ¶ 34. When Plaintiff raised the issue to Scherer, he "responded with [a] citation: 'speak English at all times in [the] workplace may be national origin discrimination[.]' " Id. at ¶ 35. Scherer then "abruptly [and] disrespectfully ended [the] conversation with [a] request not raise this subject with him at any time again." Id. He told Plaintiff that if she "need[ed] more clarification," she should "talk to HR." Id. Plaintiff alleges that Scherer had told her in 2013 that she should not speak in a language other than English in the office, even during a private conversation during lunchtime. Id. at ¶ 36. Plaintiff appears to allege that conversations between auditors and auditees in a language other than English violates public policy and auditing standards by creating an improper relationship between those persons. Id. at ¶ 37. Such conversations, she claims, also potentially violate New York ethics law by creating a suspicion of favoritism. Id. at ¶ 38. Shang and the person from the utility he audited frequently spoke together in a friendly way in a language other than English. Id. at ¶ 39. Plaintiff claims these conversations violated laws restricting business language to English at PSC, violated confidentiality rules, and undermined public trust in the office. Id.

**\*4** Plaintiff informed the PSC Chairman, ethics officer, HR director and her supervisor about her concerns on May 21, 2018. Id. at ¶ 40. About a month later the Ethics Officer distributed a reminder about the organization's confidentiality policy and rules on communications with utilities. Id. at ¶ 41. While no other responses occurred, Plaintiff noticed that Mr. Shang's conversations stopped, and she "understood" this "as a positive reaction on the reminder." Id.

Plaintiff alleges that Shang's "active and loud friendly communication with" a person from an audited utility resumed later in September 2018. Id. at ¶ 42. On October 23, 2018 Shang engaged in a conversation that "became longer and louder." Id. Plaintiff sent a supervisor an email to remind him of the distribution from the Ethics Officer and their earlier discussion about these "secret talks." Id. Plaintiff included the OAAF director on the email. Id. This supervisor called Plaintiff to his cubicle and told her that she misunderstood the

policy. Id. at ¶ 43. The Supervisor claimed that Shang was not required to speak English. Id. He did so as a favor to Plaintiff, but was free to decline to do so. Id.

Shang returned to his cube, "apparently after talking with [the] Deputy Director[.]" Id. at ¶ 44. He called the executive from the audited company, speaking in English. Id. at ¶ 44. Shang apologized "for his English," stating "I need to speak English now, because in the neighboring cube she complained about me and will complain again and all[.]" Id. Shang then used "abusive language" before continuing his "professional conversation." Id. Plaintiff sent an immediate messages to supervisors in an effort to put a stop to an "unprofessional conversation[.]" Id. at ¶ 45. She anticipated that someone "would come over and stop Mr. Shang, but there was no reaction." Id. Instead, she heard Shang on the telephone complaining about her for about ten minutes, using vulgar language that referred to her Ukranian heritage. Id. at ¶ 46. Plaintiff felt "shock, perplexity, confusion" when she heard Shang speaking, and spoke to her supervisor about Shang's comments. Id. The supervisor told her he had heard Shang and reported the conversation to the management team. Id.

On October 25, 2018, frustrated that management had done nothing to address the "harassing phone conversation," Plaintiff reported the incident to "top management." Id. She informed HR, the Ethics Officer, the PSC Chair and Deputy Chair about what she had heard, "begging for her safety, as the rage of Mr. Shang [was] only increasing towards her since 2014." Id. at ¶ 47. She received no response. Id.

Instead, Plaintiff alleges, she received an invitation to a "counseling session" with Human Resources on October 30, 2018. Id. at ¶ 48. Despite the discrim inatory and harassing language Plaintiff had reported, she "was accused again in Mr. Shang's discrimination." Id. The OAAF Director also "unreasonably condemned her recent work." Id. Plaintiff contends that the Director had not provided her sufficient time to complete the work, and "Plaintiff was very proud of her work," which she completed quickly, even though the work was difficult. Id. Three auditors who worked at a higher grade had been unable to complete the work for the previous six years. Id. Plaintiff's supervisor had approved her work on this audit, but the Director ignored these successes and ignored Plaintiff's explanation for the length of time she had spent on the project. Id.

*5 Plaintiff alleges that the Director ignored her explanations and "kept repeating '[j]ust wrap it up!' " Id.

Eventually, "Plaintiff's nerves broke, and she summarized the discriminative and harassing attitude towards her by management and said: ' I am HE[P on plantation in this Office[.]" Id. Plaintiff contends that she intended to reference the "historical meaning of brutality of slavery of historical time, extrapolating it on herself." Id. Those in the room responded with "complete silence," and Plaintiff realized that "something might be not as expected or not correct[.]" Id. at ¶ 49. Plaintiff suspected that those in the room did not like her using the word "НЕГР," which is a Russian word that she understood to be "official and polite in her former country," but which "sounds close to" the "N-word." Id. In the alternative, Plaintiff thought, those in the room may have disliked her use of the word plantation, but she had heard that word used on national television by Omarosa, a "Trump associate," when she was escorted from the Office[.]" Id. Plaintiff thought she was using a proper "historical analogy." Id. Plaintiff explained to the other people in the office that "[t]his was the history of this country,' " meaning that she had simply offered a "historical reference, no underlying meaning." Id.

At that point, the meeting had gone a half-hour past its scheduled ending, and Defendant Christine Balleau, Director of Human Resources for DPS, stated that the meeting needed to end. Id. Balleau told Plaintiff that she would forward Plaintiff links she had requested for "Affirmative officers for [a] Discrimination complaint." Id. Balleau never sent the links, but instead prepared a suspension letter. Id.

Plaintiff was suspended on November 9, 2018. Id. at ¶ 50. She returned to work on May 20, 2019, after an arbitrator returned her to her position. Id. The arbitrator concluded that the suspension was not supported by just cause and violated the union agreement in place at Plaintiff's workplace. Id. The arbitrator did not consider Plaintiff's claims of harassment and retaliation, as such issues were outside the scope of the agreement. Id. Plaintiff received back pay for all but five days of her suspension. Id. at ¶ 51. Plaintiff contends that this suspension violated her First Amendment and due process rights. Id. She also alleges that the suspension amounted to racial and national origin discrimination. Id.

Plaintiff contends that the expression she used referred to Plaintiff herself. Id. at ¶ 52. She was "feeling deep moral pain from long-term harassment and discrimination," and "public disgrace," which "culminated in suspension." Id. She did not intend to insult anyone. Id. She used the language in a private meeting with two white women, and the language

therefore "cannot be construed as derogatory language[.]" Id. Moreover, the word "НЕГР," said in Plaintiff's native language, reflects a "national mentality, developed differently in different historic, religious, educational traditions of" Ukraine, a country that did not experience race-based slavery. Id. at ¶ 53. Indeed, she claims, Russians in the past–like Peter the Great–enjoyed a reputation for treating dark-skinned people well. Id. During the existence of the Soviet Union, Plaintiff claims, that nation attracted African American immigrants, who were a source of pride in the USSR "and core propaganda against America with its racial intolerance." Id. Given this cultural and historical background, Plaintiff claims, her use of the term "НЕГР plantation" was not intended as discriminatory. Id. at ¶¶ 54-55. Plaintiff used the term "as a reproof for bad treatment of Plaintiff now as it was then at historical times. It was a bad treatment, not a bad person meaning." Id. at 55. Defendant Kirnon, Plaintiff alleges, supported her suspension because of Plaintiff's race, which is different than Kirnon's. Id. at ¶ 57. Plaintiff also insists that she did not engage in any discriminatory conduct, and that any allegations that she did so amount to defamation. Id. at ¶ 59.

Plaintiff's Amended Complaint raises four causes of action. Count One raises claims against Defendants Doris Stout and John Scherer pursuant to 42 U.S.C. § 1983, Title VII of the Civil Rights Act of 1964, New York Executive Law § 296, New York civil Service Law § 75-b, and a common–law defamation claim. Plaintiff's Section 1983 claim alleges that Defendants violated her First Amendment rights. She further alleges that Defendants discriminated against her on the basis of her race and national origin. Count Two, raised against Defendants Doris Stout, John Scherer, Christine F. Balleau, Roger Halbfinger, Thomas Congdon, and Elatisha Kirnon, raises due process claims pursuant to 42 U.S.C. § 1983, Title VII claims, and claims for defamation. Count Three alleges that Defendants PSC and DPS violated Plaintiff's due process rights and rights pursuant to Title VII. Count Four raises the same claims against the State of New York.

*6  Defendants have filed a motion to dismiss, and the parties have briefed the issues. The matter is ripe for disposition.

## II. LEGAL STANDARD

Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(5) for failure of service and Rule 12(b)(6) for failure to state a claim upon which relief could be granted.

### A. Lack of Service

Federal Rule of Civil Procedure 12(b)(5) permits a defendant to move to dismiss a complaint for "insufficient service of process." Fed. R. Civ. P. 12(b)(5). " 'Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint.' " Koulkina v. City of New York, 559 F.Supp. 2d 300, 310 (S.D.N.Y. 2006) (quoting Sunrise Indus. Joint Venture v. Ditric Optics, Inc., 873 F.Supp. 765, 769 (E.D.N.Y. 1995)). When a court considers whether a complaint has been served as required by the federal rules, the court " 'must look to matters outside the complaint to determine whether it has jurisdiction.' " Id. at 311 (quoting Darden v. DaimlerChrysler N. Am. Holding Corp., 191 F.Supp.2d 382, 387 (S.D.N.Y. 2002)). " 'Conclusory statements that a defendant was properly served are insufficient to overcome a defendant's sworn affidavit that he was never served with process.' " Mende v. Milestone Tech., Inc., 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003) (quoting Howard v. Klynveld Peat Marwick Goerdeler, 977 F.Supp. 654, 658 (S.D.N.Y. 1997)). The plaintiff has the burden to prove adequate service when challenged. Id. (citing Preston v. New York, 223 F.Supp.2d 452, 466 (S.D.N.Y. 2002); see also, Burda Media, Inc. v. Viertel, 417 F.3d 292, 298 (2d Cir. 2005)).

### B. Failure to State a Claim

Defendants have filed a motion to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Defendants argue that Plaintiff has not stated a claim upon which relief could be granted, even if all factual allegations in the complaint were proved true. In addressing such motions, the Court must accept "all factual allegations in the complaint as true, and draw[ ] all reasonable inferences in the plaintiff's favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678, 129 S.Ct. 1937. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When, as here, the Plaintiff proceeds pro se, the Court must " 'construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " Weixel v. Bd. of Educ. of N.Y.,

287 F.3d 138, 146 (2d Cir. 2002) (quoting Cruz v. Gomez, 202 F.3d 593, 597 (2d Cir. 2000)).

## III. ANALYSIS

Defendants raise a number of grounds in their motion, which the Court will address in turn, as appropriate.

### A. Service

Defendants first contend that Plaintiff has not served Defendants Stout, Scherer, Congdon, and Balleau as required by Federal Rules of Civil Procedure 4(c). Because of this lack of service, Defendants claim, the Court has not acquired personal jurisdiction over those Defendants, and must dismiss the Amended Complaint as to them. Plaintiff disputes that she has failed to serve the Defendants.

*7 Defendants Stout, Scherer, Congdon, and Balleau provide affidavits regarding service. Defendant Stout avers that she has a place of business at Empire State Plaza in Albany, New York. See Affidavit of Doris Stout, dkt. # 22-3, at ¶ 4. Stout further relates that "on or about June 24, 2020, the Summons and Amended Complaint in this action were delivered to the home address of John Graham, an employee of DPS," who resides in Brunswick, New York. Id. at ¶ 5. Stout states that she was never personally served with the summons and Amended Complaint, and she never received those documents in the mail at her residence. Id. at ¶ 6-7. She also never received those documents by mail at her workplace. Id. at ¶ 8. Defendants John Scherer, Thomas Congdon, and Christine Balleau provided nearly identical affidavits. See dkt. #s 22-4, 22-5, 22-6.

Plaintiff responds that she hired a service company, which served Stout, Scherer, Balleau, and Congdon on June 25, 2020. See Plaintiff's Brief in Opposition, dkt. # 29, at ¶ 36. Plaintiff claims that John Graham was authorized to accept service on behalf of PSC and DPS and its employees at his home address. Id. at ¶¶ 37, 40-31. During that time, Plaintiff claims, the pandemic had closed PSC and DPS to the public and employees. Id. Plaintiff promises to provide an "explanation" from the company hired to serve Defendants. Id.

Plaintiff filed affidavits of service of the summons and Amended Complaint on each of the moving Defendants. Those affidavits indicated that the process server delivered the summons and Amended Complaint to 8 Golden Eagle Ct., Brunswick, NY, leaving them with John Graham, an assistant

attorney, "a person of suitable age and discretion who agreed to accept on behalf of the party." See dkt. #s 14-4 (Christine F. Balleau); 14-5 (John Scherer); dkt. # 14-6 (Doris Stout); 14-7 (Thomas Congdon). Plaintiff also provided affidavits of service by mail. These documents indicated that Plaintiff served the moving defendants "by depositing a copy of the aforementioned documents in a postpaid, properly addressed envelope, the address for the recipient being: 8 Golden Eagle Ct., Brunswick, NY." See dkt. #s 15-3 (Thoms Congdon); dkt. # 15-4 (Christine F. Balleau); dkt. # 15-5 (John Scherer); dkt. # 15-6 (Doris D. Stout). Those affidavits indicated that mailings were directed "C/O Asst. Counsel John Graham." Id.

"[Federal] Rule [of Civil Procedure] 4(e) generally provides that individuals may be served by either (1) following the relevant state law procedures for service of the State where the district court is located or where service is made, or (2) personal delivery, leaving a copy at the individual's dwelling or usual abode with a person who resides there, or delivering a copy to an agent authorized to receive process." Vidurek v. Koskinen, 789 Fed. Appx. 889, 893 (2d Cir. 2019) (citing FED. R. CIV. P. 4(e)). New York law provides several ways by which an individual can be served. New York permits service "by delivering the summons within the state to the person to be served." NY CPLR § 308(1). A person may also be served "by delivering the summons within the state to a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served and by either mailing the summons to the person to be served at his or her last known residence or by mailing the summons by first class mail to the person to be served at his or her actual place of business[.]" NY CPLR § 308(2). New York also allows service "by delivering the summons within the state to the agent for service of the person to be served as designated under rule 318[.]" NY CPLR § 308(3). Section 318 provides that "[a] person may be designated by a natural person, corporation or partnership as an agent for service in a writing, executed and acknowledged in the same manner as a deed, with the consent of the agent endorsed thereon." NY CPLR § 318.

*8 The Court finds that Plaintiff has not met her burden to show that service was adequate for these Defendants in their individual capacities. There is no dispute that they were not personally served. While an agent did deliver the documents to an address and leave them with a person, that address was not the home of any of the Defendants. Plaintiff has provided no evidence that John Graham was the agent for service of any of the Defendants. Plaintiff thus has failed to meet her

burden with respect to Federal Rule of Civil Procedure 4(e)(2). [2] Plaintiff could also serve her Amended Complaint by following New York law. See Fed. R. Civ. P. 4(e)(1). She has not met her burden in this respect. She did not deliver the summons and complaint to Defendants' places of business, nor did she mail those documents to Defendants' last known residences. She likewise has not shown that Graham was the agent for service of any of these individuals.

[2]   A person may be served in any judicial district in the United States by:
(2) doing any of the following:
     (A) delivering a copy of the summons and of the complaint to the individual personally;
     (B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or
     (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.
     Fed. R. Civ. P. 4(e)(2).

The Court will therefore grant the motion to dismiss of Defendants Balleau, Congdon, Scherer, and Stout in their individual capacities. As a result, only Defendant Kirhon remains as an individual defendant in this matter.

### B. Section 1983 Claims Against OSC and PSC

Defendants next argue that Plaintiff's Section 1983 claims against OSC and PSC should be dismissed because those organizations are state entities entitled to sovereign immunity.

"The Eleventh Amendment provides that 'the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against the United States by Citizens of another Sate, or by Citizens or Subjects of any Foreign State.' " Dube v. State University of New York, 900 F.2d 587, (2d Cir. 1990) (quoting U.S. Const. amend. XI). Federal courts also lack jurisdiction to hear suits brought by citizens against their own states. Id. (citing Dwyer v. Regan, 777 F.2d 825, 835 (2d Cir. 1986)). While Congress has the power to "override Eleventh Amendment immunity" under some circumstances, "it is well settled that 42 U.S.C. § 1983 does not constitute an exercise of that authority." Id. (quoting Fitzpatrick v. Blitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976)). Thus, " 'in the absence of consent[, any claims against] the State or one of its agencies or departments ... [are] proscribed by the

Eleventh Amendment.' " Id. (quoting Pennhurst State School and Hosp. v. Halderman, 465 U.s. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). A Plaintiff cannot sue a state agency for damages pursuant to 42 U.S.C. § 1983.

Since OSC and PSC are state agencies, Plaintiff seeks damages from them, and the State has not waived immunity, they are entitled to sovereign immunity for any claims brought pursuant them to Section 1983. The Court will grant the Defendants' motion in this respect as well.

### C. Title VII Claims Against Individual Defendants

Defendants next seek dismissal of any claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), against the individual Defendants. They argue that such claims are unavailable as a matter of law. Plaintiff responds that the law is not clear about individual liability under Title VII.

Plaintiff is mistaken. The Second Circuit Court of Appeals is clear that "an individual defendant cannot be held liable under Title VII." Schiano v. Quality Payroll Sys., 445 F.3d 597, 608 n.8 (2d Cir. 2006) (citing Tomka v. Seiler Corp., 66 F.3d 1295, 1313-14 (2d Cir. 1995)). As such, the Court will grant the motion with respect to any claims under Title VII against the individual Defendants.

### D. Title VII Claims Against the Organizational Defendants

**\*9**  Defendants next argue that Plaintiff has failed to state any Title VII claims against the organizational Defendants, OSC and PSC. Defendants first argue that Plaintiff cannot bring a Title VII claim against either Defendant, as they were not her employer. Even if Plaintiff could bring such a claim against Defendants, they contend that Plaintiff did not file a timely discrimination charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the discrimination she faced, and therefore cannot maintain a claim. Even if Plaintiff had met the 300-day time limit, Defendants insist that she has failed to alleged facts sufficient to meet her pleading burden. Plaintiff responds that she recognizes that she has no claims against OSC and drops all claims that organization. As to the time-bar for her claim against PSC, Plaintiff notes that EEOC accepted her filing and contends that the continuing violation doctrine makes her filing timely.

Defendants argue in part that Plaintiff cannot raise a Title VII claim against either OSC or PSC because neither organization employed her. Plaintiff agrees that she cannot bring claims against OSC and states that she 'wants to drop all the issues related to OSC." The Court will therefore grant the motion with respect to OSC and dismiss that Defendant from the case. Plaintiff does not address whether she was a PSC employee at the time in question. Her Amended Complaint alleges that she "was appointed to a position of Senior Auditor, salary Grade 18, at D[epartment of]P[ublic]S[ervice], Defendant, on April 23, 2009. Amend. Complt. at ¶ 12. Plaintiff also attaches the arbitrator's decision to her Amended Complaint. That opinion states that "Olena Lake ... is employed as a Senior Auditor in the accounting, audit and finance unit within the New York State Department of Public Service. [Plaintiff] audits public utilities doing business in the State of New York. The Grievant has been employed in the Department since 2009 and has received no prior discipline." See dkt. # 7-1, at 2.

As a general rule, the proper defendant in a Title VII case against a State entity is the actual department or agency that employs the Plaintiff. See, e.g., Trostle v. New York, No. 1:13cv709, 2016 WL 1175215 at *——, 2016 U.S. Dist. LEXIS 38170 at *20=21 (N.D.N.Y. Mar. 24, 2016). The parties appear to agree that, at this time, Department of Public Service, Plaintiff's employer, is not a Defendant in this matter. Since Title VII claims are to be raised against a plaintiff's employer, there is no proper Title VII Defendant in this case. Any opinion that the Court would issue on the Title VII clams would be an advisory one. The Court will therefore grant the motion to dismiss is this respect. The motion will be granted without prejudice to Plaintiff filing an Amended Complaint that names her employer, DPS, as a Defendant.

### E. First Amendment

Defendants next seek dismissal of any claims Plaintiff brings pursuant to the First Amendment. They argue that Plaintiff has failed to allege that she spoke as a citizen on a matter of public concern, and therefore cannot make out a claim.

The Court will not render any opinion on the motion in this respect. The Court has dismissed the case against the only Defendants named on this count, Doris Stout and John Scherer. The Court does not have jurisdiction to hear the claim. The Court does not render advisory opinions and will offer no view on whether Plaintiff has here stated a claim.

### F. Fifth and Fourteenth Amendments

Defendants next contend that the Court should dismiss any due process claims Plaintiff brings pursuant to the Fifth and Fourteenth Amendment. Defendants insist that Plaintiff has not alleged that she possessed a protected property interest of which she was deprived. They also contend that Plaintiff has not alleged that any individual Defendants had personal involvement in depriving her of these rights. Plaintiff responds by explaining that she was qualified for the positions for which she sought promotion, and that others who were less qualified received promotion. She does not address the legal standards for these claims.

*10 The parties here appear to agree that Plaintiff attempts to raise a procedural due process claim. Such a claim requires a showing that Plaintiff " 'possessed a protected liberty or property interest, and that [she] was deprived of that interest without due process.' " McMenemy v. City of Rochester, 241 F.3d 279, 286 (2d Cir. 2001) (quoting Hynes v. Squillace, 143 F.3d 653, 658 (2d Cir. 1998)). The due process clause does not itself create property interests: " '[s]uch property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " Id. (Luck v. Mazzone, 52 F.3d 475, 477 (2d Cir. 1995)). Such interests are not just hopes or " 'desires' " for the property. Id. (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). A plaintiff must " 'have a legitimate claim or entitlement to it.' " Id. (quoting Roth, 408 U.S. at 577, 92 S.Ct. 2701).

Plaintiff fails the first part of this test and cannot maintain her claim. Courts are clear that "[i]n general, the nature and contours of a specific property interest are defined by some source independent of the Constitution–most often state law." Ezekwo v New York City Health & Hosp. Corp., 940 F.2d 775, 782 (2d Cir. 1991). In New York, "a civil servant seeking a promotion 'does not possess any mandated right to appointment or other legally protectible interest.' " McMenemy, 241 F.3d at 286 (quoting Cassidy v. Mun. Civ. Serv. Comm'n, 37 N.Y.2d 526, 529, 375 N.Y.S.2d 300, 337 N.E.2d 752 (N.Y. 1975)). Since the deprivation Plaintiff complains about is the State's failure to promote her, she has not alleged deprivation of a protected property interest. She cannot maintain a due process claim, and the Court will grant the motion to dismiss in this respect as well.

These claims are dismissed with prejudice as well, as Plaintiff could not plausibly allege facts which would allow her to prevail.

### G. Executive Law § 296

Defendants next argue that Plaintiff cannot maintain a claim pursuant to New York Executive Law § 296 for discrimination on the basis of her national origin. Such claims, Defendants claim, apply the same standard as claims under Title VII. Since she failed to state a Title VII claim, she must also therefore have failed to state a claim under New York law.

The Court of Appeals has "repeatedly noted that claims brought under New York State's Human Rights Law [Executive Law § 296] are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d. Cir. 1997) (citing Van Zandt v. KLM Royal Dutch Airlines, 80 F.3d 708, 714-715 & n.6 (2d Cir. 1996)).

The motion is granted without prejudice with respect to these claims for the reasons stated above in reference ot the Title VII claims.

### H. Other State Law Claims

Finally, Defendants argue that the Court should dismiss Plaintiff's claim under Civil Service Law § 75-b and her defamation claim. They first argue that the Court, having dismissed Plaintiff's federal claims, should decline to exercise supplemental jurisdiction over these state-law claims. In the alternative, they argue that Plaintiff has failed to state a claim under the Civil Service law and that the statute of limitations has run on her defamation claim. Plaintiff disputes Defendants' argument with respect to the Civil Service Law, but does not address Defendants' argument regarding the statute of limitations on her defamation claim.

The Court will exercise supplemental jurisdiction and address this issue in the interest of judicial efficiency.

As to Plaintiff's claim pursuant to New York Civil Service Law § 75-b, the Court finds that Plaintiff's claim should be dismissed with prejudice. That law "provides ... that a public employee cannot be subject to adverse action for having disclosed to a 'governmental body' information which either concerns a violation of a regulation that presents a substantial and specific danger to public health, or which he or she 'reasonably believes constitutes an improper governmental action.' " Yan Ping Xu v. New York City Dept. of Health, 77 A.D.3d 40, 46, 906 N.Y.S.2d 222 (1st Dept. 2010) (quoting NY Civil Service Law § 75-b[2](a)). To state a claim under this statute, a plaintiff must allege: "(1) an adverse personnel action; (2) disclosure of information to a

governmental body (a) regarding a violation of a law, rule, or regulation that endangers public health or safety, or (b) which she reasonably believes to be true and which she reasonably believes constitutes an improper governmental action; and (3) a causal connection between the disclosure and the adverse personnel action." Burns v. Cook, 458 F.Supp.2d 29, 44 (N.D.N.Y 2006). The statute provides that employees subject to binding arbitration or collectively bargained agreements can use their protected whistleblower conduct as a defense in a disciplinary proceeding before arbitrators. N.Y. Civ. S. L § 75-b(3)(a)-(b). An employee not covered by such agreements "may commence an action in a court of competent jurisdiction[.]" N.Y. Civ. S. L. § 75-b(3)(c). "A claim brought under Civil Service Law § 75-b must be brought within one year after it accrues." Donas v. City of New York, 62 A.D.3d 504, 504, 878 N.Y.S.2d 360 (1st Dept. 2009).

**\*11** Assuming that Plaintiff could even bring a claim under Section 70-b(3)(c), that claim would be time-barred. Plaintiff filed her initial Complaint on April 16, 2020. See dkt. # 1. She has complained of an adverse employment action that occurred in November 2018. She brought her action more than a year after that date. Even if the Court were to accept Plaintiff's argument that the adverse action in question did not accrue until after the arbitrator made her decision, Plaintiff admits that the decision came in March, 2019, more than a year before she filed her initial Complaint. Plaintiff could not prevail on this claim, and the Court will grant the motion with prejudice in this respect.

Any defamation claims Plaintiff raises are likewise time-barred. New York law provides that "an action to recover damages for ... libel [or] slander ... must be brought within one year." N.Y. CPLR § 215(3). New York law provides that a "cause of action for defamation accrues on the date the offending material is first published." Nussenzweig v. diCorcia, 9 N.Y. 3d 184, 188, 848 N.Y.S.2d 7, 878 N.E.2d 589 (N.Y. 2007). As laid out above, even assuming that Plaintiff has alleged any defamatory conduct, such defamation occurred more than a year before she filed her Complaint. The Court will grant the motion with prejudice in this respect.

### I. Sealing of Documents

Defendants also request that the Court lift the seal on documents the Plaintiff has filed in this case. Plaintiff moved on April 16, 2020, for an order to file the case under seal, arguing that a public filing of the case would "[pose] a risk to her employment, as the Defendants are current Employers and

can act adversely ... [a]s soon as Defendants will decide to let it go public or redacted, Plaintiff would be very much willing to let it be." Dkt. # 2. Magistrate Judge Christian F. Hummel granted this motion by text order on May 5, 2020. See dkt. # 6. Judge Hummel granted the motion "temporarily ... pending appearances by defendants and an opportunity for defendants to respond." Id. Defendants have now responded, and opposed restricting access to the case. Plaintiff has not responded to this portion of the motion.

"The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." United States v. Erie County, 763 F.3d 235, 238-239 (2d Cir. 2014). Our system of government, founded on the rights and input of the people, requires "that the people themselves have the ability to learn of, monitor, and respond to the actions of their representatives and their representative institutions." Id. at 239. The idea is an old one, "[i]ndeed, the common law right of public access to judicial documents is said to predate even the Constitution itself." Id.

There is a common-law right to access court information, but there is also a constitutional one. "[O]ur Constitution, and specifically the First Amendment to the Constitution, also protects the public's right to have access to judicial documents." Id. at 239. That right is "stronger than its common law ancestor and counterpart." Id. Two tests exist to determine whether the First Amendment right to access applies. Under the first approach, the First Amendment right attaches when " 'experience and logic' support making the document available to the public." Id. (quoting Logusch v. Pyramid Co., 435 F.3d 110, 120 (2d Cir. 2006)). The court is to "consider (a) whether the documents 'have historically been open to the press and general public' (experience) and (b) whether 'public access plays a significant positive role in the functioning of the particular process in question.' (logic)." Id. (quoting Logusch, 435 F.3d at 120). If the First Amendment applies, "documents 'may be sealed [only] if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.' " Id. The court's findings cannot be " 'broad and general.' " Id.

*12 Courts have been clear that "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history." Logusch v. Pyramid Co., 435 F.3d 110, 119 (2d Cir. 2006). This right exists because:

The presumption of access is based on the need for federal courts, although independent–indeed, particularly because they are independent–to have a measure of accountability and for the public to have confidence in the administration of justice. Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached through a process that is politically and practically inconvenient to invoke. Although courts have a number of internal checks, such an appellate review by multi-judge tribunals, professional and public monitoring is an essential feature of democratic control. Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior. Without monitoring, moreover, the public would have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

Id. (quoting United States v. Amodeo, 71 F.3d 1044, 1048 (2d Cir. 1995)).

The common-law right attaches when a court finds "that the documents at issue are indeed 'judicial documents.' " Id. Not all papers filed with the court qualify; "[i]n order to be designated a judicial document, 'the item filed must be relevant to the performance of the judicial function and useful in the judicial process.' " If such documents are judicial documents, "a common law presumption of access attaches[.]" Id. The court still must, however, "determine the weight of the presumption." In doing so, a court is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts. Generally,

the information will fall somewhere on the continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance.' " Id. (quoting Amodeo, 71 F.3d at 1049). The final step for the court is to " 'balance competing considerations' " against access. Id. (quoting Amodeo, 71 F.3d at 1050). "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy interests of those resisting disclosure.' " Id. (quoting Amodeo, 71 F.3d at 1050).

Weighing these considerations, the Court concludes that restrictions on access to the documents filed with the Court should be lifted. The Plaintiff's stated reason for seeking restrictions, that her employer could act against her if aware of her suit, is not a compelling reason to restrict public access. The public will not make a decision as to whether to hire or fire Plaintiff, and her employer must necessarily know of the lawsuit. The public's right to know of the lawsuit and the basis for the Court's decisions certainly outweighs the Plaintiff's stated reasons for restricting access to the documents. Judge Hummel's order will be vacated. The Clerk of Court will be directed to remove the restrictions on documents filed with the Court, except for documents for which the Local Rules of Court require restrictions.

## IV. CONCLUSION

 **\*13** For the reasons stated above, the Defendant's motion to dismiss, dkt. # 22, is hereby GRANTED. The motion is granted without prejudice to Plaintiff filing Title VII claims against her actual employer and to any First Amendment claims raised with respect to Defendants Stout and Scherer, who were not served. The motion is granted with prejudice with respect to Plaintiff's other claims. The motion is granted as to Defendants Stout, Scherer, Congdon, and Balleau for failure to serve. Plaintiff shall file a Second Amended Complaint restricted to any Title VII claims she may have against the Department of Public Service and any First Amendment claims she may have against Stout and Scherer within thirty (30) days of the date of the order. Failure to file a Second Amended Complaint by that date will cause the Court to dismiss the case with prejudice. Judge Hummel's text order, dkt. # 6, temporarily granting Plaintiff's motion to restrict case documents, dkt. # 6, is hereby VACATED. The Clerk of Court is hereby directed to lift the seal on docket entries in this case, excepted where required by the Rules of Court.

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2021 WL 3569807

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 3990770
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Charlotte MYERS, Plaintiff,
v.
State of NEW YORK–DEPARTMENT
OF MOTOR VEHICLES; Barry Wulkan;
Kathleen Sullivan; Does 1–10, Defendants.

No. 06–cv–4583 (NG)(VMS).
|
Aug. 5, 2013.

**Attorneys and Law Firms**

Nkereuwem Umoh, The Law Office of Uwem Umoh,
Brooklyn, NY, for Plaintiff.

Elizabeth Prickett–Morgan, New York State Office of the
Attorney General, New York, NY, for Defendants.

*OPINION & ORDER*

NINA GERSHON, District Judge.

 **\*1**  Defendants the New York State Department of Motor
Vehicles ("DMV"), Barry Wulkan, and Kathleen Sullivan
move under Rule 56 of the Federal Rules of Civil Procedure
for summary judgment dismissing plaintiff Charlotte Myers's
claims under Title VII, 42 U.S.C. §§ 1981 and 1983, the
Americans with Disabilities Act ("ADA"), the Family and
Medical Leave Act ("FMLA"), and New York State and New
York City antidiscrimination laws. For the reasons explained
below, defendants' motion for summary judgment is granted.

### I. BACKGROUND
Unless otherwise noted, the following facts are not in dispute.

Plaintiff Charlotte Myers began working at the DMV as a
telephone operator in 1987, and, in 1990, was promoted to
Motor Vehicle Representative ("MVR") in one of the DMV's
Traffic Violations Bureaus ("TVB"). As an MVR, she had
three primary duties related to certain kinds of non-criminal
moving violations: working as an information counter clerk,
hearing room clerk, or after-hearing cashier. In general,

MVRs rotate between these duties in response to the daily
needs of the office, and, as their job description states, they
have "substantial contact with members of the public seeking
services or information."

On December 19, 2000, plaintiff filed a charge of
discrimination based on disability and religion with the
New York State Division of Human Rights ("NYSDHR").
On March 27, 2001, plaintiff filed another charge with
the NYSDHR, this time alleging retaliation following her
December 19 charge. Both charges were dismissed.

In September 2001, plaintiff was working in the Manhattan
South TVB on a part-time schedule of 20 hours per week.
Plaintiff was absent on medical leave from September 5,
2001 until October 8, 2001. During her absence, the World
Trade Center was attacked, and plaintiff was transferred to the
Brooklyn North TVB, an assignment that became permanent
in March 2002. During the time she was at Brooklyn North
TVB, plaintiff was supervised by Barry Wulkan, who, in
turn, reported to Administrative Law Judge ("ALJ") Alan
Gelbstein, among others.

After transferring to Brooklyn, plaintiff continued on a part-
time schedule, with duties limited to working as an after-
hearing cashier and in the hearing rooms. Plaintiff claims
that her part-time, limited duty schedule was necessitated
by the stress she experienced if she had to interact with
the public and work full-time. Shortly after she began at Brooklyn
North TVB, ALJ Gelbstein told Mr. Wulkan that, in light of
plaintiff's part-time schedule, the needs of the office would
best be served if she was assigned to work only in the hearing
room. [1]

[1]     The parties dispute whether this schedule
        was available to plaintiff as a reasonable
        accommodation of a claimed disability or
        otherwise, but this dispute is not material to the
        resolution of this motion.

Plaintiff submitted no medical documentation to support a
part-time schedule between October 2001 and March 2003,
when she submitted a doctor's note that supported a three-
month long reduction in her workload.

Plaintiff received initial notice that her schedule and duties
would change in August 2004, when Mr. Wulkan told her
that she might be required to resume working on occasion as
an after-hearing cashier unless she provided the DMV with

documentation of a continuing medical need for restricted work duties. Despite several reminders, plaintiff failed to submit any such medical documentation.

 *2  On September 1, 2004, plaintiff and Mr. Wulkan had a verbal altercation involving a postage machine. According to plaintiff, Mr. Wulkan accused her of leaving the machine on and singled her out for reprimand because of her race. Defendants, relying on Mr. Wulkan's declaration, assert that Mr. Wulkan

> made a general statement to the staff who were present asking who had used the meter last. There was no response, therefore, not knowing whether I had been heard or the staff were simply avoiding answering the question, I decided to ask each person present individually. Plaintiff was sitting at the desk closest to me, so I started with her. I asked if she was the last one to use the meter. If she had said no, I would have simply moved on to the next person. If she had said yes, I would have reiterated the office policy about setting the meter back to zero. However, plaintiff began shouting at me. I told plaintiff she had to leave the office since she has already finished her daily shift.

Wulkan Decl. ¶ 19.

Plaintiff asserts that, prior to the September 1, 2004 altercation, Mr. Wulkan made racist and sexist jokes almost every day. Susan Taubman, who also worked as one of plaintiff's supervisors, stated in a declaration that she heard Mr. Wulkan make numerous sexist and racist jokes as well as plaintiff's objections to him regarding the jokes on more than one occasion. However, other than plaintiff's statement that the jokes made her feel uncomfortable, the record does not reflect the substance of the jokes themselves or any other details related to the jokes, such as whether they were directed at plaintiff. Plaintiff acknowledged that the jokes stopped after Mr. France became aware of the postage machine incident in October 2004.

Plaintiff was reprimanded on other occasions as well, although the parties dispute the reason for the reprimands. Plaintiff asserts that she was singled out because of her race and scrutinized more closely, which she characterized as a "nuisance," while defendants assert that the reprimands resulted from tardiness or absences from her work station and unauthorized use of office resources.

On September 15, 2004, Kristal Jones, plaintiff's direct supervisor,[2] notified plaintiff that she would "be put in rotation" on September 21, 2004, if no further medical documentation were received. Plaintiff submitted medical notes in support of her request for a modified work schedule on September 17, and 24, 2004, which were the first such notes submitted since March 2003. Plaintiff never resumed a full-time, full-duty schedule during the rest of her time with the DMV.

[2]     Ms. Jones reported to Mr. Wulkan.

On October 8, 2004, plaintiff submitted a grievance related to the September 1, 2004, postage machine incident. The grievance noted that it was regarding Barry Wulkan, and stated: "Verbal abuse which has resulted in harassment and retaliation. A formal (verbally) complaint which went unresolved with management at Bklyn N. Retaliation which he clearly stated would take place."[3] She also filed, on the same day, a reasonable accommodation request with the DMV's Division of Labor Relations seeking permission to work only in the hearing rooms and back office in order to reduce stress.

[3]     The parties disagree about whether this grievance was properly submitted in accordance with DMV policies. This dispute is not material to the resolution of the motion, and this opinion assumes for present purposes that the grievance was sufficient to put defendants on notice that plaintiff was complaining about race-based discrimination.

 *3  On October 19, 2004, ALJ Sullivan succeeded ALJ Gelbstein, becoming Mr. Wulkan's supervisor. On October 21, plaintiff came to ALJ Sullivan's office to introduce herself. Plaintiff told her that she had a very ill mother, she herself had fibroids and that, because of this, her work hours and duties were limited. Plaintiff also reported that she was having problems with Mr. Wulkan and told ALJ Sullivan about the incident involving the postage machine. Plaintiff avers that she told ALJ Sullivan that Mr. Wulkan's behavior was

racially motivated, but ALJ Sullivan stated in her deposition that "[a]t no time did plaintiff claim that Mr. Wulkan had discriminated against her on the basis of race or disability." ALJ Sullivan reported her conversation with plaintiff to Steve France, Director of Labor Relations, [4] and she also spoke to Mr. Wulkan about plaintiff's concerns.

> [4]    From 2002 to 2005, Mr. France was the Assistant Director of Labor Relations.

Plaintiff contends that, after complaining to ALJ Sullivan, "Wulkan approached me and stated that he would show me that he can do worse to me than I can do to him, and that he would retaliate for me reporting him." Pl.Ex. 1 ¶ 13. In her view, "[f]rom that moment on things changed drastically at work." *Id.* ¶ 14. Specifically, she states that she was no longer allowed to work solely in the hearing room, but was put into "full rotation and made to work in the information counter, thus interacting with the public and worsening [her] disability." *Id.* ¶ 15. In addition, "Ms. Sullivan and Steve France joined Wulkan and engaged in a series of acts to inject hostility into the workplace for me, at one point taking away my reasonable accommodation and instructing me to work at 100% fulltime." *Id.* ¶ 16.

On March 7, 2005, Mr. France denied plaintiff's October 8, 2004, request for a reasonable accommodation. Prior to issuing the denial, Mr. France sought to have plaintiff evaluated by the Employee Health Services ("EHS") of the Department of Civil Service to determine if "there is a medical basis" to accommodate her request for a reduced "work-related stressful environment." Plaintiff had been examined on January 13, 2005, and the DMV's examining physician determined that she needed to undergo a psychological evaluation "to determine if the cumulative stresses [which] she is presently reporting should be a reason to modify her current work situation." Plaintiff did not appear for either of the two scheduled psychological examinations. In denying the reasonable accommodation request, Mr. France stated that, because she failed to appear for the exams, his office was not able to determine the appropriateness of her reasonable accommodation request.

Plaintiff submitted three additional reasonable accommodation requests in July and August 2005, all of which were denied. In a letter dated September 2, 2005, Mr. France stated that plaintiff was expected to resume an unrestricted, full-time work schedule effective Thursday, September 8, 2005. Beginning on September 8, 2005, plaintiff

took an extended leave of absence and ultimately remained out of the office for over a year.

**\*4**  Plaintiff filed a charge of discrimination and retaliation with the NYSDHR on September 12, 2005, which was later dismissed on April 24, 2006.

On September 14, 2005, plaintiff submitted another reasonable accommodation request, which indicated that she would be temporarily disabled between September 14 and September 30, 2005. By letter dated September 21, 2005, Mr. France denied the request on the ground that plaintiff would be on approved medical leave during that time as a result of medical documentation contained in her August 2, 2005 reasonable accommodation request.

On November 3, 2005, [5] plaintiff submitted another request seeking a reasonable accommodation to her schedule to allow her to work a part-time schedule, but did not request a limited-duty schedule. On June 5, 2006, following another EHS examination, Mr. France offered plaintiff her choice of several part-time schedules, but noted that she would be expected to perform all of her job duties. Although Mr. France's proposal mirrored plaintiff's request in terms of a part-time schedule with no limitation on duties, Plaintiff did not accept the proposed accommodation.

> [5]    Although the parties treat this request as made on November 30, 2005, the date indicated on plaintiff's request is November 3, 2005.

On August 24, 2006, plaintiff filed this lawsuit. She was terminated effective December 29, 2006, on the ground that she had been continuously absent from the office for over one year due to a non-occupational disability. ALJ Sullivan and Mr. Wulkan both retired from the DMV, in March 2007 and August 2010, respectively.

## II. DISCUSSION

Plaintiff currently pursues claims against New York State under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and claims against the individual defendants, in their official and individual capacities, under 42 U.S.C. § 1981, the FMLA, 29 U.S.C § 2601 *et seq.,* the ADA, 42 U.S.C. § 12111 *et seq.,* and the New York State and New York City Human Rights Laws.

In a letter dated September 20, 2010, plaintiff represented that the following claims were abandoned: (1) claims against

the individual defendants under Title VII; (2) claims against the State of New York under 42 U.S.C. § 1981, the FMLA, the ADA, and New York State and New York City Human Rights Laws; and (3) all claims for tortious interference with contractual relations. Those claims are therefore dismissed. Finally, plaintiff does not oppose the summary judgment motion with respect to defendants Does 1–10. Therefore, the claims against these defendants are also dismissed.

#### a. Summary Judgment Standard

Summary judgment is appropriate where the "movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe the facts in the light most favorable to the non-moving party, and all reasonable inferences and ambiguities must be resolved against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), but "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587 (internal quotations and emphasis removed).

#### b. Title VII: Disparate Treatment

**\*5** Title VII makes it an unlawful employment practice for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

"A plaintiff may establish a claim of disparate treatment under Title VII either (1) by showing that he has suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or (2) by demonstrating that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir.2004).

#### i. Adverse Job Action

On a summary judgment motion, a plaintiff's claim that she suffered an adverse job action because of discrimination based on race brought under Title VII is analyzed under the three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, the plaintiff has the burden of proving a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances giving rise to an inference of discrimination. *Id.* Plaintiff's burden of proof at this threshold step is minimal. *Howley v. Town of Stratford,* 217 F.3d 141, 150 (2d Cir.2000). Second, if the plaintiff successfully proves a *prima facie* case, a presumption of unlawful discrimination arises and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Third, if the defendant carries this burden, the plaintiff must then demonstrate that the proffered reason is in fact a pretext for intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At all times, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff. *Burdine,* 450 U.S. at 253.

In New York, discrimination claims under Title VII must be filed with the Equal Employment Opportunity Commission ("EEOC") or the relevant state or local administrative agency within 300 days of the alleged unlawful act. 42 U.S.C. § 2000e–5(e)(1). "A claim is time barred if it is not filed within these time limits." *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

**\*6** Claims based on termination, failure to promote, denial of transfer, or refusal to hire must be filed within the 300–day period, even if other acts of discrimination occurred within the statutory time period. *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010). For example, in the context of discriminatory termination, the 300–day limit begins from the date upon which the employee receives a "definite notice of the termination, not upon his discharge." *Miller v. Jnt'l Telephone & Telegraph Corp.,* 755 F.2d 20, 23 (2d Cir.1985). Thus, the "proper focus" for the court is "the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981) (emphasis in original). Where the discriminatory decision has been made and communicated to the employee, the "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). In "[determining the timeliness" of a plaintiff's EEOC filing, the court must "identify precisely the unlawful employment practice of which [the plaintiff] complains." *Id.* (internal quotation marks omitted).

Applying these principles here, plaintiff filed her complaint with NYSDHR on September 12, 2005, which makes Title VII claims time-barred with respect to discriminatory acts done prior to November 16, 2004. At oral argument, plaintiff acknowledged that the modification of her schedule constituted the initial adverse job action. She received definite notice of this change on September 15, 2004, when she learned that she would begin a full-time, full-duty schedule on September 21, 2004, unless she submitted a doctor's note to support a reasonable accommodation.[6] Because notice of the modification to plaintiff's schedule occurred before November 16, 2004, this claim is time-barred.

[6]    That she submitted a medical note on September 17, 2004, does nothing to undermine the definiteness of the September 15 notice. If anything, the September 17 medical note highlights her belief that the September 15 notice set a firm deadline, since the September 17 medical note was the first such note submitted since March 2003.

Likewise, she apparently never resumed a full-time, full-duty schedule, but that does not alter the conclusion that she received definite notice of the imminent change on September 15.

Plaintiff's argument that the limitation period should be tolled because of defendants' failure to provide notice of her rights under federal or state discrimination laws is rejected. Assuming for the sake of argument that plaintiff's claims may be equitably tolled on this basis, *see Wei Hong Zheng v. Wong,* 2009 WL 2601313, *2 (E.D.N.Y.2009); but cf. AMS Group LLC v. J.P. Morgan Chase Bank,* 371 F. App'x. 149, 150 (2d Cir.2010) (recognizing that equitable estoppel may prevent defendant from asserting limitations defense where defendant impeded timely filing), because plaintiff filed two prior discrimination complaints with the NYSDHR in 2000 and 2001, no reasonable jury would find that she did not have actual knowledge of her rights. *See, e.g., Mercado v. Ritz–Carlton San Juan Hotel, Spa & Casino,* 410 F.3d 41, 48 (1st Cir.2005) (showing required that plaintiff had no actual knowledge of rights). Furthermore, plaintiff's reliance on the continuing violations doctrine is misplaced, as that doctrine does not apply to claims in which a plaintiff must demonstrate that she suffered a discrete adverse job action. *Morgan,* 536 U.S. at 114.

**\*7** Turning to the merits regarding the two other adverse job actions plaintiff identifies-the March 7, 2005 reasonable accommodation denial and the December 26, 2006 termination-those claims cannot withstand the summary judgment motion. There is insufficient evidence that either of these decisions were based on race or otherwise infected by Mr. Wulkan's alleged racial animus. Plaintiff does not contend that Mr. Wulkan made the decision to deny the reasonable accommodation request or terminate plaintiff's employment. Notably, plaintiff conceded at oral argument that the record contained no evidence that either ALJ Sullivan or Mr. France, who was responsible for the March 7, 2005 denial, harbored any racial animus toward plaintiff, with the exception of a single sentence in an email written by Mr. France on September 9, 2005. The email described the current status of plaintiff's August 2005 grievance, provided instructions on how to deal with her contemporaneous absences, and offered advice on counseling her on her attendance when she returned to work. At the conclusion, Mr. France stated, "Keep smiling .... if it was easy it wouldn't be any fun," which, plaintiff asserts, establishes Mr. France's racial animus because it demonstrates "how [Mr. France] enjoy[ed] ... putting the plaintiff through this," Hrg. Tr. 9 (July 24, 2013). This solitary statement, however, is devoid of any racial content and thus provides no evidentiary support for the claim that plaintiff's reasonable accommodation denial or termination was tainted by intentional race discrimination. Defendant has presented

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

unchallenged evidence that plaintiff's termination was the result of standard operating procedures following her year-long absence from the office. While plaintiff contends this is mere pretext, she is unable to point to any specific actions by either Mr. Wulkan or Ms. Sullivan that unlawfully influenced the decision to deny the reasonable accommodation request or terminate plaintiff's employment. No reasonable jury would find that the reasonable accommodation denial or termination was the result of intentional discrimination.

### ii. Hostile Work Environment

To make out a *prima facie* case of hostile work environment, a plaintiff must show: (1) that the harassment was sufficiently severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment and (2) that there is a specific basis for imputing the conduct creating the hostile work environment to the employer. *See Duch v. Jakubek,* 588 F.3d 757, 762 (2d Cir.2009) (internal quotation marks omitted). Isolated incidents usually will not suffice to establish a hostile work environment, although a single episode of harassment might establish a hostile work environment if the incident is sufficiently "severe." *Redd v. New York Div. of Parole,* 678 F.3d 166, 175–76 (2d Cir.2012).

At oral argument, plaintiff's counsel stated that Mr. Wulkan ceased making allegedly racist jokes around October 2004. Therefore, this claim is time-barred in accordance with the discussion above. Moreover, plaintiff's hostile work environment claim fails on the merits. The record contains no evidence regarding the substance of Mr. Wulkan's jokes, or whether they were directed at plaintiff personally. There is also no evidence that racial animus drove Mr. Wulkan's close supervision of plaintiff, which plaintiff herself characterized as a "nuisance," or the September 1, 2004, postage machine incident. Even considering all the evidence together, there is insufficient evidence for a reasonable jury to conclude that plaintiff's workplace was permeated with abusive, race-based hostilities. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) ("For racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." (internal quotation and editing marks and citations omitted).

**\*8** For these reasons, plaintiff's Title VII disparate treatment claims are dismissed. [7]

[7]    Because defendants' motion is granted on the grounds discussed above, it is unnecessary to address their argument that plaintiff's adverse job action and hostile work environment claims were not properly exhausted.

Finally, plaintiff suggests in a footnote that defendants have not moved for summary judgment regarding plaintiffs claims national origin discrimination. This is incorrect; defendants' Notice of Motion requests "summary judgment in defendants' favor dismissing the Amended Complaint." Plaintiff's declaration states that she is "of African descent," but does not identify her national origin. Other than this footnote, plaintiff makes no argument as to why national origin and race should be treated differently for the purposes of this motion, and she has pointed to no factual basis for treating the claims as distinct here. Therefore, plaintiff's national origin discrimination claims are dismissed for the same reasons.

### c. Title VII: Retaliation

Title VII prohibits an employer from retaliating against an employee for, among other things, complaining of employment discrimination prohibited by Title VII:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a).

Retaliation claims under Title VII are governed by the same burden-shifting framework laid out in *McDonnell Douglas. Summa v. Hofstra University,* 708 F.3d 115, 125 (2d Cir.2013). To establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity; (2) the employer was aware of that activity; (3) the employer took a materially adverse action; and (4) a

causal connection exists between the adverse action and the protected activity. *See Kelly v. Howard I. Shapiro & Assoc. Consulting Engs.,* P.C., 716 F.3d 10, 14 (2d Cir.2013). Under a recent decision of the Supreme Court, in making out the causal connection, a plaintiff must show that the desire to retaliate was not just a motivating factor, but was the "but-for" cause of the challenged employment action. *University of Texas Southwestern Medical v. Nassar,* —— U.S. ——, ——, 133 S.Ct. 2517, 2528, ——L.Ed.2d ——, —— (2013).

Even assuming for the purposes of this motion that a jury could find plaintiff engaged in protected activity, that is, that the October 8, 2004 complaint encompassed an allegation that plaintiff's treatment was based on her race, no reasonable jury would find that defendants retaliated against plaintiff.[8] The materially adverse action that she complains of-the notice that a modification to her schedule was imminent-occurred on September 15, 2004, the month *before* she engaged in protected activity. No reasonable jury would find the two events causally connected.

[8]   Plaintiff's assertion that her earlier objections to Mr. Wulkan about the racial content of his jokes constituted protected activity is not supported by evidence in the record, such as the timing or content of these objections.

Nor would a reasonable jury find that the March 7, 2005, reasonable accommodation denial was causally connected to the October 8, 2004 complaint solely by reason of the passage of time of nearly five months. *See, e.g., Perry v. NYSARC, Inc.,* 424 F. App'x 23, 26 (2d Cir.2011) (four-month interval insufficient in itself to establish the causal connection necessary to support a retaliation claim). And plaintiff offers nothing else to connect the two events; her argument that Mr. France's requests for additional medical information to evaluate her reasonable accommodation request constitutes additional, continuous activity of discrimination is rejected. No reasonable jury would infer from these requests the but-for causal connection between the October 8, 2004 grievance and the March 7, 2005 reasonable accommodation denial that plaintiff must establish. *Nasser,* 133 S.Ct. at 2528. Plaintiff's claim linking her December 2006 termination to the October 2004 complaint is doomed by the same infirmities.

### d. ADA: Hostile Work Environment, Failure to Provide Reasonable Accommodation, and Retaliation

**\*9** Plaintiff alleges that the individual defendants subjected her to a "discriminatory hostile work environment on

account of her disability" and retaliated against her, including terminating her, because she complained of discriminatory treatment and the lack of reasonable accommodation.

Title I of the ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to ... discharge of employees ... and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Finally, Title V provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter...." 42 U.S.C. § 12203(a).

The Second Circuit has held that the retaliation provision of the ADA does not provide for individual liability. *Spiegel v. Schulmann,* 604 F.3d 72, 79 (2d Cir.2010). Although *Spiegel* did not address individuals sued in their official capacities, numerous district courts in this circuit have persuasively held that there is no individual liability under Title I or Title II of the ADA, regardless of whether the claim is brought in an individual or official capacity. *See, e.g., Fox v. State Univ. of New York,* 497 F.Supp.2d 446, 451 (E.D.N.Y.2007); *Sutherland v. New York State Dep't. of Law,* 1999 WL 314186, *7 (S.D.N.Y.1999). Plaintiff has offered no persuasive reason to conclude otherwise with respect to Title V of the ADA. Because the plaintiff's only remaining ADA claims are brought against the individual defendants, and no such liability is available under the statute, these claims must be dismissed.

In any event, and even assuming injunctive relief could be had against the individual defendants, plaintiff was not terminated by either Mr. Wulkan or ALJ Sullivan, and the record does not establish that their respective positions at DMV were endowed with the authority to grant plaintiff the injunctive relief she seeks. For these reasons, plaintiff's claims under the ADA are dismissed.

### e. 42 U.S.C. §§ 1981 and 1983: Retaliation and Hostile Work Environment

In these claims, plaintiff alleges the individual defendants retaliated against her after she complained about racially discriminatory treatment and that they subjected her to a

discriminatory hostile work environment because of her race, in violation of § 1981.

Defendants' argument that plaintiff's § 1981 claims should be dismissed because the complaint does not include reference to 42 U.S.C. § 1983 is unpersuasive. To be sure, § 1983 creates "the express cause of action for damages" that "constitutes the exclusive federal remedy for the violation of rights guaranteed in § 1981 by state governmental units." *Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 733, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also Westbrook v. City of New York,* 591 F.Supp.2d 207, 223 (E.D.N.Y.2008) (applying holding in *Jett* to individuals sued in their individual or official capacities). At oral argument, however, defendants were unable to articulate any prejudice that would result from reading a § 1983 claim into plaintiff's complaint or allowing her to amend to add it. It would be unduly harsh to dismiss plaintiff's claim on this ground when defendants made no prior motion to dismiss, the flaw could easily be overcome by a straightforward amendment to the complaint, and treating the claim as arising under § 1983 does not modify the substance of her claim. Therefore, the court will treat plaintiff's claims as § 1981 claims arising under § 1983.

 **\*10** Turning to the merits of her § 1981 claims, the same factual allegations that form the bases of plaintiff's hostile work environment and retaliation claims under Title VII also form the bases of her claims under § 1981.[9] While plaintiff asserted Title VII claims against the DMV, the claims under § 1981 are asserted only against the individual defendants.[10] Because the Title VII and § 1981 allegations are factually and analytically the same for the purposes of this motion, plaintiff's hostile work environment and retaliation claims under § 1981 fail for the reasons stated above. *See Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004). Therefore, the plaintiff's § 1981 claims are dismissed.

[9] Neither plaintiff's complaint nor her opposition brief make mention of a claim for an adverse job action under § 1981.

[10] To the extent that plaintiff asserts her § 1981 damages claims against the individual defendants in their official capacities, such claims are barred by the Eleventh Amendment because § 1983 did not abrogate the states' sovereign immunity. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 70–71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). And any claim for injunctive relief is not supported by the record. *See infra,* p. 17.

### f. FMLA
At oral argument, plaintiff conceded that she was no longer pursuing her claims under the FMLA. 29 U.S.C. § 2601 *et seq.* Therefore, these claims are dismissed.

### g. New York State Human Rights Law and New York City Human Rights Law
As discussed above, the claims over which this court has original jurisdiction have been dismissed. Therefore, I decline to exercise supplemental jurisdiction over plaintiff's remaining state and local law claims. 28 U.S.C. § 1367(c)(3).

### III. CONCLUSION
For the reasons discussed above, defendants' motion for summary judgment is granted. The Clerk of Court is directed to enter judgment accordingly.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 3990770

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

2017 WL 7542494
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Grace Ann NETTI, Plaintiff,

v.

Christopher AYERS, et al., Defendants.

5:17-CV-976 (GTS/ATB)
|
Signed 10/05/2017

**Attorneys and Law Firms**

Grace Ann Netti, Skaneateles, NY, pro se.

## ORDER and REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent to the court for review a civil rights complaint, together with an application to proceed in forma pauperis ("IFP"). (Dkt. Nos. 1, 2). The complaint purports to be brought under 42 U.S.C. § 1983 "AND/OR ADDITIONAL LAW(S)." (Complaint ("Compl.") at 1) (Dkt. No. 1). Plaintiff also mentions violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. (*Id.*) When plaintiff filed this action, she also filed a letter requesting that the case be filed under seal. (Dkt. No. 5). Plaintiff has also moved for appointment of counsel. (Dkt. No. 3).

### I. IFP Application

A review of plaintiff's IFP application shows that plaintiff declares she is unable to pay the filing fee. (Dkt. No. 2). Although this court has some questions regarding plaintiff's stated income, for purposes of this order and report-recommendation, the court finds that plaintiff is financially eligible to proceed IFP.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

In addition, Fed. R. Civ. P. 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Although Rule 8 does not require "detailed factual allegations," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Houston v. Collerman*, No. 9:16-CV-1009, 2016 WL 6267968, at *2 (N.D.N.Y. Oct. 26, 2016) (citing *Ashcroft*, 556 U.S. at 678). A pleading that contains allegations that are " 'so vague as to fail to give the defendants adequate notice of the claims against them' is subject to dismissal." *Id.* (citing *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009)). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

### II. Facts

**\*2** Plaintiff's complaint is lengthy and difficult to understand. The court will attempt to summarize the facts as concisely and as clearly as possible. [1] Plaintiff begins by stating that she "expects all mechanics and/or inspectors to

comply [with] the standard of practice in [the] automobile
industry [to] adequately repair and/or complete[ ] safety
inspections." (Compl.¶ 1). Plaintiff's problems in this regard
started on December 3, 2015, when she went to defendant
Harry's Tire to have some mechanical work done on her
Honda Accord and to have the car inspected. [2] (Compl. ¶ 2).
Plaintiff states that she wrote the "work order," requesting
that the rear rotors and pads be replaced, that the power
steering hose be checked, and that the car receive its "NYS
Inspection." (*Id.*) She handed the paper to "John Doe, Service
Writer." [3] Plaintiff states that "another John Doe," who
plaintiff did not know, "adversely interfered" with her during
her "business relationship" because he noted that her rear
right caliper also needed to be replaced and apparently made
handwritten notes, [4] which "another John Doe" "aggressively
demanded" that plaintiff sign, while defendant Augustine
"stood by at the counter." (Compl. Facts ¶ 3 at 7). Plaintiff
states that she did not know what "his" [5] intention was at the
time. (*Id.*)

[1]  Pro se pleadings should be interpreted liberally to
     raise the strongest arguments that they suggest.
     *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

[2]  Earlier in the day, plaintiff "declined Fox Honda's
     service," and was referred to Harry's Tire by United
     Auto Supplies. (Compl. ¶ 2).

[3]  Part of the confusion in the complaint is that
     plaintiff refers to some defendants alternately as
     "Doe" defendants and then states "assume to
     be" a specifically named defendant. For example,
     although plaintiff first states that the "Service
     Writer" is a "John Doe," she lists "Mike Augustin"
     as a defendant and refers to him as the "Service
     Writer." (Compl. Parties ¶ 5(o)). In the body of
     the complaint, plaintiff spells this defendant's name
     "Augustine." (Compl. ¶ 3).

[4]  Plaintiff claims that there was "other information"
     on these handwritten notes, but does not indicate
     what this information was. (Compl. ¶ 3).

[5]  The aggressive John Doe may be defendant
     Christopher Riester, the owner of Harry's Tire.
     (Compare Compl. ¶ 3 with ¶ 6).

It is unclear what happened after this incident because the
next paragraph states that plaintiff had "[s]everal car incidents
with 18 hours." (Compl. Facts ¶ 4 at 7). Plaintiff relates

three "incidents" that allegedly occurred on December 4,
2015, which made her decide to return to Harry's Tire for a
"diagnosis." [6] (Compl. ¶ 5). Plaintiff states that "John Doe,
assume to be Mike Augustine," diagnosed a loose clamp, but
plaintiff objected "based on varied abnormal sensations." (*Id.*)

[6]  The incidents included something "abnormal[ ]"
     in the operation of the steering wheel during a
     left turn; something "banging" in the car while
     plaintiff was in a Post Office parking lot; and "a
     mechanical item in the frontal area of the driver
     side was abnormally moved," which caused a
     "highly abnormal sensation that scared [plaintiff]"
     also while she was in the Post Office parking lot.
     (Compl. ¶ 4).

Plaintiff then jumps to the "middle of December," when
defendant Christopher Riester, the owner of Harry's Tire, told
plaintiff that he remembered her from "years ago" [7] when
she filed a complaint with the New York State Department of
Motor Vehicles ("DMV"). (Compl. ¶ 6). Plaintiff states that
she "[t]hus," learned of his "intention." (*Id.*)

[7]  Plaintiff also mentions the year 2005 in the same
     paragraph. (Compl. ¶ 6).

Plaintiff claims that on December 18, 2015, she reported
the "3 car incidents" from December 4, 2015 to the DMV
by "video relay service." [8] (Compl. ¶ 7). An unidentified
DMV employee told plaintiff to complete the "Safety
Violation Complaint Form" [9] and told plaintiff not to move
her car for anyone else to inspect it until the DMV
Investigator had the opportunity to look at the car first.
(*Id.*) The unidentified DMV employee also told plaintiff
to contact her insurance company—defendant State Farm
Mutual Automobile Insurance Company ("State Farm"). (*Id.*)

[8]  A video relay service is a form of
     "Telecommunications Relay Service that enables
     persons with hearing disabilities who use American
     Sign Language to communicate with voice
     telephone users through video equipment, rather
     than through typed text." https://www.fcc.gov/
     consumers/guides/video-relay-services.

[9]  Plaintiff may be referring to a "Vehicle
     Safety Complaint Report" which is used to
     place a complaint against a DMV-regulated
     automotive business. https://dmv.ny.gov/contact-

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

us/reportproblem-dmv-regulated-automotive-business. The DMV website indicates that prior to filing a complaint against the business, the prospective complainant "must first make an attempt to resolve the complaint with the facility management." The website also states that DMV cannot take action against a facility "unless [DMV] can find adequate evidence to substantiate the claim." (Id. n.2).

**\*3** Plaintiff state that she contacted State Farm on December 18, 2015 to report the "incidents." (Compl. ¶ 8). "After" December 23, 2015, plaintiff received a "defense letter" from defendant Roger Bell, but she states that she "did not understand his advanced English writing," so she "rightfully" asked for a "basic English letter," but defendant Bell refused to provide a "written translation." (Id.)

In January of 2016, plaintiff states that she called another unidentified employee of the DMV to "seek his permission to contact local law enforcement agency [sic] investigating my car sooner than waiting for NYS DMV," but that defendant Doe said "No." (Compl. ¶ 9). Although it is a little unclear, this court has interpreted plaintiff's sentence to allege that plaintiff asked defendant Doe at the DMV if plaintiff could contact law enforcement officials to perform an investigation before DMV did its investigation, and defendant Doe told plaintiff that she could not do that.

Plaintiff claims that in January of 2016, she called defendant Tom Ferlenda, an insurance agent at State Farm in Auburn. [10] (Compl. ¶ 10). Plaintiff claims that defendant Ferlenda immediately stated that plaintiff was "suspended," without giving her a valid reason, and then told her that it was "not [his] job." [11] Plaintiff claims that defendant Ferlenda's statements caused her such emotional distress that she had to contact her medical care provider, and plaintiff was referred to "aquatic therapy under the supervision of a physical therapist for 2x weeks." (Id.)

[10]    Plaintiff states that she used the Video Relay Service to make this call. (Compl. ¶ 10).

[11]    It is completely unclear what plaintiff claims that defendant Ferlenda meant by this statement. Perhaps plaintiff meant that Mr. Ferlenda told plaintiff that it was not his job to give her a reason for her suspension.

Plaintiff then states that she repeatedly instructed State Farm employees not to harass her or interfere with her car until after the DMV inspector had a chance to respond to her safety complaint against defendant Harry's Tire. (Compl. ¶ 11). Plaintiff states that she notified defendants Ferlenda and Roger Bell, "Team Member" at State Farm before the March 11, 2016 "car investigation." Plaintiff claims that State Farm denied her claim against Harry's Tire in February 2016, before any car inspection was conducted. (Compl. ¶ 12).

Plaintiff states that, on an unknown date, [12] defendant John Iacona, "Auto Facilities Inspector," [13] asked if plaintiff had a family member who could interpret for her. (Compl. ¶ 13). Plaintiff told defendant Iacona that a "qualified sign language interpreter was required in compliance with federal law." (Id.) Then plaintiff states that she contacted the Victim Witness Coordinator for the Cayuga County District Attorney's Office, but that plaintiff never received a response from an unknown employee, who is apparently not a defendant in this case. (Compl. ¶ 14). Plaintiff claims that "an investigator" told her to speak with "the law enforcements [sic]." [14] (Id.) Plaintiff told this unidentified individual that "they" were required by federal law to provide a sign language interpreter for face-to-face communication. [15] Plaintiff states that on March 10, 2016, she called the New York State Police in Auburn, New York, and a Sergeant told plaintiff to follow the DMV's instructions. (Id.) Plaintiff also "reported" that her car door lock "pin" was damaged, and that the damage had occurred in December 2015. (Id.)

[12]    From further factual development later in the complaint, it appears that plaintiff is referring to defendant Iacona's inspection of the plaintiff's car on behalf of the DMV, pursuant to her complaint against Harry's Tire. (Compl. ¶ 47). The inspection took place March 11, 2016.

[13]    The DMV website states that once a complaint is filed, a "Consumer Services Representative ("CSR") is assigned to handle the complaint. https://dmv.ny.gov/contact-us/report-problem-dmvregulated-automotive-business.
However, if the CSR is unable to resolve the complaint, the case will be sent to an "Automotive Facilities Inspector" for a formal investigation and possibly a hearing. Id. Mr. Iacona may be the Automotive Facilities Inspector, although plaintiff never discusses being assigned a CSR or that

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

a CSR was unable to resolve the complaint. The duties of an Automotive Facilities Inspector include investigating and seeking resolution to consumer complaints involving automotive service and periodically inspecting service providers for licensing compliance; obtaining information about the consumer's complaint by reviewing the file, interviewing the complainant, and soliciting third-party information "as required," obtaining the respondent's version of the events under dispute; examining the vehicle and components to determine the nature, extent, and necessity of the work performed; examining invoices, bills of sale, purchase orders and related documents to determine whether the quality and type of repair or maintenance work conform with written estimates; acting as mediator between consumers and automotive facilities in cases where no illegality is discovered; gathering, labeling, and preparing evidence; testifying at administrative hearings; and making recommendations to the hearing officer concerning appropriate restitution. *Id.* This individual may also serve as an expert witness at court proceedings and conduct original inspection and perform periodic program audits of regulated facilities. (*Id.*)

14    It is unclear to what investigator plaintiff is referring, so the court has no idea who told plaintiff to contact "law enforcement."

15    It is also unclear to whom plaintiff was referring when she says that "they" were supposed to provide a sign language interpreter. (Compl. ¶ 14). The court assumes that plaintiff was complaining to law enforcement officials that the DMV was required to provide a sign language interpreter at defendant Iacona's inspection/examination of her car on March 11, 2016.

**\*4** Plaintiff states that early in the morning on March 11, 2016, her car was towed to Fox Honda in Auburn, New York, where plaintiff met defendant Iacona. (Compl. ¶ 15). Defendant Iacona told plaintiff to stay in the hallway while he went into the garage to examine the car. (*Id.* at 10). Plaintiff states that she observed defendant Iacona and John Doe in her car. (Compl. ¶ 16). Plaintiff states that John Doe "invaded" her car without her consent, and that this John Doe never met with plaintiff before, during, or after defendant Iacona's investigation. (*Id.*)

Plaintiff alleges that, immediately after his inspection, defendant Iacona stated that " 'Harry's Tire already fixed it and it's okay." (Compl. ¶ 17). Plaintiff refers to this as an "Inaccurate Determination," and states that her car was still on the lift even after defendant Iacona left Fox Honda on March 11, 2016. (*Id.*) Plaintiff claims that, after defendant Iacona's investigation, defendant Bell sent plaintiff another letter, denying her insurance claim. (Compl. ¶ 18).

Plaintiff claims that "in the middle of March 2016," she followed up with defendant Iacona via the video relay service. (Compl. ¶ 19). Plaintiff states that defendant Iacona told plaintiff that her "complain[t] is all made up and anyone can write it on [the] fly." (*Id.*) Plaintiff states that, despite this statement, plaintiff "attempted to further communicate" with defendant Iacona, but he refused to answer any of plaintiff's questions and hung up. (*Id.*)

Plaintiff states that in March of 2016, she "learned" from two mechanics that "three auto parts within the steering system" needed to be replaced, but that no "complete estimate" had been made. (Compl. ¶ 20). Plaintiff alleges that the "involved employees" at Harry's Tire performed defective repair, conducted a false safety inspection, concealed the defective repair, "granted a false instrument," and caused damage to the car. (Compl. ¶ 21). Plaintiff claims that the "involved mechanic and/or inspector "recklessly failed in his duty of care" and "consciously disregard[ed] [plaintiff's] public safety risk." (*Id.*)

Plaintiff states that in March 2016, she reported defendant Iacona's "inaccurate" finding to defendant Tim Furlong, the DMV Regional Manager, via email and via video relay service. (Compl. ¶ 22). Plaintiff states that defendant Furlong "suspended" defendant Iacona's report. (*Id.*) Plaintiff then states that in April of 2016, defendant Christina Longo, ADA "Designee" for the DMV, told plaintiff that "Mr. Iacona's report is valid." (Compl. ¶ 23). Plaintiff claims that defendant Longo "unreasonably" forced plaintiff to include her and defendant Iacona in a meeting that plaintiff was going to have with a "qualified investigator" with the "provision of a highly qualified interpreter." (*Id.*) Plaintiff objected to this, and alleges that this conduct was "Interferences." (*Id.*)

Defendant Longo asked plaintiff where she wanted to meet, and plaintiff suggested Cayuga Community College ("CCC") in Auburn. (Compl. ¶ 24). However, defendant Longo then demanded that the meeting be relocated to the DMV Regional

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Office on Taft Road in North Syracuse, N.Y. (*Id.*) Plaintiff objected to moving the meeting, but defendant Longo told plaintiff that, if she did not attend, the meeting would be cancelled. (*Id.*) Plaintiff states that defendant Longo "oppressed" plaintiff's "rights." [16] (*Id.*)

16     This paragraph of the complaint is entitled: "Coercion and Interferences." (Compl. ¶ 24 at 11).

Plaintiff states that she attended the meeting at the DMV Regional Office on May 20, 2016. (Compl. ¶ 25). Plaintiff claims that a "Jane Doe" "angrily" accused plaintiff of cancelling the interpreter, and left the room without explaining anything to the plaintiff. When Jane Doe returned to the room, "she simply sat and interrupted [plaintiff] by arm movement," and "apparently recorded [plaintiff] without her consent." (*Id.*)

**\*5** Plaintiff states that on May 20, 2016, [17] defendant Christopher Ayers, who plaintiff identifies as the Director of Vehicle Safety Field and Consumer Services in Albany "had a dramatic body language with very negative facial expression." ( Compl. ¶ 26). In the paragraph entitled "Failure to Act Neutral[ly]," plaintiff states that defendant Ayers "provoked denying all documents, even though he knew of plaintiff's intention to sue Harry's Tire. (*Id.*) Defendant Iacona was "evasive," and when plaintiff showed him her typed questions, he "declined to answer," and instead, "gestured" toward defendant Ayers. (Compl. ¶ 27).

17     The court can only assume that defendant Ayers attended the May 20, 2016 meeting, although plaintiff does not specifically state that he was present. She only discusses his behavior on the same date at the DMV Regional Office. (Compl. ¶ 26).

However, when plaintiff showed the typed questions to defendant Ayers, he "aggressively wrote notes using pencil" and acted "negatively" toward plaintiff. (Compl. ¶ 28). Defendant Ayers occasionally said something to defendant Iacona, but plaintiff states that she could not hear or understand his words. (*Id.*) Defendant Ayers selected "a quite [sic] few questions to allow Mr. Iacona to respond." [18] (*Id.*) Plaintiff claims that defendant Ayers said something to defendant Iacona that plaintiff did not understand, and defendant Iacona went to get "a bulk of pencils" from another room. (Compl. ¶ 29). Plaintiff states that this conduct made plaintiff "concerned" about the defendants' "intentions." (*Id.*)

Plaintiff claims that defendant Ayers "mocked" that his hand was "hurting" so much. Plaintiff claims that this "violates [her] equal benefits of participations [sic]." (*Id.*)

18     Once again, the court assumes that defendant Ayers was selecting some of the plaintiff's typed questions for defendant Iacona to answer. In addition, based upon facts stated later in the complaint, it appears that plaintiff is complaining that defendant Ayers only asked defendant Iacona a few of the questions that plaintiff proposed.

Plaintiff stated that she became frustrated and tired because of the defendants' intimidation. (Compl. ¶ 30). Defendant Ayers was aware that plaintiff was frustrated and asked her about the "physical evidence." (*Id.*) Plaintiff stated that she "complied" with his "inspection request," and instructed the defendants to stay in the room, while she drove her car to the side door of the building. (*Id.*) Plaintiff claims that defendant Ayers stood still in the area of her car trunk, obstructing her from reaching her sealed evidence box. (Compl. ¶ 30). Plaintiff alleges that the "Physical Evidence" was "altered" when defendant Ayers took the power steering hose out of "the bag" to inspect it. He moved "dramatically," pulling pieces of the hose apart. He then said something to defendant Iacona that plaintiff did not understand and then went back into the building. (Compl. ¶ 31).

Plaintiff alleges when defendants Ayers and Iacona went back into the meeting, they "repositioned their seats," and that defendant Longo, who plaintiff also refers to as Jane Doe, was moving to stand at the "other end of the table." (Compl. ¶ 32). Plaintiff alleges that, in an attempt to get defendant Ayers to pay attention to her, she "had to apply [her] pressurized speech and mime," when she described an incident at Harry's Tire, during which defendant Riester "aggressively" demanded that plaintiff sign his paper during a business transaction. [19] (Compl. ¶ 33). Plaintiff states that this "intense effort" at communication with defendant Ayers was "oppressive" because she did not have access to a sign language interpreter. Plaintiff states that sign language is her right, and an "essential part" of her identity. Thus, plaintiff's freedom of speech was violated for three hours at the May 20 [th] meeting. (*Id.*)

19     It is unclear whether plaintiff is referring to the December 3, 2015 incident, during which plaintiff stated that "John Doe aggressively demanded" that plaintiff sign his handwritten notes, or whether the incident that she was describing to defendant

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 79 of 151

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Ayers on May 20, 2016 was a different incident. (*Compare* Compl. ¶ 3 *with* Compl. ¶ 33).

**\*6** Plaintiff claims that defendant Ayers ignored her by walking around the table to stand with "Jane Doe"/defendant Longo. Defendant Ayers's back was turned to plaintiff, blocking plaintiff's view of what he and Jane Doe were doing. (Compl. ¶ 34). Plaintiff alleges that this constituted "Obstruction of Justice," and it prevented her "Equal Benefits to Participate." [20] This conduct allowed defendant Iacona to speak, while plaintiff was not given a fair opportunity to do so. Plaintiff claims that this improper conduct insulted her as a person, and that this "pattern of ... intimidation[ ]" caused plaintiff to be fatigued. (*Id.*)

[20]    Plaintiff may also be attempting to assert an "Equal Protection" claim.

Plaintiff then states that she was "wake" by defendant Ayers turning to face her quickly while she was "sitting and tired." [21] (Compl. ¶ 35 at 14). Defendant Ayers smiled at plaintiff, [22] "mouthed 'my department' and gestured 'me.'" (*Id.*) Plaintiff states that defendants Iacona and Jane Doe/Longo quickly invaded plaintiff's personal space when defendant Longo "closely" came to stand at plaintiff's left side. (*Id.*) Plaintiff states that she became concerned for her personal safety, and that this "pattern of intimidations" "oppress[ed] [plaintiff's] rights." (*Id.*)

[21]    Plaintiff actually states that she was "wake by Mr. Ayer's [sic] frontal body swiftly turned toward facing me as I was sitting and tired." (Compl. ¶ 35). Because plaintiff just stated that Mr. Ayers back was to her, the court assumes that perhaps plaintiff dozed off and was awakened when Mr. Ayers turned to face her.

[22]    Plaintiff refers to this as Mr. Ayers having a "smile face." (Compl. ¶ 35).

Plaintiff must have received an unfavorable decision from this meeting because her next paragraph is entitled "Grievances and Appeal." (Compl. ¶ 36). Plaintiff states that in response to defendant Iacona's determination, she filed a "complaint" in late June 2016." (*Id.*) There is no indiction where she filed her complaint, but she states that some of the issues included "public accommodation and determination appeal [sic]." (*Id.*) Plaintiff states that in July of 2016, she learned for "the first time of a single violation that Harry's Tire had 'willfully improperly repaired,' " but that DMV had only given the

company a "warning letter." [23] (*Id.*) Plaintiff then stated that she then realized that the "personal property" [24] which she brought to the meeting was "missing," and that due to the state defendants "deceptive[ ] behavior[ ]," she became ill and was confined to bed through July of 2016. (*Id.*) Plaintiff states that she has been experiencing emotional distress which has lasted longer than she anticipated. (*Id.*)

[23]    This court can only assume that this finding was made in her case.

[24]    Plaintiff never states what this "personal property" was or whether it was the "evidence" that she brought to the meeting to sustain her claim. However, the court assumes that plaintiff is referring to the car parts that she was hoping to use as evidence against Harry's Tire in "court."

Plaintiff alleges that in August of 2016, she told defendant Ayers that her "personal property" was missing, but that she never received a reply. (Compl. ¶ 37). Plaintiff also emailed defendant Furlong to inform him of the missing property, but never received a reply. (Compl. ¶ 37). Plaintiff notified defendant Furlong that she no longer recognized the "ADA Designee," and asked Mr. Furlong why the meeting was recorded. (*Id.*) Plaintiff states that she never received a reply to this inquiry. (*Id.*)

Finally, plaintiff claims that she has had increased concerns for her personal safety because her iPhone has been "frozen" several times through 2016, and she was not able to enter activities into her calendar. (Compl. ¶ 38). Plaintiff claims that her iPhone photo application did not function properly when she attempted to take pictures of defendant Ayers holding her physical evidence on May 20, 2016. Plaintiff claims that the "disturbances and invasion of privacy" dramatically increased, although the description of these disturbances seems unrelated to plaintiff's complaint. Plaintiff claims that "varied individuals" attempted to "interfere with [her] in public places using negative gestures." (*Id.*) Plaintiff also alleges that a black car with tinted windows followed her at the parking lot, slowly passing by plaintiff and "posting" a "disability signal onto the driver's side tinted window."

**\*7** Plaintiff reported these concerns to her physical therapist, who allegedly told plaintiff that the DMV "does not care about you." (*Id.*) Plaintiff states that the following week, in September 2016, "a man quickly scooped over [her] in [the] library." Plaintiff claims that she detected "several more

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 80 of 151

incidents" in December of 2015 and in the Fall of 2016. Plaintiff had bad nightmares, and minor property damage. She became very concerned for her personal safety, and these "frequent disturbances affected her health." (*Id.*)

The complaint contains thirty one paragraphs under the heading "Causes of Action." (Compl. ¶¶ 39-69). The court will attempt to list the Causes of Action, [25] with the caveat that plaintiff's references are often confusing, and the court is attempting to match defendants with claims. [26] The complaint contains what appear to be state law claims in addition to claims purportedly under the ADA. The court has interpreted the claims as follows:

(1) Tortious Interference with Business Relations (Compl. ¶ 39). This claim is asserted against employees of Harry's Tire.

(2) Disregarding Plaintiff's Safety and a Pattern of Reckless Conducts/RICO [27] (Compl. ¶¶ 40, 41). This is also a complaint against employees and management of Harry's Tire.

(3) Financial Burden of "Evidence Preservation" against the DMV. (Compl. ¶ 42).

(4) "Core Policy" [28] as Deceptive and Unfair Practice/RICO. (Compl. ¶¶ 43, 69). This may be a claim against Harry's Tire.

(5) Improper acts by defendant State Farm "Before Car Inspection." (Compl. ¶ 44). State Farm improperly denied plaintiff's "claim" before the DMV had a chance to conduct its investigation of plaintiff's claims against Harry's Tire regarding the improper repair/inspection of plaintiff's vehicle.

(6) Intentional Infliction of Emotional Distress by defendant Ferlenda from State Farm when he "suspended" plaintiff without explaining his rationale. (Compl. ¶ 45).

(7) Plaintiff alleges that she did not get adequate assistance from Law Enforcement, including the Victim/Witness Coordinator at the Cayuga County District Attorney's Office. (Compl. ¶ 46).

(8) The DMV violated the ADA when defendant Iacona asked whether someone from plaintiff's family could interpret for her, instead of providing a sign language interpreter when Mr. Iacona went to Fox Honda to inspect plaintiff's car. (Compl. ¶ 47). Plaintiff was not given an "equal opportunity" to participate in the DMV investigation at Fox Honda on March 11, 2016 because defendant Iacona "interacted with John Doe who had invaded my car property without my consent." (*Id.*)

(9) State Farm adversely interfered with plaintiff's DMV investigation and a John Doe "caused the destruction of evidence preservation," so that "no completed estimate" could be made. State Farm defendant Bell denied plaintiff's "claim" after the "car investigation." (Compl. ¶ 48).

(10) Defendant Iacona did not make the proper finding after inspecting the car, and as a result, State Farm and defendant Iacona "failed their duties." (Compl. ¶ 49). Defendant Iacona insulted plaintiff and refused to answer her questions when she was speaking with him "despite the availability of an interpreter via video relay service." (Compl. ¶ 50).

(11) After plaintiff filed a grievance against defendant Iacona, and defendant Furlong "suspended" defendant Iacona's report, defendant Longo acted "beyond the scope of her employment as ADA designee," when she stated that defendant Iacona's report was valid, interfering with plaintiff's rights to report a legitimate grievance. (Compl. ¶ 51).

**\*8** (12) Defendant Longo interfered with plaintiff's "federal rights," when she changed the location of the meeting that was scheduled with the investigator and told plaintiff that the meeting would be cancelled if she did not attend. (Compl. ¶ 52). Plaintiff alleges that defendant Longo acted "beyond the scope of her employment" and "oppressed the fact-finding process." (*Id.*)

(13) Defendant Longo violated the ADA when she asked that she and defendant Iacona attend a meeting that plaintiff planned to have "alone" with a "qualified investigator" and with a highly qualified sign language interpreter." (Compl. ¶ 53). Due to the "change" by her demand, plaintiff prepared many questions for defendant Iacona, and the sign language interpreter determined that a second interpreter was necessary. (*Id.*) Plaintiff claims that the "meeting was conducted depriving plaintiff of a full and fair opportunity for approximately 3 hours on May 20, 2016," resulting in plaintiff becoming very frustrated and tired. (*Id.*)

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

(14) Plaintiff claims that "unqualified" sign language contractors should be "eliminated." (Compl. ¶ 54). Plaintiff claims that the sign language interpreter who was assigned to her May 20, 2016 meeting was "unqualified," and as a result, she did not have "equal benefits of full participation" in the meeting which took place at the DMV Facility in North Syracuse. (*Id.*)

(15) Invasion of Privacy and ADA. Plaintiff claims that defendant Longo accused plaintiff of cancelling the interpreter for the meeting. Plaintiff claims that she "learned" that "someone" had accessed ... [her] medical records" (Compl. ¶ 55). Plaintiff claims that "Jane Doe" (maybe defendant Longo) "apparently recorded" plaintiff without her consent, and "engaged in oppressive [sic] environment," violating plaintiff's right to "equal benefits" in the proceeding. (*Id.*)

(16) Defendant Ayers was not neutral. (Compl. ¶ 56). He "acted out with dramatic body language and unnecessary provoked denying "the documents." (Compl. ¶ 56). Although plaintiff typed questions for defendant Iacona, defendant Ayers "restrictively selected a few questions" for defendant Iacona to answer, thus, depriving plaintiff of her procedural rights. (*Id.*)

(17) Defendants Iacona and Ayers violated the ADA when they brought pencils into the meeting room, and when defendant Ayers "mocked" that his hand hurt from writing so many notes. (Compl. ¶ 57). Plaintiff claims that she was "excluded from full participation, and that defendants did not give her a full and fair opportunity to be heard. (*Id.*)

(18) Defendant Ayers "restricted" plaintiff's movement and "altered" her evidence when he asked her for physical evidence and pulled apart the "evidence" that she had sealed in a box in her car. (Compl. ¶ 58). Plaintiff claims that defendant Ayers knew that she was going to use the evidence to take Harry's Tire to trial. (*Id.*)

(19) Plaintiff was required to use "pressurized speech" to get defendant Ayers's attention, and she was not given a fair opportunity to express herself with sign language, which made her very tired. [29] (Compl. ¶ 59).

(20) "Altered and Missing Documents." Plaintiff noticed "an altered record" on May 20, 2016, and she was not given an opportunity to review defendant Iacona's original report, before, and during the meeting. (Compl.

¶ 60). "Someone" consciously concealed information in order to injure plaintiff's credibility. (*Id.*)

**\*9** (21) "Obstruction of Justice and Improper Influence." (Compl. ¶ 61). Defendant Ayers stood in between plaintiff and defendant Longo, so plaintiff could not hear or see what the two defendants were talking about or doing. They allowed defendant Iacona to speak with them, but plaintiff was not given a fair opportunity to participate. (*Id.*) Plaintiff seems to allege that there was no "oral record" by plaintiff, but defendant Longo said something different in an email. Plaintiff alleges that defendant Longo's conduct was a "gross deviation of the ADA Coordinators' roles." (*Id.*)

(22) "Breach of Duty Owed to Witnesses." (Compl. ¶ 62). Defendant Ayers failed to perform "his duty," and caused plaintiff emotional distress. (*Id.*)

(23) Defendants Iacona and Longo invaded plaintiff's personal space by standing too close to her. (Compl. ¶ 63).

(24) "Highly Offensive Acts." (Compl. ¶ 64). Plaintiff alleges that defendant Ayers attempted to pressure her into ending the meeting. Plaintiff also claims that defendant Ayers "right shoulder quickly invaded her [her] frontal chest area on May 20, 2016," and then he quickly moved to the left side of her body. (*Id.*)

(25) "Determination Appeal." (Compl. ¶ 65). Plaintiff claims that she only learned in July of 2016 that Harry's Tire had only been guilty of a "single violation," that the company had "willfully improperly repaired," but was only given a "warning" letter by the DMV. (Compl. ¶¶ 36, 65). Plaintiff seems to allege that defendant Longo acted beyond the scope of her employment to deny plaintiff's appeal. Plaintiff alleges that as a result of this conduct by defendants she has suffered emotional distress. (Compl. ¶ 65).

(26) Plaintiff was deprived of her personal property by defendant Ayers, who did not respond to her requests to have the property returned to her so that she could use it as evidence against State Farm and Harry's Tire. (Compl. ¶ 66).

(27) "Gross Deviations by a Licensed Entity." (Compl. ¶ 67). Plaintiff alleges that Harry's Tire is liable for "causing two separated car incidents," one in 2005 and one in 2015 in order to "retaliate" against plaintiff.

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Plaintiff also alleges that the employees of Harry's Tire engaged in a "pattern of improper actions." (*Id.*)

(28) "An Increased Pattern of Disturbances and Intimidations." (Compl. ¶ 68). Plaintiff apparently blames many adverse occurrences "through 2016" on these defendants. These include "stalking," property damage, invasion of privacy, and negative gestures by unknown individuals. (*Id.*)

Reduced to its essence, plaintiff is essentially upset because she believes that Harry's Tire did not fix or inspect her car properly, and that the employees of the DMV did not properly handle the investigation of her complaints against Harry's Tire, and in the process, the DMV discriminated against plaintiff because she is disabled.

25      The court has combined some of the causes of action that appear to be the same or that involve the same conduct.

26      As an example, ¶ 3 discussed "Adverse Interference," which the court has interpreted as a claim for "Tortious Interference with Advantageous Business Relations." In ¶ 3, plaintiff states that a "John Doe ... whom [she] did not know, adversely interfered me [sic] during a business relationship." Then she states that "another John Doe," who she believes to be Mr. Augustine, stood by the counter, while "another" John Doe demanded that she sign his handwritten notes. (Compl. ¶ 3). In plaintiff's cause of action entitled "Adversely [sic] Interference," she never discusses the first John Doe, names Mr. Augustine as the second John Doe, and apparently asserts that defendant Riester is the third John Doe. (Compl. ¶ 39). The court can assume this because plaintiff states that "John Doe, assume to be Mr. Riester, adversely interfered" with her and demanded that she sign his handwritten notes. (*Id.*) Thus Riester "interfered" with her rights during a business relationship. In ¶ 3, plaintiff alleges that the first John Doe interfered with her rights, while in ¶ 39, plaintiff states that the third John Doe, who she identifies as defendant Riester interfered with her rights. This confusion does not affect this court's ultimate decision that plaintiff does not state a civil rights claim or a supplemental state law claim.

27      The complaint does not contain a statutory cite for civil RICO, which refers to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

28      As far as this court can determine, plaintiff is referring to a policy of returning certain automotive parts, known as "cores" to the manufacturer when they are replaced, so that the manufacture may recycle the part. *See e.g.* https://hs-motorsports.com/core-policy. An item purchased from the manufacturer contains a "core charge," in addition to the listing price. The core charge is added to the list price, and is refundable when the "core" is returned to the manufacturer. Thus, if the core is not returned the purchaser loses the amount of the core charge. *Id.*

29      Plaintiff does not allege a specific basis for this claim. However, the court will assume that plaintiff is referring to the ADA.

**\*10**   The court also notes that plaintiff's Prayer for Relief adds various claims to each of her main claims. In addition to "failure of investigation," against the State actors, plaintiff also includes a deprivation of freedom of speech, witness intimidation, and unlawful searches and seizures. (Compl. ¶ 70). Plaintiff also requests that the court "modify" the ADA to "restructure the funding mechanism for face-to-face communication when deaf persons are engaging in any type of industries." (Compl. ¶ 74). Plaintiff requests a variety of injunctions having to do with the ADA. (Compl. ¶ 76). Finally, although she does not name a defendant in this regard, plaintiff states that she wishes money damages from an "unqualified major contractor, located in Utica, NY." 30 (Compl. ¶ 77).

30      This appears to be the company which provided allegedly unqualified sign language interpreters.

## III. Tortious Interference

### A. Legal Standards

Tortious interference is a state law cause of action. *See Foster v. Churchill*, 87 N.Y.2d 744, 749-50 (1996). The elements of a cause of action for tortious interference with a contract require (a) the existence of a valid contract between the plaintiff and a third party; (b) the defendant's knowledge of that contract; (c) the defendants intentional procurement of a third party's breach of that contract, and (d) damages.

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

*Environmental Services, Inc. v. Recycle Green Svcs., Inc.*, 7 F. Supp. 260, 276 (E.D.N.Y. 2014) (citing *Foster v. Churchill*, 87 N.Y.2d 744, 749-50, (1996); *Chung v. Wang*, 79 A.D.3d 693, 694 (2d Dep't 2010)).

If jurisdiction is not based on diversity of citizenship, state law claims may be brought in federal court if the claim is supplemental to a federal cause of action. *See Sonterra Capital Master Fund, Ltd. v. Credit Suisse Grp., AG*, No. No. 1:15-CV-871, 2017 WL 4250480, at *43 (S.D.N.Y. Sept. 25, 2017) (citations omitted); 28 U.S.C. § 1367(a).[31] The state law claims must be so related to the existing claims within the court's original jurisdiction that they form part of the same "case or controversy." *Id.* (citation omitted).

[31]   Section 1367(a) provides:

   Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

### B. Application

In this case, plaintiff claims that there was "adverse interference" with her business relationship. However, there is no cause of action for "adverse interference." Therefore, the court must attempt to determine what plaintiff might be trying to claim.[32] Even without deciding whether supplemental jurisdiction would be proper, this court finds that plaintiff has failed to state a claim under New York State law for tortious interference with contract. Plaintiff claims that she submitted a hand-written work request to defendant Augustine, which included certain items. (Compl. ¶ 39). However, defendant Riester "adversely interfered" with plaintiff by making her sign his hand-written notes which contained an additional item to be fixed. Plaintiff believes that this action constitutes "adverse interference."

[32]   The Second Circuit has recently restated that the plaintiff's failure to cite a statute or to cite the correct one, in no way affects the merits of the

claim. *Cinotti v. Aldeman*, No. 16-1804, slip op. at 3 (2d Cir. Sept. 15, 2017) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 199 n.2 (2d Cir. 2004)). The court finds that the same applies for common law causes of action because a pro se complaint is to be read to raise the strongest arguments suggested therein. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).

**\*11**   The named defendant is Mr. Riester. At best, even assuming that plaintiff's handwritten work order was a contract, the contract was with defendant Riester as the owner of Harry's Tire, not with a "third party." Plaintiff would have to show that she had a contract with a third party, and that defendant Riester caused the third party to breach a contract with plaintiff. Plaintiff has not established any of the elements of tortious interference with contract. At best, she is unhappy because she presented defendant Augustine with a work order that either defendant Augustine or defendant Riester changed by adding an item that plaintiff believed did not need fixing, and defendant Riester "forced" plaintiff to sign "on his handwritten notes."[33] Plaintiff's claim of "adverse interference" may be dismissed.

[33]   It is a little unclear whose notes plaintiff was "forced" to sign. Essentially, plaintiff alleges that she was forced to fix something that she believed did not need fixing.

## IV. RICO

### A. Legal Standards

In order to establish a violation of the RICO statute, 18 U.S.C. § 1962(c), a plaintiff must show " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *DeFalco v. Bernas*, 244 F.3d 286, 305–06 (2d Cir. 2001) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) and citing *Cofacredit, S.A. v. Windsor Plumbing Supply Co. Inc.*, 187 F.3d 229, 242 (2d Cir. 1999); *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 520 (2d Cir. 1994)). These must be established as to each individual defendant. *Id.* (citing *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise, which are proscribed by section 1962(d).))

The terms "enterprise," "racketeering activity," and "pattern of racketeering activity" are defined in 18 U.S.C. § 1961.

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 84 of 151

2017 WL 7542494

A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" is broadly defined to encompass a variety of state and federal offenses including, inter alia, murder, kidnaping, gambling, arson, robbery, bribery and extortion. *See* 18 U.S.C. § 1961(1). A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

In essence the civil plaintiff must establish that the defendant violated the criminal RICO statute. *Wood v. General Motors Corp.*, No. 08-CV-5224, 2015 WL 1396437, at *3 (E.D.N.Y. Mar. 25, 2015) (citing 18 U.S.C. § 1962; *Moss v. Morgan Stanley*, 713 F.2d 5, 17 (2d Cir. 1983)). In addition, the racketeering activities must be related and "pose a threat of continuing criminal activity." *Tooker, supra.* These include the crimes listed above, and other crimes, " 'chargeable under State law and punishable by imprisonment for more than a year.' " *Id.* (citations omitted).

**B. Application**

In this case, plaintiff has simply added the words, or words similar thereto: "Alternatively RICO has been violated" to some of the paragraphs of her complaint. (Compl. ¶¶ 40, 41, 43). At the end of her complaint, plaintiff has included a paragraph, entitled "RICO Statement." (Compl. ¶ 69). Plaintiff claims that the mechanics and inspectors at Harry's Tire were liable for a "pattern of misconducts," which involved improperly fixing her car and "granting a false certificate of safety inspection sticker, and/or conceal[ing] the defective repair." (Compl. ¶ 41).

**\*12**  None of the conduct that plaintiff alleges rises to the level of a RICO violation. Even if the mechanics at Harry's Tire improperly fixed plaintiff's car, resulting in an inspection sticker being issued prematurely or even improperly, there is no indication of any "racketeering" activity. Plaintiff returned to Harry's Tire on December 4, 2015 to explain that there was a problem with her car, and that the work was not properly done. Plaintiff alleges that defendant Augustine found a "loose clamp," but plaintiff "objected based on varied abnormal sensations. (Compl. ¶ 5). As stated above, "racketeering activities" must be state or federal "offenses." [34]  Disagreement over what needs to be

fixed on a car or event negligent repair does not rise to the level a state or federal offense.

[34]    The predicate crimes are listed in 18 U.S.C. § 1961(1) and include mail fraud and wire fraud. *See Mathon v. Marine Midland Bank*, 875 F. Supp. 986, 995 (E.D.N.Y. 1995). A party asserting mail fraud must comply with the heightened pleading standard contained in Fed. R. Civ. P. 9(b). *Allstate Ins. Co. v. Elzanaty*, 916 F. Supp. 273, 293-94 (E.D.N.Y. 2013) (citation omitted).

Plaintiff states that she has always had her car fixed by Fox Honda, and that she went to Harry's Tire because she declined Fox Honda's service. Although it appears from plaintiff's complaint that this was the first time she took her automobile to Harry's Tire, she also states that she dealt with defendant Riester in 2005, when plaintiff previously made a complaint to the DMV. (Compl. ¶¶ 2, 6). It is unclear what happened in 2005, but the RICO statute requires that the acts of "racketeering activity" must occur within ten years of each other, and if they involve fraud, they must be stated with particularity. *Tooker v. Guerrera*, No. 15-CV-2430, 2017 WL 3475994, at *9-10 (E.D.N.Y. Aug. 11, 2017). Plaintiff in this case has absolutely no basis for asserting a pattern of violations under RICO against Harry's Tire on the facts of this complaint. [35]

[35]    A plaintiff's burden is quite high when pleading civil RICO claims. *Wood*, 2015 WL 1396437, at *3. In *Wood*, the court stated that " 'Courts look with particular scrutiny at claims for a civil RICO, given the statute's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies.' " *Id.* (quoting *Spiteri v. Russo*, No. 12-CV-2780, 2013 WL 4806960, at *45 (E.D.N.Y. Sept. 7, 2013)).

Plaintiff also alleges that the "Core Policy" violates RICO "on a regular basis." (Compl. ¶ 69). The "Core Policy," as stated above, is a policy by which automotive parts are sold, not unlike the deposit that one pays on a soda bottle. When the bottle is returned, the deposit is payed back. If the bottle is not returned, the purchaser loses the amount of the deposit. The automotive policy encourages the recycling of materials and the proper disposal of parts. Plaintiff alleges that she was not allowed to keep her old parts without incurring a charge pursuant to this policy. Plaintiff wished to keep her rear caliper as evidence that it was not necessary to be replaced in order for the car to pass inspection. (Compl. ¶

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 85 of 151

69). Plaintiff states that she "suspect[s] possible frauds behind the deceptive norm of core policy." (*Id.*) Plaintiff claims that she relied on defendant Iacona's "investigative expertise," but that he was "evasive," preventing plaintiff from "knowing whether deliberate opportunistic breaches have occurred on a regular basis." (*Id.*) The closest predicate act that plaintiff could be alleging is fraud. A necessary element of a scheme to defraud under the federal fraud statutes is the making of a false statement or material misrepresentation, or the concealment of a material fact. *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 299 (7th Cir. 2003) (citing, inter alia, *Neder v. United States*, 527 U.S. 1, 25 (1999)). *See also Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169-70 (2d Cir. 1999) (discussing mail fraud); *Boneta v. Rolex Watch, Inc.* 232 F. Supp. 3d 354, 358-59 (S.D.N.Y. 2017) (discussing the elements of a RICO fraud claim).

**\*13** In this case, plaintiff's allegations are vague, and plaintiff's claims of fraud are speculative and anything but specific. Plaintiff seems to allege that this policy itself improperly enriches the parts manufacturer and/or repair shop, but it is not clear what RICO enterprise is alleged. Plaintiff asks that "all repair services and involved businesses" compensate her for their "gains, and/or profits" that they generated from her "personal property" since plaintiff has owned her automobile. (*Id.*) First, none of the defendants are parts manufacturers or are responsible for the Core Policy,[36] and in any event, there is no indication that such a policy amounts to "a crime" for purposes of the RICO statute. Plaintiff does not state that she was mislead or that the Core Policy is somehow "false," or that she relied upon a defendant's statement or policy to her detriment. She simply wanted to keep her old auto parts without incurring the deposit fee. She may not agree with the policy, and it may have prevented her from keeping an old car part, but there is no fraud involved with this conduct. Thus, plaintiff's RICO claims may be dismissed.

[36]     Plaintiff does not allege otherwise.

## V. **Section 1983**

### A. Legal Standards

Plaintiff has filed this case, using a form for civil rights actions under 42 U.S.C. § 1983. To state a claim under section 1983, the plaintiff must allege both that the defendant has violated plaintiff's rights under either the Constitution or laws of the United States and that the defendant acted "under color of

state law." *Rae v. City of Suffolk*, 693 F. Supp. 2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983.

A person acts under color of state law when he or she acts in his or her official capacity, "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power. *Pleasure Island, Inc. v. City of New York*, No. 12 Civ. 4699, 2013 WL 2311837, at *5-6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). The requirement that the defendant acted under "color of state law" is jurisdictional. *Lucas v. Riggi*, No. 07-CV-6200, 2008 WL 4758706, at *2 (W.D.N.Y. Oct. 29, 2008) (citing *Polk County v. Dodson*, 454 U.S. 312, 315 (1981)). Private conduct is simply beyond the reach of section 1983 " 'no matter how discriminatory or wrongful' that conduct may be." *Id.* (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999)). A private party may act under color of state law if he or she engages in conduct that constitutes willful participation in joint activity with the state. *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted).

The actions of a nominally private entity are attributable to the state when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Academy v. Tennessee*, 531 U.S. at 296) (brackets in original).

### B. Application

#### 1. State Farm, Bell, and Ferlenda

Plaintiff has sued State Farm Insurance Company, Roger Bell (Team Member), and Tom Ferlenda (Agent). Neither the company, nor its employees act "under color of state law." Plaintiff does not allege otherwise. Plaintiff is upset with State

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 86 of 151

2017 WL 7542494

Farm, Bell, and Ferlenda because the company denied her insurance claim before the DMV had a chance to conduct its investigation of plaintiff's complaints against Harry's Tire regarding the improper repairs/inspection. Plaintiff also claims that defendant Ferlenda intentionally inflicted "emotional distress" upon plaintiff when he "suspended" [37] plaintiff without explanation. (Compl. ¶¶ 44-45). Plaintiff also alleges that State Farm "interfered with" the DMV investigation, and a "John Doe," invaded her "car property" without plaintiff's consent and caused the destruction of "evidence" so that no completed estimate could be made, and defendant Bell denied plaintiff's claim *after* the DMV "investigation." [38] (Compl. ¶ 48).

[37]   Plaintiff never explains what she means by "suspended" in this context because it is not relevant to this court's decision. The court will not speculate as to the meaning.

[38]   The court would first point out that this allegation is inconsistent with the statement plaintiff makes that State Farm denied her claim "before" the DMV had a chance to investigate. (Compl. ¶ 44). This court has interpreted plaintiff's claim as raising the issue of negligent or intentional spoliation of evidence. This cause of action is based in state law. *See Alegria v. Metro Metal Products, Inc.*, 20 Misc. 3d 591, 594-96 (S. Ct. Kings Cty. 2010) (discussing spoliation). A claim of spoliation has been utilized when the destruction of evidence is related to an ongoing lawsuit. *See Tomkins v. Armstrong*, 7 Misc. 3d 311, 313 (S. Ct. Kings Cty. 2005). However, New York does not recognize a general duty to preserve evidence as an independent tort. *Alegria*, 20 Misc. 3d at 594-96 (citing *MetLife Auto & Home v. Joe Basil Chevrolet*, 1 N.Y.3d 478, 480-81 (2004)). In any event, a cause of action for spoliation would also require diversity jurisdiction which is lacking in this action. Plaintiff also alleges a potentially related cause of action against the DMV as a "supplemental" claim to any section 1983 causes of action. (Compl. ¶ 42). The court will discuss this claim as relates to the DMV below.

 **\*14** State Farm is a private entity, and there are absolutely no allegations that would establish a conspiracy with state officials or any other allegations establishing state action by the State Farm defendants. [39] Thus, any claims against State

Farm Insurance and its employees may be dismissed. (Compl. ¶¶ 44-45, 48, 49).

[39]   Diversity jurisdiction under 28 U.S.C. § 1332 is not available in this case. Although State Farm is listed as an Illinois company, and defendant Bell appears to be from Arizona, diversity jurisdiction requires that *all defendants* must be of diverse citizenship in addition to requiring a jurisdictional threshold of $75,000.00 in damages. *Greene v. Paramount Pictures Corp.*, No. 14-CV-1044, 2017 WL 4011240, at *2 (E.D.N.Y. Sept. 11, 2017) (citation omitted). Even assuming that some of the defendants are of diverse citizenship to plaintiff, there are several defendants whose citizenship for jurisdictional purposes is New York. Thus, plaintiff cannot raise any claims that would require diversity of citizenship as a jurisdictional basis.

### 2. Harry's Tire

Harry's Tire is also a private company. Plaintiff alleges that Harry's Tire acted under color of state law because the State of New York regulates auto repair/inspection establishments, and inspections are conducted pursuant to New York State law. Plaintiff alleges "gross deviations by a licensed entity." (Compl. ¶ 67) It has been held that licensing by the state alone does not render the licensee a state actor. *White v. St. Joseph's Hospital*, 369 Fed.Appx. 225, 226 (2d Cir. 2010).

> [A] private entity does not become a state actor for purposes of § 1983 merely on the basis of the private entity's creation, funding, licensing, or regulation by the government. Rather, there must be such a close nexus between the [s]tate and the challenged action that the state is *responsible* for the specific conduct of which the plaintiff complains.

*Rose v. City of Waterbury*, No. 3:12-CV-291, 2013 WL 1187049, at *5 (D. Conn. Mar. 21, 2013) (emphasis in original some alterations in original) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

In the case of Harry's Tire, it is undisputed that the state licenses and regulates the businesses which perform New York State inspections, but the state is not *responsible* for the inspection. The mere licensing and regulation of New York State inspection facilities does not render them state actors. In addition, plaintiff appears to conflate her "inspection" with other repairs that she had done to the automobile which apparently were not done properly. There is an insufficient nexus between Harry's Tire and the State of New York to find that Harry's Tire acted under color of state law. [40] Any claims against Harry's Tire may be dismissed.

[40]  In any event, even assuming that Harry's Tire somehow acted under color of state law with respect to plaintiff's "inspection," there is no indication that plaintiff was deprived of a constitutional right. As stated above, plaintiff alleges "gross deviations" by a licensed entity. Plaintiff claims that Harry's Tire was responsible for her "incidents." The "incidents" that plaintiff describes did not cause an accident, and plaintiff was able to bring the car back to Harry's Tire so that the car could be fixed. There is no constitutional right to have one's car fixed properly. While there may be state law repercussions, sounding in tort, plaintiff has cited no constitutional violations as the result of the actions by Harry's Tire. The fact that plaintiff may have been without her car for a period of time is due to her own complaint to the DMV, whose employees apparently told plaintiff not to move or use the car until it could be "inspected" by the DMV investigator. In fact, plaintiff herself blames the DMV for its delay in inspecting the car, allegedly causing the financial burden of "Evidence Preservation." Harry's Tire did not deprive plaintiff of her property. Plaintiff also claims that Harry's Tire and its employees "disregard[ed] [plaintiff's] safety." (Compl. ¶¶ 40, 41). This statement does not cite any constitutional provision or protection. Finally, plaintiff claims that the 2015 "incidents" are somehow related to plaintiff's 2005 issues with Harry's Tire because defendant Riester mentioned that he remembered plaintiff from 2005. However, Mr. Riester's comment was made after the plaintiff's car was inspected by Harry's Tire, and the prior "incident" was ten years prior. There are absolutely no facts that would support any claim of "retaliation." Plaintiff may not turn alleged state law violations into constitutional claims by simply bringing an action purportedly under section 1983.

## VI. Assistance from Law Enforcement/DMV

### A. Legal Standards

**\*15** Plaintiff has no constitutional right to an investigation of any sort by government officials. *See Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008); *Lewis v. Gallivan*, 315 F. Supp. 2d 313, 317 (W.D.N.Y. 2004) (citing cases). In order for a constitutional violation to have occurred, the investigation itself must have resulted in the deprivation of a constitutional right. *Faison v. Hash*, 03-CV-6475P, 2004 WL 944523, at \*6 (W.D.N.Y. April 23, 2004) (citation omitted). The exception exists when the failure to investigate is based on improper motives—race, gender, or disability. *Walker v. City of New York*, No. 05-CV-1283, 2010 WL 5186779, at \*5 (E.D.N.Y. Dec. 15, 2010). The Government may not "selectively" deny its protective services to disfavored minorities without violating the Equal Protection Clause. *Id.* However, the fact that plaintiff is disabled is not, by itself indicative of an improper motive. Rather, she must show that other, similarly situated individuals were treated differently. *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011).

### B. Application

#### 1. Law Enforcement

In this case, plaintiff alleges that she did not get adequate assistance from law enforcement, including the Victim/Witness Coordinator ant the Cayuga County District Attorneys Office. [41] (Compl. ¶ 46). The court first notes that plaintiff has not named anyone who she alleges failed to give her "adequate assistance." In any event, even if plaintiff had named a responsible defendant, she has no constitutional right to an "investigation" of any kind. *Berstein, supra.* In addition, plaintiff does not specify to what she believed she was entitled, [42] or that the failure to "assist" or "investigate" was motivated by any type of discrimination. In any event, plaintiff does not even allege that any of the defendants violated any criminal laws. It is unclear what plaintiff wished law enforcement to investigate. Thus, any such claim may be dismissed.

[41]  This court will assume that individuals working for the Cayuga County District Attorneys office work

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Case 1:21-cv-00860-GLS-TWD    Document 17    Filed 01/26/22    Page 88 of 151

under color of state law. However, plaintiff does not state a constitutional claim, nor does she sue any specific defendants. Thus, the court may dismiss the claim on both bases.

42
    To the extent that plaintiff is attempting to allege that there should have been some prosecution by law enforcement officials, it is well settled that no private citizen has a constitutional right to bring a criminal complaint against another individual. *Lewis v. Gallivan*, 315 F. Supp. 2d at 316-17 (citation omitted).

### 2. DMV Defendants

Plaintiff also seems to allege that the DMV investigation was not adequate[43] and that defendants Ayers, Iacona, and Longo "obstructed justice," destroyed evidence, and "someone" altered records, and "concealed information to injur[e plaintiff's] credibility." (Compl. ¶¶ 60-61). As a result, "someone" breached "standard practice." (Compl. ¶ 60). Plaintiff does not specify what records were "altered" or how they were altered. Plaintiff also does not specify what information was "concealed" or why that would injure plaintiff's credibility. Conclusory allegations such as these do not state civil rights claims. *See Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (conslusory allegations are insufficient to state a constitutional claim).

43
    To the extent that plaintiff alleges ADA violations as a result of the investigation, these claims are discussed separately below.

Plaintiff also blames the DMV because she incurred a "financial burden" to preserve her "evidence." (Compl. ¶ 42). It appears from other comments in the complaint that plaintiff was told not to use the car, pending the DMV's investigation, but that it took longer than plaintiff anticipated. This resulted in plaintiff incurring expenses in order to use public transportation so that she could "preserve" the evidence. Plaintiff is not entitled to any kind of an investigation, and the fact that she had to "preserve" her evidence is not the fault of the DMV, certainly not a constitutional violation by the DMV.[44]

44
    In fact, the DMV website specifically states that "[d]epending on the complaint, this process can take several weeks to several months

to resolve." https://dmv.ny.gov/contact-us/report-problemdmv-regulated-automotive-business.

**\*16** Plaintiff states that she was not allowed to look at defendant Iacona's "original" report, before, during, or after the hearing. (*Id.*) Plaintiff alleges that defendant Ayers was not "neutral," and that he denied plaintiff unspecified documents. When plaintiff told defendant Ayers that she was going to take Harry's Tire to court, and showed defendant Ayers "typed" questions, defendant Ayers "acted out" by writing notes back to plaintiff and choosing only certain questions to ask defendant Iacona. (Compl. ¶ 56).

These allegations all appear to relate to an attempt to state a due process claim.[45] Procedural due process requirements are triggered when a liberty or property interest is at stake. *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016) (citations omitted). Once due process is triggered then the "question becomes what process is due." *Id.* (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1971)). In this case, plaintiff initiated the complaint with the DMV against Harry's Tire, thus, the hearing was not protecting plaintiff's property or liberty interest from being impaired by a state actor.

45
    A plaintiff who has been denied state-protected services may potentially assert a section 1983 claim under both Equal Protection and Due Process. *Patterson v. City of New York*, No. 16-CV-3525. 2017 WL 3432718, at \*12 (E.D.N.Y. Aug. 9, 2017). However, to establish an Equal Protection violation, plaintiff must show that the defendant intentionally discriminated against the plaintiff based on the plaintiff's membership in a protected class. *Id.* The claim is similar an ADA claim as the court will discuss below. In this case, plaintiff does not allege that other similarly situated individuals were treated differently than she was treated, sufficient to state an equal protection claim.

In any event, the essence of due process is notice and an opportunity to be heard. *Id.* In this case, plaintiff complains bitterly about the conduct of the hearing that was afforded to her. She claims that defendant Ayers did not ask all the questions that plaintiff had prepared for defendant Iacona. However, plaintiff does not allege that there were particular questions that she was not able to ask that would have made a difference to her complaint. There is no right to ask unlimited questions at any hearing. Plaintiff asserts vague claims against the defendants for moving around the room and for depriving her of multiple or "qualified" sign language interpreters.

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 89 of 151

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

Plaintiff's disagreement with the methods that the DMV used to investigate plaintiff's complaint against Harry's Tire, and her disagreement with the outcome of the investigation do not state civil rights claims.

### 3. State of New York

It is now well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995) (citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. Immunity from suit under the Eleventh Amendment extends to State agencies and departments. *Burnette v. Carothers*, 193 F.3d 52, 57 (2d Cir. 1999). Thus, to the extent that plaintiff is attempting to bring a section 1983 action for damages against the State of New York, the complaint may be dismissed with prejudice.

### VII. ADA Claims

#### A. Legal Standards

The ADA contains three titles: Title I relates to discrimination in employment (42 U.S.C. § 12112(a)); Title II relates to public services and public entities (42 U.S.C. § 12132); and Title III reaches discrimination by public accommodations and services operated by private entities (42 U.S.C. § 12182). The only title applicable to plaintiff's claims against the DMV would be Title II because the DMV would be considered a public entity.

**\*17**  To prove a violation of Title II, the plaintiff must establish that she is a qualified individual with a disability, that she was excluded from participating in a public entity's services, programs or activities or was otherwise discriminated against by a public entity, and that the exclusion or discrimination was due to disability. *Klaes v. Jamestown Bd. of Public Utilities*, No. 11-CV-606, 2013 WL 1337188, at \*12 (W.D.N.Y. Mar. 29, 2013) (citing *Hargrave v. Vermont*, 340 F.3d 27, 34-35 (2d Cir. 2003)).

#### B. Application

Plaintiff filed a claim with the DMV to report Harry's Tire, based upon the incidents in December of 2015. The DMV has a procedure by which complaints may be made against a "regulated automotive business," which includes "all repair shops, inspection stations, dealers,

junk and salvage vendors, and other automotive related businesses in New York State." https://dmv.ny.gov/contact-us/report-problem-dmv-regulated-automotive-business.  The procedures are clearly specified on the DMV website. The DMV also has a policy of affording access to its programs, services, or activities to persons with disabilities. The policy includes a grievance procedure by which individuals who believe that this policy has been violated may complain.

In this case, plaintiff states that she is hearing impaired. She alleges that she filed a complaint with the DMV against Harry's Tire, and that defendant Iacona was assigned to investigate the problem. However, plaintiff alleges that defendant Iacona violated the DMV's ADA policy when he asked plaintiff if she had a family member who could interpret for her March 11, 2016, when Mr. Iacona went to inspect her car. Plaintiff claims that she was not given an "equal opportunity" to participate in the investigation on March 11, 2016 because defendant Iacona spoke with an individual in the garage at Fox Honda, while plaintiff was told to wait in the hallway.

The fact that plaintiff had to wait in the hallway, while defendant Iacona went to examine plaintiff's car in the Fox Honda garage had nothing to do with plaintiff's disability. The John Doe was presumably an employee of Fox Honda and not one of the defendants from Harry's Tire. Based on the allegations in plaintiff's complaint, it is also clear that plaintiff was later afforded a hearing [46] regarding her complaint against Harry's Tire.

[46]  In her complaint, plaintiff refers to this as a "meeting," but it appears to be a meeting/hearing at which decisions were made about plaintiff's complaint to the DMV about Harry's Tire, with defendant Ayers as the decision-maker, based upon defendant Iacona's investigation/report.

Plaintiff alleges that her "rights" were "oppressed" when the DMV changed the location of her hearing and told her that she was required to attend or the "meeting" would be canceled. Changing the location of the meeting did not deprive plaintiff of access to the DMV program and was not based on plaintiff's disability. Plaintiff claims "interferences" because defendant Longo told plaintiff that defendant Iacona would be allowed to attend plaintiff's meeting with a "qualified investigator with provision of a highly qualified interpreter." (Compl. ¶ 23). Allowing the investigator from DMV and the ADA coordinator to attend plaintiff's meeting does not deny

**Netti v. Ayers, Not Reported in Fed. Supp. (2017)**

2017 WL 7542494

plaintiff access to the DMV program, and plaintiff does not allege that the investigator would not regularly be allowed to attend the hearing.

**\*18** The meeting/hearing took place on May 20, 2016. None of the conduct alleged by plaintiff states a claim under the ADA or the constitution. In order to state a claim under the ADA, plaintiff must allege that she was *excluded from participating* in a public entity's services, programs or activities or was otherwise discriminated against by a public entity, and that the exclusion or discrimination was due to disability. Plaintiff was not excluded from participating in the DMV's complaint procedures, nor was she excluded from participating in the hearing. Plaintiff was not satisfied with the result of the hearing, she believed that the defendants' facial expressions were negative, and that they were making fun of her because they had to write out questions or take notes. It does not appear that plaintiff was denied a qualified sign language interpreter, even though some of the paragraphs of the complaint seem to imply that she was denied an interpreter at the hearing. Instead, plaintiff alleges that the interpreter who provided was not to her liking and was not qualified to perform the extent of interpretation required.[47] Plaintiff also complains that defendants Longo, Ayers, and Iacona moved about the meeting room and "repositioned their seats." (Compl. ¶ 32). Plaintiff also claims that, at one point during the meeting, defendant Ayers moved around the table, and had his back to plaintiff, blocking her view of what defendants Longo and Ayers were doing.

[47]    Plaintiff states that when defendant Longo insisted that she and defendant Iacona attend a meeting that plaintiff wished to have "alone" with a highly qualified sign language interpreter, plaintiff "prepared asking a lot of questions to Mr. Iacona," and the sign language interpreter determined that two sign language interpreters were required. (Compl. ¶ 53). "As a result the meeting was conducted depriving a fair and full opportunity for approximately 3 hours on May 20, 2016." (*Id.*) The complaint is very vague and difficult to understand, but it appears that plaintiff is simply unhappy with the extent of assistance that she received from the DMV employees and from the DMV's ADA coordinators.

Plaintiff also claims that defendant Ayers "tampered" with plaintiff's physical evidence by taking the power steering hose from plaintiff's "sealed" evidence box and pulling pieces

apart. The court must point out that in order for the DMV to know whether an automotive business has been violating consumers' rights, the investigators may need to look at the parts that the car owner alleges were improperly handled or improperly fixed or inspected. Defendant Ayers's handling plaintiff's evidence had nothing to do with her disability, and thus, plaintiff does not state an ADA claim as a result.

Plaintiff claims that defendant Longo "apparently recorded" plaintiff without her consent, engaged in an "oppressive environment on May 11, 2016, and "failed" in her "duty as an ADA designee." (Compl. ¶ 55). Plaintiff alleges that defendant Longo acted "beyond the scope" of her ADA responsibilities when she told plaintiff that defendant Iacona's report was "valid." (Compl. ¶ 52). Plaintiff claims that this interfered with her ability to report a grievance. (*Id.*) Plaintiff's assertions are vague, and do not state claims under either the ADA or the constitution.

Finally, the court notes that individuals cannot be held liable under the ADA. *Baross v. Greenlawn*, No. 16-CV-4805, 2017 WL 2124424, at \*4 (E.D.N.Y. May 15, 2017) (citing *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)) (holding that Title II of the ADA does not provide for suits against individuals); *Fox v. State Univ. of N.Y.*, 497 F. Supp. 2d 446, 449 (E.D.N.Y. 2007) ("[T]here is no individual liability under Title I or Title II of the ADA, or the ADEA."); *Sutherland v. New York State Dep't of Law*, No. 96 Civ. 6935, 1999 WL 314186, at \*7 (S.D.N.Y. May 19, 1999) ("Individual defendants may not be held personally liable for alleged violations of the ADA....").

Thus, although plaintiff may name New York State or the DMV as defendants under Title II of the ADA, she may not name the state defendants in their *individual* capacities. Thus, to the extent that plaintiff attempted to assert a claim for damages under the ADA, she may not name defendants Ayers, Iacona, Longo, or Furlong in their "individual capacities," and the ADA claims may be dismissed as against these defendants with prejudice.

## VIII. Miscellaneous Claims

**\*19** Plaintiff has included miscellaneous claims that she apparently believes are related to her complaint. As stated above, in conclusory fashion, plaintiff has asserted that unknown individuals are "stalking" her and making negative gestures toward her. Plaintiff has not asserted that any of the defendants committed any specific act to which she refers, and all such conclusory allegations may be dismissed. *See*

**Netti v. Ayers, Not Reported in Fed. Supp. (2017)**

2017 WL 7542494

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 91 of 151

*Warner v. Mandell*, No. 3:15-CV-807, 2015 WL 5827668, at *4 (N.D.N.Y. Oct. 6, 2015) ("[C]omplaints relying on civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.") (quoting *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995)) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)).

In her "Prayer for Relief," plaintiff has listed a variety of claims, including unlawful search and seizure, negligent hiring of defendant Iacona, and "adverse inferences toward [plaintiff] as a government witness." (Compl. ¶ 70). Plaintiff also alleges deliberate failure of "disclosures," and intentional concealment. Although some of plaintiff's allegations correspond to claims that she made in the body of the complaint, some are completely unrelated. In addition, some of the claims made in the body of the complaint do not specify which defendant was responsible for the alleged conduct. Thus, none of the plaintiff's additional and miscellaneous allegations state plausible claims for relief under any civil rights statute as the complaint is written.

## IX. Opportunity to Amend

### A. Legal Standards

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### B. Application

In this case, it is questionable that plaintiff will be able to cure the defects in her pleading. No attempt at amendment will revive a RICO claim, and there are no supplemental state law claims that have been stated under the facts in this case. However, the court recommends that she be given an opportunity to amend the claims under the ADA relative to the DMV or New York State only, not against any of the individual DMV defendants. Based on the facts stated, plaintiff will also be unable to state claims against the private automotive repair company or against plaintiff's insurance

company under section 1983, and plaintiff does not allege ADA claims against the private entities or individuals.

## X. Appointment of Counsel

### A. Legal Standards

There is no bright-line test for determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). A number of factors must be carefully considered by the court in ruling upon the motion. The court must first assess whether the indigent's claims seem likely to be of substance. If so, the court then considers:

> [t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)). Each case must be decided on its own facts, and the court may consider any or all of the above factors in its determination. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

### B. Application

**\*20** Plaintiff has indicated in her motion for appointment of counsel that she has contacted multiple attorneys who have refused to take her case. Based upon a thorough review of the complaint, this court finds that most of plaintiff's complaint may be dismissed with prejudice. To the extent that the court is recommending dismissal with leave to amend, it is premature to determine whether the complaint will have substance, sufficient to continue with the appropriate analysis for appointment of counsel. Thus, the court will deny plaintiff's motion without prejudice to renewal, when and if, the court approves this recommendation, plaintiff files an

amended complaint, and the court has had an opportunity to review it.

## XI. <u>Sealing</u>

### A. Legal Standards

As the Second Circuit has stated, "[t]he common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (citing *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*)). Before this right attaches, however, the court must conclude that the documents at issue are "judicial documents," which are those that are " 'relevant to the performance of the judicial function and useful in the judicial process.' " *Id.* (quoting *Amodeo I, supra*). Once the documents are determined to be judicial documents, and the presumption of access attaches, then the court must consider the weight of that presumption by determining the role of the materials at issue in the exercise of judicial power and the resulting value of such information to those who monitor the federal courts. *Id.* (citing *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) (*Amodeo II*)). Where the particular document or documents are usually filed with the court and are "generally" available, the weight of the presumption is stronger than when a document is generally filed under seal. *Amodeo II*, 75 F.3d at 1050.

The court considers privacy interests of "third" parties and the degree to which the subject matter is traditionally considered private. *Lugosch*, 435 F.3d at 120; *Amodeo II*, 75 F.3d at 1051 (citations omitted). Motions to seal must be " 'carefully and skeptically review[ed] ... to insure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Under Seal v. Under Seal*, No. 16-CV-7820, 2017 WL 3432720, at *3 (S.D.N.Y. Aug. 10, 2017) (citing *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). Documents may be sealed if "specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Fitzpatrick v. American Internat'l Grp.*, No. 10 Civ. 142, 2012 WL 4378098, at *1 (S.D.N.Y. Sept. 24, 2012) (citation omitted).

### B. Application

In this case, plaintiff asked the Clerk of the Court to "seal" the entire action. Plaintiff filed a "motion to seal," and in an abundance of caution, the Clerk sealed the documents without

consulting any judicial officer. (Dkt. No. 5). However, having reviewed the documents, together with plaintiff's letter, the court finds no basis for sealing. Plaintiff states that she wishes the court to seal the case because she has had "frequent disturbances," which include "stalking." She does not want the public to know her name because she has been on a long road to recovery and does not wish to experience any more retaliation. (*Id.*)

Although plaintiff seems to believe that she has been the subject of "stalking" and "retaliation," she has only asserted vague and conclusory statements as her basis for these assertions. Plaintiff has interpreted every mishap which has befallen her since the incidents of which she complains as "stalking" or "retaliation." These include "negative gestures" by unknown individuals, a "frozen" iPhone, and being followed by a black car with "tinted" windows. (Compl. ¶ 38). Plaintiff's allegations have no basis in fact, and I will order that the case be unsealed prior to dismissal.

**\*21** **WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's application to proceed IFP (Dkt. No. 2) is **GRANTED FOR PURPOSES OF FILING ONLY**, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 3) is **DENIED**, and it is

**ORDERED**, that the plaintiff's motion to seal (Dkt. No. 5) is **DENIED**, and the Clerk is directed to **UNSEAL THIS ACTION**, and it is

**RECOMMENDED**, that this complaint be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as against defendants **3RPM, INC. d/b/a HARRY'S TIRE; AUGUSTINE; RIESTER; FERLENDA; BELL; and STATE FARM INSURANCE**, and it is

**RECOMMENDED**, that the complaint be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as against defendants **AYERS; IACONA; FURLONG; and LONGO IN THEIR INDIVIDUAL CAPACITIES**, and it is

**RECOMMENDED**, that the complaint be **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B)(i-ii) for failure to state a claim as against defendant

Netti v. Ayers, Not Reported in Fed. Supp. (2017)

2017 WL 7542494

**STATE OF NEW YORK only with respect to claims under the ADA**, and it is

**RECOMMENDED**, that all section 1983 claims against the **STATE OF NEW YORK be DISMISSED WITH PREJUDICE**, pursuant to 28 U.S.C. § 1915(e)(2)(B) (iii), and it is

**RECOMMENDED**, that if the District Court approves this recommendation, plaintiff be given thirty (30) days from the date of the District Judge's Order within which to submit a proposed amended complaint which complies with the above Report, and it is

**RECOMMENDED**, that if plaintiff files a proposed amended complaint within the time allotted or within any requested extension of time that the District Court approves, the proposed amended complaint be returned to me for further review, and it is

**RECOMMENDED**, that if plaintiff does not file a proposed amended complaint within the above time limits, the complaint be dismissed with prejudice without further review by the court, and it is

**ORDERED**, that if the District Judge approves this Recommendation, plaintiff is reminded that any amended complaint must be a complete pleading that replaces and supercedes the original. The original complaint will have "no legal effect." Plaintiff's new proposed amended complaint may not incorporate by reference any part of her original complaint. In any amended complaint, plaintiff must clearly set forth the facts that give rise to her claim, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act, and it is

**ORDERED**, that the Clerk serve a copy of this Order and Report Recommendation on the plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 7542494

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 94 of 151

2017 WL 9487185
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Francis AMATO, et al., Plaintiffs,
v.
Judge Anthony MCGINTY, et al., Defendants.

1:17-CV-593 (MAD/ATB)
|
Signed 06/06/2017

**Attorneys and Law Firms**

Frances Amato, Marlboro, NY, pro se.

John Doe, pro se.

Adrienne Auchmoody, pro se.

Toni Jean Kulpinski, pro se.

Vladimir Kulpinski, pro se.

Michaela Kulpinski, pro se.

Michelle Arzola, pro se.

Jane Doe, pro se.

Adrienne J. Kerwin, Office of Attorney General, David B. Cabaniss, Cabaniss Casey LLP, Albany, NY, for Defendants.

**ORDER and REPORT-RECOMMENDATION**

Hon. Andrew T. Baxter, U.S. Magistrate Judge

**\*1** The Clerk has sent to the Court a civil rights complaint filed by pro se plaintiffs Francis Amato, her son "John Doe," Adrienne Auchmoody, Toni Jean Kulpinski, Vladimir Kulpinski, Michaela Kulpinski, Michelle Arzola, and Ms. Arzola's two children, who have also been referred to as Jane and John Doe. (Complaint ("Compl.") at 1). Plaintiffs have paid the filing fee for this action. However, the court will conduct an initial review of the complaint.[1] Plaintiff Amato has also filed a motion to obtain an ECF Login and Password. (Dkt. No. 10).

[1]     The court notes that on June 2, 2017, plaintiff Amato filed a motion for a Temporary Restraining

Order. (Dkt. No. 8). District Judge D'Agostino denied the motion on the same day. (Dkt. No. 9).

A complaint must allege " 'enough facts to state a claim to relief that is plausible on its face.' " *Preacely v. City of New York*, 622 Fed.Appx. 14, 15 (2d Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim " 'has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ). A case is "frivolous" when either the factual contentions are "clearly baseless or when the claim is based upon "an indisputably meritless legal theory." " *Id.* (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ). A district court has inherent authority to dismiss a frivolous action sua sponte "even when the plaintiff has paid the required filing fee." *Id.* (quoting *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) ). Finally, a federal court has a continuing and independent obligation to examine its subject matter jurisdiction sua sponte. *Robbins v. City of New York*, 254 F.Supp.3d 434, 436 (E.D.N.Y. 2017) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999) ). *See also Forde v. Hornblower New York, LLC*, 243 F.Supp.3d 461, ——, 2017 WL 1078585, at \*2 (S.D.N.Y. 2017) (citations omitted).

**I. Complaint**

This civil rights action has been brought by plaintiffs Frances Amato, her son ("CB"), Adrienne Auchmoody (CB's grandmother), Toni Jean Kulpinski (CB's Aunt and Godmother), Vladimir Kulpinski (CB's Uncle and Godfather), Michaela Kulpinski (CB's cousin), and Michelle Arzola and her two minor children (CB's sister, niece, and nephew). (Compl. ¶¶ 1-7).

Plaintiffs appear to challenge the conduct of defendant Ulster County Family Court Judge Anthony McGinty relative to a custody proceeding involving CB. (Compl. ¶¶ 8, 16). Plaintiffs have also named Attorney Andrew Gilday, who plaintiffs state is a "Public Defender," but appears to be the assigned counsel for Patrick Bessmer—CB's father[2]—in the custody proceeding. (Compl. ¶ 9). Patrick Bessmer and his alleged "paramour," Pamela Augustine are also named as defendants. (Compl. ¶¶ 11, 12). Plaintiffs have also named Amy Ingram, Esq., CB's assigned attorney for the custody proceeding.

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

[2]     Plaintiff Amato and defendant Patrick Bessmer were apparently not married.

**\*2**  Plaintiffs allege that defendant McGinty was "highly abusive" to "all" plaintiffs; violated "constitutional" and "ADA rights;" caused "extreme pain, suffering, and trauma to "all" plaintiffs when he violated their constitutional rights; endangered the welfare of "a child;" and "illegally extended fictitious authority in CLEAR ABSENCE of subject matter jurisdiction." " (Compl. ¶ 18(a)-18(e) ). Plaintiff Amato then describes conduct that was allegedly directed at her.[3] (Compl. ¶ 20). Plaintiff Amato alleges that defendant McGinty denied access to " 'his court,' " denied plaintiff Amato her "rights to proper serving process," denied "any evidence into the court for purpose of record," and denied "the serious risk and harm to [her] child- who is currently and not by [her] consent in public governmental counseling for high risk children." (Compl. ¶ 20). Plaintiff Amato believes that the state proceedings "remain plagued by retributions [sic] for plaintiff's exercise of First Amendment rights to free speech and petition government [sic] for redress of grievances." (Compl. ¶ 19).

[3]     The court notes that, although there are multiple plaintiffs, most of the defendants' alleged conduct was directed at plaintiff Amato alone. Plaintiff Amato appears to allege that the defendants' conduct toward her and CB injured the other defendants because of their family relationship to plaintiff Amato and CB. (*See* Compl. ¶ 45) (stating that "no parties had a due process court hearing or trial, [and] were never served any form of order").

Plaintiff Amato alleges that she is an "outspoken advocate," working along side the District Attorney of Ulster County to compile evidence and to file numerous complaints against defendant McGinty. (*Id.*) Plaintiff Amato states that she has been interviewed by many local newspapers and television stations regarding her concerns about Ulster County Family Court and attorney Amy Ingram. Plaintiff claims she has been "very outspoken" regarding the "countless children" endangered by the "decisions of these judges and the negligence of these public servants and child attorneys mentioned [in the complaint.]" (*Id.*)

Plaintiff Amato lists a series of alleged violations which were committed by defendant McGinty, together with defendants Ingram and Gilday, resulting in the "kidnaping" and "endangerment of a minor." (Compl. ¶ 22).[4] Plaintiff Amato

states that these three defendants intentionally inflicted emotional distress by removing her child, "altering the 9 year status quo from me and my entire family, violating *our* due process...." (Compl. ¶ 22(a) ). These three defendants also allegedly committed "Malicious Trespass," "Abuse of Process," "Retaliation," "False and Unlawful Arrest," "Pre decided trial with no evidence allowed, Obstructing Justice," "Child Endangerment," and "Falsely placing mother and child on a missing persons clearinghouse...." (Compl. ¶ 22(b)-22(h) ).

[4]     There appears to be no ¶ 21 in the complaint.

The complaint contains three "Causes of Action," which contain additional facts and various citations to case law. (Compl. ¶¶ 30-41). The first cause of action is "First Amendment." (Compl. ¶¶ 30-33). The second cause of action is "Parental Impairment," and the third cause of action is "Due Process." (Compl. ¶¶ 34-37, 38-41). Because of the way that the complaint is written, rather than repeating all of the facts, the court will discuss the additional facts as necessary to the analysis of plaintiff's complaint.

## II. Judicial Immunity

### A. Legal Standards

With minor exceptions, judges are entitled to absolute immunity for actions relating to the exercise of their judicial functions. *Mireles v. Waco*, 502 U.S. 9, 9-10, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991). Judicial immunity has been created for the public interest in having judges who are "at liberty to exercise their functions with independence and without fear of consequences." *Huminski v. Corsones*, 396 F.3d 53, 74 (2d Cir. 2004). Judicial immunity applies even when the judge is accused of acting maliciously or corruptly. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.12, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (citing *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) ). Judicial immunity is immunity from suit, not just immunity from the assessment of damages. *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The only two circumstances in which judicial immunity does not apply is when he or she takes action "outside" his or her judicial capacity and when the judge takes action that, although judicial in nature, is taken "in absence of jurisdiction." *Mireles*, 502 U.S. at 11-12, 112 S.Ct. 286.

**\*3**  Injunctive relief against judges is also barred "unless a declaratory decree was violated or declaratory relief

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.        2

was unavailable." *Bobrowski v. Yonkers Courthouse,* 777 F.Supp.2d 692, 711 (S.D.N.Y. 2011) (citing inter alia *Montero v. Travis,* 171 F.3d 757, 761 (2d Cir. 1999) (per curiam) ). Although fairness and injustice may result on occasion, a judicial officer must be free to act on his or her own convictions in exercising the authority vested in him or her, "without apprehension of personal consequences...." *Id.* (citing inter alia *Mireles,* 502 U.S. at 10, 112 S.Ct. 286).

Whether an act by a judge is a "judicial one" relates to the "nature of the act itself"—whether it is a function that is necessarily performed by a judge. *Id.* (citing *Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) ). The parties must have dealt with the judge in his or her "judicial capacity." *Id.* The court acts in "absence of all jurisdiction" when "it does not have any statutory or constitutional power to adjudicate the case." *Id.* (citing *Gross v. Rell,* 585 F.3d 72, 84 (2d Cir. 2009) ). The judge will not be deprived of absolute immunity if he or she takes action that is merely "in excess" of his or her authority. *Id.* (citing *Mireles,* 502 U.S. at 12-13, 112 S.Ct. 286).

### B. Application

Plaintiffs have named Ulster County Family Court Judge Anthony McGinty as a defendant. Plaintiff states that the "defendants" have violated "clearly established laws." (Compl. ¶ 31). Plaintiffs allege that defendant McGinty is biased, discriminates against women who are victims of domestic violence, and has retaliated against plaintiff Amato because she has spoken out against him and other Family Court judges, staff, and appointed counsel for her child.

Plaintiffs claim that the "federal funding law" rewards "states and judicial agents," based on the "number and size of child support orders." (Compl. ¶ 32). Based on this "fact," plaintiffs state that a "financial bias has impaired fair and proper consideration of plaintiff's claims and defenses in the challenged proceedings." However, all of Judge McGinty's alleged "biased" or "illegal" conduct was taken in connection with his position as a Family Court judge presiding over plaintiff Amato's custody case. Whether the judge's conduct involved issuing orders based on "funding," allegedly biased decisions in favor of defendant Bessmer, or making decisions that were not in the best interest of CB, these were all actions taken in the course of a custody proceeding in his capacity as a Family Court Judge. Thus, Judge McGinty is entitled to judicial immunity.

Plaintiff attempts to argue that Judge McGinty acted "in absence" of jurisdiction because he took over plaintiff's custody case from another judge in violation of N.Y. Judiciary Law § 21. (Compl. ¶ 18). Plaintiff Amato's argument is misplaced. N.Y. Judiciary Law § 21 reads as follows:

> A judge other than a judge of the court of appeals, or of the appellate division of the supreme court, shall not decide or take part in the decision of a question, which was argued orally in the court, when he was not present and sitting therein as a judge.

N.Y. Jud. Law § 21. This means that a trial-level judge shall not decide factual issues that were tried before a different judge. *See People v. Hampton,* 21 N.Y.3d 277, 284-85, 970 N.Y.S.2d 716, 992 N.E.2d 1059 (2013). This applies to situations in which the new judge is called upon to make rulings based on an evaluation of testimony that he or she did not hear. *Id.* at 286, 970 N.Y.S.2d 716, 992 N.E.2d 1059. It does not apply to motions involving pure issues of law. *Id.* at 285, 970 N.Y.S.2d 716, 992 N.E.2d 1059. This also does not mean that a judge cannot take over a custody case, or any other action, after another judge has recused herself. *See id.* Otherwise, no judge could ever be replaced after a case has begun.

*\*4* Plaintiff does not allege that there were motions pending that the previous judge did not address when Judge McGinty took over the case. In fact, the complaint indicates that Judge McGinty presided over the challenged proceedings himself. (Compl. ¶ 22(f) ). Plaintiff Amato states that Judge McGinty "pre-decided" the trial with no evidence allowed. (*Id.*) Plaintiff Amato states that defendant McGinty "struck from the record anything that was pertinent to the safety of the child and mother...." (*Id.*) Finally, plaintiff alleges that defendant McGinty and defendants Gilday and Ingram held a "mock trial." (*Id.*) Thus, the judge heard the factual issues in question, and plaintiff has not alleged a violation of Judiciary Law § 21.

In any event, even if the judge acted in violation of Judiciary Law § 21, the appropriate remedy in state court would be remand to the same judge for his or her own hearing of the issue and a subsequent decision. *Id.* at 286, 970 N.Y.S.2d 716, 992 N.E.2d 1059. Although the state court has referred

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 97 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

to this statute as "jurisdictional," it is only with respect to the particular decision that the judge made without hearing the evidence him or herself. *Id.* It does not deprive the court of "jurisdiction" over custody cases. Judge McGinty was still a family court judge with jurisdiction over custody matters. At worst, if Judge McGinty decided a motion or issue improperly, he would have been acting "in excess" of jurisdiction, and he would still be entitled to judicial immunity.

Plaintiffs challenge rulings by Judge McGinty and complain of the way that he managed his courtroom, allegedly "denying access to what the judge called 'his court.' " (Compl. ¶ 20). Judge McGinty allegedly placed CB in "governmental counseling for high risk children" without plaintiff Amato's consent, "denied evidence ... for purpose of record; and "falsely" placed plaintiff Amato and CB on a "missing persons clearinghouse." " (Compl. ¶¶ 20, 22(h) ). Plaintiffs allege that on January 31, 2017, defendant McGinty "issued a directive to plaintiff [Amato] under penalty of imprisonment .... sixty days in county jail on a civil offense of a woman with no background at all because she wanted to protect her child from further addiction and domestic violence." (Compl. ¶ 24). Plaintiff Amato alleges that the court mocked her and endangered CB with its rulings. (*Id.*) Plaintiff Amato also claims that a "stay" was granted by the Appellate Division, which ordered plaintiff's immediate release from the Ulster County Jail "false arrest and abuse of power." (*Id.*)

Notwithstanding plaintiffs' allegations that the Judge made improper adverse rulings against plaintiff Amato during the custody proceeding with malice or in retaliation for her "exposing" abuses in Family Court, the judge was still performing judicial functions and presiding over plaintiff's custody action. As stated above, a judge does not lose his or her judicial immunity because he or she is accused of acting with malice or corruptly.

In *Koziol v. King*, the plaintiff sued a variety of judges in connection with custody and support proceedings. *Koziol v. King*, No. 6:14-CV-946, 2015 WL 2453481 (N.D.N.Y. May 22, 2015). In *Koziol*, then-Chief District Court Judge Gary Sharpe dismissed claims against County Court Judge King which related primarily to visitation and custody orders in matters pending before him, based on absolute immunity. *Id.* at *8. Plaintiff Koziol had also challenged that way that Judge King "managed his courtroom." *Id.*

In dismissing the claims against Judge King, Judge Sharpe cited *Davis v. Kushner*, No. 1:14-CV-511, 2014 WL 5308142, at *5 (N.D.N.Y. Oct. 16, 2014), in which the court held that a family court judge was protected by judicial immunity where the plaintiff alleged that the judge denied him custodial and visitation rights because he was a Muslim, which violated his civil rights. Thus, judicial immunity is not lost because plaintiff alleges that the judge's decision was unconstitutional. Plaintiffs in this case disagree with the judge's decisions. (Compl. ¶ 29). Plaintiff Amato quotes the judge's order awarding custody to defendant Bessmer, and states that the judge did not properly consider CB's father's drug dealing, drug abuse, arrests, domestic violence, and probation violations. (*Id.*)

**\*5** Plaintiff Amato also states that defendant McGinty abused his authority when he issued an order of protection without "a trial or hearing," and subjected plaintiff Amato to supervised visitation, allegedly contrary to New York law. (Compl. ¶ 35). Plaintiff discusses the proper procedure for "imposing supervised visitation," and faults the judge as well as the other defendants for imposing such restrictions on her. However, these decisions are also within the purview of the Family Court Judge. Even if the judge was incorrect in imposing the alleged restrictions to plaintiff Amato's visitation, it would not deprive Judge McGinty of judicial immunity.

Plaintiff Amato clearly has issues with the Family Court system and claims that the system has been abused by Judge McGinty. The complaint also contains two paragraphs which refer to "financially based custody laws" and states that "Plaintiff" seeks an order declaring Sections 236 and 240 of the Domestic Relations Law unconstitutional. (Compl. ¶¶ 36). Judge McGinty's application of the laws that he has jurisdiction to interpret does not deprive him of judicial immunity, even if those laws were unconstitutional. The constitutionality of state statutes is an issue separate from judicial immunity. [5]

[5]    Although plaintiffs' complaint asks that two sections of New York Domestic Relations Law be declared "unconstitutional," the court must first note that, to the extent that the claim could be asserted at all, it could only be asserted by plaintiff Amato because she is the only plaintiff who has been a party to the custody proceedings and to whom the statute would have been applied. In addition, none of the individuals

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 98 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

named as defendants are proper defendants in such an action. Finally, in cases involving Domestic Relations issues, the court must afford the state court appropriate deference in light of ongoing proceedings involving the plaintiff. *See Kahn v. Shaiswit*, 414 F.Supp. 1064, 1068 (S.D.N.Y. 1976) (dismissing an action by plaintiff husband in a divorce matter in which he challenged the constitutionality of New York Domestic Relations Law § 239). The court in *Kahn* cited *Mendez v. Heller*, 530 F.2d 457 (2d Cir. 1976), in which Judge Oakes stated in a concurring opinion, that " 'probate and domestic relations are matters which have long been recognized as invoking, at least initially, interests which are predominantly of state concern.' " *Id.* at 1067 (quoting *Mendez*, 530 F.2d at 461). Thus, to the extent that plaintiff Amato may be attempting to challenge the constitutionality of sections of the New York Domestic Relations Law, the claim may be dismissed.

Plaintiff Amato claims in her third cause of action that she was denied the right to a "rational, orderly and timely court proceeding before a neutral and detached magistrate or judge." (Compl. ¶ 39). This is clearly an action that is judicial in nature, and Judge McGinty would be entitled to judicial immunity for any such claim. The same is true for plaintiff's state law claims of intentional and negligent infliction of emotional distress. Thus, plaintiffs'[6] complaint must be dismissed as against defendant McGinty.

[6]     Judicial immunity applies to shield Judge McGinty's liability as to all the plaintiff's, although plaintiff Amato is generally the plaintiff to whom the complaint refers. Plaintiff Amato appears to attempt to include the other plaintiffs by stating that they did not get "hearings," they do not appear to have been parties to the custody case. To the extent that any of the other "plaintiffs," uncle, aunt, grandmother, sister, niece and nephew had dealings with Judge McGinty, it was only in connection with the custody action, and the judge is entitled to absolute immunity no matter who the plaintiff is.

**\*6**  It has also been held that law guardians are entitled to absolute quasi-judicial immunity for their actions in representing children in Family Court. *Davis v. Kushner*, No. 1:14-CV-511, 2014 WL 5308142, at \*5 (N.D.N.Y. Oct. 16, 2014) (citing inter alia *Yapi v. Kondratyeva*, 340 Fed.Appx. 683, 685 (2d Cir. 2009) (citations omitted) ); *Holland v.*

*Morgenstern*, No. 12-CV-4870, 2013 WL 2237550, at \*4 (E.D.N.Y. May 20, 2013) (citations omitted); *Lewittes v. Lobis*, No. 04 Civ. 155, 2004 WL 1854082, at \*11 (S.D.N.Y. Aug. 19, 2004) (citations omitted). In *Lewittes*, the court held that the plaintiff would have other available remedies if the child's attorney were derelict in performing his or her duties. 2004 WL 1854082, at \*12. This holding is supported by New York State court decisions holding that such guardians are protected by quasi-judicial immunity. *Id.* at \*11-12, 112 S.Ct. 286 (citing inter alia *Bluntt v. O'Connor*, 291 A.D.2d 106, 737 N.Y.S.2d 471 (4th Dep't), appeal denied, 98 N.Y.2d 605, 746 N.Y.S.2d 279, 773 N.E.2d 1017 (2002) ). Thus, defendant Ingram, as the attorney for CB would also be entitled to absolute immunity, and the complaint must be dismissed as against her.

### III. State Action

#### A. Legal Standards

To state a claim under section 1983, the plaintiff must allege both that the defendant has violated plaintiff's rights under either the Constitution or laws of the United States and that the defendant acted "under color of state law." *Rae v. City of Suffolk*, 693 F.Supp.2d 217, 223 (E.D.N.Y. 2010); 42 U.S.C. § 1983.

A person acts under color of state law when he or she acts in his or her official capacity, "clothed with the authority of state law," or acts under "pretense" of law by purporting to act with official power. *Pleasure Island, Inc. v. City of New York*, No. 12 Civ. 4699, 2013 WL 2311837, at \*5-6 (E.D.N.Y. May 24, 2013) (quoting *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) ). The requirement that the defendant acted under "color of state law" is jurisdictional. *Lucas v. Riggi*, No. 07-CV-6200, 2008 WL 4758706, at \*2 (W.D.N.Y. Oct. 29, 2008) (citing *Polk County v. Dodson*, 454 U.S. 312, 315, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) ).

Private conduct is simply beyond the reach of section 1983 " 'no matter how discriminatory or wrongful that conduct may be.' " *Id.* (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999) ). A private party may act under color of state law if he or she engages in conduct that constitutes willful participation in joint activity with the state. *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (per curiam). The nexus to the state must be so close as to be fairly treated as that of the state itself. *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) (citations omitted).

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

**B. Application**

Plaintiffs have sued Attorneys Andrew Gilday and Amy Ingram [7] as well as Patrick Bessmer and his girlfriend, Pamela Augustine. With respect to Attorneys Gilday and Ingram, it is well-established that private attorneys do not act under color of state law even if they are court-appointed attorneys, performing their traditional function as counsel. *See Harmon v. New York County Dist. Attorney's Office*, No. 13 Civ. 1711, 2014 WL 1044310, at *9 (S.D.N.Y. March 17, 2014) (citing inter alia *Brown v. Legal Aid Soc'y*, 367 Fed.Appx. 215, 216 (2d Cir. 2010); *Rodriguez v. Weprin*, 116 F.3d 62, 65-66 (2d Cir. 1997) ). *See also Licari v. Voog*, 374 Fed.Appx. 230, 231 (2d Cir. 2010) (private attorneys, even if they are court-appointed, and/or associated with a Legal Aid organization, do not act under color of state law when representing their clients). According to plaintiffs, defendant Gilday is the court-appointed attorney for defendant Bessmer, and defendant Ingram was appointed by the court as the attorney for CB.

[7]   As stated above, defendant Ingram is entitled to immunity. The lack of state action is an alternative basis for dismissal as against this defendant.

 *7  Defendants Bessmer (CB's father) and Augustine are clearly private parties who do not act under color of state law for purposes of section 1983. Although plaintiffs allege that Bessmer and Augustine "conspired" with other defendants, plaintiff states no facts to support these conclusory statements that are dispersed throughout the complaint. (Compl. ¶¶ 11, 12). Conclusory allegations of conspiracy are insufficient to state a claim under the civil rights laws. *See Brown*, 367 Fed.Appx. at 216 (color of state law may be established if the individual conspired with a state actor, however, conclusory allegations of conspiracy are insufficient). The only state actor is Judge McGinty, and there is no indication, other than the judge's decision in Bessmer's favor, how defendant Bessmer or defendant Augustine would have "conspired" with the judge sufficient to establish that they acted under color of state law. [8]

[8]   Plaintiff alleges that she was verbally and physically threatened by defendants Bessmer and Augustine outside the court, and that Judge McGinty only issued an order of protection for plaintiff Amato and not for CB. (Compl. ¶ 29). The alleged attack by Bessmer and Augustine was certainly a "private action," and the judge's failure to issue a protective order for CB is not alleged to have been the result of any "conspiracy."

Plaintiffs allege that defendants Gilday, Ingram, and Judge McGinty "co-conspired," violated her rights and placed CB in the custody of a dangerous criminal in violation of "Statute." (Compl. ¶ 22). "Merely resorting to the courts and being on the winning side of a lawsuit does not rise to the level of "conspiracy." " *Dennis v. Sparks*, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1988). Defendant Gilday was appointed to represent defendant Bessmer and had a duty to represent his interests in the custody proceeding. Defendant Ingram was appointed to protect the interests of CB during the proceedings. Plaintiff faults Attorney Ingram for being ill prepared, not returning plaintiff Amato's calls, and was generally an ineffective advocate for CB. Plaintiff claims that defendant Ingram also "fought vehemently" in favor of custody for defendant Bessmer (Compl. ¶ 26). Plaintiff also states that her "adversary," the judge, and the appointed child attorney "ganged up" on her. (Id.)

Defendant Ingram's alleged incompetence and the fact that the judge ultimately ruled in defendant Bessmer's favor does not indicate that the judge conspired with the attorneys regarding his ruling or that defendants Bessmer and Augustine somehow conspired with the judge to obtain a favorable result. Thus, the complaint may be dismissed in its entirety as against defendants Attorney Gilday, Attorney Ingram, Bessmer and Augustine.

**IV. Minor Child Plaintiffs**

**A. Legal Standards**

It is well-settled that a person who has not been admitted to practice law may not represent anyone other than himself. [9] *Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007). *See also* 28 U.S.C. § 1654.

[9]   An limited exception exists if an individual appears for an estate in which there are no other beneficiaries or creditors. *See Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010). The exception is not applicable to this case. An exception has also been established for parents representing their children in applications for Supplemental Security Income ("SSI"). *Machadio v. Apfel*, 276 F.3d 103, 106-07 (2d Cir. 2002). However, the interests of the child and the parent were "intertwined," and

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 100 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

the Social Security regulations provided for such representation.

**B. Application**

Plaintiff's have listed various "John" or "Jane" Doe minors as plaintiffs, including CB, plaintiff Amato's child. The adult plaintiffs have all signed the complaint and added their John or Jane Doe children under their names. [10] (Compl. CM/ECF pp. 27, 28, 32). However, while the adults may represent their own interests, they may not represent the interests of their children. See *Cheung v. Youth Orchestra Found. of Buffalo*, 906 F.2d 59, 61 (2d Cir. 1990) (a non-attorney parent must be represented by counsel in bringing an action on behalf of his or her child because the choice to appear pro se is not a true choice for minors who, under state law, cannot determine their own legal actions) (citing *Fed. R. Civ. P. 17(b)* ). The court in *Cheung* further stated that it is not in the interests of minors or incompetents that they be represented by non-attorneys. *Id.* "Where they have claims that require adjudication, they are entitled to trained legal assistance so their rights may be fully protected." *Id.* Thus, the minor children may not be plaintiffs on their own because they are minors, [11] and the adult plaintiffs may not represent their children. *See also Armatas v. Maroulleti*, 484 Fed.Appx. 576 (2d Cir. 2012).

[10]    One plaintiff has attempted to sign the complaint herself as a "minor," with her "guardian" signing the complaint underneath the minor's name. (Compl. at CM/ECF p.32).

[11]    *Fed. R. Civ. P. 17(e).*

**\*8** The court would also point out that although all the adult plaintiffs have signed the complaint, they did not include their addresses. The only specific contact information is for plaintiff Amato. The complaint contains a description of the various plaintiffs and generally where they live, [12] but no specific addresses have been provided. (Compl. ¶¶ 3-7). Plaintiff Amato may not act on behalf of any of the other plaintiffs because she is not an attorney. This includes accepting mail from the court and sending it to the other plaintiffs. In any event, as discussed below, the adults, other than the plaintiff have no standing to bring this action.

[12]    Most of the plaintiffs live in New York State, but Michelle Arzola and her two "Doe" "children" live in Ohio. (Compl. ¶ 7).

**V. Standing**

**A. Legal Standards**

A plaintiff bears the burden of establishing that he or she has standing to bring an action in federal court. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). "To establish constitutional standing, a plaintiff must show (1) an injury in fact, (2) causation between the injury and the offensive conduct, and (3) 'a likelihood that the injury will be redressed by a favorable decision.' " *Heath v. Banks*, No. 16-3493-cv, slip. op. at 2 (2d Cir. June 5, 2017) (quoting *Susan B. Anthony List v. Driehous*, —— U.S. ——, 134 S.Ct. 2334, 2341, 189 L.Ed.2d 246 (2014) ). In addition, there is a "prudential standing rule" which states that, normally litigants are barred from "asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Id.* (quoting *Rajamin v. Deutsche Bank Nat't Tr. Co.*, 757 F.3d 79, 86 (2014) ).

**B. Application**

In this case, plaintiff Amato has added other adult plaintiffs, including her mother, CB's Aunt and Uncle, and CB's adult cousin. None of these individuals are parties to the custody action, and it is unclear how family that lives in Ohio, (Compl. ¶ 7), would have standing to assert claims in this case. According to the prudential standing rule, the additional plaintiffs would be barred from asserting the legal interests of either plaintiff Amato or CB even if the other plaintiffs claimed that they are "injured" by any of the defendants' actions. Thus, the complaint may also be dismissed for lack of standing as against all plaintiffs other than plaintiff Amato and CB.

**VI.** *Rooker-Feldman***, The Domestic Relations Exception, and** *Younger v. Harris*

**A. The Domestic Relations Exception**

**1. Legal Standards**

Under the domestic relations exception to the jurisdiction of federal courts, cases involving divorce, alimony, and child custody remain outside federal court jurisdiction. *Marshal v. Marshall*, 547 U.S. 293, 308, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006). This exception is based upon a policy dictating that the states have traditionally adjudicated marital and child custody disputes, developing "competence and expertise in adjudicating such matters, which the federal courts lack." *Thomas v. N.Y. City*, 814 F.Supp. 1139, 1146 (E.D.N.Y. 1993).

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 101 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

In *Bukowski v. Spinner*, No. 17-CV-845, 2017 WL 1592578 (E.D.N.Y. Apr. 28, 2017), the District Court dismissed a fee-paid action, sua sponte which raised very similar claims to the case herein. In *Bukowski*, the plaintiff sought to challenge rulings made in an underlying state court child custody case, [13] naming the Judge, law guardian, and County Attorney, among other defendants. *Id.* Plaintiff in *Bukowski* criticized the Judge, stated that the law guardian was "not troubled" by the judge's actions, criticized the caseworkers, and claimed that she was subjected her to "unfounded" charges. *Id.* at *1.

[13]     One of the rulings granted sole custody to the father of the child. 2017 WL 1592578, at *1.

### 2. Application

**\*9**  Plaintiffs in this case are making the same claims and challenging similar actions by the state court judge and the state court attorneys who appeared in plaintiff Amato's custody case. The plaintiff in *Bukowski* also raised "constitutional" issues, but the court recognized that the allegations essentially challenged a state domestic relations matter, and were therefore, outside the federal court's jurisdiction. 2017 WL 1592578, at *3 (citations omitted). A review of plaintiffs' request for relief in this case shows that they are essentially challenging the state court's action. In addition to substantial monetary damages, plaintiffs seek "immediate return" of CB, together with a judgment "declaring the orders, edicts, and processes described in this Complaint unconstitutional with an order permanently enjoining the enforcement of these orders." (Compl. at CM/ ECF p. 26).

In order to return custody of CB to plaintiff, or to "enjoin" the state court's orders, this court would have to re-determine the judge's decision in the custody matter. This would also involve resolving factual disputes regarding custody and visitation. This court is divested of jurisdiction to make such determinations. *See also Ankenbrandt v. Richards*, 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992); *Hernstadt v. Hernstadt*, 373 F.2d 316, 317 (2d Cir. 1967) (it has been uniformly held that federal courts do not adjudicate cases involving the custody of minors and rights of visitation); *Sobel v. Prudenti*, 25 F.Supp.3d 340, 353 (E.D.N.Y. 2014) (the domestic relations exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees"). Thus, the case may be dismissed based on the domestic

relations exception. To the extent that the custody case has been concluded, the court will also discuss alternate bases for dismissal.

### B. *Rooker-Feldman*

#### 1. Legal Standards

A dismissal pursuant to the *Rooker Feldman* [14] doctrine is for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *Remy v. New York State Dep't of Taxation and Finance*, 507 Fed.Appx. 16, 18 (2d Cir. 2013). This doctrine divests the federal court of jurisdiction to consider actions that seek to overturn state court judgments. *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) ). The doctrine also bars the federal court from considering claims that are "inextricably intertwined" with a prior state court determination. *Id.* (quoting *Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir. 1999) ).

[14]     *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983) and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 414 17, 44 S.Ct. 149, 68 L.Ed. 362 (1923).

There are four requirements to the application of *Rooker Feldman*: (1) the federal court plaintiff must have lost in state court; (2) the plaintiff's injuries must have been caused by the state court judgment; (3) the plaintiff must be asking the federal court to review and reject the state court's judgment; and (4) the judgment must have been rendered prior to filing the federal court action. *Bukowski*, 2017 WL 1592578, at *3 (citing *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) ).

### 2. Application

As Judge D'Agostino stated in her June 2, 2017 decision, under the *Rooker Feldman* doctrine, the district court also does not have subject matter jurisdiction over claims that effectively challenge state court judgments in general. (Dkt. No. 9) (quoting *Arena v. Dep't of Soc. Servs. of Nassau Cty.*, 216 F.Supp.2d 146, 151 (E.D.N.Y. 2002) ). Although it is unclear whether the plaintiff's custody case is finally decided because plaintiff claims that the Judge scheduled a proceeding

Case 1:21-cv-00860-GLS-TWD  Document 17  Filed 01/26/22  Page 102 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

in "October" notwithstanding that the witnesses were ready to testify. [15] (Dkt. No. 8 at CM/ECF p.4). To the extent that plaintiff's custody case is terminated, or to the extent that plaintiff seeks review of decisions that the judge has already issued, this complaint is barred by *Rooker Feldman* because plaintiff is essentially challenging the state court's decision. Plaintiff lost in state court, her injuries are allegedly causes by the state court judgment that she seeks to overturn, plaintiff is asking this court to overturn Judge McGinty's rulings, and it appears that custody was awarded to Mr. Bessmer prior to plaintiff bringing this action. Thus, all the requirements for *Rooker Feldman* have been met with respect to orders that have already been issued by Judge McGinty.

[15]    Plaintiff Amato does allege that custody has already been awarded to defendant Bessmer.

### C. *Younger v. Harris* [16]

[16]    401 U.S. 37 (1971).

### 1. Legal Standards

**\*10**  In *Younger v. Harris*, the Supreme Court held that federal courts must abstain from exercising jurisdiction over claims, seeking declaratory or injunctive relief, that implicate ongoing state proceedings. 401 U.S. at 43-44. The Supreme Court held that when there is a parallel criminal proceeding in state court, the federal court must refrain from enjoining the state prosecution. *Id.* *Younger* abstention has been expanded to include state civil proceedings which are akin to criminal prosecutions [17] and state court proceedings which implicate a state's interest in enforcing the orders and judgments of its courts. [18] Until 2013, the abstention analysis involved determining (1) whether there was an ongoing state proceeding; (2) whether an important state interest was implicated; and (3) whether the plaintiff had an avenue open for review of constitutional claims in state court. *See Middlesex County Ethics Comm. v. Garden State Bar Assn.*, 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Parent v. New York*, 485 Fed.Appx. 500, 503 (2d Cir. 2012) (quoting *Younger, supra; Liberty Mut. Ins. Co. v. Hurlbut*, 585 F.3d 639, 647 (2d Cir. 1997) ).

[17]    *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975).

[18]    *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

In *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 134 S.Ct. 584, 588, 187 L.Ed.2d 505 (2013), the Court revisited the analysis required to invoke abstention under *Younger*. In *Sprint*, the Court rejected the three-part test in favor of a "categorical approach." *Mir v. Shah*, 569 Fed.Appx. 48, 51 (2d Cir. 2014) (citing *Sprint*, 134 S.Ct. at 591-94). *Younger* abstention is triggered only by three categories of state court proceedings: (1) state criminal prosecutions; (2) civil proceedings that are akin to criminal proceedings; and (3) civil proceedings that "implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* (quoting *Sprint*, 134 S.Ct. at 588). In *Sprint*, the Court used state-initiated custody proceedings in its analysis [19] as an example of civil proceedings which are akin to criminal proceedings. 134 S.Ct. at 592 (citing *Moore v. Sims*, 442 U.S. 415, 419–420, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (state-initiated proceeding to gain custody of children allegedly abused by their parents) ). *See also Davis v. Baldwin*, 594 Fed.Appx. 49, 51 (2d Cir. 2015) (same).

[19]    *Sprint* did not involve custody proceedings.

"If the federal court action falls into one of the three categories listed above, the court may then consider additional factors, such as "whether the state interest is vital and whether the state proceeding affords an adequate opportunity to raise the constitutional claims." " *Torres v. Gaines*, 130 F.Supp.3d 630, 636 (D. Conn. 2015). In Judge D'Agostino's decision, she stated that "several courts in the Circuit have held that *Younger* abstention applies in similar circumstances as this case." (Dkt. No. 9 at 5) (citing *Graham v. Ctr. for Interpersonal Dev.*, No. 15-CV-459, 456 S.W.3d 545, 2015 WL 1120121, at *2-3 (E.D.N.Y. Mar. 12, 2015) (holding that plaintiff's claim for injunctive relief was barred by *Younger* when the plaintiff sought to challenge an ongoing family court custody proceeding) ).

In *Graham*, the court stated that " 'there can be no doubt that a custody dispute ... raises important state interests.' " 2015 WL 1120121, at *3, 456 S.W.3d 545 (quoting *Reinhardt v. Com. of Mass. Dep't of Social Servs.*, 715 F.Supp. 1253, 1256 (S.D.N.Y. 1989) ). In addition, the court held that plaintiff was able to raise any potential constitutional claims in state court. *Id.* Therefore, the court applied *Younger* to dismiss plaintiff's claims for injunctive relief. The same is true in this action to the extent that any of the issues upon which plaintiffs base their action are still pending or are to be tried in the

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 103 of 151

Amato v. McGinty, Not Reported in Fed. Supp. (2017)

2017 WL 9487185

future. [20] In fact, plaintiff Amato has cited a quote from a letter, signed by Judge McGinty, telling plaintiff Amato that, if she is unhappy with the court's decision, her recourse is an appeal of that decision. [21] (Compl. ¶ 41).

[20]   *Younger* does not apply to monetary damages, thus, the dismissal of plaintiff's damage claims would be governed by the domestic relations exception and not *Younger*.

[21]   The letter is referring to a "decision" from 2016. It is unclear what that decision may have been or whether it was the judge's actual custody decision.

## VII. Opportunity to Amend

### A. Legal Standards
 **\*11** Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### B. Application
Because Judge McGinty and Attorney Ingram are entitled to absolute immunity, it would be futile to allow the plaintiffs to amend their complaint. No amendment will cure this deficiency. Defendant Gilday does not act under color of state law, and plaintiffs have made no sufficient allegations of a conspiracy with Judge McGinty that would be sufficient to establish state action by defendant Gilday. Thus, the court also recommends that no amendment be allowed. Defendants Bessmer and Augustine also do not act under color of state law, and defendant Bessmer is simply plaintiff Amato's adversary in the custody dispute. Defendant Augustine does not appear to be involved in the litigation at all. Thus, no amendment would change this court's recommendation with respect to defendants Bessmer and Augustine.

The court notes that, as stated above, in two of the paragraphs of her complaint, plaintiff appears to state that New York Domestic Relations Law §§ 236 and 240 are "unconstitutional," but her reasoning for this allegations is completely unclear. (Compl. ¶ 36). While plaintiff Amato

might in certain circumstances be entitled to challenge the constitutionality of laws as they applied to her without running afoul of the domestic relations exception, *Younger*, or *Rooker Feldman*, the other plaintiff's do not have standing to assert this claim because the laws have not been applied to them, and plaintiff Amato has not named any defendants that would be able to afford her the relief that she seeks with respect to the sections of the law that she appears to challenge. In addition, it is likely that even a proper challenge to the statute would have to be brought first in state court. *See Kahn, supra.* The court also points out that this claim does not appear in plaintiff's "relief" section. Thus, the court will recommend dismissing this claim without prejudice to filing an amended complaint with only plaintiff Amato as the plaintiff, against the proper defendant, at the proper time, and in the appropriate forum. [22]

[22]   Although plaintiff also mentions the Family Court Act in paragraph 36 of her complaint, she does not indicate which sections of the Act she believes to be unconstitutional.

## VIII. Motion to Obtain ECF Login and Password
Because this court is recommending dismissal at this time, the court will deny plaintiff's motion to obtain ECF privileges without prejudice.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that plaintiffs' complaint be dismissed in its entirety **WITH PREJUDICE** as against defendants McGinty, Ingram, Gilday, Bessmer, and Augustine, and it is

**RECOMMENDED**, that plaintiff Amato's complaint be dismissed **WITHOUT PREJUDICE** only with respect to any claim challenging the constitutionality of New York Domestic Relations Law, and only against the proper defendant for such challenge, at the proper time for such challenge, and in the proper forum, as discussed above, and it is

 **\*12 ORDERED**, that plaintiff Amato's motion to obtain ECF privileges (Dkt. No. 10) is **DENIED**, and it is

**ORDERED**, that the Clerk serve a copy of this order on plaintiffs to the extent that addresses are available.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written

objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993)(citing *Small v. Secretary of* *Health and Human Services,* 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9487185

---

**End of Document**                                        © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5823116
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Edwin FERNANDEZ, Plaintiff,
v.
Vicky TURETSKY, et al., Defendants.

No. 12–cv–4092 (SLT)(MDG).
|
Signed Nov. 5, 2014.
|
Filed Nov. 7, 2014.

**Attorneys and Law Firms**

Edwin Fernandez, Staten Island, NY, pro se.

Kathleen Anne Mahoney, United States Attorneys Office, Elizabeth A. Forman, Attorney General of the State of New York, Gloria Mihee Yi, NYC Law Department, Omar Hani Tuffaha, New York City Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

TOWNES, District Judge.

**\*1** Plaintiff Edwin Fernandez, proceeding *pro se,* alleges that his constitutional right to due process was violated by (1) federal defendants: Vicki Turetsky and Joyce A. Thomas, respectively, the Commissioner and Regional Administrator of the U.S. Department of Health and Human Services, Office of Child Support Enforcement; (2) state defendants: Thomas H. Mattox and C. Duncan Kerr, respectively, the Commissioner and Deputy Tax Commissioner of the New York State Department of Taxation and Finance, Office of Child Support Enforcement; and three Tax Compliance Agents employed by the New York State Department of Taxation and Finance, Child Support Enforcement Section– Patty Whitford, Georgia Brown, and Margaret Ramsay; and (3) a municipal defendant: Robert Doar, a former Commissioner of the New York City Human Resources Administration. Plaintiff alleges that his vehicles and funds were seized, wages garnished, and tax refunds intercepted in order to collect child support arrears even though "Plaintiff was in compliance paying child support arrears." [Dkt. 4,

Amd. Compl. ¶ 26.] This action was reassigned to this Court on March 18, 2014, after Judge Mauskopf entered a recusal order on March 17, 2014. Currently before the Court is state defendants' ("Defendants") motion to dismiss for, *inter alia,* lack of subject matter jurisdiction. [1]

[1] Defendants also seeks to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff's claims are time-barred. This Court need not reach the issue because it lacks subject matter jurisdiction over the case.

**Legal Standard**

Defendants move to dismiss on the grounds that this Court lacks subject matter jurisdiction. *Remy v. New York State Dep't of Taxation & Fin.,* 507 F. App'x 16, 18 (2d Cir.2013) ("A challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction.") (quoting *Moccio v. N.Y. State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996)). "A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) 'when the district court lacks the statutory or constitutional power to adjudicate it.' " *Sobel v. Prudenti,* 12 CV 3258 DRH WDW, 2014 WL 2750364, at \*10 (E.D.N.Y. June 18, 2014) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). Unlike on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." ' *Mac Pherson v. State St. Bank & Trust Co.,* 452 F.Supp.2d 133, 136 (E.D.N.Y.2006) aff'd, 273 F. App'x 61 (2008) (quoting *Makarova,* 201 F.3d at 113). In resolving a motion to dismiss under Rule 12(b)(1), the Court is not limited to the face of the complaint, but may also consider evidence such as affidavits submitted by the parties. *Robinson v. Government of Malaysia,* 269 F.3d 133, 141 (2d Cir.2001).

**Factual History**

According to the factual recitation in the May 13, 2008 Decision and Order of the Honorable Francois A. Rivera, Justice of the Supreme Court of the State of New York, Kings County dismissing Plaintiff's CPLR Article 78 petition, Plaintiff's obligation to pay child support to his ex-wife, custodial parent of their child, arises out of a June 7, 1990 divorce decree. After Plaintiff did not comply with his child support obligations, in June 1999, his ex-wife requested that

the New York City Support Collection Unit assist her in enforcing Plaintiff's support obligations. Justice Rivera's May 13, 2008 Order finds that although the child support order was terminated *nunc pro tunc* to January 9, 2007, the day that the subject child turned 21 Plaintiff still owed outstanding support arrears. Subsequently, a Supreme Court of the State of New York, Kings County Family Court Support Magistrate, at an October 23, 2007 hearing, set Plaintiff's child support arrears at $33,468.80. Justice Rivera's Order rejects Plaintiff's contention "that he has paid the required child support and now that the child is emancipated, he no longer owes any money," because "[i]n actuality, though Mr. Fernandez [*sic*] paid child support through an income execution of his wages, and the child in question is now emancipated, *he is still in arrears for prior child support payments that he never paid.*" (emphasis added). Accordingly, Justice Rivera dismissed Plaintiff's CPLR Article 78 petition.

 **\*2** Plaintiff filed the instant lawsuit pursuant to 42 U.S.C. § 1983 against employees of federal, state, and municipal child support enforcement agencies alleging that, because his ongoing support obligations were terminated *nunc pro tunc* to January 9, 2007 when his child turned 21, he had no further obligations and all subsequent child support collection efforts were unconstitutional. [2] In his papers, Plaintiff challenges the October 23, 2007 decision of a Family Court Support Magistrate setting Plaintiff's child support arrears at $33,468.80. Although he does not mention his unsuccessful CPLR Article 78 petition in his pleadings, he, in effect, asks this Court to reconsider Justice Rivera's May 13, 2008 Order finding that Plaintiff owed money under a valid child support arrears decree. Defendants have moved to dismiss Plaintiff's action for, *inter alia*, lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction and the *Rooker–Feldman* doctrine.

[2]     *Pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

## Discussion

### A. *Domestic Relations Exception to Jurisdiction*
Defendants contend that this Court lacks subject matter jurisdiction over the action under the domestic relations exception to federal court jurisdiction. *See Ankenbrandt v.*

*Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). The so-called "domestic relations exception" dates back to 1858, when the Supreme Court announced that federal courts have no jurisdiction over suits for divorce or the allowance of alimony. *Barber v. Barber,* 62 U.S. 582, 584, 21 How. 582, 16 L.Ed. 226 (1858); *Ankenbrandt,* 504 U.S. at 703 (explaining that exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees.") Although courts frequently use broad language when characterizing the exception, the Supreme Court has clarified that, in actuality, the exception is narrow, and "encompasses *only* cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt,* 504 U.S. at 704 (emphasis added). Thus, where a lawsuit "in no way seeks such a decree," the exception's invocation is inappropriate. *Id.; Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995) ("[T]he exception is very narrow."); *but see McKnight v. Middleton,* 699 F.Supp.2d 507, 516–17 (E.D.N.Y.2010) *aff'd,* 434 F. App'x 32 (2d Cir.2011) (observing that in *Schottel v. Kutyba,* 06–1577–CV, 2009 WL 230106 (2d Cir. Feb.2, 2009), the Second Circuit expanded the exception to claims that, in fact, challenge domestic relations decrees, even where they are recast as actions seeking monetary relief).

The domestic relations exception is rooted in an understanding that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890). "[T]he exception is grounded, not in the Constitution, but as a matter of 'statutory construction' of the federal diversity statute." *Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 733–34 (D.Conn.2003) (citing *Ankenbrandt,* 504 U.S. at 703). Despite its origins in the federal diversity statute, courts in this district routinely apply the exception to cases brought under the federal courts' federal question jurisdiction. *See Mitchell–Angel v. Cronin,* 101 F.3d 108 (2d Cir.1996) ("District courts in this Circuit have held that the exception includes civil rights actions directed at challenging the results of domestic relations proceedings.") (citing *McArthur v. Bell,* 788 F.Supp. 706, 708 (E.D.N.Y.1992)); *see also Sobel,* 2014 WL 2750364, at *11 (finding exception strips federal court of jurisdiction where "Plaintiff's complaint is, in effect, a civil rights action directed at challenging the results of domestic relations proceedings, and, in particular, a state court's decisions regarding child support."); *Sullivan v. Xu,* No. 10–CV–3626 (ENV), 2010 WL 3238979, at *2 (E.D.N.Y. Aug.13, 2010) ("Although plaintiff invokes his constitutional rights, the substance of his claims concern state law domestic

relations matters."). That said, the Second Circuit recently noted in a summary order that the Circuit "expressly decline[s] to address whether the domestic relations exception to federal subject matter jurisdiction applies to federal question actions." *See Ashmore v. Prus,* 12–2760–CV, 2013 WL 362998, at *2 (2d Cir. Jan.31, 2013) (summary order); *see also Ahlawat v. State of Connecticut Superior Court,* 3:12–CV–1042 JBA, 2013 WL 3338572, at *1 n. 2 (D.Conn. July 2, 2013) (noting that "the Second Circuit has not resolved whether [the domestic relations] exception would provide a further bar to Plaintiff's federal question lawsuit.").

**\*3** Here, if Plaintiff's claim is read to challenge the enforcement of a child support decree on the grounds that it is erroneous, his lawsuit, even though framed as a civil rights action, would be barred by the domestic relations exception. However, reading *pro se* Plaintiff's complaint to "raise the strongest arguments that they suggest," *Triestman,* 470 F.3d at 474, Plaintiff's complaint can be read more narrowly-to seek monetary damages for violations of his due process rights that occurred during the enforcement of a *valid* child support decree. *Ankenbrandt,* 504 U.S. at 704 (noting that the exception has no application where the lawsuit "in no way seeks [a domestic relation] decree"). Even so, some courts in this district have held that lawsuits seeking monetary relief for purportedly unlawful conduct undertaken to enforce valid support decrees are also barred by the domestic relations exception. *See Joseph v. Stewart,* 13–CV–1678 NGG LB, 2013 WL 3863915, at *2 (E.D.N.Y. July 24, 2013) (applying domestic relations exception where "Plaintiff challenges the enforcement and effect of his child support obligations, and although he invokes his constitutional rights, the essence of his allegations concern state law domestic relations matters.").[3] This Court need not resolve whether such a narrow challenge would be barred by the domestic relations exception because the Court lacks subject matter jurisdiction over this action under, *inter alia,*[4] the *Rooker–Feldman* doctrine.

[3]   But see *King v. Comm'r & New York City Police Dep't,* 60 F. App'x 873, 874–75 (2d Cir.2003) (summary order) ("The instant appeal is brought pursuant to the court's federal question jurisdiction, not its diversity jurisdiction. Nevertheless, the City argues that the domestic relations exception is not limited to diversity cases. Although this seems contrary to precedent, the city does cite language to support its argument. We need not

examine this question, however, because even under the broadest interpretation of the exception, it applies only to cases that seek issuance or modification of divorce, alimony, or child custody decrees. Appellant is not seeking a domestic relations award, and he is not asking that his parental rights be reinstated. Instead, his complaint seeks monetary damages. The domestic relations exception to federal jurisdiction is therefore irrelevant to this action.") (citation and parenthetical explanation omitted).

[4]   Even if this Court has jurisdiction, "[a] federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." *Am. Airlines, Inc. v. Block,* 905 F.2d 12, 14 (2d Cir.1990).

**B.** *Rooker–Feldman Doctrine*
The so-called *Rooker–Feldman* doctrine divests federal courts of jurisdiction to consider suits which seek to overturn state court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Additionally, the doctrine "bars federal courts from considering claims that are 'inextricably intertwined' with a prior state court determination." *Johnson v. Smithsonian Inst.,* 189 F.3d 180, 185 (2d Cir.1999) (citations and internal quotation marks omitted). In *Exxon Mobil,* the Supreme Court reined in the use of the doctrine, explaining that the doctrine "is confined to cases ... brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* In the wake of *Exxon Mobil,* the Second Circuit revisited its prior precedents and limited the application *of Rooker–Feldman* to cases satisfying four "requirements":

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment [.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"-i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of

these requirements may be loosely termed procedural; the second and third may be termed substantive.

**\*4** *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005) (quoting *Exxon Mobil,* 544 U.S. at 284); *see also McKit hen v. Brown,* 626 F.3d 143, 154 (2d Cir.2010).

Courts have repeatedly invoked the doctrine in cases, like the one currently before the Court, in which plaintiffs challenge family court decrees setting child support arrears. *See Sorenson v. Suffolk Cnty. Child Support Enforcement Bureau,* 07–CV–03755JFBAKT, 2009 WL 580426, at \*6– 7 (E.D.N.Y. Mar.5, 2009) (finding plaintiff, who previously unsuccessfully sought to have child support "arrears vacated ... in state court" cannot "utilize the federal courts to, in essence, challenge the existing judgment regarding child support arrears, or the County's enforcement of that judgment."); *Remy,* 507 F. App'x at 18–19 (finding that court was barred under *Rooker–Felman* from exercising jurisdiction over suit challenging "Family Court's arrears order[, where plaintiff] ... had a full and fair opportunity to litigate [the arrears order in state court].");  *Chestnut v. Gabler,* No. 06 Civ. 34E(F), 2007 WL 529556, at \*3 (W.D.N.Y.Feb.13, 2007) ("Construed liberally, the complaint essentially alleges that plaintiff's constitutional rights were violated during the course of the Family Court proceedings and plaintiff now seeks, in part, to challenge in this Court the orders issued in those proceedings. To the extent plaintiff is asking this Court to review the proceedings before the Allegany County Family Court, said review by this Court is barred by the *Rooker–Feldman* doctrine and the complaint must be dismissed accordingly."). In *Sorenson,* the Court explained that although the plaintiff attempted to recast his claims as alleging "improper enforcement of the Family Court judgment rather than [challenging] the judgment itself[,] ... *Rooker–Feldman* also bars such claims because the enforcement is inextricably intertwined with the state court judgment." *Sorenson,* 2009 WL 580426, at \*7 (collecting cases).

Plaintiff expressly asks this Court to review the October 23, 2007 family court order setting arrears on the grounds that the decision was erroneous because he had complied with all previous child support obligations and thus could not be liable for arrears. Under the *Rooker–Feldman* doctrine, this Court may not do so. As in *Sorenson,* to the extent Plaintiff recasts his claims as alleging improper enforcement of the

child support arrears decree, under these circumstances, the enforcement of the arrears decree is inextricably intertwined with the validity of the decree, itself. Thus this Court is barred under the *Rooker–Feldman* doctrine from reviewing the claim. Additionally, this Court is precluded from reviewing Plaintiff's claims for the separate reason that Plaintiff has already brought an Article 78 petition in state court raising these exact arguments. Thus, the instant lawsuit, in effect, challenges not only the October 23, 2007 arrears order, but also the May 13, 2008 decision of Justice Rivera dismissing the Article 78 petition. Plaintiff's attempts to appeal to this Court the decisions of the Family Court Support Magistrate and Justice Rivera are barred by the *Rooker–Feldman* doctrine. Accordingly, Defendant's motion to dismiss is granted.

**\*5** The above reasoning applies with equal force to Plaintiff's claims against the other defendants who allegedly enforced the child support arrears decree. Thus, this Court lacks subject matter jurisdiction to adjudicate Plaintiff's claims against all of the remaining defendants in the action. Given that this Court has determined that it lacks subject matter jurisdiction over the entire action, the Court, *sua sponte,* dismisses Plaintiff's claims against the remaining defendants and dismisses Plaintiff's complaint in its entirety. *Morris v. Rosen,* 12–3143–CV, —— F. App'x ——, 2014 WL 4233392, at \*1 (2d Cir. Aug.28, 2014) (affirming district court's *sua sponte* dismissal of *pro se* plaintiff's complaint for lack of subject matter jurisdiction under the *Rooker–Feldman* doctrine.)

### Conclusion

For the foregoing reasons, the State Defendant's motion to dismiss is granted on the grounds that this Court lacks subject matter jurisdiction over the instant action under the *RookerFeldman* doctrine. For the same reasons, the Court *sua sponte* dismisses the action against all other defendants. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 5823116

456 S.W.3d 545 (Mem)
Missouri Court of Appeals, Eastern District,
DIVISION TWO.

Jacqueline T. PITTMAN, Appellant,

v.

DIRECTOR OF REVENUE, Respondent.

No. ED 100881
|
Filed: March 10, 2015

Appeal from the Circuit Court of St. Louis County, Honorable David Lee Vincent, III, Judge.

**Attorneys and Law Firms**

Michael E. Reid, 205 S. Main Street, Suite B, Edwardsville, IL 62025, For Appellant.

Rachel M. Jones, P.O. Box 475, 301 W. High Street, Jefferson City, MO 65105, For Respondent.

Before Sherri B. Sullivan, P.J., Mary K. Hoff, J., and Philip M. Hess, J.

*ORDER*

PER CURIAM.

 **\*1** Jacqueline T. Pittman appeals from the trial court's judgment upholding the administrative revocation of her driving privileges for refusing to submit to a chemical analysis of her breath under Missouri's Implied Consent Law, Section 577.020 RSMo 2006. We have reviewed the briefs of the parties and the record on appeal and conclude the judgment of the trial court was supported by substantial evidence, was not against the weight of the evidence, and did not erroneously declare or apply the law. *Velluto v. Dir. of Revenue,* 383 S.W.3d 14, 17 (Mo. App. E.D. 2012). An extended opinion would have no precedential value. We have, however, provided **\*546** a memorandum setting forth the reasons for our decision to the parties for their use only. We affirm the judgment pursuant to Missouri Rule of Civil Procedure 84.16(b).

**All Citations**

456 S.W.3d 545 (Mem), 2015 WL 1120121

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22937688
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Peter C. LOMTEVAS, Plaintiff,

v.

NEW YORK STATE, Defendant.

No. 03–CV–2359 (FB).
|
Nov. 13, 2003.

**Synopsis**

**Background:** Child support obligor brought action against
state, seeking declaratory and injunctive relief, and alleging
that definition of "child support" under New York Family
Court Act (NYFCA) was unconstitutional. State moved to
dismiss.

**Holding:** The District Court, Block, J., held that *Younger*
abstention was appropriate.

Motion granted.

West Headnotes (1)

[1]     **Federal Courts**  🔑  **Families and children**

District Court would abstain under *Younger* from
considering challenge by child support obligor to
constitutionality of definition of "child support"
under New York Family Court Act (NYFCA)
which allegedly conflicted with definition under
Social Security Act; obligor was challenging, in
ongoing state proceeding, family court action
which required him to pay support, definition
of "child support" and actions to enforce
child support orders implicated important state
interests and issues of comity, and state afforded
obligor opportunity for judicial review of his
constitutional challenge.

1 Cases that cite this headnote

**Attorneys and Law Firms**

Peter C. Lomtevas, Pro Se, Ozone Park, NY, for Plaintiff.

Eliot Spitzer, Esq., Attorney General for the State of New
York, by: Charles F. Sanders, Assistant Attorney General,
New York, NY, for Defendant.

***MEMORANDUM AND ORDER***

BLOCK, District Judge.

**\*1** Seeking declaratory and injunctive relief, *pro se* plaintiff
Peter C. Lomtevas, an attorney, alleges in his complaint that
the definition of "child support" under the New York Family
Court Act ("NYFCA") is inconsistent with the meaning
of that term under the federal Social Security Act and is
therefore unconstitutional as violative of the Supremacy
Clause. Defendant State of New York moves to dismiss for
failure to state a claim upon which relief can be granted, *see*
Fed.R.Civ.P. 12(b)(6), or, alternatively, on abstention grounds.
The Court determines that abstention is appropriate under
*Younger v. Harris,* 401 U.S. 37 (1971), and dismisses the
complaint.

**I.**

Lomtevas's complaint states that in a divorce proceeding
approximately sixteen years ago, he was awarded sole
custody of a minor child and ordered to make "a $50 weekly
payment that was labeled as 'child support' in the divorce
judgment [,]" Compl. at ¶ 4; that his ex-wife "abducted their
child to Germany 16 years ago and raised him to adulthood
without [his] knowledge of his whereabouts [,]" *id.;* that she
initiated a proceeding against him in New York Family Court
under the NYFCA to collect $39,000 in child support arrears,
apparently because he did not make the weekly payments
during the child's absence, *see id.;* and that he is challenging
the Family Court action.

Lomtevas's prayer for relief requests that the Court "strik[e] ...
th[e allegedly unconstitutional] definition, and ... refer[ ] ...
that provision to New York's legislature to rewrite that
definition such that it will parallel the federal definition." *Id.*
at ¶ 5. He also seeks an "[a]n evaluation by New York State
of all divorce decrees' child support orders being enforced

under New York's unconstitutional definition of child support, and refunds for improperly assessed payments and arrears to victimized parents." *Id.*

## II.

"[F]ederal abstention [under *Younger* ] rests foursquare on the notion that, in the ordinary course, 'a state proceeding provides an adequate forum for the vindication of federal constitutional rights.' " *Diamond " "D" " Const. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002). "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Id.* "In determining whether the 'important state interest' requirement has been met, [courts] ... do not look narrowly to [the state's] interest in the outcome of the particular case,' but rather look to 'the importance of the generic proceedings to the state.' " *Philip Morris, Inc. v. Blumenthal,* 123 F.3d 103, 105–06 (2d Cir.1997) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 365, 109 S.Ct. 2506, 105 L.Ed.2d 298, (1989)).

**\*2** Here, each of the three conditions is satisfied. First, there is an ongoing state proceeding; Lomtevas is challenging the Family Court action. Second, the NYFCA's definition of "child support" and actions to enforce child support orders under the NYFCA implicate not only important state interests, but also issues of comity. *See Moore v. Sims,* 442 U.S. 415, 435, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) ("Family relations are a traditional area of state concern."); *Hisquierdo*

*v. Hisquierdo,* 439 U.S. 572, 581, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States."); *Alleyne v. City of New York,* 244 F.Supp.2d 214, 216 n. 2 (S.D.N.Y.2002) (noting that in a prior decision in that case, "the Court held that because the State Proceeding involved the important, traditional state interest of family relations and was adequate to resolve plaintiff's constitutional claims, the doctrine of abstention applied."). Finally, Lomtevas will be able to challenge New York's definition of "child support" and its application to his case in the ongoing state court proceeding, if he has not done so already. He does not allege, and there is no reason to believe, that the New York courts could not afford him the opportunity for judicial review of his constitutional challenge. Because the *Younger* abstention conditions are satisfied, the Court dismisses Lomtevas's complaint. *See Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 719, 116 S.Ct. 1712, 135 L.Ed.2d 1 ("federal courts not only have the power to stay the action based on abstention principles, but can also ... decline to exercise jurisdiction altogether by ... dismissing the suit.").

## CONCLUSION

Defendant's motion is granted, and the complaint is dismissed.

**SO ORDERED.**

## All Citations

Not Reported in F.Supp.2d, 2003 WL 22937688

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1011054
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Gilbert M. MARTINEZ, Plaintiff,

v.

QUEENS COUNTY DISTRICT ATTORNEY, ADA
Debra Pomodor; Kings County District Attorney;
New York City Police Department, Narcotics
Division; City of Reading Police Department; Gloria
P. Margary; Rafael Margary; Gloria A. Margary;
Mid–Penn Legal Services; New York Supreme
Court, Hon. Alice Schlesinger; Kings County Family
Court, Hon. Anthony Cannataro; Berks County
Family Court, Hon. Scott E. Lash; Berks County
Human Resources; Berks County Social Security
Administration; T–Mobile U.S. Inc.; Met–Ed
Electric Supplier; Verizon New York Inc.; Berks
Community Health Center; Reading Hospital; Saint
Joseph Health Network d/b/a Saint Joseph Medical
Center; Suny Downstate Medical Center; Michael D.
Carlin Esq. and Jessica A. Spector Esq., Defendants.

No. 12–CV–06262 (RRM)(RER).
|
Signed March 17, 2014.

**Attorneys and Law Firms**

Gilbert M. Martinez, Reading, PA, pro se.

Andrew B. Adair, Deasey, Mahoney, Valentini & North, Ltd., Media, PA, A. Taylor Williams, Administrative Office of PA. Courts, Christopher Negrete, Deasey, Mahoney, Valentini & North Ltd., Philadelphia, PA, John P. Beyel, McElroy, Deutsch, Mulvaney & Carpenter, LLP, Morristown, NJ, William D. Christ, Phillips Lytle LLP, Buffalo, NY, Bradley L. Mitchell, Stevens & Lee, Princeton, NJ, Sharon W. Rahman, Roland Stock, LLC, Reading, PA, Amy L. Blackmore, Post & Schell, P.C., Allentown, PA, David Macmain, The Macmain Law Group, Malvern, PA, Aaron Michael Schue, Phillips Lytle LLP, Charles K. Faillace, Kenneth P. Starace, McAloon & Frideman P.C., Dennis C. Hopkins, Perkins Coie LLP, Ami Bhatt, Norris, McLaughlin & Marcus, Wendy B. Shepps, Podvey, Meanor, Catenacci, Hildner, Cocoziello & Chattman, PC, Jason Michael Halper, Michelle Lesser, William Joseph Foley, Jr., Cadwalader, Wickersham & Taft LLP, Marc A.

Rapaport, Law Offices of Marc A. Rapaport, Esq., New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, District Judge.

**\*1** Plaintiff Gilbert M. Martinez, appearing *pro se,* commenced this action on December 20, 2012. In his second amended complaint, plaintiff alleges violations of 42 U.S.C. § 1983 against twenty-three governmental and private defendants, including state court judges, state prosecutors, private attorneys, utilities, hospitals, and private parties, and seeks monetary damages and various declaratory judgments. (*See* Second Am. Compl. (Doc. No. 77).) Presently before the Court are several motions, all of which are fully briefed: (1) plaintiff's motion for recusal pursuant to 28 U.S.C. § 455 (Doc. No. 142) and (2) motions to dismiss filed by Berks County Family Court (Doc. No. 107); Metropolitan Edison Company, a/k/a Met–Ed Electric ("Met–Ed") (Doc. Nos. 124 and 126); St. Joseph Regional Health Network d/b/a St. Joseph Medical Center ("SJMC") (Doc. No. 129); Reading Hospital (Doc. No. 128); Berks Community Health Center ("BCHC") (Doc. No. 131); Mid–Penn Legal Services ("Mid–Penn") (Doc. No. 108); Verizon New York, Inc. ("Verizon NY") (Doc. No. 130); T–Mobile US, Inc. ("T–Mobile") (Doc. No. 160); City of Reading Police Department ("RPD") (Doc. No. 123); and Jessica A. Spector (Doc. No. 161). In response to these motions, plaintiff filed several opposition briefs in which plaintiff cites broad principles of law relating to Section 1983 claims, criminal conspiracies, and tort liability. [1] For the reasons set forth below, plaintiff's motion for recusal is denied, and the motions of these defendants are granted as to all claims filed against them.

[1]     The Court will grant the motions to strike plaintiff's declaration at Doc. No. 168 (*see* Doc. Nos. 171, 177) as plaintiff's filing was made long after completion of full briefing on these motions, and constitutes an improper attempt by plaintiff to supplement his pleadings "by the briefs in opposition to a motion to dismiss." *LaFlamme v. Societe Air France,* 702 F.Supp.2d 136, 148 n. 18 (E.D.N.Y.2010).

Furthermore, Defendants Queens County District Attorney, ADA Debra Pomodor; Kings County District Attorney; City of New York; Gloria P. Margary; Rafael Margary; Gloria A Margary; Berks County Social Security Administration

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 113 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

("BCSSA"); SUNY Downstate Medical Center ("SUNY Downstate"); New York Supreme Court, Hon. Alice Schlesinger; and Kings County Family Court, Hon. Anthony Cannataro have not appeared in this matter. Defendant Berks County Human Resources ("BCHR") has appeared by counsel and by letter seeks to dismiss plaintiff's claims against it on several grounds. All of these defendants either were not sufficiently served with process and/or would not be amenable to suit, and the Court dismisses the claims against these defendants as well. Accordingly, plaintiff's second amended complaint is dismissed in its entirety.

## BACKGROUND [2]

[2]   The following facts are taken from the second amended complaint and, to the extent they include concrete facts as opposed to conclusory legal assertions, are presumed to be true for the purposes of defendants' motions to dismiss. *See E.E.O. C. v. Staten Island Sav. Bank,* 207 F.3d 144, 148 (2d Cir.2000); *see also Jackson v. Cnty. of Rockland,* 450 F. App'x 15, 19 (2d Cir.2011) (noting that since defendant's "assertions lack any factual foundation, they are merely conclusory allegations masquerading as factual conclusions, which are insufficient to defeat a motion to dismiss" (internal quotation marks omitted)).

In his second amended complaint, plaintiff, a resident of Reading, Pennsylvania, alleges that defendants engaged in several elaborate and multi-faceted conspiracies to deprive him of his civil rights. Plaintiff's claims are logically grouped as follows: First, plaintiff alleges that, beginning in July 2009 and continuing through the present, he was unlawfully investigated and indicted by Debra Pomodor, a prosecutor in the Queens County District Attorney's Office, with help from the Kings County District Attorney and members of the New York City and Reading Police Departments. Specifically, plaintiff alleges that Debra Pomodor filed a fraudulent indictment against him, for which he spent two-and-a-half months in jail and incurred $30,000 dollars in costs; that the Queens County and Kings County district attorneys—together with the New York Police Department ("NYPD"), Verizon NY, and T–Mobile—unlawfully wire-tapped his phone and internet connection in order to compel him to accept a plea agreement and become a state trial witness; that "the Queens County court illegally sentenced [plaintiff] for charges that were already dismissed by the

Grand Jury"; and that T–Mobile conspired with authorities to ignore a court-ordered subpoena and withhold certain phone records of defendant Gloria P. Margary. (2d Am. Compl. at 5–7, 19–20.)

 **\*2**  Second, plaintiff challenges several decisions entered in child-custody cases pending before the Berks County, Pennsylvania, and the Kings County, New York, Family Courts as well as the New York County Supreme Court, alleging a conspiracy between the attorneys who were involved in those matters, the courts themselves, and other state agencies. Plaintiff alleges that, beginning in January 2012 and continuing through May 2013, these defendants conspired to remove his son from his custody by, *inter alia,* improperly denying plaintiff's court requests and motions, forcing plaintiff to accept a burdensome interim custody agreement, proceeding against plaintiff despite lacking jurisdiction over him, unlawfully jailing plaintiff overnight for contempt, meeting in private to strategize against plaintiff, aiding witnesses in testifying falsely, and making factual findings not supported by the evidence. (*Id.* at 7–12, 20–22.) Plaintiff further alleges that, from September 2012 through January 2013, BCHR and BCSSA conspired to cause plaintiff hardship and to make it difficult for plaintiff to commute to the New York Family Court by purposefully depriving plaintiff of federal benefits for which he was eligible and by intentionally scheduling a benefit hearing to conflict with a court date. (*Id.* at 13–14.) Plaintiff also alleges that defendants Gloria P. Margary, Rafael Margary, and Gloria A. Margary worked together to wrongfully deprive plaintiff of custody over his son by making fraudulent misrepresentations and by submitting false abuse allegations to the state family courts. (*Id.* at 18–19.)

Next, plaintiff alleges that Met–Ed, a power utility serving Berks County, Pennsylvania, intentionally shut off the power to plaintiff's home in October 2012 so that police could enter his home and retrieve a tape recorder without tripping his alarm. (*Id.* at 14–15.) Finally, plaintiff alleges another conspiracy between SJMC, Reading Hospital, BCHC, SUNY Downstate, and the NYPD from July 2012 through March 2013 to repeatedly deprive plaintiff of needed pain medication, entrap him into purchasing illegal narcotics, and intentionally administer harmful medications to him. (*Id.* at 15–18.)

Plaintiff filed his original complaint on December 20, 2012. By a Memorandum and Order dated December 26, 2012, *See Martinez v. Pomodor,* No. 12–CV–6262, 2012 WL 6698733,

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 114 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

at *1–2 (E.D.N.Y. Dec.26, 2012), the Court dismissed the original complaint as against defendants Berks County Family Court, Judge Lash, Kings County Family Court, Judge Cannataro, and New York Supreme Court, Judge Schlesinger for lack of subject matter jurisdiction pursuant to the domestic relations exception to federal jurisdiction.[3] (*Id.* at 3.) On July 8, 2013 plaintiff filed his proposed second amended complaint. By Order dated July 24, 2013, the Court adopted the second amended complaint as the operative complaint and granted leave to the remaining defendants to submit fully briefed motions to dismiss by September 13, 2013. By order dated October 10, 2013, the Court granted further leave to defendants Jessica A. Spector, T–Mobile, and City of Reading Police Department to submit motions to dismiss by December 5, 2013.

[3]     Plaintiff, however, continues to assert claims against defendants in his second amended complaint.

### DISCUSSION

### I. Plaintiff's Motion for Recusal

 **\*3**  The Court will first address plaintiff's motion for recusal, as it challenges the Court's ability to preside impartially over this matter. Plaintiff argues that this Court should recuse itself under 28 U.S.C. § 455[4] because the Court "has in the past deliberately violated the plaintiff's personal liberties and/ or has wantonly refused to provide due process and equal protection to the litigants before the court or has behaved in a manner inconsistent with that which is needed for full, fair, impartial hearings." (Mot. to Recuse (Doc. No. 142) at 1.) The motion is without merit.

[4]     Plaintiff also bases his motion for recusal on *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). That case, however, is inapposite as it dealt with whether a provision of the Fair Labor Standards Act unconstitutionally "creat[ed] an impermissible risk of bias in the Act's enforcement and administration." *See id.* at 239–40, 243.

Under 28 U.S.C. § 455, "[a]ny justice, judge or magistrate judge of the United States shall disqualify [her]self in any proceeding in which h[er] impartiality might reasonably be questioned" and, in particular, where she "has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(a)-(b)(1).

"This provision is to be evaluated on an *objective* basis, so that what matters is not the reality of bias or prejudice but its appearance." *ISC Holding AG v. Nobel Biocare Fin. AG,* 688 F.3d 98, 107 (2d Cir.2012) (quoting *Liteky v. United States,* 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). "The question ... is whether an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal, or alternatively, whether a reasonable person, knowing all the facts would question the judge's impartiality." *ISC Holding AG,* 688 F.3d at 107 (alteration in original) (internal quotation marks omitted). "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky,* 510 U.S. at 555. Thus, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.; see also Lewis v. Tuscan Dairy Farms, Inc.,* 25 F.3d 1138, 1141 (2d Cir.1994) (noting that showing of personal bias necessary to prevail on a motion for recusal ordinarily "must be based on extrajudicial conduct ... not conduct which arises in a judicial context" (quotations omitted)).

There is no reason for recusal here. As evidence that the Court violated his civil rights, plaintiff submitted a declaration pointing to seven instances where the Court issued substantive and procedural rulings in defendants' favor in this matter.[5] (*See* Mot. to Recuse at 2.) Plaintiff maintains that these rulings indicate the Court is biased against plaintiff. However, the mere fact that the Court has declined to afford plaintiff his suggested relief provides no grounds to suggest that the Court is biased or prejudiced against plaintiff, nor does it in any way suggest that the Court's "impartiality might reasonably be questioned." *See Liteky,* 510 U.S. at 548; *Lewis,* 25 F.3d at 1141. Based on the objective circumstances, no reasonable observer could conclude otherwise. Accordingly, plaintiff's motion for recusal is denied. *See Clemmons v. Comm'r of Social Sec.,* No. 11–CV–1645, 2011 WL 6130926, at *6 (E.D.N.Y. Dec. 8, 2011); *Robles v. Lempke,* No. 09–CV–2636, 2011 WL 9381499, at *30 (E.D.N .Y. Sept. 9, 2011), *adopted by No.* 09–CV–2636, 2012 WL 5507303 (E.D.N.Y. Nov.14, 2012).

[5]     Specifically, plaintiff claims that, in an attempt to cause him financial harm, the Court improperly (1) dismissed the claims against the state court judges; (2) failed to issue plaintiff's requested order to show

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

cause and injunction against defendants BCHR and BCSSA; (3) failed to issue an injunction to stay the state child custody proceedings; (4) refused to grant a writ of *habeas corpus* overturning plaintiff's state family court offense conviction; (5) refused to issue a default judgment against defendant Gloria P. Margary; (6) rescinded its prior order allowing plaintiff to electronically file documents; and (7) misplaced plaintiff's opposition brief against defendant Judge Scott E. Lash.

## II. Substantive Grounds for Dismissal

### A. Personal Jurisdiction

**\*4** Defendants Met–Ed, BCHC, SJMC, and Reading Hospital move to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2). When faced with a motion to dismiss under Rule 12(b)(2), "the plaintiff bears the burden of establishing that the court has personal jurisdiction over the defendant." *DiStefano v. Carozzi North America,* 286 F.3d 81, 84 (2d Cir.2001). To survive a 12(b)(2) motion prior to discovery, "a plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *Id.* "Unlike a motion to dismiss pursuant to Rule 12(b)(6), deciding a Rule 12(b)(2) motion necessarily requires resolution of factual matters outside the pleadings. [W]here the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Zibiz Corp. v. FCN Technology Solutions,* 777 F.Supp.2d 408, 416 (E.D.N.Y.2011) (citations and quotations omitted).

"In a federal question case where a defendant resides outside the forum state, a federal court applies the forum state's personal jurisdiction rules if the federal statute does not specifically provide for national service of process." *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997). Under New York law, a court may exercise personal jurisdiction over a defendant in two ways. *See Schultz v. Safra Nat. Bank of New York,* 377 F. App'x 101, 101 (2d Cir.2010) (summary order). First, a court may exercise general personal jurisdiction over a foreign corporation that has "continuous and systematic" contact with the State of New York. *See Licci ex rel. Licci v. Lebanese Can. Bank, SAL,* 673 F.3d 50, 60 n. 9 (2d Cir.2012); *see also* N.Y. C.P.L.R. § 301. A corporation is subject to general personal jurisdiction in New York "if it does business in New York not occasionally or casually, but with a fair measure of permanence and continuity." *Zibiz,* 777 F.Supp.2d at 416

(quoting *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 95 (2d Cir.2000). Factors to consider when determining whether general jurisdiction lies include: (1) whether the defendant maintains an office in New York; (2) whether the defendant has any bank accounts or other property within the state; (3) whether the defendant has a telephone listing in the state; (4) whether the defendant does public relations work or solicits business within the state; and (5) whether the defendant has employees or agents located within the state to promote its interests. *See Wiwa,* 226 F.3d at 98.

Med–Ed, BCHC, SJMC, and Reading Hospital have each submitted affidavits or declarations stating that (1) they are Pennsylvania corporations or entities, each with a principal place of business in Berks County, Pennsylvania; and (2) they do not conduct business, solicit business, or own or lease land in New York. (*See* Marconi Aff. (Doc. No. 126–1); Karpovich Aff. (Doc. No. 128–1); Schmehl Aff. (Doc. No. 129–2); Kargbo Aff. (Doc. No. 133).) In response, plaintiff argues that the court has personal jurisdiction over these defendants based on their relationship to other corporate entities, which do conduct business in New York. (*See* Pl.'s Met–Ed Opp'n Br. (Doc. No. 152) at 3–4; Pl.'s Hospital Opp'n Br. (Doc. No. 129–6) at 12–13.) Plaintiff claims that Met–Ed was a subsidiary of a holding company called GPU Energy, which subsequently merged with FirstEnergy Corporation, and points to FirstEnergy's website as proof that FirstEnergy provides energy to customers in New York and that Met–Ed is a subsidiary. (*See* Pl.'s Met–Ed Opp'n (Doc. No. 126–3) at 3–4.) Plaintiff also provides a copy of SJMC's website, which states that SJMC is "affiliated with Catholic Health Initiatives (CHI), a national nonprofit health system with headquarters in Englewood, Colorado ... [that] operates in 18 states," provides copies of website for two other hospitals in New York called "St. Joseph," and argues that SMJC's "corporation has several locations New York and does conduct business in New York." (Pl.'s Hospital Opp'n (Doc. No. 129–6) at 12–13.)

**\*5** Even assuming that there is some connection between these defendants and New York entities,[6] "the presence of a local corporation does not [automatically] create jurisdiction over a related, but independently managed, foreign corporation." *Gundlach v. IBM Japan, Ltd.,* No. 11–CV–846, 2013 WL 6123627, at *3–4 (S.D.N.Y. Nov.21, 2013); *see also Gallelli v. Crown Imports, LLC,* 701 F.Supp.2d 263, 271–272 (E.D.N.Y.2010). Rather, to determine whether a foreign entity is a "mere department" of a New York corporation such that general personal jurisdiction over the foreign entity is proper, courts look to the

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 116 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

following four factors: "(1) common ownership, (2) financial dependency of the subsidiary on the parent corporation, (3) the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities, and (4) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Gundlach,* 2013 WL 6123627, at *4. Similarly, to assert personal jurisdiction over a foreign entity under the theory that a domestic subsidiary is an "agent" of the foreign entity, a "plaintiff must show that the subsidiary does all the business which [the parent corporation] could do were it here by its own officials." *Jazini v. Nissan Motor Co., Ltd.,* 148 F.3d 181, 184 (2d Cir.1998).

6        Med–Ed states that it has not merged with FirstEnergy or the FirstEnergy subsidiary that provides electric power to a small number of customers in New York, and that it remains a separate and distinct legal entity that services a distinct geographic area with a distinct set of customers, is operated by separate management, and is independent financially. (See Marconi Reply Aff. (Doc. No. 126–5) at 2.) As for SJMC, the Court is skeptical that these religiously-affiliated entities are related simply because they share the same of a well-known religious figure. Finally, plaintiff does not offer anything to show that Reading Hospital or Berks Community Health Center is affiliated in any way with another New York-based entity.

Other than the few excerpts from websites suggesting that the defendants may be affiliated in some way with other corporate entities, plaintiff has offered no facts showing that the these named defendants are owned by a New York corporation or financially dependent on a New York corporation, are controlled in any way by a New York corporation, or fail to observe corporate formalities that separate them from New York corporations. Plaintiff has also offered no evidence that these defendants control any New York corporation or conducted business in New York using a New York corporation as its agent. Since plaintiff has offered nothing else that rebuts these defendants' sworn statements that they do not continuously and systematically conduct business in New York, the Court finds that plaintiff has failed to make a prima facie showing that any of these defendants have the requisite contact with New York sufficient to establish general personal jurisdiction under N.Y. C.P.L.R. § 301.

In addition to exercising general personal jurisdiction under N.Y. C.P.L.R. § 301, a court may also exercise specific personal jurisdiction over an out of state defendant pursuant to New York's long-arm statute, which provides:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

> 2. commits a tortious act within the state ...; or

> **6** 3. commits a tortious act without the state causing injury to person or property within the state ... if he

>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

> 4. owns, uses or possesses any real property situated within the state.

N.Y. C.P.L.R. § 302(a). Specific personal jurisdiction under the long arm statute "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation. Such jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Licci,* 673 F.3d at 60 n. 9 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown,* ——U.S. ——, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (quotations omitted)); *see Zibiz,* 777 F.Supp.2d at 420 ("Unlike Section 301, which confers personal jurisdiction over an out-of-state defendant for any cause of action, Section 302 requires that the cause of action 'arise from' the defendant's contacts with New York, i.e., that the cause of action arose from the defendant's transaction of business within New York."). Where the Court lacks personal jurisdiction under New York's long arm statute, the Court need not address whether personal jurisdiction "comports with the Due Process Clause." *See Chloe v. Queen Bee of Beverly Hills, LLC,* 616 F.3d 158, 164 (2d Cir.2010); *see also Licci,* 673 F.3d at 61 (where "plaintiffs premise their theory

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 117 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

of personal jurisdiction upon the New York long-arm statute, we first consider whether the requirements of the statute have been satisfied before proceeding to address whether the exercise of jurisdiction would comport with the Due Process Clause.").

All of the events giving rise to plaintiff's claims against these defendants and all of the alleged harm he suffered as a result of the defendants' alleged actions occurred in Berks County, Pennsylvania. (Second Am. Compl. at 14–17.) Plaintiff alleges that Met–Ed conspired with the police to shut off the power supply to his home in Reading, Pennsylvania, so that the police could unlawfully enter it without tripping the alarm. (*Id.* at 14–15.) Specifically, plaintiff alleges that the power to his home went out due to severe weather on October, 29, 2012; was restored on October 30, 2012; and was subsequently turned off for several hours on October 31, 2012. [7] (*Id.*). Plaintiff alleges that "the power was turned off prior to him having an appointment at [a hospital] to drain his home battery so the Berks County Police c[ould] enter his premises to retrieve a tape recorder." (*Id.*) Plaintiff also alleges that Reading Hospital, BCHC, and SJMC— all of which are medical centers located in Pennsylvania— refused to provide him with pain medications for his medical conditions and conspired to cause him serious injury by administering medications harmful to his liver. (*See id.* at 15– 16.)

[7]     The Court takes judicial notice of the fact that Hurricane Sandy struck the northeastern United States on October 29, 2012.

 **\*7** Plaintiff acknowledges that these events took place in Pennsylvania, but argues that defendants' role as part of a larger conspiracy is sufficient to establish personal jurisdiction in New York. Plaintiff alleges that Met–Ed "conspired with State authorities to commit unlawful acts and or to intimidate plaintiff with fear." (2d Am. Compl. at 14.) Plaintiff further argues that Reading Hospital, BCHC, and SJMC's actions forced him to leave Pennsylvania and go to New York and were "intended to force [him] into the forum state so their accomplices could set their trap into motion by planting an informant in [SUNY Downstate] to solicit the illegal sale of prescription drugs" and were thus "intended to have consequences in the forum state which establishes personal jurisdiction." (Pl.'s Hospital Opp'n Br. at 8.)

In some cases, "[t]he New York activities of a 'co-conspirator' may ... be imputed to an out-of-state defendant

for purposes of personal jurisdiction under § 302(a)(2) under an agency rationale." *Shpak v. Curtis,* No. 10–CV–1818, 2011 WL 4460605, at \*8 (E.D.N.Y. Sept. 26, 2011). However, "[t]o establish jurisdiction on this basis, a plaintiff must 'make a prima facie showing of a conspiracy and allege specific facts warranting the inference that the defendants were members of the conspiracy.' " *Id.* (quoting *First Capital Inv. Holdings LLC v. Wilson Capital Grp.,* No. 10–CV–2948, 2010 WL 4967833, at \*2 (S.D.N.Y. Nov. 30, 2010)). "A court may infer that defendants are members of a conspiracy if plaintiff alleges specific facts showing that (a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control, or at the request of or on behalf of the out-of-state defendant." *Id.* (quotations and citations omitted).

Here, plaintiff has failed to allege any specific facts that warrant any such inferences. While plaintiff claims that Met– Ed shut off his power at the behest of the Berks County Police, plaintiff offers absolutely no facts suggesting that Met–Ed conspired with anyone in New York. Similarly, although plaintiff suggests that Reading Hospital, BCHC, and SJMC conspired with SUNY Downstate to force him to New York so that unnamed law enforcement officers could seek to entrap him, he offers no factual allegations to support this claim. He fails to allege any specific facts tending to show that these defendants denied him pain medication or prescribed him a particular mix of medications at the request of a New York entity, rather than based on their independent medical judgment. He offers no specific facts suggesting that these defendants knew their actions would drive him to seek medical treatment at a New York hospital at a predictable time such that entities in New York could seek to violate his civil rights. There is simply no basis to impute the alleged activities of any New York entities to these Pennsylvania-based defendants for the purposes of personal jurisdiction.

 **\*8** In short, none of these defendants transacts business in New York, appears to derive substantial revenue from interstate or international commerce, or owns real estate in New York. None of the alleged activity that forms the basis for plaintiff's claims against these defendants occurred in New York. And there is no factual basis supporting plaintiff's claims that these defendants conspired with a New York entity in order to cause plaintiff harm. Therefore, there is no basis for the Court to exercise personal jurisdiction over these defendants pursuant to N.Y. C.P.L.R. § 302(a).

2014 WL 1011054

Accordingly, plaintiff's claims against Med–Ed, BCHC, SJMC, and Reading Hospital are dismissed.

### B. Domestic Relations Exception

In his second amended complaint, plaintiff alleges that defendants New York Supreme Court, Hon. Alice Schlesinger; Kings County Family Court, Hon. Anthony Cannataro; and Berks County Family Court, Hon. Scott E. Lash conspired to take plaintiff's son from him by concealing facts and evidence and otherwise acting improperly during state court child custody proceedings. However, in a Memorandum and Order dated December 26, 2012, the Court dismissed all claims against these defendants pursuant to the domestic relations exception to the jurisdiction of the federal courts. *See Martinez v. Pomodor,* No. 12–CV–6262, 2012 WL 6698733, at *1–2 (E.D.N.Y. Dec.26, 2012) (citing cases). As the Court explained in that Order:

> It is well-settled that "the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890). "So strong is [the Supreme Court's] deference to state law in this area that [the Supreme Court has] recognized a 'domestic relations exception' that 'divests the federal courts of power to issue divorce, alimony, and child custody decrees.' " *Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 12–13, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (quoting *Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992)); *Fischer v. Clark,* No. 08–CV–3807, 2009 WL 3063313, at *2 (E.D.N.Y. Sept.24, 2009).

*Id.* at 1. The Court further noted in that Order that "[a]lthough plaintiff cites to 42 U.S.C. § 1983, the sum and substance of his claims concern matters of state domestic relations law." *Id.* at *2. The Court held that plaintiff's "claims against [these defendants were] dismissed as they [were] barred by the domestic relations exception to the jurisdiction of the federal courts." *Id.*

In his second amended complaint, plaintiff makes substantially the same allegations as he made in his original complaint, and adds additional allegations of wrongdoing related to proceedings that occurred in 2013. Again, plaintiff takes issue with several actions taken by the state court judges during the child custody proceedings. However, once again, the sum and substance of his claims against these defendants concern matters of state domestic relations law. Thus, for the

same reasons set forth in its December 26, 2012 Order, the Court again dismisses all of plaintiff's claims against New York Supreme Court, Hon. Alice Schlesinger; Kings County Family Court, Hon. Anthony Cannataro; and Berks County Family Court, Hon. Scott E. Lash pursuant to the domestic relations exception to federal jurisdiction. [8] *See Schottel v. Kutyba,* No. 06–CV–1577, 2009 WL 230106, at *1 (2d Cir. Feb. 2, 2009) (affirming dismissal under domestic relations exception where plaintiff's claims were "at heart, a dispute surrounding the custody of [plaintiff's] child" and therefore "begin and end in a domestic dispute.").

[8]    In addition, plaintiff's claims against these defendants are also barred for several other reasons. First, state agencies and state officials sued in their official capacities "are immunized from suit by private citizens under the Eleventh Amendment." *Sundwall v. Leuba,* 28 Fed. App'x 11, 12 (2d Cir.2001) (applying Eleventh Amendment immunity to state court judges). Thus, plaintiff's claims against the state courts and the individual judges, to the extent that plaintiff is suing the judges in their official capacities, are barred under the Eleventh Amendment. *See McKnight v. Middleton,* 699 F.Supp.2d 507, 521–23 (E.D.N.Y.2010) (dismissing claims asserted against Kings County family court and family court judge in her official capacity on sovereign immunity grounds). Moreover, to the extent Plaintiff is suing these judges in their individual capacities, his claims are barred under the doctrine of judicial immunity. Judicial officers enjoy broad immunity from suit for monetary and injunctive relief for actions they take that are "judicial in nature." *See Huminski v. Corsones,* 396 F.3d 53, 74–75 (2d Cir.2004). To determine whether actions taken by a judge are judicial in nature, courts ask whether those actions were "function[s] normally performed by a judge, and ... whether [the parties] dealt with the judge in his judicial capacity." *Id.* Here, plaintiff does not allege that these defendants performed actions not typical of judges or that he dealt with them outside of their judicial capacity in court. Thus, to the extent that plaintiff is suing the judges in their individual capacities, his claims against them are also barred. *See McKnight,* 699 F.Supp.2d at 523–25 (dismissing claims asserted against family court judge in her individual capacity on judicial immunity grounds). To the extent that plaintiff

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 119 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

is seeking an injunction to vacate judgments that have already been entered before the state family courts (*see* Doc. No. 102), plaintiff's claims are barred by the *Rooker–Feldman* doctrine, which "provides that the lower federal courts lack subject matter jurisdiction over a case if the exercise of jurisdiction over that case would result in the reversal or modification of a state court judgment." *Hachamovitch v. DeBuono,* 159 F.3d 687, 693 (2d Cir.1998). Finally, to the extent that plaintiff is seeking to enjoin ongoing family court proceedings, his claims are barred by the *Younger* abstention doctrine, as those state proceedings appear to be ongoing, implicate the important interest the state has in child custody matters, and provide plaintiff with an adequate opportunity for judicial review of his claims. *See McKnight,* 699 F.Supp. at 520–21 (holding that pro se plaintiff's claims for injunctive relief related to child custody dispute were barred under the *Younger* abstention doctrine).

**\*9** Plaintiff's claims against Gloria P. Margary, Rafael Margary, and Gloria A. Margary must be dismissed on the same basis. Plaintiff alleges that Gloria P. Margary, who appears to be the mother of his child, wrongfully removed their child from his residence with the intent to inflict emotional distress, and made fraudulent representations to the family courts. Plaintiff further alleges that Rafael Margary and Gloria A. Margary—whose relationship to Gloria P. Margary is never explained—aided and facilitated Gloria P. Margary's wrongful removal of the child from plaintiff's custody. Plaintiff claims that these defendants are "liable to plaintiff for damaging his relationship with his son and causing him pain and suffering, emotional distress, financial hardship, mental anguish and the loss of enjoyment of life." (2d Am.Compl.¶ 66.) As relief, plaintiff requests, among other things, $17,000,000, "a Declaratory Decree Declaring Pennsylvania the Home State in [the] child custody case," "a Declaratory Decree vacating the judgment against plaintiff in [the] Family Offense case," and "a Declaratory Decree granting a trial against the defendant Gloria P. Margary for [the] Family Offenses committed." (2d Am. Compl. at 24.)

However, under the domestic relations exception, "[f]ederal courts have discretion to abstain from exercising jurisdiction over issues on the verge of being matrimonial in nature as long as full and fair adjudication is available in state courts." *Fischer v. Clark,* No. 08–CV–3807, 2009 WL 3063313, at

\*2 (E.D.N.Y. Sept.24, 2009). Thus, courts "may be deprived of jurisdiction over claims that 'begin and end in a domestic dispute,' even if the plaintiff is seeking only monetary damages." *McKnight v. Middleton,* 699 F.Supp.2d 507, 517 (E.D.N.Y.2010) (quoting *Schottel,* 2009 WL 230106, at \*1). At heart, plaintiff is complaining of conduct that is indistinct from the conduct at issue in the state family court proceedings. Whether plaintiff's son was wrongfully removed from his custody by Gloria P. Margary, whether plaintiff's son's home state is Pennsylvania or New York, and whether Gloria P. Margary's representations are indeed fraudulent are all questions that begin and end in the domestic dispute between these parties, and which should be adjudicated in the state family courts. *See McKnight,* 699 F.Supp.2d at 520 ("This Court does not have superior competence to adjudicate these claims and, therefore, leaves them for the state courts to decide."). The relief that plaintiff seeks here against these defendants, if appropriate, can be obtained through the state courts. Accordingly, plaintiff's claims against Gloria P. Margary, Rafael Margary, and Gloria A. Margary are dismissed. [9] *See McKnight,* 699 F.Supp.2d at 519–520 (dismissing under the domestic relations exception certain claims asserted against mother of plaintiff's child and her relatives since plaintiff "is complaining of the state court custody proceedings and thus his claims are indistinct from the domestic dispute."); *Fischer,* 2009 WL 3063313, at \*3 (dismissing under the domestic relations exception certain claims asserted against mother of plaintiff's child because plaintiff "may raise such arguments before the various state courts currently hearing the parties' custody dispute" and "[a] full and fair adjudication of [p]laintiff's claims ... is available to [p]laintiff in state court.").

[9]     Even if the domestic relations exception did not apply, claims against these defendants would have to be dismissed. Plaintiff brings suit against these defendants under Section 1983 and the Uniform Child Custody Enforcement Act. (*See* 2d Am. Compl. at 17.) However, as discussed in more detail below, to state a claim under Section 1983, a plaintiff must show that the defendants were acting under the color of state law. These defendants are private individuals, and the extent of plaintiff's allegations against them pertains to their alleged misrepresentations in the state court child custody proceedings and their related actions to obtain custody over plaintiff's son. Plaintiff fails to allege any facts that that show that these defendants were state actors or were willful participants,

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

had an agreement, or conspired with state actors. Therefore, plaintiff fails to plausibly allege a Section 1983 claim against these defendants. *Cf. Humphurys v. Nager,* 962 F.Supp. 347, 353 (E.D.N.Y.1997) (*sua sponte* dismissing for failure to state a claim § 1983 claim against private individuals who filed answer but not motions to dismiss). As all federal claims against these defendants would be dismissed, the Court would decline to exercise supplemental jurisdiction over plaintiff's state law claims. *See* 28 U.S.C. § 1367(c).

### C. Claims Against Remaining Defendants

**\*10** Plaintiff asserts claims under Section 1983 against SUNY Downstate, Berks County Human Resources, the Queens County District Attorney, ADA Debra Pomodor, the Kings County District Attorney, and BCSSA. The claims against these defendants must be dismissed as well.

First, it appears that plaintiff has not properly served any of these defendants. In plaintiff's affidavit of service on SUNY Downstate, (Doc. No. 18 at 8), the affiant, Nicole Spansler, indicates that she "personally served the summons on the individual at [SUNY's address]," (*id.*) but the affidavit fails to indicate who the individual was, the relationship between that individual and the corporation, and whether that individual was authorized to accept service of process. As for the district attorneys, plaintiff insists that the personal service effectuated upon the New York Attorney General was sufficient service as to the New York district attorneys. However, under both federal and New York law, personal service upon the Attorney General is not sufficient for service upon a state official. *See* Fed.R.Civ.P. 4(j)(2); N.Y. C.P.L.R. § 307(2); *see also Berkowitz,* 921 F.Supp. at 968 ("[I]t is well established that service on the state attorney general does not constitute service on a state agency." (internal quotation marks omitted)). It appears that plaintiff mailed a copy of the summons and complaint to Pennsylvania's Attorney General. (*See* Doc. 18 at 4.) However, the Pennsylvania Attorney General is not authorized by law or appointment to accept process on behalf of a Pennsylvania county agency. *See* Pa. R. Civ. P. 422(b); *cf. White,* 2009 WL 320964, at \*1 (discussing method of proper service on Pennsylvania county). Thus, it appears that plaintiff has not properly served BCHR. Finally, "[t]o serve a United States agency or corporation ... a party must serve the United States and also send a copy of the summons and of the complaint by registered or certified mail to the agency ...." Fed.R.Civ.P. 4(i)(2); *see also id.* 4(i)(1) (setting forth method for serving the United States). Here,

it appears that plaintiff has not served the United States nor mailed a copy of the summons and complaint to BCSSA.

Moreover, the state actors sued here are entitled to immunity under the Eleventh Amendment. *See McCullough v. Burroughs,* No. 04–CV–3216, 2005 WL 3164248, at \*1 n. 3 (E.D.N.Y. Nov. 29, 2005) (noting that a "Court may *sua sponte* dismiss a claim on the ground of Eleventh Amendment immunity because it affects subject matter jurisdiction." (quoting *Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993)); *Benoit v. Conn. Dept. of Motor Vehicles,* 10–CV–1007, 2012 WL 32962, at \*3 (D. Conn. Jan 6, 2012) (noting that "lower courts may raise the issue of Eleventh Amendment immunity *sua sponte,* [but] they are not required to do so." (quoting *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 237 (2d Cir.2006)); *Elliot v. New York,* No. 09–CV–5019, 2009 WL 4039414, at \*1–2 (E.D.N.Y Nov. 20, 2009) (dismissing *sua sponte* claims asserted by *pro se* plaintiff who paid filing fee against state as barred under Eleventh Amendment).

**\*11** The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This amendment "bars federal courts from entertaining suits brought by a private party against a state," *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993), unless the state waives its Eleventh Amendment immunity by express consent to suit or Congress abrogates the state's immunity by statute, *Gollomp v. Spitzer,* 568 F.3d 355, 366–67 (2d Cir.2009). Neither New York nor Pennsylvania has consented to Section 1983 suits in federal court. *See Mamot v. Bd. of Regents,* 367 F. App'x 191, 192 (2d Cir.2010) ("It is well-established that New York has not consented to § 1983 suits in federal court and that § 1983 was not intended to override a state's sovereign immunity."); *Nails v. Pennsylvania Dept. of Transp.,* 414 F. App'x 452, 455 (3d Cir.2011) ("Congress has not abrogated the States' immunity from section 1983 actions, and Pennsylvania has withheld its consent to suit in federal court." (citations omitted)) Similarly, it is well settled that Congress did not abrogate the states' sovereign immunity under Section 1983. *Dube v. State Univ. of N.Y.,* 900 F.2d 587, 594 (2d Cir.1990). The Eleventh Amendment extends immunity not only to a state but also to its agencies. *See Dube,* 900 F.2d at 594; *Mamot,* 367 F. App'x at 192–93; *Nails,* 414 F. App'x at 455. Thus, "in the absence of consent[, any claims against] the State or one of its agencies or departments ...

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 121 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

[are] proscribed by the Eleventh Amendment." *Dube,* 900 F.2d at 594 (quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)).

Plaintiff alleges that SUNY Downstate conspired with the New York Police Department [10] "to cause plaintiff bodily injury by giving him steroid [*sic* ] and Motrin," deprive him of needed pain medication, and entrap him into purchasing illegal narcotics by "planting a confidential informant in the hospital." (Second Am. Compl. at 17.) Plaintiff claims that these actions violated his constitutional rights. (*See id.* at 15.) However, "[f]or Eleventh Amendment purposes, SUNY is an integral part of the government of the State [of New York] and when it is sued the State is the real party." *Dube,* 900 F.2d at 594. Thus, SUNY, and by extension SUNY Downstate, is entitled to Eleventh Amendment immunity. *See Mamot v. Bd. of Regents,* 367 Fed. App'x 191, 192 (2d Cir.2010) (holding that SUNY is entitled to Eleventh Amendment immunity); *Castells v. Fisher,* No. 05–CV–4866, 2007 WL 1100850, at *5 (E.D.N.Y. Mar. 24, 2007) (holding that SUNY Downstate is entitled to Eleventh Amendment immunity). As SUNY has not consented to suit under Section 1983 in federal court, "no relief, either legal or equitable, is available against" it. *Dube,* 900 F.2d at 594. Therefore, plaintiff's claims against SUNY Downstate are barred under the Eleventh Amendment and are dismissed. *See Garcia v. State Univ. of New York Health Sciences Center at Brooklyn,* No. 97–CV–4189, 200 WL 1469551, at *4 (E.D.N.Y. Aug. 21, 2000) *aff'd* 280 F.3d 98 (2d Cir.2001) (dismissing Section 1983 claims asserted against SUNY Downstate as barred under Eleventh Amendment); *Acquaah v. State Univ. of New York Health Sciences Center at Brooklyn,* 199 F.3d 1321 (2d Cir.1999) (affirming dismissal of Section 1983 claims asserted against SUNY Downstate on Eleventh Amendment immunity grounds).

[10]   It appears that plaintiff has dropped all claims against the New York Police Department and instead has substituted the City of New York in its place.

**\*12**  Plaintiff's claims against BCHR must be dismissed on the same basis. Plaintiff alleges that he "was eligible for cash assistance thru the Tanf Federal funded program since he is disabled," but that in September 2012 BCHR denied "plaintiff cash assistance, conspiring with State Authorities so [that he] would not have funds to commute to New York for family court proceedings." (Second Am. Compl. at 13.) Plaintiff further claims that the "Public Welfare Hearing and Appeals

office for Berks County" scheduled a hearing "knowing that it would conflict with a court date with the Family court in New York," but notwithstanding the fact that plaintiff gave notice of the conflict, "they dismissed the appeal for non appearance." (*Id.*) Finally, plaintiff alleges that he was directed to send BCHR some paperwork and did so, but that a "CAO Heidecker ... maliciously canceled snap benefits." (*Id.*)

Although plaintiff names Berks County Human Resources as a defendant, based on these allegations, it appears that plaintiff is referring to Berks County Human Services, which coordinates the delivery of various welfare programs for Berks County and shares the same address as the Human Resources department. *See* http://www.co.berks.pa.us/Dept/ HumanServ/Pages/default.aspx (last accessed March 1, 2014). But, the cash assistance programs that plaintiff alleges were wrongfully denied to him—TANF and SNAP—are administered by the Pennsylvania Department of Public Welfare. *See id.; see also* http: // www.dpw.state.pa.us/ learnaboutdpw/index.htm (last accessed March 1, 2013).

Thus, it appears that plaintiff claims are directed against the Pennsylvania Department of Public Welfare. However, "Pennsylvania and federal law establish that the [Department of Public Welfare] is entitled to Eleventh Amendment immunity because it is an administrative agency without existence apart from the [Commonwealth of Pennsylvania]." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 254–55 (3d Cir.2010). Thus, plaintiff's Section 1983 claims related to the alleged wrongful denial of welfare benefits are dismissed. *See Bryant v. Allegheny County Domestic Relations Section,* No. 10–1272, 2011 WL 5326051, at *2 (W.D.Pa. Nov.3, 2011) (dismissing *sua sponte* Section 1983 claims brought against the Pennsylvania Department of Public Welfare on Eleventh Amendment immunity grounds); *Dill v. Comm. of Pennsylvania,* 3 F.Supp.2d 583, 587 (E.D.Pa.1998) (holding that Section 1983 claim against Pennsylvania Department of Public Welfare was barred under the Eleventh Amendment).

Finally, the claims against BCSSA—a federal agency—also must be dismissed on sovereign immunity grounds. Plaintiff alleges that around November 2012 he "filed for disability thru the Berks County Social Security Administration," but BCSSA "conspiring with State authorities refused him benefits that he is eligible" to receive. (*See* Second Am. Compl. at 14.) Plaintiff alleges that in September 2012 he "applied for [t]he Social Security Administration to expedite the appeal due to hardship," but "their office stated it was denied by a judge, but refused to give the judge['s] name

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 122 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

or reason for the denial." (*Id.*) Although plaintiff brings suit against under Section 1983, the Court construes his claim as an action under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). (*Id.*) However, "[b]ecause an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived." *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994). "It is well settled that the United States has not waived its sovereign immunity as to constitutional tort claims for money damages." *Spinale v. U.S. Dept. of Agriculture,* 621 F.Supp.2d 112, 120 (S.D.N.Y.2009). Therefore, plaintiff's claims against BCSSA must be dismissed on sovereign immunity grounds. [11] *See Robinson,* 21 F.3d at 510; *Spinale,* 621 F.Supp.2d at 120; *Wooten v. U.S. Dept. of Health and Human Servs.,* No. 10–CV–3728, 2011 WL 536448, at *6 (S.D.N.Y. Feb.15, 2011).

[11]  Furthermore, "a *Bivens* claim can only be brought against a federal employee in his individual capacity. It cannot be maintained against the United States, its agencies, or its employees in their official capacities." *McManamon v. Dept. of Veterans Affairs,* No. 11–CV–2820, 2011 WL 3423346, at *2 (citing *FDIC v. Meyer,* 510 U.S. 471, 484–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)). Thus, even if sovereign immunity did not apply, plaintiff's *Bivens* claim against the Social Security Administration would have to be dismissed for failure to state a claim upon which relief may be granted. *See id* .

**D. Failure to State a Claim Under 42 U.S.C. § 1983**

 **\*13**  Finally, plaintiff complaint fails to plausibly state § 1983 claims. A motion to dismiss for the failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the Court to examine the legal, rather than factual, sufficiency of a complaint. A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

A court considering a 12(b)(6) motion must "take[ ] factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." *Harris v. Mills,* 572 F.3d 66, 71 (2d Cir.2009). A complaint need not contain "detailed factual allegations," but it must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 555). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly,* 550 U.S. at 555). Rather, the plaintiff's complaint must include "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). The determination whether "a complaint states a plausible claim for relief will ... be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citing *Iqbal v. Hasty,* 490 F.3d 143, 157–158 (2d Cir.2007)).

In deciding a 12(b)(6) motion to dismiss, the Court must "construe a *pro se* complaint liberally." *Harris,* 572 F.3d at 72. In other words, "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008) (quoting *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007)). Since *pro se* litigants "are entitled to a liberal construction of their pleadings," the Court reads such pleadings "to raise the strongest arguments that they suggest." *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001) (internal quotations marks omitted). Furthermore, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker v. Schult,* 717 F.3d 119, 122 n. 1 (2d Cir.2013). However, the Court "need not argue a *pro se* litigant's case nor create a case for the *pro se* which does not exist." *Molina v. New York,* 956 F.Supp. 257, 259 (E.D.N.Y.1995). A *pro se* plaintiff "must still comply with the relevant rules of procedural and substantive law ...." *Ally v. Sukkar,* 128 Fed. App'x 194, 195 (2d Cir.2005). When a *pro se* plaintiff has altogether failed to satisfy a pleading requirement, the Court must dismiss the claim. *See Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997).

 **\*14**  Moreover, "[a] district court has the inherent authority to dismiss an action as frivolous, regardless of whether the plaintiff has been granted leave to proceed *in forma*

2014 WL 1011054

*pauperis.*" *Storm–Eggink v. Gottfried,* 409 F. App'x 426, 427 (2d Cir.2011) (citing *Fitzgerald v. First E. Seventh St. Tenants Corp.,* 221 F.3d 362, 363–64 (2d Cir.2000) (per curiam)). "An action is frivolous where it lacks an arguable basis either in law or in fact." *Id.* (internal quotation marks omitted); *see also* 28 U.S.C. § 1915(e)(2) ("Notwithstanding any filing fee ... that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."); *Kaiser v. Roberts,* No. 09–CV–1361, 2010 WL 326208, at *2 (D.Conn. Jan. 22, 2010) ("Although entitled 'Proceedings *in forma pauperis,* ' section 1915(e)(2)(B) applies to parties who do not proceed *in forma pauperis* and who pay the relevant filing fees.")." [12]

[12]    Moreover, a district court may dismiss a complaint *sua sponte* for the failure to state a claim where a plaintiff was given notice of the grounds for dismissal and an opportunity to be heard. *Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991). Here, the numerous motions to dismiss filed by other defendants provide sufficient notice, and plaintiff was afforded an opportunity to be heard when he replied to those motions with several opposition briefs. *See Wachtler v. County of Herkimer,* 35 F.3d 77, 82 (2d Cir.1994) (affirming *sua sponte* dismissal for failure to state claim as against a defendant who did not appear in the matter where other defendants filed a motion to dismiss and plaintiff responded thereto). Moreover, plaintiff has already had two opportunities to amend his complaint. Thus, although several defendants have not filed motions to dismiss, the Court has the authority to *sua sponte* dismiss plaintiff's claims for the failure to state a claim as against those defendants. *See Wang v. Miller,* 356 F. App'x 516, 517 (2d Cir.2009) (affirming *sua sponte* dismissal of § 1983 claim against private attorney for failure to state a claim).

**1. Failure to Plausibly Allege State Action by Private Individuals**

Several defendants argue that plaintiff's action must be dismissed because plaintiff fails to plausibly allege that they were state actors. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Feingold v. New York,* 366 F.3d 138, 159 (2d Cir.2004) (quoting *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)). Therefore, private parties are not proper defendants in a Section 1983 action unless the private parties were acting under color of state law. *Jae Soog Lee v. Law Off. of Kim & Bae, PC,* 530 F. App'x 9, 9 (2d Cir.2013) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)). "[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents." *Id.* (internal quotation marks omitted). A "conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity." *Ciambriello v. Cnty. of Nassau,* 292 F.3d 307, 324 (2d Cir.2002). Rather, to demonstrate a § 1983 conspiracy between a private party and a state authority sufficient to survive a motion to dismiss, plaintiff must show "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Id.* at 324–25. "[C]omplaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977). Moreover, "assertions [that] lack any factual foundation ... are merely conclusory allegations 'masquerading as factual conclusions' [and] are insufficient to defeat a motion to dismiss." *Jackson v. Cnty. of Rockland,* 450 Fed. App'x 15, 19 (2d Cir.2011) (quoting *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 398 (2d Cir.2006)).

**\*15** In his second amended complaint, plaintiff asserts § 1983 claims against a number of private parties, but fails to plausibly allege that these private parties were acting under the color of state law. Plaintiff alleges that Verizon N.Y. and T–Mobile unlawfully wiretapped his home phone and internet services without a warrant "for the New York Police and District attorneys office." (2d Am. Compl. at 19–20.) Plaintiff's alleges that Verizon N.Y. began wiretapping him around 2010. (*Id.* at 20.) As for T–Mobile, plaintiff alleges that T–Mobile wiretapped his cellular phone from "about November 2009 until present" and conspired with authorities to withhold from state court the phone records of Gloria P. Margary that would have been helpful to plaintiff in resolving his state court child custody dispute. (*Id.*)

However, although plaintiff argues that Verizon N.Y. and T–Mobile acted under color of state law because they were involved in a conspiracy with state actors, (*see* Pl.'s Opp'n

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 124 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

Br. (Doc. No. 149) at 3–6; Pl.'s Opp'n Br. (Doc. No. 159) at 2–4), and that they acted under the direction of defendant Pomodor, (*see* 2d Am. Compl. at 6), he wholly fails to allege specific facts that would plausibly show the existence of any agreement or concerted action between these defendants and any state actors. Plaintiff fails to provide any allegations describing the purported agreement between these defendants or the alleged acts these defendants engaged in in furtherance of their purported agreement. Indeed, plaintiff fails to provide the factual basis for his belief that his phone and internet services were tapped. Plaintiff's bald assertions that there was a conspiracy between state actors and Verizon N.Y. and T–Mobile to illegally wiretap him, without more, are insufficient to plausibly allege that these private defendants were acting under the color of state law. *See Ciambriello,* 292 F.3d at 324–25; *see also Peacock v. De Simone,* No. 95–CV–3094, 1996 WL 1088917, at *12 (E.D.N.Y. July 1, 1996) (noting that to allege Section 1983 conspiracy, "plaintiff must demonstrate that the private party acted in a wilful manner culminating in an agreement, understanding or "meeting of the minds" that violated the plaintiff's rights"). Thus, plaintiff's claims against Verizon N.Y. and T–Mobile must be dismissed.

Plaintiff's claims against the lawyers involved in the child custody proceedings must be dismissed on the same basis. Plaintiff alleges that Mid–Penn conspired with the Berks and Kings County Family Courts to remove his son from his custody. Specifically, plaintiff alleges that the Berks County Family Court instructed Mid–Penn to "represent mother," but advised plaintiff "that there were no legal services available to him." (Second Am. Compl. at 7.) Plaintiff further alleges that Mid–Penn "deliberately gave Gloria Margary services knowing that she did not qualify for services since she was not a resident of the state and employed at the time." (*Id.*) Plaintiff also alleges that defendants Michael D. Carlin and Jessica A. Spector—two private attorneys—conspired with state court Judge Cannataro to deprive plaintiff of a fair trial during plaintiff's state child-custody proceeding. (*See* Second Am. Compl. at 20–22.) However, "[i]t is well established that private attorneys—even if appointed by the court—are not state actors for the purposes of § 1983 claims." *Licari v. Voog,* 374 Fed. App'x 230, 231 (2d Cir.2010). Furthermore, "a legal aid society ordinarily is not a state actor amenable to suit under § 1983." *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000). Although he argues that these defendants conspired with the state court, plaintiff has failed to set forth any facts from which a conspiracy between these defendants and any state actor can be inferred. Plaintiff alleges that these defendants met in private with Judge Cannataro, but

this sole, conclusory allegation "falls far short of pleading a 'close nexus' or 'joint engagement' to sustain a § 1983 claim." *See McKnight,* 699 F.Supp.2d at 531. Furthermore, the fact that Mid–Penn was assigned by the Berks County Family court to represent the mother of plaintiff's child does not, by itself, supply the requisite nexus to finding state action by conspiracy. *See Ciambriello,* 292 F.3d at 324–25. Quite simply, plaintiff's conclusory assertions that these defendants conspired with the state court falls short of the specific factual pleadings required under *Twombly. See McKnight,* 699 F.Supp.2d at 531; *Peacock,* 1996 WL 1088917, at *12; *see also Schnabel,* 232 F.3d at 87. Accordingly, plaintiff's claims against Mid–Penn, Michael D. Carlin and Jessica A. Spector must be dismissed.

### 2. Failure to Plausibly Allege a Municipal Policy or Practice

**\*16** Finally, plaintiff's claims against RPD [13] and the City of New York must be dismissed. Plaintiff alleges that RPD violated his rights under § 1983 and the Fourth, Eighth, and Fourteenth Amendments because the police unlawfully "concealed a Gps [*sic* ] (FCC ID: Koblear1XR No.15042969) and wire tap [*sic* ] in [plaintiff's] car" and used the GPS to unlawfully track and follow him; the police unlawfully "pulled [plaintiff] over for speeding when ... doing 25 mph in a 25 mph zone and issued him a citation;" and the police conspired to unlawfully enter plaintiff's home. (2d Am. Compl. at 6–7.) For the reasons set forth below, the Court finds that plaintiff's claims against the RPD are dismissed in their entirety.

[13]    Plaintiff identifies the RPD in the complaint's caption but fails to mention the RPD anywhere in the body of the complaint, which only includes allegations against the Berks County Police Department—a nonexistent entity, apparently. (*See* RPD's Br. (Doc. No. 123–3) at 8.) The RPD, which filed a motion to dismiss, argues as a threshold matter that the complaint should be summarily dismissed against it because the RPD is not mentioned anywhere in the body of the complaint. However, given plaintiff's *pro se* status and the fact that the RPD will not in any way be prejudiced the court considers plaintiff's references to the Berks County Police Department as referring to the RPD. Moreover, this approach avoids the necessity of deciding plaintiff's argument that he can easily correct the "error of mislabeling" the

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 125 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

RPD by amending the complaint. (Pl.'s Opp'n Br. (Doc. No. 143) at 4.)

As an initial matter, the Court notes that a municipal police department is not subject to suit under Section 1983. Section 1983 only applies to legal "person[s]." 42 U.S.C. § 1983. Although a municipality is considered a "person" within the meaning of § 1983, see *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a police department, is a "sub-division" of the municipal government "through which the [municipality] fulfills its policing functions" and is not an independent legal entity subject to suit under § 1983. See *Martin v. Red Lion Police Dep't*, 146 Fed. App'x 558, 562 n. 3 (3d Cir.2005); *United States v. Kama*, 394 F.3d 1236, 1239 (9th Cir.2005); *Dean v. Barber*, 951 F.2d 1210, 1214 (11th Cir.1992). Numerous courts addressing this issue have concluded that municipal police departments are not subject to suit under § 1983. *See, e.g.*, *Kiriakidis v. Borough of Vintondale Police Dep't*, No. 12–CV–188, 2013 WL 5414110, at *7 (W.D.Pa. Sept. 26, 2013); *La Grande v. Town of Bethlehem Police Dep't*, No. 08–CV–0738, 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009); *Walker v. U.S. Marshals*, No. 08–CV–959, 2009 WL 261527, at *2–3 (E.D.N.Y. Feb.4, 2009); *Francis v. State's Attorney Off.*, No. 05–CV–64, 2006 WL 2349638, at *3 (D.Conn. July 27, 2006); *Nicholson v. Lenczewski*, 356 F.Supp.2d 157, 164 (D.Conn.2005); *Peterson v. Easton Police Dep't Criminal Investigations Divs.*, No. 99–CV–4153, 1999 WL 718551, at *1 (E.D.Pa. Aug.26, 1999). Thus, all of plaintiff's claims against the RPD could be dismissed on this ground alone.

In any event, even construing plaintiff's claims as properly directed at the correct municipal entity, his claims must nevertheless fail, as plaintiff fails to allege a § 1983 against a municipality. "To maintain a section 1983 claim against a municipality or its agents in their official capacities, a plaintiff must show that the municipality's agents engaged in unconstitutional actions ... pursuant to an official policy or custom." *Katz v. Morgenthau*, 892 F.2d 20, 22 (2d Cir.1989) (citing *Monell*, 436 U.S. at 690–95). To state a Section 1983 claim against a municipality, a plaintiff must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco v. Port Auth.*, 615 F.3d 129, 140 (2d Cir.2010). A plaintiff "need not identify an express rule or regulation." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir.2004). Rather, "[i]t is sufficient to show ... that a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law ...." *Id.* (internal quotations marks omitted). "Liability of a municipal

defendant or an individual sued in his official capacity under ... § 1983 cannot, however, be premised on a theory of *respondeat superior.*" *Patterson*, 375 F.3d 206, 226. Instead, "there must be a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Matthews v. City of New York*, 889 F.Supp.2d 418, 444 (quoting *Abreu v. City of New York*, 657 F.Supp.2d 357, 360 (E.D.N.Y.2009)).

**\*17** Here, however, plaintiff fails completely to allege —let alone provide any facts in support of an allegation —that the RPD, or the City of Reading, maintained a custom, policy, or practice of unlawfully pulling over and citing drivers for speeding or for installing GPS tracking devices on automobiles. Plaintiff does not even name a single individual or allege that the officers of the RPD directed similar conduct toward anyone other than plaintiff. Moreover, in regard to the GPS device, plaintiff fails to allege any specific facts connecting the RPD to the installation of the GPS device. Instead, plaintiff vaguely asserts that "the NYC police and [the RPD]" concealed the GPS device and that the Pennsylvania police unlawfully followed him using the GPS device. (2d. Am. Compl. at 6.) Plaintiff fails to even identify whether it was the NYPD, the RPD, or some other Pennsylvania police department that "concealed" the device. These omissions highlight plaintiff's complete failure to meet *Twombly* 's plausibility threshold, and plaintiff's allegations fall far short of demonstrating a practice "so persistent or widespread as to constitute a custom or usage with the force of law." *Patterson*, 375 F.3d at 226 (internal quotation marks omitted). Thus, plaintiff's Section 1983 claim relating to these claims must fail. *See, e.g.*, *Palumbo v. Manhattan and Bronx Surface Transit Operating Auth.*, 346 F.Supp.2d 493, 495 (S.D.N.Y.2004) (dismissing § 1983 due process claim because plaintiff failed to allege "a policy or custom of violating employees' due process rights"). [14]

---

[14]  Furthermore, plaintiff's claim that he was unlawfully pulled over and cited for speeding is not cognizable because plaintiff does not dispute that he subsequently pleaded guilty to speeding on January 10, 2012. (*See* RPD's Br. Ex. A (Doc. No. 123–3) at 12–13 (ECF pagination).) In *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 126 of 151

sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal.... A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

*Id.* at 486–87; *see also Collins v. Greenberg, 32 Fed. App'x 3, 4 (2d Cir.2002)* (§ 1983 claims involving false arrest and malicious prosecution "require a showing of a favorable disposition"). Thus, to the extent that that plaintiff claims a § 1983 violation in connection with being pulled over and cited for speeding, his claim is not cognizable under *Heck. See Oliver v. Tepperman,* No. 08–CV–3685, 2010 WL 889276, at *3 (E.D.N.Y. Mar.10, 2010) ("[I]t is well-established that a defendant who pleads guilty waives any challenge to the constitutionality of his arrest, interrogation, search and prosecution." (internal quotation marks omitted)); *Feurtado v. Gillespie,* No. 04–CV–3405, 2005 WL 3088327, at *6–7 (E.D.N.Y. Nov. 17, 2005)* (dismissing, under *Heck,* § 1983 false arrest claim where plaintiff was convicted for underlying charge).

As to plaintiff's claim that the RPD conspired to unlawfully enter his home, plaintiff similarly fails to allege that the RPD, or the City of Reading, maintained a custom, policy, or practice of such conduct. Plaintiff broadly alleges that the RPD "conspired to enter his home by forcing him to register with the police departments [*sic* ] False Alarm Reduction Program," and that "[t]he ordinance was changed by authorities to give themselves authority to enter the premises without a warrant." (2d Am. Compl. at 7.) Although plaintiff baldly alleges a conspiracy to change a city ordinance so that police could enter his home, his conspiracy allegation is devoid of a single fact demonstrating an agreement between the police and the Reading City Council to change the ordinance. Plaintiff likewise fails to allege a single fact in support of his allegation that the RPD forced plaintiff to register with the alarm program or, indeed, that he actually suffered any harm as a result of this supposed registration. As these assertions lack any factual foundation, they are merely conclusory allegations "masquerading as factual conclusions," *Jackson,* 450 F. App'x at 19, and fall far short of demonstrating a custom, policy, or practice of unlawfully entering homes. Thus, plaintiff's Section 1983 claim relating to the alleged conspiracy for RPD to unlawfully enter his home must fail.

*18 Similarly, plaintiff's claims against the City of New York must be dismissed. Plaintiff alleges that the NYPD, acting under the direction of ADA Pomodor, unlawfully commenced an investigation in 2009 in order to force him to testify for the state. (*See* Second Am. Compl. at 5). Plaintiff claims that the NYPD "pursued [him] with illegal wire tapping and [subjected him] to at least three unlawful stop[s] and search[es]." (*Id.*) Finally, plaintiff alleges that the NYPD sent him threats through his internet browser to intimidate him. (*Id.*) However, plaintiff again completely fails to allege any facts that suggest that these actions were taken pursuant to a municipal policy or practice. Plaintiff offers no facts that suggest that the alleged actions of the NYPD represented a practice so persistent or widespread as to constitute a custom or usage with the force of law. Thus, plaintiff's conclusory allegations of wrongdoing simply do not plausibly allege a claim against the City of New York. Accordingly, these claims are dismissed.

### III. Leave to Amend

When addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated. *Aquino v. Prudential Life & Cas. Ins. Co.,* 419 F.Supp.2d 259, 278 (E.D.N.Y.2005); *see also Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir.2002) ("The liberal pleading standards applicable to pro se civil rights complaints in this circuit require that the district court give [plaintiff] an opportunity to flesh out his somewhat skeletal complaints before dismissing them"). A court should only deny a *pro se* plaintiff leave to amend when "it is 'beyond doubt that the plaintiff can provide no set of facts in support' of his amended claims." *Pangburn v. Culbertson,* 200 F.3d 65, 71 (2d Cir.1999) (quoting *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). Where a complaint has been dismissed for lack of subject matter jurisdiction, denial of leave to amend on the basis of futility may be appropriate. *Rahim v. Secretary, Establishment Div., Gov't of People's Republic of Bangl.,* 481 Fed. Appx. 18, 19 (2d Cir.2012) (affirming district court's dismissal of *pro se* plaintiff's complaint without leave to amend where complaint was dismissed for lack of subject matter jurisdiction); *Gomes v. ANGOP,* No. 11 Civ. 0580, 2012 U.S. Dist. LEXIS 119049, at *55–56, 2012 WL 3637453 (E.D.N.Y. Aug. 22, 2012) (dismissing pro se plaintiff's claim for lack of personal and subject matter jurisdiction, and declining to grant plaintiff leave to amend as amendment would be "futile").

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 127 of 151

Martinez v. Queens County Dist. Atty., Not Reported in F.Supp.3d (2014)

2014 WL 1011054

There are many reasons here why leave to amend is denied. Primary among them is that this Court lacks subject matter jurisdiction over most of plaintiff's claims under the domestic relations exception, and jurisdiction over many of the defendants either because they are not amenable to suit in New York, or enjoy some type of immunity. He has also failed to properly serve those defendants over whom the Court may arguably exercise jurisdiction, obstinately relying on his prior efforts at service despite being told of service deficiencies as well as the proper service addresses to cure those defects. Finally, plaintiff has been unsuccessful in his attempt to raise many of the same claims in separate actions before this Court. (*See Martinez v. Cannataro et al.,* 13–CV–3392; *Martinez v. Cannataro et al.,* 14–CV–753.) [15] Moreover, plaintiff has already had two bites at the apple in this case, failing to plead anything but frivolous and factually unsupported claims in two complaints. He has also properly serve several defendants despite being given proper addre. Moreover, It appears from his various pleadings that plaintiff has not and cannot provide a set of facts that will give rise to a plausible claim in this Court. As such, leave to amend would be futile.

[15]    By separate Memorandum and Order issued today, the later-filed action has been dismissed.

## CONCLUSION

**\*19**  For the reasons set forth above, plaintiff's second amended complaint is dismissed in its entirety. The Clerk of the Court is directed to enter judgment accordingly and to close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

The Clerk of Court is directed to mail a copy of this Memorandum and Order and the accompanying Judgment to petitioner *pro se* via U.S. Mail, and close this case.

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 1011054

---

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2022 Thomson Reuters. No claim to original U.S. Government Works.  16

2021 WL 3723091
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher J. HAMLETT, Plaintiff,
v.
CITY OF BINGHAMTON et al., Defendants.

3:20-cv-880 (GLS/ML)
|
Signed 08/23/2021

**Attorneys and Law Firms**

FOR THE PLAINTIFF: OF COUNSEL: RONALD R. BENJAMIN, ESQ., Office of Ronald R. Benjamin, P.O. Box 607, 126 Riverside Drive, Binghamton, NY 13902.

FOR THE DEFENDANTS: HON. KENNETH FRANK, OF COUNSEL: SHARON ANNE SORKIN, BRIAN M. SEACHRIST, Assistants Corporation Counsel, City of Binghamton, Corporation Counsel, 38 Hawley Street, Binghamton, NY 13901.

### MEMORANDUM-DECISION AND ORDER

Gary L. Sharpe, Senior District Judge

### I. Introduction

*1 Plaintiff Christopher Hamlett commenced this action against defendants Richard David, Mayor of the City of Binghamton, Joseph Zikuski, Chief of Police for the City of Binghamton, John Ryan, Assistant Chief of Police for the City of Binghamton, (collectively, hereinafter "individual defendants"), and the City of Binghamton, pursuant to Title VII of the Civil Rights Act of 1964 [1] and 42 U.S.C. § 1981. (Compl., Dkt. No. 1.) Pending before the court is defendants' motion to dismiss. (Dkt. No. 9.) For the reasons that follow, the motion is granted in part and denied in part as described below.

---

[1]    See 42 U.S.C. §§ 2000e-2000e-17.

### II. Background [2]

[2]    The facts are drawn from Hamlett's complaint, (Dkt. No. 1), and presented in the light most favorable to him.

Hamlett has served as a police officer for the City of Binghamton Police Department (BPD) since 2004. (Compl. ¶ 8.) He has served in a number of different roles at BPD, including as a member of BPD's SWAT team, a field training officer (FTO), and a "Pre-Academy instructor." (Id. ¶¶ 11-12, 45.) The FTO position, in particular, is "prestigious," requiring leadership skills, knowledge in all of BPD's rules and regulations, and various increased responsibilities. (Id. ¶¶ 13-15.)

In October 2016, Hamlett applied for selection to the detective division for assignment in 2017. (Id. ¶¶ 16-17.) BPD has not adopted any regulations that set forth criteria for such applications. (Id. ¶ 19.) Hamlett's application was not successful; instead, three police officers, who, presumably but not alleged, were white, and who were less experienced and less qualified than him were selected. (Id. ¶¶ 20-21.) One such police officer was selected over him purportedly due to that officer's "phone hacking skills." (Id. ¶ 24.) Hamlett asserts that this justification is "clearly pretextual," and, in actuality, "racial animus tainted the decision-making process." (Id. ¶¶ 23, 25.) He maintains that he was denied selection "because of his race." (Id. ¶ 23.)

After seeking advice from Zikuski as to how to increase his chances of being assigned to the detective division and being told by Zikuski that he would be a "good" detective, Hamlett, in 2017, re-applied for selection to the division for assignment in 2018. (Id. ¶¶ 27-28.) But he was, again, passed over for a presumably white police officer who was less experienced and less qualified than him. (Id. ¶ 30.)

In January 2018, Ryan was placed in charge of the detective division. (Id. ¶ 29.) Hamlett alleges that Ryan has a reputation for being "racist" and "biased against African Americans." (Id. ¶¶ 34-35.) He alleges that BPD Lieutenant, Alan Quinones, told Zikuski in 2015 that Ryan was a racist. (Id. ¶ 34.) Moreover, Hamlett asserts that Zikuski informed Quinones, that "the reason [Hamlett] was not given the position was because ... Ryan would not agree to have an African American work in the detective division so long as he was in charge." (Id. ¶¶ 31-33.) Hamlett also applied for the 2019 opening in the detective division, and, seemingly, although not alleged, was passed over again. (Id. ¶ 36.)

**\*2** On August 20, 2019, Hamlett filed a complaint with the New York State Division of Human Rights (NYSDHR) and the Equal Employment Opportunity Commission (EEOC), and was issued a right-to-sue letter by the EEOC. (*Id.* ¶ 22.) A few months later, copies of the City's answer to this complaint were posted in BPD's locker room and gym, and were placed within documents that supervisors reviewed on a daily basis. (*Id.* ¶ 57.) Hamlett has also been "shunned and ostracized by both officers and supervisors" at BPD, and individual defendants have failed to take any steps to intervene or ameliorate this situation. (*Id.* ¶¶ 59-62.)

He commenced the instant action in August 2020, asserting the following three claims: (1) a Title VII employment discrimination claim, (2) a Title VII retaliation claim, and (3) a discrimination claim pursuant to 42 U.S.C. § 1981. (*See generally* Compl.) Hamlett seeks monetary damages, injunctive relief, attorney's fees, and a recoupment of expenses he incurred by litigating this matter before the NYSDHR. (*Id.* ¶ 40.)

### III. **Standard of Review**

The standard of review under Fed. R. Civ. P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the governing standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP*, 701 F. Supp. 2d 215, 218 (N.D.N.Y. 2010).

### IV. **Discussion**

#### A. **Title VII Claims**

Hamlett brings a Title VII employment discrimination claim and a Title VII retaliation claim, apparently against all defendants. (*See generally* Compl.) Defendants argue that Title VII claims cannot be made against individuals, and, thus, to the extent Hamlett brings these claims against individual defendants, they should be dismissed. (Dkt. No. 9, Attach. 5 at 17.) Hamlett concedes in his opposition to defendants' motion to dismiss that his retaliation claim is brought only against the City, (Dkt. No. 11 at 12), but he is silent as to his employment discrimination claim, (*see generally id.*).

It is axiomatic that "Title VII does not impose liability on individuals." *Lore v. City of Syracuse*, 670 F.3d 127, 169 (2d Cir. 2012) (citations omitted); *see Golden v. Syracuse Reg'l Airport Auth.*, No. 5:20-CV-1566, 2021 WL 485731,

at \*1 (N.D.N.Y. Feb. 10, 2021) ("[I]ndividuals are not subject to liability under Title VII" (internal quotation marks and citation omitted)). Accordingly, defendants' motion to dismiss Hamlett's Title VII claims as against individual defendants is granted.

Additionally, in his opposition to defendants' motion to dismiss, Hamlett concedes that, to the extent that his Title VII claims are based on his unsuccessful applications for assignment to the detective division in 2017 and 2018, they are time-barred. (Dkt. No. 11 at 8.) Accordingly, his Title VII claims relate only to his 2018 application for assignment in the detective division in 2019, and the rest of the allegations consist of "background evidence." (*Id.*)

#### *1. Employment Discrimination*

Hamlett brings a Title VII employment discrimination claim against the City, asserting that the actions described above "constitute a continuous pattern of racist behavior that has caused [him] injury including but not limited to failing to be appointed to the detective division." (Compl. ¶ 38.) According to Hamlett, assignment as a BPD detective is "highly desired" and affords police officers the opportunity to earn more money, and, thus, defendants' alleged discrimination deprived Hamlett of "advancement in his career in law enforcement," in addition to causing him "embarrassment and humiliation" and "emotional distress and mental anguish." (*Id.* ¶¶ 37, 39.)

**\*3** Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42. U.S.C. § 2000e-2(a). A plaintiff asserting a claim under Title VII may establish a prima facie case by showing that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). The last factor may be satisfied "through direct evidence of intent to discriminate, or by indirectly showing circumstances giving rise to an inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (citations omitted).

The City argues that this claim should be dismissed because (1) Hamlett has not set forth sufficient allegations to establish that he was qualified for the detective position, (2) denying

Hamlett v. City of Binghamton, Slip Copy (2021)
Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 130 of 151
2021 WL 3723091

Hamlett a position in a particular assignment is not an adverse employment action for purposes of Title VII, and (3) even if Hamlett did suffer an adverse employment, he has not set forth sufficient allegations to establish discriminatory intent. (Dkt. No. 9, Attach. 5 at 8-11.) In response, Hamlett contends that the allegations in his complaint are sufficient to maintain his Title VII employment discrimination claim, and that the City's arguments are based on a higher burden of proof that does not apply at the pleading stage. (Dkt. No. 11 at 3-7.)

The court agrees with Hamlett that, at this early stage in the litigation, he has set forth sufficient allegations to maintain a Title VII employment discrimination claim. First, as to whether he was qualified for selection to the detective division, he has alleged that he has been a police officer since 2004, and has served in various "prestigious" roles at BPD, including as an FTO, a position that requires leadership skills and knowledge in all of BPD's rules and regulations. (Compl. ¶¶ 8, 11-15, 45.) He has also alleged that Zikuski, who, as Chief of Police, presumably has knowledge as to the qualifications for detective, told him that he would make a good detective, and that there are no formal criteria or regulations as to detective selection. (*Id.* ¶¶ 19, 28.)

Next, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment ... [that] is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Abboud v. Cnty. of Onondaga, N.Y.,* 341 F. Supp. 3d 164, 179 (N.D.N.Y. 2018) (citation omitted). "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Id.* (citation omitted).

At this juncture, a denial of selection to the detective division, a quasi-promotion and something that prohibited Hamlett from advancing in his career, is an adverse employment action. *See Sotak v. Bertoni,* 501 F. Supp. 3d 59, 79 (N.D.N.Y. 2020) ("While there is no exhaustive list of what constitutes an adverse employment action, courts have held that the following actions, among others, may qualify: discharge or demotion; denial of a provisional or permanent promotions; involuntary transfer that entails objectively inferior working conditions; denial of benefits; denial of a requested employment accommodation; denial of training that may lead to promotional opportunities; and a shift assignment that makes a normal life difficult for

the employee." (citation omitted)); *Krul v. Brennan,* 501 F. Supp. 3d 87, 97 (N.D.N.Y. 2020) (finding that allegations that a plaintiff "missed out on several career advancement opportunities and was denied professional training" was sufficient to satisfy the "adverse employment action" element at the motion to dismiss stage). Accordingly, Hamlett's complaint sufficiently alleges that he suffered an adverse employment action for purposes of his Title VII employment discrimination claim.

**\*4** Finally, the City contends that Hamlett has not sufficiently pleaded discriminatory intent because one of the allegations on which he relies to show racial animus —statements from his co-worker, Alan Quinones—consists of "self-serving hearsay"; he was selected for other special detail assignments during his tenure at BPD; he was denied selection to the detective division prior to Ryan taking over as well; and, aside from "conclusory speculation," Hamlett has not alleged that he was similarly situated in all material respects to the officers who were ultimately selected as detectives. (Dkt. No. 9, Attach. 5 at 8-11.)

As argued by Hamlett, (Dkt. No. 11 at 3-7), many of the City's arguments with respect to this claim are not applicable at the motion to dismiss stage in the litigation. "[T]o survive a motion to dismiss, a plaintiff is not required to plead a *prima facie* case under *McDonnell Douglass,* at least as the test was originally formulated." *Garvey v. Wegmans,* No. 5:17-CV-1257, 2018 WL 5983374, at \*4 (N.D.N.Y. Nov. 14, 2018) (internal quotation marks and citations omitted). Rather, "to defeat a motion to dismiss ... in a Title VII discrimination claim, a plaintiff must plausibly allege that (1) the employer took adverse action against him, and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision." *Vega,* 801 F.3d at 87.

Here, Hamlett has alleged that his race was a motivating factor in his denial to the detective division. He has alleged that Ryan had a "reputation" at BPD "for being racist," (Compl. ¶ 35), that Zikuski stated "that the reason he was not given the position was because ... Ryan would not agree to have an African American work in the detective division," (*id.* ¶ 31), and, based on the totality of the complaint, the court assumes for purposes of ruling on the pending motion that the alleged lesser qualified individuals who were ultimately selected over him were white, (*see generally* Compl.).

In sum, at this early stage, Hamlett has set forth sufficient allegations to maintain a Title VII employment discrimination

2021 WL 3723091

claim against the City, and, thus, the motion to dismiss in that regard is denied.

### 2. Retaliation

Hamlett brings a Title VII retaliation claim against the City, asserting that, because he pursued his NYSDHR and EEOC claims against BPD, he was not re-assigned as a Pre-Academy instructor, a desirable position that he had been assigned to on an annual basis from 2017 through 2019. (Compl. ¶¶ 49-50.) Hamlett alleges that he was also retaliated against by receiving "a poor evaluation in 2019, despite the fact that [he] performed his duties no differently than he had for the previous fifteen years," and by not being scheduled for "Glock Armorer School." (*Id.* ¶¶ 51-52.)

To state a retaliation claim under Title VII, a plaintiff must plausibly allege "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn v. City of New York*, 795 F.3d 297, 315-16 (2d Cir. 2015) (citation omitted). The City concedes that Hamlett's commencement of a discrimination claim against it is a protected activity and that it was aware of that discrimination claim. (Dkt. No. 9, Attach. 5 at 13.) However, it argues that the claim should be dismissed because Hamlett has not established there was an adverse employment action taken against him or that there was a causal connection between the filing of his complaint and any adverse employment action. (*Id.* at 13-14.)

 **\*5** First, "in the context of a Title VII retaliation claim, an adverse employment action is any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (internal quotation marks and citation omitted). Examples of adverse actions "include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks and citation omitted). "Petty slights or minor annoyances that often take place at work and that all employees experience do not constitute actionable retaliation." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (internal quotation marks and citation omitted). However, "an act that would be immaterial in some situations is material in others," and some minor acts may be substantial if considered in the aggregate. *Id.*

Hamlett alleges that each of the following constitute an adverse employment action: (1) he was not scheduled for a "Glock Armorer School recertification," (2) he was not assigned as a Pre-Academy instructor, and (3) he received a poor evaluation "despite the fact that [he] performed his duties no differently than he had for the previous fifteen years." (Compl. ¶¶ 45-52.) The City contends that none of these things "affected any material employment conditions," as he has alleged "no change to his responsibilities, pay, rank, or title." (Dkt. No. 9, Attach. 5 at 13.)

Contrary to the City's contention, the alleged retaliatory act no longer needs to "bear on the terms or conditions of employment; the proper inquiry now is whether the employer's actions [were] harmful to the point that they could well dissuade a reasonable worker from" engaging in protected activity. *Hicks*, 593 F.3d at 169 (citation omitted).

Indeed, courts have found that conduct similar to the conduct alleged by Hamlett constitutes a retaliatory act. *See Orsaio v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 6:17-cv-00685, 2019 WL 3891085, at \*26 (N.D.N.Y. Aug. 19, 2019) ("[T]he Second Circuit has made it clear that a poor evaluation could very well deter a reasonable worker from complaining, and may therefore constitute an adverse employment action for purposes of a Title VII retaliation claim." (internal quotation marks and citation omitted)); *Abboud*, 341 F. Supp. 3d at 183 n.23 ("[Plaintiff's] retaliation claims based on his omission from the 2013 firearms qualification list survives."); *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 369 (N.D.N.Y. 2017) ("Courts in the Second Circuit have taken a 'generous' view of retaliatory acts at the motion to dismiss stage." (citation omitted)). Accordingly, Hamlett has sufficiently alleged an adverse employment action for purposes of his retaliation claim.

Next, as for causation, a plaintiff must plausibly plead a connection between the retaliatory act and his engagement in protected activity. *See* 42 U.S.C. § 2000e-3(a). To adequately plead causation, a "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega*, 801 F.3d at 90 (citation omitted). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* at 90-91 (citation omitted). However, the "but-for causation does not ... require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have

occurred in the absence of the retaliatory motive." *Id.* at 91 (internal quotation marks, alterations, and citation omitted).

"Causation may be shown by direct evidence of retaliatory animus or inferred through temporal proximity to the protected activity." *Duplan v. City of New York*, 888 F.3d 612, 625 (2d Cir. 2018) (citation omitted); *see Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship." (citation omitted)).

**\*6** The City argues that the complaint does not establish causation because Hamlett's theory of causation is based on temporal proximity, which is too attenuated here as seven months passed between Hamlett filing his discrimination complaint and when he was allegedly passed over for assignment as a Pre-Academy instructor, and he has not specified "when (or if) the Glock Armorer School recertification was scheduled" or when exactly he received his poor evaluation. (Dkt. No. 9, Attach. 5 at 14.) In his opposition, Hamlett does not respond to this argument, and, instead asserts that the City relies on "evidentiary burdens ... that are ... not applicable at the pleading stage." (Dkt. No. 11 at 9-10.)

Here, there is no allegation of retaliation in the complaint in that there are no specific facts alleged to establish that Hamlett's poor evaluation, failure to be selected as a Pre-Academy instructor, and failure to be invited to attend Glock Armorer School recertification would not have occurred in the absence of a retaliatory motive. (*See generally* Compl.) Additionally, temporal proximity cannot form the basis of causation given that, aside from his failure to be selected as a Pre-Academy instructor, which was seven months after he filed his discrimination complaint, Hamlett has not alleged when exactly the adverse employment actions took place, or if they even took place after he filed his NYSDHR and EEOC complaint. (*Id.*) Moreover, Hamlett has provided the court with absolutely no clarification or argument with respect to this issue in his opposition brief. (*See generally* Dkt. No. 11.)

Accordingly, Hamlett's complaint fails to adequately allege the causation element of his Title VII claim, and, thus, the City's motion to dismiss with respect to that claim is granted. [3] *See New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 480 (S.D.N.Y. 2021) ("Given the

glaring absence of direct evidence of causation, the passage of approximately seven months between [the plaintiff's] arguably protected activity and his termination defeats any inference of causation between the two." (citations omitted)); *Williams v. N.Y.C. Dep't of Educ.*, No. 1:19-cv-01353, 2021 WL 1178118, at \*9 (S.D.N.Y. Mar. 29, 2021) ("Indeed, even if one only measures from the date of Plaintiff's first EEOC charge to the date of her termination, more than seven months passed between the charge and Plaintiff's termination. Plaintiff cannot show causal connection by temporal proximity.").

[3]   The City also maintains that Hamlett's retaliation claim must be dismissed for the separate reason that he has failed to exhaust it. (Dkt. No. 9, Attach. 5 at 15-16.) A plaintiff asserting a Title VII claim in federal court "generally must file a charge of discrimination with the EEOC within three hundred days after the alleged unlawful employment practice occurred, and must then file an action in federal court within 90 days of receiving a right-to-sue letter from the agency." *Duplan*, 888 F.3d at 621-22 (internal quotation marks and citations omitted). Hamlett asserts that his retaliation claim is reasonably related to the claim brought to the EEOC, and, thus, it is exhausted. (Dkt. No. 11 at 10-11.) A claim is "reasonably related" if (1) "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination"; (2) "the complaint is one alleging retaliation by an employer against an employee for filing an EEOC charge"; or (3) "the complaint alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Terry v. Ashcroft*, 336 F.3d 128, 151 (2d Cir 2003) (internal quotation marks and citations omitted). However, even assuming that Hamlett's retaliation claim is reasonably related to the claim alleged in his EEOC charge, the court does not reach the exhaustion issue, as it is not jurisdictional, *see Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir. 2000), and the claim is dismissed on the merits for the reasons described above.

## B. Section 1981 Discrimination Claim

**\*7** Hamlett brings a discrimination claim pursuant to 42 U.S.C. § 1981 against all defendants, asserting that Ryan

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 133 of 151

refused to consider assigning Hamlett to the detective division because of racial animus, that David and Zikuski were aware of this and did not ameliorate the situation, and that Hamlett was subject to work-place harassment as retaliation for filing his race-based discrimination complaint. (Compl. ¶¶ 54-67.) In his opposition to defendants' motion to dismiss, Hamlett apparently concedes that, as to individual defendants, he brings this claim against them in their individual capacities only. (Dkt. No. 11 at 15.) Hamlett also concedes that his claim can arise only from actions that took place subsequent to August 4, 2017, based on the applicable three-year statute of limitations, and that statements and other facts that took place prior to that date are background information. (*Id.* at 12.)

Claims of discrimination under Section 1981 are analyzed under the same standard as Title VII claims. *See Pertillar v. AAA W. & Cent. N.Y.*, No. 5:16-cv-238, 2018 WL 583115, at *7 (N.D.N.Y. Jan. 26, 2018) ("The standards applicable to [the plaintiff's] Section 1981 claims are the same as those applicable to his Title VII claims." (citations omitted)); *Brown v. State Univ. of N.Y.*, No. 3:12-cv-411, 2015 WL 729737, at *3 n.7 (N.D.N.Y. Feb. 19, 2015) ("Both the Supreme Court and Second Circuit have treated the substantive issues arising under Title VII and § 1981 identically." (alteration and citations omitted)). As such, for the reasons described above, *see supra* Part IV.A.1, Hamlett has set forth sufficient allegations to support a Section 1981 claim. However, defendants proffer additional reasons for why this specific claim should be dismissed, which are addressed below.

*1. Section 1981 Claim Against Individual Defendants*
Defendants argue that the claim should be dismissed against individual defendants because Hamlett has not sufficiently pleaded that they were personally involved in any discrimination or that they acted with any discriminatory intent. (Dkt. No. 9, Attach. 5 at 19-22.)

"In order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate some affirmative link to causally connect the actor with the discriminatory action.... [P]ersonal liability under section 1981 must be predicated on the actor's personal involvement." *Patterson v. Cnty. Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004) (internal quotation marks and citation omitted). Personal involvement on the part of a supervising official includes direct participation in the challenged conduct, and may also be established by allegations setting forth an official's:

(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

*Mabb v. Town of Saugerties*, No. 1:18-CV-866, 2020 WL 210313, at *5 (N.D.N.Y. Jan. 14, 2020) (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003)).

While the complaint is sparse on details, reading it broadly, Hamlett has set forth sufficient allegations to establish personal involvement on the part of all individual defendants. He has alleged that Ryan directly committed the discriminatory act, and that David and Zikuski were aware of the act, and did nothing to correct or ameliorate the situation. (Compl. ¶¶ 55-56, 61-62.) In particular, Zikuski is alleged to have been "fully aware" that Ryan had a bias against African Americans prior to the time he promoted him to Captain ... and that ... [Hamlett] would never be assigned to detective so long as Ryan was [in charge of the division]." (*Id.* ¶ 56.) Further, Hamlett alleges that Zikuski knew he was being "shunned and ostracized by both officers and supervisors" at BPD. (*Id.* ¶¶ 59-60.)

**\*8** At this early stage, these allegations are sufficient, if only by a thread, to maintain a Section 1981 claim against individual defendants. *See Avent v. Target Corp.*, No. 1:19-CV-1565, 2021 WL 3089120, at *6 (N.D.N.Y. July 22, 2021) ("Plaintiff alleges that [individual defendants] failed to address harassment directed at him by white employees. At this stage, that is enough, albeit barely, to keep them in the case." (citation omitted)); *Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 225 (E.D.N.Y. 2018) ("The Plaintiff alleges that Kaczynski, [her] direct supervisor, was the principal actor in her discrimination claims. Sygman, as Kaczynski's supervisor, was allegedly informed about the discrimination over a period of several months but took no remedial action. The Plaintiff has clearly stated a claim of individual liability against both Kaczynski and Sygman under § 1981."). Thus, the motion to dismiss in that regard is denied.

*2. Monell Claim*

Defendants argue that Hamlett's Section 1981 claim should be dismissed against the City because he "fails to allege a specific policy or practice, let alone official endorsement or any specific custom, or usage." (Dkt. No. 9, Attach. 5 at 23.)

A municipality may be liable under § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To establish a municipal policy or custom, a plaintiff must allege (1) a formal policy endorsed by the municipality; (2) actions taken or decisions made by the municipality's policymakers, which caused the alleged civil rights violation; (3) a practice so widespread that it constitutes "a custom or usage"; or (4) a failure by the municipality's policymakers to properly train or supervise their subordinates. *See Green v. City of New York*, 465 F.3d 65, 80-82 (2d Cir. 2006).

Hamlett argues that the complaint sets forth sufficient allegations to maintain a claim against the City due to David and Zikuski's status as policymakers with respect to personnel decisions. (Dkt. No. 11 at 15-16.) On reply, defendants' do not address the issue of whether David and Zikuski are final policymakers for purposes of Hamlett's claim. (Dkt. No. 13 at 9-10.) Although it might ultimately be revealed during discovery that this is not true, it is clear that David and Zikuski *may* be considered policymakers for purposes of *Monell* liability at this phase of the litigation. *See Gronowski v. Spencer*, 424 F.3d 285, 296-97 (2d Cir. 2005) (holding retaliatory termination by mayor of city established *Monell* liability because "he has final authority over hiring and firing decisions, which are discretionary matters"); *Griffin v. Vill. of Frankfort*, No. 10-CV-627, 2012 WL 4491276, at *4 (N.D.N.Y. Sept. 28, 2012) ("Thus, the record certainly demonstrates or suggests that [the Chief of Police] has final policy-making authority in the Village, at least insofar as police matters go.").

Accordingly, defendants' motion to dismiss in this regard is denied as well. And, just like any other argument made in their motion to dismiss, defendants are free to renew this argument at summary judgment.

**C. Attorney's Fees**

Hamlett asserts in the complaint that he is entitled to "reasonable attorney's fees including the fees expended in the administrative proceedings before the [NYSDHR]." (Compl. ¶ 67.) In their motion to dismiss, defendants contend that "[b]ecause [Hamlett] fails to plead [that] he prevailed before the NYSDHR and/or the EEOC, he cannot state a claim for attorney fees from his actions before those bodies in this proceeding." (Dkt. No. 9, Attach. 5 at 24.) Because there is virtually no briefing on this issue, and granting defendants' motion in this regard will not narrow the issues in the case, the court declines to address whether Hamlett can recover attorney's fees from litigating his NYSDHR and EEOC actions at this time. Defendants can renew their motion at a later juncture.

**V. Conclusion**

**\*9 WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 9) is **GRANTED IN PART and DENIED IN PART** as follows:

> **GRANTED** as to the following claims, which are **DISMISSED**, Hamlett's (1) Title VII claims to the extent that they are based on actions taken by defendants prior to October 2018; (2) Title VII retaliation claim; (3) Title VII employment discrimination claim against individual defendants; (4) Section 1981 claim against individual defendants to the extent that the claim is brought against them in their official capacities; and (5) Section 1981 claim to the extent that the claim is based on actions taken by defendants prior to August 2017; and

> **DENIED** in all other respects; and it is further

**ORDERED** that the following claims remain against the City of Binghamton: (1) a Title VII employment discrimination claim and (2) a Section 1981 discrimination claim; and it is further

**ORDERED** that the following claim remains against individual defendants: a Section 1981 discrimination claim, brought against them in their individual capacities; and it is further

**ORDERED** that defendants shall respond to the complaint, (Dkt. No. 1), within the time allotted by the rules; and it is further

**Hamlett v. City of Binghamton, Slip Copy (2021)**
Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 135 of 151
2021 WL 3723091

**ORDERED** that the parties shall contact Magistrate Judge Miroslav Lovric to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3723091

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 485731
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Roderick GOLDEN, Plaintiff,

v.

SYRACUSE REGIONAL AIRPORT AUTHORITY;
Debbie Marshall, Individually and as Employees
of Syracuse Regional Airport Authority; Dennis
Mathers, Individually and as Employees of
Syracuse Regional Airport Authority; Peter Ryan,
Individually and as Employees of Syracuse Regional
Airport Authority; Andrew Baker, Individually
and as Employees of Syracuse Regional Airport
Authority; and John Carney, Individually and as
Employees of Target Corporation, Defendants.

5:20-CV-1566 (MAD/TWD)
|
Signed 02/10/2021

**Attorneys and Law Firms**

RODERICK GOLDEN, 208 Melrose Avenue, Syracuse, New
York 13206, Plaintiff pro se.

OF COUNSEL: JOHN T. MCCANN, ESQ., HANCOCK,
ESTABROOK LAW FIRM, 100 Madison Street, Suite 1500,
Syracuse, New York 13202, Counsel for Syracuse Regional
Airport Authority.

## ORDER

Mae A. D'Agostino, U.S. District Judge:

**\*1** On December 16, 2020, Plaintiff commenced this
action alleging employment discrimination and retaliation in
violation of Title VII of the Civil Rights Act of 1964, 42
U.S.C. § 2000e *et seq.* ("Title VII"). *See* Dkt. No. 1.

In an Order and Report-Recommendation dated January
11, 2021, Magistrate Judge Dancks granted Plaintiff leave
to proceed *in forma pauperis* and performed an initial
review of the complaint. *See* Dkt. No. 5. In the Order
and Report-Recommendation, Magistrate Judge Dancks
recommended that the Court dismiss Plaintiff's Title VII
claims against the individual Defendants with prejudice
but permit Plaintiff's Title VII claims against Defendant

Syracuse Regional Airport Authority to proceed. *See id.* at
5-6. Liberally construed, Magistrate Judge Dancks found
that Plaintiff sufficiently alleged Title VII employment
discrimination and retaliation claims against Defendant
Syracuse Regional Airport Authority. *See id.* Plaintiff has
not objected to Magistrate Judge Dancks's Order and Report-
Recommendation.

When a party files specific objections to a magistrate judge's
report-recommendation, the district court makes a "*de novo*
determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." 28 U.S.C. § 636(b)(1). However, when a party
files "[g]eneral or conclusory objections or objections which
merely recite the same arguments [that he presented] to the
magistrate judge," the court reviews those recommendations
for clear error. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011
WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and
footnote omitted). After the appropriate review, "the court
may accept, reject, or modify, in whole or in part, the
findings or recommendations made by the magistrate judge."
28 U.S.C. § 636(b)(1).

"[I]n a *pro se* case, the court must view the submissions by a
more lenient standard than that accorded to 'formal pleadings
drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d
289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404
U.S. 519, 520, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)) (other
citations omitted). The Second Circuit has held that the court
is obligated to " 'make reasonable allowances to protect *pro
se* litigants' " from inadvertently forfeiting legal rights merely
because they lack a legal education. *Govan*, 289 F. Supp. 2d at
295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

In the present matter, the Court finds that Magistrate Judge
Dancks correctly determined that Plaintiff's Title VII claims
against the individual Defendants must be dismissed with
prejudice. This is appropriate because " 'individuals are
not subject to liability under Title VII.' " *Patterson v. Cty.
of Oneida, New York*, 375 F.3d 206, 221 (2d Cir. 2004)
(quotation and other citations omitted).

Next, the Court finds that Magistrate Judge Dancks correctly
determined that the Court should permit Plaintiff's Title VII
employment discrimination and retaliation claims against
Defendant Syracuse Regional Airport to proceed. "In order
to plead a plausible claim of Title VII discrimination, the
plaintiff must allege that (1) he is a member of a protected
class; (2) he is qualified for a disputed employment position;

WESTLAW © 2022 Thomson Reuters. No claim to original U.S. Government Works. 1

(3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Bowman v. Granny's Kitchen, LLC*, No. 6:14-CV-00585, 2015 WL 541276, *3 (N.D.N.Y. Feb. 10, 2015)* (citing *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004)).

**\*2** Plaintiff has sufficiently alleged Title VII employment discrimination based on wrongful termination. Plaintiff, an African American man, is a member of a protected class. Dkt. No. 1 at 4; *see* 42 U.S.C. § 2000e-2(a)(1). It appears that Plaintiff, who won a "bid," was adequately qualified for his custodial position. Dkt. No. 1 at 9; *see de la Cruz v. N.Y.C. Human Res. Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 20 (2d Cir. 1996)* (citations omitted) (holding that an employee only must show "that he 'possesses the basic skills necessary for performance of [the] job' "). Plaintiff then sufficiently alleged that he suffered adverse employment action when he was passed over for the "bid" he allegedly won and was terminated just over two months later. Dkt. No. 1 at 3; *see Cunningham v. N.Y. State Dep't of Labor*, 326 Fed. Appx. 617, 619 (2d Cir. 2009)* (citation omitted). Finally, Plaintiff has sufficiently alleged the adverse employment actions occurred under circumstances giving rise to an inference of discriminatory intent. *See* Dkt. No. 1 at 9-14. Plaintiff's claims that he was forced to give up the bid, called a racial slur, and later terminated lend at least a minimal inference of discriminatory intent. *See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

Similarly, Plaintiff has sufficiently alleged retaliation against Defendant Syracuse Regional Airport Authority. To state a claim of retaliation under Title VII, a plaintiff must plausibly allege "that (1) [ ]he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 24 (2d Cir. 2014)* (citation omitted).

Plaintiff sufficiently alleged that he engaged in a protected activity that Defendant was aware of because he reported more than one incident with a co-worker whom Plaintiff alleges called him a racial slur and threatened him physically. *See* Dkt. No. 1 at 9-14; *Dixon v. Int'l Fed'n of Accountants*, 416 Fed. Appx. 107, 110 (2d Cir. 2011)* (holding that

an employee participates in a protected activity when she complains of discrimination to her employer). Plaintiff has also sufficiently alleged that Defendant took adverse action against him. *See Feingold*, 366 F.3d at 152. Finally, Plaintiff has sufficiently alleged a causal connection between the protected activity and his termination, which occurred less than two months after he reported the racial slur. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)* (holding that where temporal proximity by itself is accepted as "sufficient evidence of causality ... [it] must be very close"); *Crosby v. McDonald's of Guilderland, LLC*, No. 1:17-CV-1160, 2018 WL 2077884, *6 (N.D.N.Y. May 2, 2018)* (citations omitted) ("District courts have generally found ... that 'a passage of two months between the protected activity and the adverse employment action seems to be the dividing line' ").

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Dancks's Order and Report-Recommendation (Dkt. No. 5) is **ADOPTED in its entirety** for the reasons set forth therein; and the Court further

**ORDERS** that Plaintiff's claims against the individual Defendants are **DISMISSED with prejudice**; and the Court further

**ORDERS** that Plaintiff's claims against Defendant Syracuse Regional Airport Authority shall **proceed**; and the Court further

**ORDERS** that the Clerk of the Court shall issue summonses and forward them with copies of the complaint to the United States Marshal, along with packets containing General Order 25, which sets forth this District's Civil Case Management Plan, for service upon the named Defendant; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 485731

---

   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 138 of 151
Brooks v. Onondaga County Department of Children &..., Not Reported in Fed....

2018 WL 2108282

🏴 KeyCite Yellow Flag - Negative Treatment
Distinguished by Marshall v. New York State Public High School Athletic Association, Inc., W.D.N.Y., March 15, 2019

2018 WL 2108282
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rochelle BROOKS, formerly
Rochelle Coleman, Plaintiff,
v.
ONONDAGA COUNTY DEPARTMENT
OF CHILDREN & FAMILY
SERVICES, et al., Defendant.

5:17-CV-1186 (GLS/TWD)
|
Signed 04/09/2018

**Attorneys and Law Firms**

ROCHELLE BROOKS, formerly, ROCHELLE COLEMAN, 231 Lilac Street, Syracuse, New York 13208, pro se.

**ORDER AND REPORT-RECOMMENDATION**

Thérèse Wiley Dancks, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** On October 25, 2017, Plaintiffs Rochelle Brooks, formerly Rochelle Coleman, individually and on behalf of her two minor daughters F.B. and H.B., submitted two complaints she wished to file in a single action to the Clerk. (Dkt. Nos. 1 and 1-1.) One of the complaints was brought under 42 U.S.C. § 1983. (Dkt. No. 1.) The second was brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* as amended. (Dkt. No. 1-1.) The Onondaga Department of County Children & Family Services ("Children and Family Services"), Syracuse Police Department, and Onondaga County Family Courthouse ("Family Court") were named as Defendants in the § 1983 complaint. (Dkt. No. 1 at 1-2. [1] ) Onondaga County Family Court Judge, the Hon. Michael L. Hanuszczak, and Children and Family Services were named as Defendants in the ADA action. (Dkt. No. 1-1 at 1-2.)

[1]   Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

Plaintiff Brooks also submitted an application to proceed *in forma pauperis* (Dkt. No. 2) and a motion for appointment of counsel. (Dkt. No. 3.) Plaintiff's *in forma pauperis* application was granted by the Court and her motion for appointment of counsel was denied without prejudice in an Order filed on December 18, 2017. (Dkt. No. 8 at 7-8.)

In its December 18, 2017, Order, the Court determined that initial review under 28 U.S.C. § 1915(e) was premature because Plaintiff Brooks had named her minor daughters as Plaintiffs, and non-lawyer parents cannot represent their children *pro se. Id.* at 5-6. *See Cheung v. Youth Orchestra Foundation of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir. 1990). The Court ordered that the case be stayed for ninety days to allow Plaintiff Brooks to "retain counsel with regard to all claims being pursued on behalf of her minor children, to move for appointment of counsel for her minor children, or to file amended complaints deleting her minor children as Plaintiffs and deleting all claims asserted on behalf of [her] minor children." (Dkt. No. 8 at 7.)

**II. PLAINTIFF'S AMENDED COMPLAINT**
On March 19, 2018, Plaintiff Brooks refiled her original complaints on which she had crossed out her minor children F.B. and H.B. as Plaintiffs and added the word "amended. (Dkt. No. 9.) The amended complaints are in all other respects identical to the originals. (*See* Dkt. Nos 1, 1-1, and 9.)

In her amended § 1983 complaint, Plaintiff alleges that Children and Family Services unlawfully seized her two daughters without a warrant, court order, or probable cause, and unlawfully arrested Plaintiff. (Dkt. No. 9 at 2.) Plaintiff has also alleged in conclusory fashion violations by the Defendants of criminal statutes at 18 U.S.C. §§ 241 and 242, N.Y. RPAPL § 755, and fruits of the poisonous tree, unlawful arrest, perjury, corruption, treason, and kidnaping. *Id.* at 3. Plaintiff seeks damages in the amount of ten million dollars for retaliation, and three million dollars for the third unlawful seizure of her daughters, mental anguish, harassment, duress, and punitive damages for the hardship Plaintiff and her daughters have suffered. *Id.* at 4.

**\*2** In her amended ADA complaint, Plaintiff alleges that she suffers from brain and lung cancer, migraines, memory

2018 WL 2108282

loss, vision loss, asthma, COPD, arthritis, degenerative joint disease, back and neck arthritis pain, and walking limitations. *Id.* at 6. Plaintiff claims that Judge Hanuszczak violated the ADA by making her appear in court at the last minute, or having a hearing without her by scheduling appearances in two courts at almost the same time. *Id.* at 3. Plaintiff alleges Children and Family Services violated 18 U.S.C. §§ 241 and 242, and also that they violated N.Y. CPLR §§ 4501 through 4548 (state court civil evidentiary rules) by committing perjury, fraud, and evidence and witness tampering to justify removing/seizing Plaintiff's two daughters from her home three times. *Id.* at 7. Plaintiff is seeking reversal of the Family Court decision and return of her two daughters, along with ten million dollars in damages for the retaliation Plaintiff and her daughters were required to suffer, $86, 400 × 4 dollars for each month Plaintiff's daughters were deprived of their family and family bond, and three million for the defamation, duress, and cruel and unusual hardship the Plaintiffs were forced to endure. [2] *Id.* at 8.

[2]       Inasmuch as Plaintiff's minor daughters are no longer parties, the Court will disregard Plaintiff's damages claim on their behalf in its initial review of the amended complaints.

### III. INITIAL REVIEW

Having found that Plaintiff meets the financial criteria for commencing this case *in forma pauperis*, and because Plaintiff seeks relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e). Section 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). [3]

[3]       To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or fact." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989).

In reviewing a *pro se* complaint, the Court has the duty to show liberality towards *pro se* litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990), and should exercise "extreme caution ... in ordering *sua sponte* dismissal of a *pro se* complaint *before* the adverse party has been served

and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the Plaintiff has stated "enough facts to state a claim that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court should construe the factual allegations in the light most favorable to Plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the possibility of misconduct, the complaint has alleged but it has not "show[n] that the pleader is entitled to relief." *Id.* at 679 (quoting Federal Rule of Civil Procedure 8(a)(2) ). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotations marks and alterations omitted). Allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them" are subject to dismissal. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009).

**\*3**  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

### IV. ANALYSIS

In conducting an initial review under 28 U.S.C. § 1915(e), the Court will treat Plaintiff's two complaints as a single action.

### A. Claims in Plaintiff's Amended § 1983 Complaint

Brooks v. Onondaga County Department of Children &..., Not Reported in Fed....

2018 WL 2108282

In her § 1983 claim, Plaintiff has alleged violation of 18 U.S.C. §§ 241 and 242 by Defendants Children and Family Services, Syracuse Police Department, [4] and the Onondaga Family Court. [5] However, 18 U.S.C. §§ 241 (criminal conspiracy) and 242 (criminal deprivation of rights under color of law) are criminal statutes that afford no private right of action. *See Hill v. Didio*, 191 Fed.Appx. 13, 14 (2d Cir. 2006) (no private right of action under 18 U.S.C. §§ 241 and 242) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 511 (2d Cir. 1994) ). Therefore, the Court finds Plaintiff has failed to state a § 1983 claim against the three Defendants under either of those provisions.

[4]      As the Court has previously explained to Plaintiff, the Syracuse Police Department does not have the capacity to be sued as an entity separate from the City of Syracuse. *See Coleman v. Syracuse Police Department*, No. 5:16-CV-00836 (LEK/ TWD), 2016 WL 4411339, at *3 (N.D.N.Y. July 22, 2016). Therefore, the Court will deem the City of Syracuse to be the named Defendant in its initial review.

[5]      The New York State Unified Court System, of which the Onondaga County Family Court is a part, as an arm of the State, is protected from Plaintiff's suit by the State's Eleventh Amendment sovereign immunity. *See McKnight v. Middleton*, 699 F. Supp. 2d 507, 521 (E.D.N.Y. 2010) (citing *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009) ). Therefore, Plaintiff's claims against the Onondaga County Family Court are barred by the Eleventh Amendment.

Plaintiff has also alleged a state law claim for abuse of process under N.Y. RPAPL § 755 against all three Defendants. RPAPL § 755 provides for a stay of proceedings or an action for rent upon failure to make repairs. Inasmuch as the Court is recommending that all of Plaintiff's federal claims against Defendants be dismissed with prejudice and without leave to amend, it also recommends that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims, without prejudice to refiling in state court and to reconsideration in the event the District Court does not accept this Court's recommendation for dismissal of all of Plaintiff's federal claims with prejudice and without leave to amend. *See Kolari v. New York Presbyterian Hosp.*, 455 F.3d 118, 120 (2d Cir. 2006).

Plaintiff has failed to allege any facts whatsoever plausibly showing viable federal claims against any of the Defendants for fruits of the poisonous tree, perjury, corruption, treason, and kidnaping. To the extent Plaintiff intends to plead state law claims, the Court recommends that the District Court decline to exercise supplemental jurisdiction.

Plaintiff's wholly conclusory assertion of unlawful arrest likewise fails to state a false arrest claim under the Fourth Amendment. The elements of a § 1983 claim for false arrest in violation of the Fourth Amendment are "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (internal citation and quotations marks omitted). Probable cause is a complete defense to a false arrest claim. *Id.*

 *4      The sole factual allegation in Plaintiff's amended complaint regarding her false arrest claim is that Children and Family Services "unlawfully seized my two daughters, without warrant, court order, or any probable cause, history of any crime & unlawfully arrested me, seized my two daughters ... in retaliation." (Dkt. No. 9 at 2.) In order to "establish a claim for false arrest under § 1983, a plaintiff must show that the defendant intentionally confined him without his consent and without justification." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir 2004) (citation and internal quotations omitted). Conclusory allegations are insufficient to state a claim, and Plaintiff has failed to allege facts regarding the charge on which she was arrested and the facts and circumstances surrounding the alleged arrest, and she has not made a plausible showing that she was taken into physical custody and confined without consent or justification. *See Lacey v. Yates County*, 30 F. Supp. 3d 213, 226 (W.D.N.Y. 2014) ("The heart of a false arrest claim is a being taken into physical custody.")

Based on the foregoing, the Court finds that Plaintiff has failed to state a claim under § 1983 against Children and Family Services and the City of Syracuse, and that her § 1983 claim against Onondaga County Family Court is barred by the Eleventh Amendment. Therefore, the Court recommends dismissal with prejudice and without leave to amend of Plaintiff's § 1983 claims as set forth in her § 1983 amended complaint against the City of Syracuse, the Onondaga County Court, and Children and Family Services. [6] (Dkt. No. 9 at 1-4.)

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 141 of 151

Brooks v. Onondaga County Department of Children &..., Not Reported in Fed....

2018 WL 2108282

6      Although leave to amend is to be freely granted to pro se plaintiff, the Court declines to recommend that Plaintiff be granted leave to amend her false arrest claim in this case because her single conclusory allegation that she was "unlawfully arrested" (Dkt. No. 9 at 2), even liberally read, is insufficient to give any indication that Plaintiff would be able to state a valid claim if given the opportunity. *See Cuoco*, 222 F.3d at 112. [Editor's Note: Appended decisions have been deleted for online purposes.]

## B. Claims in Plaintiff's Amended ADA Complaint

### 1. ADA Claim Against Judge Hanuszczak

Plaintiff alleges that Family Court Judge Hanuszczak violated her rights under the ADA by my making her appear in court at the last minute, having an ex parte hearing without serving her, or scheduling her to appear in two courts at the same time or close to the same time. (Dkt. No. 9 at 7.) It is well-settled that judges generally have absolute judicial immunity from suits for money damages for their judicial actions. *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009). The fact that a plaintiff is asking for non-money damages as well is of no consequence to the application of the doctrine of judicial immunity. *See DiPasquale v. Milin*, 303 F. Supp. 2d 430 432 (S.D.N.Y. 2004). Absolute immunity extends to any actions taken within the scope of a judge's judicial responsibilities or within his jurisdiction. *Mireles v. Waco*, 502 U.S. 9, 9-12 (1991).

Courts in this Circuit and others have found judicial immunity to extend to claims under the ADA. *See Richter v. Connecticut Judicial Branch*, No. 3:12cv1638 (JBA), 2014 WL 1281444, at *10 (D. Conn. Mar. 27, 2014)[7] (dismissal of ADA claim on judicial immunity grounds where alleged denial of ADA accommodations related to court's control over ongoing proceedings and managing the court's docket); *Positano v. New York*, No. 12-CV-2288 (ADS) (AKT), 2013 WL 880329, at *4 (E.D.N.Y. Mar. 7, 2013) (plaintiff may not bring action against a judge for actions taken in his judicial capacity, even when the actions violated the ADA); *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692 (S.D.N.Y. 2011) (dismissing an action that included an ADA claim against three state judges on judicial immunity grounds); *see also Goldblatt v. Doerty*, 503 Fed.Appx. 537 (9th Cir. 2013) ("The

district court properly dismissed Goldblatt's claims regarding defendant's alleged denial of ADA accommodations be they arose out of defendant's rulings in his capacity as a judge presiding over a state court family law proceeding, and, therefore, they were barred by absolute judicial immunity.")

7      Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*5** Plaintiff claims Judge Hanuszczak violated her rights under the ADA in the scheduling of hearings involving custody of her children. (Dkt. No. 9 at 7.) As noted above, absolute judicial immunity applies to ADA claims related to the court's control over ongoing proceedings and managing the court's docket. *See Richter,* 2014 WL 1281444, at *10. Therefore, the Court finds that Judge Hanuszczak is entitled to absolute judicial immunity with regard to Plaintiff's claims against him and recommends dismissal of the action with prejudice and without leave to amend against Judge Hanuszczak.

### 2. Claim Against Children and Family Services

Plaintiff alleges again in her amended ADA complaint that Child and Family Services violated criminal statutes 18 U.S.C. §§ 241 and 242. (Dkt. No. 9 at 7.) As noted above those criminal statutes afford Plaintiff no private right of action, *see Hill*, 191 Fed.Appx. at 14, and the Court has recommended that those claims be dismissed with prejudice and without leave to amend.

Plaintiff also appears to allege state law claims for perjury, fraud, and evidence and witness tampering in violation of the New York State court civil rules of evidence set forth in CPLR 4501 through 4548, to get her children removed from her home unlawfully three times. (Dkt. No. 7.) As with Plaintiff's other state law claims, the Court is recommending that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims. *See Kolari,* 455 F.3d at 120.

## C. Motion for Appointment of Counsel

Plaintiff filed a second motion for appointment of counsel with her amended complaints. (Dkt. No. 10.) Plaintiff claims she was denied representation by legal services because she has been black-balled. *Id.* Even if the Court

Case 1:21-cv-00860-GLS-TWD   Document 17   Filed 01/26/22   Page 142 of 151

Brooks v. Onondaga County Department of Children &..., Not Reported in Fed....

2018 WL 2108282

were not recommending dismissal of both of Plaintiff's amended complaints, a more fully developed record would be necessary before an assessment can be made as to whether counsel should be appointed. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of merit of the underlying dispute in determining whether to appoint counsel). Therefore, the motion is denied. The denial is without prejudice so that Plaintiff will not be precluded from making a subsequent motion for appointment of counsel in the event the District Court allows the action to proceed.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 10) is **DENIED WITHOUT PREJUDICE**; and it is

**RECOMMENDED** that Plaintiff's action (Dkt. No. 9 at 1-8) be **DISMISSED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that Plaintiff's amended 42 U.S.C. § 1983 complaint (Dkt. No. 9 at 1-4) be **DISMISSED WITH PREJUDICE** upon initial review under 28 U.S.C. § 1915(e), with the exception of Plaintiff's state law claim under N.Y. RPAPL 755; and it is further

**RECOMMENDED** that Plaintiff's amended ADA complaint (Dkt. No. 9 at 5-8) be **DISMISSED WITH PREJUDICE** upon initial review under 28 U.S.C. § 1915(e), with the exception of Plaintiff's state law claims for perjury, fraud, and evidence and witness tampering in violation of CPLR 4501 through 4548; and it is further

**RECOMMENDED** that the District Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims under claim under N.Y. RPAPL 755 (Dkt. No. 9 at

4) and those for perjury, fraud, and evidence and witness tampering alleged to be in violation of CPLR 4501 through 4548, *id.* at 7; and it is hereby

**ORDERED**, that the Clerk send Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*6** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[8]    If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 2108282

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00860-GLS-TWD  Document 17  Filed 01/26/22  Page 143 of 151

Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)

2019 WL 2717211

2019 WL 2717211
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Elizabeth SHOLLENBERGER, Plaintiff,

v.

NEW YORK STATE UNIFIED COURT SYSTEM;
Janet DiFiore, in her official capacity as the Chief
Judge of the State of New York; and Lawrence K.
Marks, in his individual capacity and in his official
capacity as the Chief Administrator of the New
York State Unified Court System, Defendants.

18 CV 9736 (VB)
|
Signed 06/28/2019

**Attorneys and Law Firms**

Larry Cary, Tara Lynn Jensen, Anthony Patrick Consiglio,
Cary Kane LLP, New York, NY, for Plaintiff.

Lee Alan Adlerstein, Office of New York State Office of
Court Administration, Michael John Siudzinski, New York
State Office of the Attorney General, New York, NY, for
Defendant New York State Unified Court System.

Michael Adam Berg, Office of the Attorney General, New
York, NY, for Defendants Lawrence K. Marks, Janet DiFiore.

**OPINION AND ORDER**

Briccetti, J.:

**\*1** Plaintiff Elizabeth Shollenberger, a judge suspended
from the White Plains City Court in 2018, brings this action
against defendants Chief Judge Janet DiFiore in her official
capacity, and Chief Administrative Judge Lawrence Marks
in his individual and official capacities (collectively, the
"individual defendants"), and the New York State Unified
Court System, asserting claims pursuant to the Americans
with Disabilities Act ("ADA"), the Rehabilitation Act, and
the New York State Human Rights Law ("NYSHRL"), N.Y.
Exec. Law § 296(1). Plaintiff claims defendants discriminated
against her because of her disabilities and seeks damages and
reinstatement to the bench.

Before the Court is the individual defendants' motion to
dismiss the amended complaint in its entirety as to Chief
Judge DiFiore, and in part as to Judge Marks, pursuant to Rule
12(b)(6). [1] (Doc. #39).

[1]  The individual defendants also initially moved to
dismiss the amended complaint pursuant to Rule
12(b)(1) but abandoned that argument in their reply
brief.

For the reasons set forth below, the motion is DENIED.

The Court has subject matter jurisdiction under 28 U.S.C. §
1331.

**BACKGROUND**

For the purpose of ruling on the motion to dismiss, the Court
accepts as true all well-pleaded factual allegations in the
amended complaint and draws all reasonable inferences in
plaintiff's favor, as summarized below.

I. Plaintiff's Judicial Appointment and Health Issues
In December 2016, the White Plains Common Council
appointed plaintiff to a ten-year term as a judge on the City
Court, which is part of the Ninth Judicial District in the New
York State Unified Court System. This was plaintiff's first
judicial appointment. One of four City Court judges, plaintiff
would preside over traffic court, civil disputes, landlord-
tenant and other housing cases, and certain criminal matters.
As a part of the appointment, plaintiff was required to retire
from the practice of law.

Plaintiff has several serious health issues, including (i)
pulmonary hypertension (high blood pressure in the lungs);
(ii) chronic obstructive pulmonary disease (lung disease);
(iii) immune thrombocytopenia (blood clotting disorder); (iv)
lymphedema (swelling) in her legs resulting from a fall on
a subway platform in 1989; (v) a fungal infection in her
leg from the 1989 accident; (vi) lack of strength in her legs
from the same accident; and (vii) obesity. To treat these
conditions, plaintiff takes prescription medications, including
antibiotics and antifungal drugs, which "frequently cause
stress to Plaintiff's gastrointestinal system, requiring her to
have quick access to the restroom." (Doc. #31 ("Am Compl.")
¶ 25). Plaintiff also struggles with her mobility. She uses a

Case 1:21-cv-00860-GLS-TWD    Document 17    Filed 01/26/22    Page 144 of 151

Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)

2019 WL 2717211

walker or a motorized scooter, carries an oxygen concentrator to assist her breathing, and must frequently stop to rest.

After plaintiff was sworn in as a judge on January 3, 2017, she claims she unsuccessfully sought certain accommodations. According to plaintiff, White Plains City Court Chief Clerk Ellen Byrne refused to give plaintiff access to the judges' restroom. Byrne allegedly instructed plaintiff to use the restroom located off the jury deliberation room and, without consulting plaintiff, had handrails installed in that restroom. Plaintiff claims she objected to using that restroom because it was a long walk from her chambers and certain courtrooms. Further, the restroom is not private or discrete, as it is located in a conference room where drug treatment meetings and other confidential conferences occurred. Plaintiff also alleges she asked for railings to be installed along the steps up to the judge's seat in two courtrooms, but those railings were not fully installed for more than eighteen months. Plaintiff claims in the interim, court officers refused to help her up the steps. According to plaintiff, she presided from a table set up on the courtroom floor.

 **\*2** During the first four months of plaintiff's judgeship, she was hospitalized three times, once for a leg wound infection and twice for pneumonia. During that time, she worked fifty-two days and took sick leave for thirty-six days.

## II. Plaintiff's First Suspension
On May 1, 2017, after the afternoon court session had ended and plaintiff was alone in the courtroom, plaintiff alleges she "suddenly and urgently needed to use the restroom" and "defecated in a plastic-lined wastepaper basket." (Am. Compl. ¶ 58). Plaintiff states she "removed and tied the plastic liner bag and double-bagged it for disposal, but a small stain about the size of a quarter was visible on the carpet." (Id.). Plaintiff claims she informed a court employee additional cleaning was needed.

In response, court employees allegedly "mounted yellow police tape to cordon off both entrances" to the courtroom through May 2, 2017. (Am. Compl. ¶ 61). That morning, plaintiff conducted her court proceedings in another courtroom and the clerk assisting plaintiff allegedly wore bright yellow rubber gloves such as those used for dishwashing. Plaintiff says that when she asked the clerk why she was wearing rubber gloves, the clerk replied, "For my health." (Id. ¶ 61). That afternoon, plaintiff saw three people entering the cordoned off courtroom wearing what appeared to be full hazardous material (hazmat) suits and breathing masks. According to plaintiff, there was no legitimate reason to don such equipment.

Later on May 2, 2017, plaintiff received a hand-delivered order from Judge Marks reassigning all judicial matters pending before her and directing that no additional matters be assigned to her. (See Doc. #40-1). An accompanying letter notified plaintiff that pursuant to Part 113 of the Rules of the Chief Administrative Judge, Judge Marks was instituting a medical investigation after being advised plaintiff had been unable to fully perform her judicial duties in recent months. (See Doc. #40-2). The letter also stated the May 1 incident raised serious issues of public health and operational safety. (Id.). [2]

> [2] The individual defendants submitted the May 2 order and the May 2 letter in support of their motion to dismiss. The Court may consider these documents in deciding the pending motion as documents incorporated by reference or documents integral to the amended complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002).

Part 113 authorizes the chief administrator to make "such inquiry as is necessary to ascertain the reason for [a judge's] ... inability to perform, the prognosis for recovery, and the time the judge ... is expected to be able to return to full performance." N.Y. Code Rules & Regs., tit. 22, § 113. The rule permits the chief administrator, "after consultation with the Presiding Justice of the appropriate Appellate Division," to "direct a judge or justice who has been unable to fully perform his or her duties for an extended period of time to be examined by a physician selected by the Chief Administrator to ascertain the physical or mental condition of the judge or justice and the prognosis for his or her return to full performance." Id.

According to plaintiff, Judge Alan D. Scheinkman, then-Administrative Judge of the Ninth Judicial District, told plaintiff she was prohibited from attending a scheduled judicial training session during her suspension.

## III. Alleged Difficulties During Plaintiff's First Suspension
 **\*3** The first suspension remained in effect until July 16, 2018. Plaintiff was hospitalized twice during this fourteen-month period, from June 6 to 8, 2017, and from June 21 to August 11, 2017, with a case of shingles. She remained in

in-patient rehabilitation until September 16, 2017. Plaintiff alleges she was otherwise in good health.

During the suspension, defendants made several demands to evaluate plaintiff's health.

First, defendants allegedly required plaintiff to provide all her hospital and physician records from the first three quarters of 2017. Plaintiff claims she provided nearly 1,000 pages of unredacted records.

Second, defendants allegedly asked plaintiff to submit to two medical examinations by defendants' chosen physician, Dr. Hernandez, on May 24, 2017, and March 12, 2018. Plaintiff alleges at the end of both examinations, Dr. Hernandez told plaintiff he would recommend that she be permitted to return to work and expressed surprise she had not returned already.

Third, defendants allegedly required plaintiff to submit to an examination by defendants' chosen pulmonary specialist, Dr. Shulman, whose offices are in Nassau County. After the examination on March 8, 2018, Dr. Shulman allegedly told plaintiff he would recommend that she be permitted to return to work.

Fourth, defendants allegedly required plaintiff to submit to two psychiatric examinations by defendants' chosen psychiatrist, Dr. Portnow, on June 6, 2017, and March 28, 2018. The first examination ended early when plaintiff's oxygen concentrator malfunctioned. After the second examination, Dr. Portnow allegedly told plaintiff he would recommend that she be permitted to return to work.

According to plaintiff, defendants sought to prevent her from returning to work by making "overly burdensome demands for duplicative medical examinations." (Am Compl. ¶ 104). Although plaintiff says she complied with every requirement, plaintiff alleges defendants repeatedly asked for new or additional certifications from plaintiff's doctors in an effort to delay examinations by defendants' doctors. For instance, the March 12, 2018, examination by Dr. Hernandez was originally scheduled for November 16, 2017, and delayed until plaintiff scheduled a further examination with her own pulmonary hypertension specialist. The March 8, 2018, examination by Dr. Shulman was scheduled only after plaintiff's pulmonary hypertension specialist submitted further certification as to plaintiff's health. Moreover, plaintiff alleges defendants selected a pulmonologist in Nassau County in order to inconvenience and harass plaintiff.

Plaintiff also alleges defendants needlessly subjected her to a mental health evaluation despite that all her difficulties stemmed from her physical health problems.

Plaintiff further alleges during the first suspension, court employees "publicize[d] false information" about her, and defendants "either tolerated or failed to correct this harassment." (Am. Compl. ¶ 111). For instance, Judge Marks's May 2, 2017 order suspending plaintiff was allegedly leaked to the press, and a month later, a photograph of the suspension order was published online. Another article, published in the New York Post on June 22, 2017, "included a host of wildly inaccurate, crass, and hateful allegations, quoting and attributing unnamed court employees." (Id. ¶ 113). Moreover, on March 5, 2018, an attorney filed an affirmation on the public court docket of an action in Supreme Court, Westchester County, swearing he "ha[d] been advised by the White Plains City Court that Ms. Shollenberger is no longer a judge in the White Plains City Court." (Id. ¶ 125). According to plaintiff, the attorney sent a package for plaintiff to the court, and after informing a court employee, the employee told the attorney the court had no forwarding address for plaintiff. Plaintiff alleges she never received the package.

**\*4** Plaintiff sent letters to defendants through her attorney on June 29, July 24, and October 2, 2017, requesting they curb employee comments like those described above. Plaintiff also asked defendants to meet with her and hear her account of the events that led to her suspension and make reasonable accommodations for her return. Defendants refused to do so until Judge Marks's investigation was complete but told plaintiff that defendants' Office of the Inspector General would conduct a confidential investigation. Plaintiff sat for a two-hour interview with that office but alleges she was later improperly denied access to the final report.

#### IV. Reinstatement and Second Suspension

Plaintiff was reinstated on July 16, 2018. Defendants allegedly issued no formal determination following Judge Marks's Part 113 investigation.

Representatives of the court system allegedly met with plaintiff in May, June, and July 2018 to discuss her return to active judicial duty. According to plaintiff, the parties orally agreed the court would provide odor-free waste receptacles for plaintiff's discarded bandages and incontinence pads, and would better communicate about any future concerns.

Case 1:21-cv-00860-GLS-TWD  Document 17  Filed 01/26/22  Page 146 of 151
Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)
2019 WL 2717211

On August 15, 2018, Judge Kathie Davidson, the Ninth Judicial District Administrative Judge, allegedly met with plaintiff and informed her that court employees had complained of unpleasant and offensive odors. Plaintiff replied that an odor can result from discarded bandages used to cover her leg infection. According to plaintiff, despite the earlier agreement, the odor-free waste receptacles had not been placed in plaintiff's judicial chambers or the judges' restroom.

A few hours later, Judge Marks signed an order suspending plaintiff for a second time, which plaintiff received the following day. (Doc. #40-3). [3] Judge Marks's letter to plaintiff states he was "advised that you have not been able to fully perform your judicial duties in recent weeks, due to what appear to be medically-related conditions," and cited concerns for the health and safety of court employees. (Am. Compl. ¶ 168). Judge Marks also ordered further medical evaluations. On October 16, 2018, plaintiff submitted to another medical examination—this time, with Dr. Keolamphu, who shares an office and medical practice with Dr. Hernandez.

[3]    The Court also considers this order in deciding the pending motion. See *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

To date, the second suspension remains in effect. Throughout the relevant time period, plaintiff has continued to receive her full salary and benefits.

## DISCUSSION

### I. Standard of Review
In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the U.S. Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). First, a plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and thus are not sufficient to withstand a motion to dismiss. *Id.* at 678; *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, a complaint's allegations must meet a standard of "plausibility." *Ashcroft v. Iqbal*, 556 U.S. at 678; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. at 556).

### II. Analysis
**\*5** As relevant here, plaintiff brings ADA claims for prospective injunctive relief against Chief Judge DiFiore and Judge Marks sued in their official capacities (Counts 1 to 3), and NYSHRL claims for damages against Judge Marks sued in his individual capacity (Counts 7 and 8). The ADA and NYSHRL claims are discussed in turn.

#### A. ADA Claims
The individual defendants argue plaintiff's ADA claims cannot proceed because she fails plausibly to allege their conduct violated the ADA.

The Court disagrees.

"[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law" under the well-known exception set forth in *Ex parte Young*, 209 U.S. 123 (1908). *State Emp. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007) (internal quotation omitted). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks and brackets omitted). Plaintiff must also name defendants in their official capacities who have "the authority to provide the requested relief." *Ross v. New York*, 2016 WL 626561, at *4 (S.D.N.Y. Feb. 16, 2016) (quoting *Siani v. State Univ. of N.Y. at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014)). To state such a claim, a plaintiff need only allege the defendant has responsibility for the alleged conduct and the ability to redress the alleged violations. See *CSX Transp., Inc. v. N.Y. State Office of*

Case 1:21-cv-00860-GLS-TWD  Document 17  Filed 01/26/22  Page 147 of 151

Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)

2019 WL 2717211

Real Prop. Servs., 306 F.3d 87, 99 (2d Cir. 2002) ("*Ex Parte Young* allows for jurisdiction over the Individual Defendants inasmuch as it is in the performance of their duties that there may be an ongoing violation of federal law.").

The individual defendants do not dispute plaintiff properly alleges an ongoing violation of federal law. Nor do they challenge whether plaintiff properly seeks prospective injunctive relief or whether the individual defendants can redress the alleged violation. Rather, they argue plaintiff fails to allege Chief Judge DiFiore and Judge Marks violated plaintiff's rights under the ADA by personally discriminating, interfering, or retaliating against plaintiff. However, they do not point to a single case—and the Court is aware of none—that requires a plaintiff to allege anything more than that a defendant sued in his or her official capacity for injunctive relief had the authority to control and correct the alleged violation.

Accordingly, plaintiff's ADA claims against Chief Judge DiFiore and Judge Marks for injunctive relief shall proceed.

### B. NYSHRL Claims

The individual defendants argue plaintiff fails to state a hostile work environment claim or a retaliation claim under the NYSHRL against Judge Marks in his individual capacity.[4]

> [4] Plaintiff also brings disability discrimination claims under the NYSHRL against Judge Marks on several other theories, namely, "refusing to grant reasonable accommodations for Plaintiff's known disabilities, creating and tolerating a hostile work environment, suspending Plaintiff from performing her duties, requiring prohibited medical examinations and inquiries of her, and repeatedly moving the goalposts." (Am. Compl. ¶ 219). Because the individual defendants do not move to dismiss the disability claims brought pursuant to these theories, the Court will not address their viability here.

**\*6** The Court disagrees.

### 1. Hostile Work Environment Claim

Employment discrimination claims under the NYSHRL are subject to additional requirements than those brought only

under federal law. To adequately plead such a claim, a plaintiff must allege "that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and ... that a specific basis exists for imputing the objectionable conduct to the employer." Fox v. Costco Wholesale Corp., 918 F.3d 65, 74, 76 (2d Cir. 2019) (applying same standard for hostile work environment claims under NYSHRL and ADA). In addition to alleging these elements, to proceed against an individual defendant as an employer under the NYSHRL, a plaintiff must allege the individual has an "ownership interest or any power to do more than carry out personnel decisions made by others," Heskin v. Insite Advert., Inc., 2005 WL 407646, at *24 (S.D.N.Y. Feb. 22, 2005), and "that the employer acquiesced in the discriminatory conduct or subsequently condoned it." Hill v. Children's Vill., 196 F. Supp. 2d 389, 400–01 (S.D.N.Y. 2002). Condonation contemplates a knowing, after the fact forgiveness or acceptance of an offense, and "calculated inaction in response to discriminatory conduct may [also] ... indicate condonation." Id. at 401. "[C]ondonation requires actual notice." Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch., LLC, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007).

Plaintiff plausibly alleges she was subject to harassment, both at the courthouse and during her suspension, that is sufficiently severe or pervasive to support her hostile work environment claim. These allegations include court employees' delayed installation of handrails in the courtroom; their refusal to assist plaintiff before the installation of the handrails; their refusal to allow plaintiff access to the judges' restroom; their direction to use the conference room bathroom instead; their decision to barricade the courtroom with police tape; their allegedly unnecessary use of hazmat suits, and their allegedly false statements to the press and at least one local attorney. Plaintiff also alleges she informed her supervisors, including Judge Marks, about this objectionable conduct, but no one took action.

Furthermore, despite the individual defendants' argument to the contrary, plaintiff plausibly alleges both additional elements required for her state law claim to proceed against Judge Marks. First, she alleges Judge Marks had the power to do more than carry out personnel decisions made by others, as demonstrated by his two orders suspending her. Second, she alleges Judge Marks was aware of the discrimination against her and either knowingly accepted or subsequently condoned it. Plaintiff alleges she communicated her concerns to defendants in letters dated June 29, July 24, and October

Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)

2019 WL 2717211

2, 2017, and March 7, 2018. Defendants, including Judge Marks, allegedly refused to meet with her or hear her account of the events. Plaintiff also alleges she had discussions with court supervisors in May, June, and July 2018 concerning requested arrangements and accommodations. Moreover, plaintiff offers facts suggesting that despite knowing of the harassment, Judge Marks refused plaintiff's repeated requests to have a discussion and refused to restrain court employees from making public remarks about her.

**\*7** These allegations are sufficient to permit plaintiff's NYSHRL hostile work environment claim against Judge Marks to proceed.

### 2. Retaliation Claim

The individual defendants argue plaintiff's NYSHRL retaliation claims fails to identify any retaliatory act by Judge Marks, or any causal link between such an act and a purportedly protected activity.

The Court disagrees.

To state a retaliation claim, a plaintiff must allege "(1) [she] engaged in [a protected] activity ...; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (applying same legal standard to retaliation claims under NYSHRL, ADA, and Title VII). To qualify as an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67–68 (2006).

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Hicks v. Baines, 593 F.3d 159, 170 (2d Cir. 2010) (emphasis added). While the Second Circuit has not drawn a bright line to define temporal proximity, the Circuit

has found a connection of a few months may suffice. Treglia v. Town of Manlius, 313 F.3d at 720.

Drawing all inferences in plaintiff's favor at this early stage of the case, the Court finds plaintiff has sufficiently alleged an adverse employment action—namely, at least, that Judge Marks required her to undergo unnecessary and repetitive medical examinations, see Baum v. Rockland County, 337 F. Supp. 2d 454, 474 (S.D.N.Y. 2004), aff'd, 161 F. App'x 62 (2d Cir. 2005) (summary order), and imposed a second, indefinite suspension, see Burlington N. & Santa Fe Ry. v. White, 548 U.S. at 73.

Plaintiff also sufficiently alleges a causal connection between a protected activity and these adverse employment actions. Plaintiff claims she communicated her concerns to defendants and sought reasonable accommodations in letters dated June 29, July 24, and October 2, 2017, and March 7, 2018, and during meetings in May, June, and July 2018. Seeking a reasonable accommodation for a disability is a protected activity under the NYSHRL. See Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 149 (2d Cir. 2002). The temporal proximity between those letters and meetings and plaintiff's repeat medical examinations in March 2018 and her suspension in August 2018 adequately supports causation. Indeed, even if several months passed between the alleged protected and retaliatory acts, that lapse in time would not, as a matter of law, be cause for dismissal at this point.

**\*8** The individual defendants argue plaintiff has not plausibly alleged a causal connection between a protected activity and her second suspension, because Judge Marks lifted plaintiff's first suspension on July 16, 2018, which defendants analogize to an interim promotion or positive performance review that severed any causal link between a protected activity and an adverse action. Not necessarily so. Judge Marks's actions, on the whole, could still amount to a condonation or tacit acceptance of the alleged discrimination. See E.E.O.C. v. Suffolk Laundry Servs., Inc., 48 F. Supp. 3d 497, 522 (E.D.N.Y. 2014) (taking some proactive measures in response to complaints of discrimination does not prevent a conclusion that the actions, viewed as a whole, amounted to discrimination). The individual defendants rely on two Second Circuit summary judgment cases that supposedly support this severance theory, but both cases primarily turn on the lack of temporal proximity, not the plaintiffs' interim promotion or positive performance review. See Rosinski v. Am. Axle & Mfg., Inc., 402 F. App'x 535, 537–38 (2d Cir. 2010) (summary order); Dayes v. Pace Univ., 2 F. App'x 204,

Case 1:21-cv-00860-GLS-TWD Document 17 Filed 01/26/22 Page 149 of 151

**Shollenberger v. New York State Unified Court System, Not Reported in Fed. Supp. (2019)**

2019 WL 2717211

208 (2d Cir. 2001) (summary order). Here, evidence may yet demonstrate sufficient temporal proximity. Moreover, it is questionable whether returning to active duty from a fourteen-month suspension qualifies as a promotion or positive performance review.

Accordingly, plaintiff's NYSHRL retaliation claim against Judge Marks shall proceed.

## CONCLUSION

The motion to dismiss is DENIED.

By July 12, 2019, the individual defendants shall answer the amended complaint.

The Clerk is directed to terminate the motion. (Doc. #39).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2717211

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 213831

2012 WL 213831
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Mary LOPEZ, Plaintiff,
v.
JET BLUE AIRWAYS, Defendant.

No. 12–CV–0057.
|
Jan. 24, 2012.

**Attorneys and Law Firms**

Mary Lopez, Brooklyn, NY, pro se.

*ORDER*

JOHN GLEESON, District Judge.

**\*1** Plaintiff Mary Lopez, appearing *pro se,* files this *in forma pauperis* action asserting that Jet Blue Airways ("JetBlue") violated her rights by failing to provide adequate wheelchair assistance when she flew from New York to Puerto Rico on July 3, 2009. For the reasons discussed below, the complaint is dismissed with prejudice.

BACKGROUND

According to Lopez's complaint and attached exhibits, Lopez was scheduled to travel from New York, New York, to Aguadilla, Puerto Rico, on July 3, 2009 on a JetBlue flight. Compl. Ex. 1. While she was at the airport, JetBlue failed to timely provide her with a wheelchair, which caused Lopez physical and psychological injury. Compl. at 2. Reading her complaint broadly, Lopez asserts that JetBlue's actions violated her rights under the Air Carrier Access Act of 1986, 49 U.S.C. § 41705, and its regulations, 14 C.F.R. § 382 .95.

DISCUSSION

Under 28 U.S.C. § 1915(e)(2)(B), a district court has an independent obligation to review a complaint filed *in forma pauperis* and must dismiss the complaint *sua sponte* if the

court determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." When an *in forma pauperis* action is *res judicata,* it fails to state a claim upon which relief may be granted and thus § 1915(e)(2)(B) compels its dismissal. *See Cieszkowska v. Gray Line New York,* 295 F.3d 204 (2d Cir.2002). Because I find that the instant action is barred by the doctrine of *res judicata,* I dismiss the complaint.

"Under the doctrine of *res judicata,* once a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning the transaction, or series of connected transactions, out of which the [first] action arose." *Cieszkowska,* 295 F.3d at 205 (quoting *Maharaj v. Bankamerica Corp.,* 128 F.3d 94, 97 (2d Cir.1997)) (internal quotation marks omitted) (alterations in original); *accord Waldman v. Village of Kiryas Joel,* 207 F.3d 105, 108 (2d Cir.2000). In other words, later actions will be *res judicata* and subject to dismissal if "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir.2001) (quoting *Monahan v. N.Y.C. Dep't of Corr.,* 214 F.3d 275, 284–85 (2d Cir.2000)) (internal quotation marks omitted) (alterations in original).

The same facts Lopez alleges in the complaint before me form the basis for a prior complaint she filed against the same defendant, JetBlue, on April 6, 2010 in this Court. *See Lopez v. Jet Blue Airways,* 10 Civ. 1552, Dkt. Entry 1. She thus could have, and did, raise her Air Carrier Access Act claims in that complaint, and I dismissed that action on the merits for failure to state a claim upon which relief may be granted. *See Lopez v. Jet Blue Airways,* No. 10 Civ. 1552, 2010 WL 3311428 (E.D.N.Y.2010), *aff'd,* 662 F.3d 593 (2d Cir.2011). The doctrine of *res judicata* thus squarely bars this action, and I dismiss the complaint pursuant to § 1915(e)(2)(B).

CONCLUSION

**\*2** For the reasons provided herein, the complaint is dismissed with prejudice. Lopez is cautioned not to file additional duplicative actions.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

So ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 213831

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.